IN THE DISTRICT OF THE VIRGIN ISLANDS

DIVISION OF ST. THOMAS/ ST. JOHN

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| V. | )   CRIM. NO. 2014-54 |
| | ) |
| SHERRYMAE MORALES, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

**DEFENDANT SHERRYMAE MORALES' SENTENCING
MEMORANDUM**

COMES NOW Defendant, SHERRYMAE MORALES, by and through her counsel, Omodare Jupiter, Federal Public Defender, and respectfully requests that this Honorable Court consider this sentencing memorandum in granting Ms. Morales a sentence of probation.

The U.S. Office of Probation (herein after "Probation") used §2B1.1 of the United States Sentencing Guidelines to calculate Ms. Morales' base offense level in its August 10, 2015 Presentence Report (hereinafter "PSR"). According to Probation, Ms. Morales' total offense level is fifteen (15) (including eight (8) levels for a loss in excess of $70,000) with a criminal history category of I. This calculation exposes Ms. Morales to a guideline range of eighteen (18) to twenty-four (24) months imprisonment. Ms. Morales objects to this guideline calculation. Her objections are argued below. The government cannot substantiate a monetary loss

1

in this case and thus, her total offense level should be a seven (7) with an applicable guideline range of zero (0) to six (6) months. A sentence of probation is just and would fulfill the mandates of §3553(a). Ms. Morales offers the following for the Court's consideration:

### I.  *Sherrymae Morales' History and Characteristics*

#### a. Childhood

Ms. Sherrymae Dutchelle Morales was born on November 7, 1960 on St. Croix, U.S.V.I. to Mr. Eric Barnes and Ms. Rose Foye. Ms. Morales was primarily raised by her maternal grandmother, Ms. Viola Simmiolkjier, who she lived with from birth to fifteen years old. Ms. Morales is the eldest of three children born to her mother and father. She was the only child who lived with her grandmother. Her younger siblings lived with her parents. Early in childhood, this arrangement did not bother Ms. Morales, but at six years old Ms. Morales' mother started the process to give Ms. Morales her father's last name. Ms. Morales was a bright child and this situation sparked her curiosity as to why she was the only child of three not living at home and not given her father's last name at birth. She believed that her father questioned her paternity. This is the earliest memory she has of a continuing insecurity and hurt of being unwanted by both of her parents. This feeling followed her into adulthood, tainted her relationship with her father, and solidified her desire to prove her self-worth.

b. <u>Adolescent Years and Primary Education</u>

Ms. Morales attended Juanita Gardine Elementary School and Central High School on St. Croix. She was an involved student who enjoyed learning. In high school, Ms. Morales was a member of the student council and student government. She was voted Senior Class President and "Most Poplular" by her classmates. Ms. Morales idolized Barbara Walters and dreamed of becoming a journalist.

Despite excelling academically, Ms. Morales was dealing with a number of challenges at home. As stated previously, she was raised from birth by her grandmother. However, at fifteen, her mother felt that she had become "too sheltered". Despite her wishes to remain with her grandmother, Ms. Morales was forced to move into her mother's home. She remembers feeling inadequate in her mother's eyes. Looking back on the situation, she realizes it fostered a closer relationship with her siblings, and ultimately, a more meaningful relationship with her mother. This is something she has learned to value and appreciate. Additionally, she remained close with her grandmother, who she visited every day after school.

Ms. Morales never got the opportunity to form a relationship with her father. Throughout her early childhood, her parents resided together along with Ms. Morales' two younger siblings. Sometimes, Ms. Morales would see her father when she visited her mother and siblings. Her father did not make any effort to engage

or bond with her.  After Mr. Barnes and Ms. Foye's relationship ended, Mr. Barnes relocated to Florida.  The distance restricted Ms. Morales' and Mr. Barnes' relationship even further. Ms. Morales cannot recall a conversation with her father that lasted longer than 15 minutes.

    c.  <u>College</u>

In 1978, Ms. Morales graduated high school with honors. She wanted to study journalism but her mother insisted she attend finishing school in Hopewell, Virginia.  After finishing school, Ms. Morales began her studies at Strayer University in Herndon Virginia. At her mother's direction, she decided to get a degree in court reporting.  Unfortunately, Ms. Morales had only completed a year and a half of schooling when she was sexually assaulted by another student.  Traumatized and afraid, she moved home to St. Croix.  She completed her bachelor's degree online while working for the Territorial Court as an administrative assistant (See, Bachelor of Science Degree from California Coast University, attached hereto as Ex. A).

    d. <u>Army</u>

Determined not to allow the trauma she experienced at Strayer University take her power, Ms. Morales decided to join the Virgin Islands National Guard (hereinafter "VING").  In 1983, she attended basic training in Fort McClellan in Atlanta, Georgia.  One year later, she attended Officer Candidate School, where she excelled and was noticed by the leadership as "stand out."  After twenty

weeks of rigorous study and physical training, Ms. Morales graduated from Officer Candidate School as a 2nd Lieutenant. She returned to St. Croix to work full-time within the VING. She began her tenure as a systems analyst in the Logistics Department and she headed the Military Police Unit when on active duty during drills and training exercises.

Unfazed by long hours and hard work, Ms. Morales moved through the ranks, ultimately obtaining the rank of Major, and leading various departments throughout the years such as Logistics, Recruiting and Retention, Contracting, and Human Resources. Throughout her career, she received numerous awards and honors for her exemplary service, such as: Army Service Ribbon, Army Achievement Medal, Army Reserve Component Achievement Medal, Army Reserve Component Overseas Training Ribbon, Humanitarian Service Medal, Meritorious Service Medal, Army Commendation Medal, National Defense Service Medal (*See*, Certificates attached hereto as Ex. B - E).





Not only was Ms. Morales' hard work recognized publicly through awards and commendations, but very early on her commanding officers also recognized her skill in identifying and helping to correct systemic organizational issues. (*See*, Letters of Commendation, attached hereto as Ex. F - H). These skills lead to greater promotions and more complex task assignments.

Ms. Morales did not mind working in a male dominated environment. However, in 2000 she began to be sexually harassed by one of her direct supervisors. Loving and trusting in the Army, Ms. Morales reported her experience to Command. Her concerns were not met with understanding but her complaints were swept under the rug. The supervisor was never reprimanded and Ms. Morales was transferred from the department. In 2003, Ms. Morales made the very difficult decision to retire from VING.

e. <u>Career Outside of the VING</u>

Ms. Morales developed skills in analyzing organizational processes, and in creating strategies for greater efficiency and productivity. After her retirement from the Army, she opened her own real estate office, Mahogany Realty, while also working as a freelance logistics consultant to various U.S.V.I. and stateside companies. She also obtained her Master's degree in Public Administration from Walden University.

In 2007, Ms. Morales was contacted by General Elton Lewis about the Employee Support of the Guard and Reserve (hereinafter ESGR) Coordinator position. General Lewis told her about the

vacancy and asked her to come back to the VING as an independent contractor.  She worked as the ESGR Coordinator from 2007 to 2010. She used her skills to transform the struggling ESGR program into a strong network of over 500 volunteers.  She was an asset and was commended for her hard work by ESGR Supervisor Baron Hignite (*See*, Letter of Commendation and Pay Increase, attached hereto as Ex. I).

As the ESGR Coordinator, Ms. Morales was required to organize and attend briefings during VING drills and Yellow Ribbon events. This requirement kept Ms. Morales in regular contact with the VING Command. In 2010, General Lewis again contacted Ms. Morales. This time regarding a full-time opening as a systems analyst with the VING. General Lewis was well acquainted with Ms. Morales' skill and needed a person with her experience to fill this position. She accepted.

It is undisputed that Ms. Morales worked extremely hard for both the leaders and the soldiers of the Virgin Islands National Guard.  It was common for Ms. Morales to arrive at the VING offices at 7:00am and not leave until well after 9:00pm (*See*, General Elton Lewis' Trial Testimony stating it was not uncommon for Ms. Morales to work 12, 13, 14 hour days under his command).  Many nights Ms. Morales' husband and daughter would bring her dinner to the office, both to ensure that she had eaten and to see her for a few minutes (*See*, Pedro Morales Letter of Support, attached hereto as Ex. J).

After retiring from the VING in 2011, Ms. Morales relocated to Arlington Virginia with her daughter, Rosa.  While there, Ms. Morales worked for Serco Incorporated and the Freer Sackler Gallery.  She also started her own consulting firm, ARRI Consulting, and began her second Master's degree at George Mason University studying Business Administration.  Ms. Morales is currently scheduled to graduate in June 2016.

    f.  <u>Family</u>



Ms. Morales is the very proud mother of one daughter, Rosa Shari Morales. Rosa is twenty years old, a college sophomore at St. Mary's University, and is currently preparing to study abroad in London, England next semester.  Ms. Morales and her daughter are very close.  Ms. Morales also maintains a loving and supportive relationship with her ex-husband, Rosa's father, Pedro Morales. Despite Rosa's success, Ms. Morales carries a tremendous amount of guilt about not spending enough time with Rosa as she was growing

up.  Ms. Morales was a dedicated soldier but this dedication caused her to sacrifice precious time with her family.

g.  <u>Community Involvement</u>

It has always been important to Ms. Morales that she give back to her community through volunteer work.  While living in St. Croix, Ms. Morales used her experience of being sexually assaulted while in college to help other women. For over ten years, she served as a victim's advocate for the Woman's Coalition as well as President of the Woman's Coalition Board of Directors.  Ms. Morales also served as the Federal Political Coordinator for the National Association of Realtors and as the Secretary and President of the St. Croix Board of Realtors.

Ms. Morales still gives of her time generously. Recently, she was recognized for her contribution to the Latin American Youth Center in Virginia (See, Certificate of Appreciation, attached hereto as Ex. K).  She also provides *pro bono* consulting services to Taproot, a Washington D.C. non-profit organization that offers skilled *pro bono* services to companies whose mission is to improve society.

Ms. Morales is respected, loved, and admired amongst her family and friends.  She is described as an honest, motivated, and compassionate woman.  She has served as mentor and confidante to many of her friends and family.  No task is too big or too small. She is always willing to lend a helping hand (See, Letters of Support, attached hereto as Ex. L - P).

II.   *Sentencing Factors*

In Rita v. United States, 127 S.Ct. 2456 (2007), Kimbrough v. United States, 128 S.Ct. 558 (2007) and Gall v. United States, 128 S.Ct 586 (2007), the Supreme Court made it clear that 18 U.S.C. § 3553(a) is the controlling sentencing law and rejected the devices that were used after *Booker* to maintain a *de facto* mandatory United States Sentencing Guideline system. An examination of 18 U.S.C. § 3553(a) is still appropriate.  As set forth in Rita, this Court must engage in a classic guidelines and departure analysis followed by an exhaustive review of the section 3553(a) factors.  In determining that the sentence is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]" a district court must not apply a presumption of reasonableness to the calculated guideline range, but rather "must . . . consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Rita v. U.S. at 355 (Stevens, J., concurring) (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).

Title 18 United States Code, Section 3553 provides that in imposing a sentence, the Court must consider (1) the nature and circumstances of the offense and the history and characteristics of the Defendant; and (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense; afford adequate deterrence,

11

protect the public, and to rehabilitate the offender. 18 U.S.C. § 3553. Accordingly, Ms. Morales submits this Sentencing Memorandum in order to assist the Court in assessing the section 3553(a) factors in this case to arrive at a sentence that is sufficient, but not greater than that necessary, to comply with the purposes of sentencing.

      a. *Nature and Circumstances of the Offense*

On December 4, 2015, Ms. Morales was named in a thirty-eight (38) count Indictment which alleged that from March 2010 to July 2011, Ms. Morales was fraudulently employed with the VING while still employed by Military Personnel Services Corporation as the ESGR Coordinator.   The government alleged that both positions were full-time with regular business hours occurring between 8am to 5pm.  On July 2015, the jury returned a verdict acquitting Ms. Morales of counts one (1) through fourteen (14), and count thirty-six (36) of the Indictment.  Counts thirty-seven (37) and thirty-eight (38) were dismissed by this Honorable Court through Ms. Morales' Motion for Judgment of Acquittal after the close of the government's case-in-chief.  Ms. Morales was found guilty of counts fifteen (15) through thirty-five (35).

The counts of conviction involve allegations of wire fraud. More specifically, the indictment charged that:

> From on or about March 12, 2010, to on or about July 13, 2011, at St. Croix, in the District of the Virgin Islands, the defendant, SHERRYMAE MORALES, did knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by

> means of false and fraudulent pretenses,
> representations and promises, and caused to be
> transmitted by means of wire communications in
> interstate commerce, an electronic funds
> transfer of funds, described below for each
> count from the Virgin Islands National Guard
> to defendant's checking account number
> XXXX8022 at USAA Federal Savings Bank, San
> Antonio Texas, each transmission constituting
> a separate count as specified below:

Indictment, p. 3. The indictment goes on to give a different count number to each deposit that was made into Ms. Morales' bank account. The government has not presented specific evidence substantiating that all of these payments were for salary.

### b. *Advisory Guideline Range/ Objections to PSR*

Ms. Morales agrees that the applicable guidelines are found, as stated in the Presentence Report ("PSR"), at USSG §2B1.1. Ms. Morales disagrees with Probation's calculated total offense level, as well as calculated loss figure.  According to Probation, the total offense level is fifteen (15) (including eight (8) levels for a loss in excess of $70,000) with a criminal history category of I.  Specifically, Probation asserts that the amount of loss is $90,852.38.  This calculation exposes Ms. Morales to a guideline range of eighteen (18) to twenty four (24) months.

No documentation has been provided to account for or substantiate the purported total loss figure.  Additionally, neither the government nor Probation has identified what loss theory *i.e.* actual loss or intended loss, the proposed eight (8) level enhancement is applicable under.  Ms. Morales contends that

the government cannot support a pecuniary loss to the VING under either theory.

### i.  Actual Loss

On September 30, 2015, the Third Circuit Court of Appeals clarified the correct method for determining actual loss pursuant to §2B1.1.  In United States v. Nagle, 2015 WL 5712253 (3d. Cir. 2015), the Third Circuit held that the District Court for the Middle District of Pennsylvania erred in its finding that pursuant to §2B1.1 the defendant, Mr. Nagle, was responsible for the "face value" of fraudulently obtained contracts, without receiving any credit for "services actually rendered". United States v. Nagle, No. 14-3184, 2015 WL 5712253, at *9 (3d Cir. Sept. 30, 2015).  The Court recognized that although Mr. Nagle obtained these contracts under false pretenses, he did in fact perform the services contracted for.  The Court explained that, "in a normal fraud case, where value passes in both directions [between defrauded and defrauder] ... the victim's loss will normally be the difference between the value he or she gave up and the value he or she received." Id. (quoting, United States v. Dickier, 64 F.3d 818, 825 (3d. Cir. 1995).  Ultimately, Mr. Nagle's sentence was vacated and the matter was sent back to the District Court with directions, "to calculate the amount of loss under §2B1.1 by taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts." Id. at 13.

Throughout trial several witnesses testifying for both the government and the defense, stated that Ms. Morales was a dedicated and reliable VING employee. There was also testimony that Ms. Morales was the only applicant who qualified for her position. Known for working long hours, Ms. Morales was often relied upon by superior officers to complete complex task assignments. Never did Ms. Morales miss a deadline or fail to complete her duties. In fact, Ms. Morales consistently performed above and beyond her job description. (*See*, Testimony of government witnesses General Elton Lewis, Adjutant General Renaldo Rivera, Mr. Baron Hignite, and defense witness Captain Wanda Williams). The VING paid Ms. Morales a salary in exchange for her services. Both parties received the benefit of their bargain equally. As such, the government cannot establish an actual loss to the VING.

### ii. Intended Loss

The United States Sentencing Commission (hereinafter "USSG") in its November 2015 amendments has acted to revise the definition of "intended loss". Previously, the commentary to §2B1.1 stated that "loss is the greater of actual loss or intended loss. . . 'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense; 'intended loss' means the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1. The USSG's amendment to this section, slated to take effect November 1, 2015, revises the commentary in Application Note

3(A)(ii) to provide that 'intended loss' means the pecuniary harm that "the defendant purposely sought to inflict."  United States Sentencing Commission, April 30, 2015 Amendments to the Guidelines (available                                                                at: http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf. "The amendment reflects the Commission's continued belief that intended loss is an important factor in economic crime offenses, but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability." Id.

The government bears the burden of establishing a *prima facie* case that the defendant intended to cause a pecuniary loss. United States v. Miller, 316 F.3d 495, 504 (4th Cir. 2003).

> [O]ur precedent allows some limited burden shifting in the proving of intended loss under the guidelines. We have previously recognized that though the government bears the burden of proof in guidelines cases, the burden of production may shift to the defendant once the government presents prima facie evidence of a given loss figure."

United States v. Greevers, 226 F.3d 186, 186 (3d. Cir. 2000)(*quoting*, United States v. Evans, 155 F.3d 245, 253 (3d Cir.1998)).

In <u>United States v. Geevers</u>, *supra*, the defendant was convicted of bank fraud after depositing fraudulent checks into his account and immediately withdrawing the cash prior to the checks being deemed worthless by the bank.  The government argued that the face value of the fraudulently deposited checks established a *prima facie* showing that the defendant intended to cause pecuniary loss to the bank in that amount. The Court found that, "intended loss does not equal the face value of the deposited checks as a matter of law. Rather, a defendant is free to proffer evidence about his or her true intentions in order to rebut the presumption . . . ". <u>Id.</u>

In <u>Greevers</u>, there was no exchange of cash for services.  Mr. Greevers intended to take money to which he had no lawful right. This Court would be presented with a wholly different scenario if Ms. Morales drew a pay check from the VING but performed no work in exchange. However, this is not the case. Ms. Morales was a hardworking employee, who completed all duties assigned to her. She took no funds from the VING that were not earned.  The government has failed to offer even a *prima facie* showing that Ms. Morales intended to cause a pecuniary loss to the VING.  As such, Ms. Morales asks that this Honorable Court find that the eight (8) level increase pursuant to loss amount is inapplicable in this case.

### iii. USSG Loss Table November 1, 2015 Amendments

After receiving criticism from various federal judges regarding §2B1.1, the Sentencing Commission formed the Over-Criminalization Task Force of the Committee on the Judiciary (herein after the "Task-Force") to perform a detailed examination of available sentencing data. Pursuant to the task-force's findings, the Sentencing Commission has submitted to Congress for approval proposed changes to the loss table of §2B1.1 (See, Table below).

**Amendment:**

**§2B1.1.** **Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States**

\* \* \*

(b)     Specific Offense Characteristics

(1)     If the loss exceeded $5,000$6,500, increase the offense level as follows:

| [Multiplier Comparison to Current Table] | | Loss (Apply the Greatest) | Increase in Level |
|---|---|---|---|
| [1.30] | (A) | $5,000$6,500 or less | no increase |
| [1.30] | (B) | More than $5,000$6,500 | add 2 |
| [1.50] | (C) | More than $10,000$15,000 | add 4 |
| [1.33] | (D) | More than $30,000$40,000 | add 6 |
| [1.36] | (E) | More than $70,000$95,000 | add 8 |
| [1.25] | (F) | More than $120,000$150,000 | add 10 |
| [1.25] | (G) | More than $200,000$250,000 | add 12 |
| [1.38] | (H) | More than $400,000$550,000 | add 14 |
| [1.50] | (I) | More than $1,000,000$1,500,000 | add 16 |
| [1.40] | (J) | More than $2,500,000$3,500,000 | add 18 |
| [1.36] | (K) | More than $7,000,000$9,500,000 | add 20 |
| [1.25] | (L) | More than $20,000,000$25,000,000 | add 22 |

13

United States Sentencing Commission, April 30, 2015 Amendments to the Guidelines (available at: http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf.

The above changes, if approved, will take effect on November 1, 2015, and could prove significant to determining the applicable guidelines in this case.

### iv.  Restitution Calculation

It is well settled that "information relied upon at sentencing must have "sufficient indicia of reliability to support its probable accuracy." United States v. Brown, 534 F. App'x 132, 137 (3d Cir. 2013) (quoting, United States v. Berry, 553 F.3d 273, 280 (3d Cir. 2009); (United States v. Warren, 186 F.3d 358, 364-65 (3d Cir. 1999)). As stated above, the Indictment gives a separate count to each deposit made into Ms. Morales' bank account. According to Probation, the calculated restitution amount pursuant to § 5E1.1 is $90,852.38.  However, the counts of conviction (counts 15-35) do not add up to $90,852.38 (See, Counts of Conviction Table, attached hereto as Ex. Q).  Despite undersigned counsel's request, neither the government nor probation has provided an accounting or documentation to support this figure.

### c. Basis for Below Guideline Sentence: No Risk to Public- Low Risk of Recidivism

Beginning in fiscal year 1992 and continuing into fiscal year 2004, the United States Sentencing Commission conducted a thorough recidivism analysis of approximately 29,000 offenders.  This fourteen year analysis took into consideration several offender characteristics including: criminal history category, age, work history.  The analysis found that a person who possesses a

combination of these characteristics, like Ms. Morales, results in lower recidivism rates.  For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category; 45% below the rate for all fraud offenders. (*See* Sent'g Comm'n, <u>Recidivism and the "First Offender</u>*,"* at 13-14 (May 2004).  Offenders like Ms. Morales with zero criminal history points have a rate of recidivism half that of offenders with even one criminal history point. <u>Id.</u>

     i.   <u>Age</u>

Recidivism rates decline relatively consistently as age increases.  Generally, the younger the offender, the more likely the offender is to recidivate.  The table below illustrates the age/recidivism trend of the study sample.  Among all offenders over age 50 with a criminal history category of I, like Ms. Morales, the recidivism rate is just 6.2%, almost five times lower than those under the age of 21 (*See*, <u>United States v. Hamilton</u>, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); <u>Simon v. United States</u>, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); <u>United States v. Nellum</u>, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age).

Exhibit 9
**Primary Definition Recidivism Rates[1] for General Demographic Variables, by Criminal History Category**
**Gender, Age at Sentencing, and Race**
Recidivism Study 2003

**CRIMINAL HISTORY CATEGORIES**

| Demographic Characteristics | Total Percent Recidivating | Category I Percent Recidivating | Category II Percent Recidivating | Category III Percent Recidivating | Category IV Percent Recidivating | Category V Percent Recidivating | Category VI Percent Recidivating |
|---|---|---|---|---|---|---|---|
| TOTAL[2] | 24,335 | 15,429 | 2,857 | 2,844 | 1,359 | 779 | 1,067 |
| **Gender** | | | | | | | |
| Female | 13.7 | 10.0 | 23.6 | 30.7 | 40.0 | 36.8 | 39.0 |
| Male | 24.3 | 15.2 | 24.1 | 34.7 | 45.0 | 52.8 | 56.3 |
| **Age at Sentence** | | | | | | | |
| Under 21 | 35.5 | 29.5 | 35.6 | 54.7 | 64.3 | 60.1 | 55.0 |
| 21 – 25 | 31.9 | 22.3 | 29.1 | 42.7 | 55.1 | 70.1 | 68.1 |
| 26 – 30 | 23.7 | 13.3 | 27.3 | 33.6 | 43.9 | 53.1 | 58.8 |
| 31 – 35 | 23.8 | 14.6 | 22.7 | 32.7 | 42.7 | 50.8 | 59.3 |
| 36 to 40 | 19.7 | 12.1 | 23.2 | 29.4 | 33.1 | 40.0 | 51.3 |
| 41 to 50 | 12.7 | 6.9 | 13.3 | 24.5 | 45.3 | 35.7 | 41.3 |
| Over 50 | 9.5 | 6.2 | 13.9 | 19.8 | 21.0 | 57.1 | 41.1 |
| **Race** | | | | | | | |
| White | 16.0 | 8.9 | 18.9 | 27.8 | 42.8 | 46.8 | 50.9 |
| Hispanic | 24.3 | 18.9 | 22.9 | 36.0 | 28.1 | 47.0 | 57.8 |
| Black | 32.8 | 23.7 | 31.4 | 41.6 | 48.0 | 55.6 | 60.7 |
| Other[3] | 26.4 | 15.5 | 35.9 | 58.3 | 39.6 | 100.0‡ | 57.1 |

[1] Primary recidivism definition based on offender's re-arrest, including supervised release/ probation violations, re-arrest, or re-conviction.
[2] Number of offenders with a 24 month period at risk of recidivating following either initiation of probation (for offenders receiving probation–only sentences) or release from confinement (for those offenders receiving confinement sentences).
[3] "Other" race category includes Native Americans and Asians.
‡ Indicates fewer than 10 sample subjects. Findings may not be statistically significant.
SOURCE: U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.

## ii. Criminal History

The Commission has recognized the advisability of revising the guidelines to take 'first offender' status into account. (*See,* U.S. Sent'g Comm'n, _Recidivism and the First Offender_, at 1-2, Exh. 6 (May 2004) (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure.").  The Commission has not yet implemented any such revisions to the criminal history guidelines, but working groups within the Commission have begun to try to define the characteristics of a true 'first offender'.

Since 1992, three working definitions of a "first offender' have emerged and been used to evaluate recidivism rates of 'first

offenders'; Group A - no arrests, Group B – no convictions, Group C – minor convictions only. Id. at 13. The Commission has found that even within the above groups there are distinctions in rates of recidivism. For example, all offenders with zero criminal history points have a primary recidivism rate of 11.7%. Id. However, this figure includes any arrest even if the arrest did not lead to a conviction. The re-conviction rate for all 'first offenders', regardless of grouping, is substantially lower at 3.5%. Id. This recidivism rate is over seven times lower than the recidivism rates for offenders with only one criminal history point (22.6%) and twelve times lower then offenders with two or more points (36.5%). Id. at 14. Moreover, the re-conviction rate for Group A first offenders *i.e.* no prior arrests, like Ms. Morales, is even lower at 2.5%. Id.

In imposing a sentence sufficient to account for the need to protect the public from further crimes, but not greater than necessary, this Court should consider the statistically low risk of recidivism presented by Ms. Morales' history and characteristics (See, *United States v. Cabrera,* 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); United States v. Darway, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status).

iii.   <u>Employment History</u>

Ms. Morales has always been a very hard worker and has never been without stable employment. The table below shows that those with stable employment in the year prior to their offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%). Moreover, those with a criminal history category of I, like Ms. Morales, are even less likely to recidivate at 12.7% (See, <u>United States v. Urbina</u>, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

Exhibit 10
**Primary Definition Recidivism Rates[1] for General Demographic Variables, by Criminal History Category**
**Employment, Education, Marital Status, and Illicit Drug Use**
Recidivism Study 2003

| Demographic Characteristics | CRIMINAL HISTORY CATEGORIES | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Percent Recidivating | Category I Percent Recidivating | Category II Percent Recidivating | Category III Percent Recidivating | Category IV Percent Recidivating | Category V Percent Recidivating | Category VI Percent Recidivating |
| TOTAL[2] | 24,335 | 15,429 | 2,857 | 2,844 | 1,359 | 779 | 1,067 |
| **Employment Status[3]** | | | | | | | |
| Unemployed | 32.4 | 20.6 | 26.8 | 39.4 | 48.0 | 53.0 | 54.5 |
| Employed | 19.6 | 12.7 | 23.3 | 32.1 | 43.1 | 50.8 | 55.7 |
| **Educational Attainment[4]** | | | | | | | |
| Less Than High School | 31.4 | 21.3 | 31.3 | 38.5 | 49.8 | 50.9 | 59.5 |
| High School | 19.3 | 10.6 | 21.8 | 32.5 | 40.1 | 53.5 | 52.6 |
| Some College | 18.0 | 13.9 | 17.8 | 29.0 | 39.0 | 45.6 | 50.0 |
| College Graduate | 8.8 | 7.1 | 6.5 | 18.5 | 34.6 | 73.3 | 36.2‡ |
| **Marital Status** | | | | | | | |
| Never Married | 32.3 | 22.7 | 32.3 | 44.6 | 46.9 | 56.8 | 57.9 |
| Legal Marriage | 13.8 | 9.8 | 13.9 | 25.1 | 40.0 | 41.3 | 52.7 |
| Divorced | 19.5 | 9.8 | 23.3 | 27.2 | 44.0 | 40.1 | 51.1 |
| Other[5] | 22.9 | 12.9 | 23.1 | 31.4 | 45.1 | 62.0 | 55.7 |
| **Illicit Drug Use[6]** | | | | | | | |
| No Illicit Drug Use | 17.4 | 10.8 | 21.2 | 31.5 | 40.2 | 53.5 | 53.7 |
| Illicit Drug Use | 31.0 | 21.9 | 27.5 | 37.6 | 49.6 | 49.8 | 56.7 |

[1] Primary recidivism definition based on offender's re-arrest, including supervised release/ probation violations, re-arrest, or re-conviction.
[2] Number of offenders with a 24 month period at risk of recidivating following either initiation of probation (for offenders receiving probation-only sentences) or release from confinement (for those offenders receiving confinement sentences).
[3] Employment status during the year prior to the instant offense. "Employed" includes alternative forms of employment and "Unemployed" includes missing values.
[4] Educational Attainment at the time of the instant offense.
[5] "Other" marital status category includes "Co-habitating," "Widowed," and "Separated."
[6] Illicit drug use during the year prior to the instant offense. Missing values counted as "No" illicit drug use.
‡ Indicates fewer than 10 sample subjects. Findings may not be statistically significant.

Page 20 of 28

23

### d. *Probation is a Sufficient Deterrent.*

According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al.,* Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011). In 2002, the Centre for Criminal Justice Studies at the University of New Brunswick, looked at a number of different studies which assessed punishment types in both American and international criminal justice systems. They looked at the effect of longer prison sentences in comparison to shorter prison sentences, incarceration in comparison to community-based sanctions, and the effect of intermediate sanctions. Their findings supported the hypothesis that incarceration does **not** decrease recidivism rates (*See,* Gendreau, P. *et al.,* The Effects of Prison Sentences and Intermediate Sanctions on Recidivism: General Effects and Individual Differences, 2002 (available at: https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ffcts-prsn-sntncs/ffcts-prsn-sntncs-eng.pdf). There was no difference found in recidivism rates of incarceration versus community based sanctions, and intermediate sanctions had only a 1% decrease in recidivism.  These findings are also supported by research done by a 2002 study that looked at recidivism rates in Missouri (See, Spohn, C. and Holleran, D., The Effect Of Imprisonment On Recidivism Rates Of Felony Offenders: A Focus On Drug Offenders

Criminology, Volume 40, Issue 2,  pages 329-358 (May 2002)). This
particular study looked at the deterrent effect of probation versus
incarceration, and notably found that there were higher rates of
recidivism for those who had spent time in prison.

These results suggest that incarceration, in general, has
little or no deterrent effect and may even increase the likelihood
of recidivism.  Thus, probation, which has been found to involve
a "substantial restriction of freedom" Gall v. United States, 552
U.S. 38, 48 (2007), is sufficiently punitive to serve the purposes
of deterrence here.

III. <u>CONCLUSION</u>

Ms. Morales is a decorated veteran who has devoted her life to her country, her fellow service members, and the betterment of her community. She is a dedicated mother and loyal friend.  Ms. Morales respectfully asks that her life of service not be discounted and that this Honorable Court take into consideration the collateral consequences she must face as a result of her conviction.  A sentence of probation is sufficient to achieve the purposes of sentencing and is therefore, fair and just under these circumstances.

Respectfully submitted,


OMODARE JUPITER
FEDERAL PUBLIC DEFENDER

<u>s/ Omodare Jupiter</u>
1115 Strand Street
Suite 201
Christiansted, VI 00820
Tel (340) 773-3585
Fax (340) 776-7683
E-mail:
omodare_jupiter@fd.org

**CERTIFICATE OF SERVICE**

I, HEREBY CERTIFY that on the 13th day of October, 2015, I electronically filed the foregoing *Defendant's Sentencing Memorandum* with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:


Everard Potter
United States Attorney
Federal Building & U.S.Courthouse
5500 Veterans Drive
Suite 260
St. Thomas, VI 00802
340-774-5757
Fax: 340-776-3474
Email: everard.potter@usdoj.gov



/s/ Omodare Jupiter