IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

---

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
vs.                                )   CRIM. NO. 2014-54
                                   )
                                   )
SHERRYMAE MORALES,                 )
                                   )
                    Defendant.     )
_____)

REPORTER'S TRANSCRIPT

JURY SELECTION & TRIAL

Monday, June 29, 2015

---

BEFORE:        THE HONORABLE CURTIS V. GOMEZ
               District Judge

APPEARANCES:   OFFICE OF THE UNITED STATES ATTORNEY
               BY: EVERARD POTTER, AUSA
               5500 Veterans Drive Suite 260
               St. Thomas, Virgin Islands 00802

               For the Government

               OFFICE OF THE FEDERAL PUBLIC DEFENDER
               BY: OMODARE B. JUPITER, FPD
               1115 Strand Street, Suite 201
               Christiansted, VI 00820-5073

               For the Defendant

---

COURT REPORTER:   CHANDRA R. KEAN, RMR
                  Official Court Reporter
                  Virgin Islands District Court
                  St. Thomas, Virgin Islands

1                                    INDEX

2

3      JURY SELECTION                                              5

4      PRELIMINARY JURY INSTRUCTIONS                               56

5      OPENING STATEMENT BY THE GOVERNMENT                         62

6      OPENING STATEMENT BY DEFENDANT                              67

7      WITNESS (Government)    DIRECT   CROSS   REDIRECT   RECROSS

8      Aubrey Ruan              73       82      ---        ---

9      Kai Schjang              88      104      107        ---

10     Linda A. Cills          111      133      147        ---

11     Elton Lewis             151      166      178        ---

12     Renaldo Rivera          183      192      197        ---

13     Baron Hignite           201      220      228        ---

14
          (Court recessed)
15

16                              ---

17

18

19

20

21

22

23

24

25

<pre>
1                            EXHIBITS

2
      GOVERNMENT'S
3     EXHIBIT NO.        MARKED        ADMITTED

4        1.1              90              96

5        1.2              90              96

6        1.3              91              96

7        1.4              91              96

8        1.5              91              96

9        1.6              92              96

10       1.7              92              96

11       1.8              92              96

12       1.9              93             ---

13       1.10             93             ---

14       1.11             93             ---

15       1.12             94             ---

16       1.13             94              96

17       10              122             123

18       5.2             207             208

19       5.3             213             ---

20       5.4             214             ---

21       5A              217

22

23

24

25
</pre>

<u>EXHIBITS</u> (Continued)

| DEFENDANT'S EXHIBIT | MARKED | ADMITTED |
|---------------------|--------|----------|
| 7 | 134 | --- |
| 8 | 146 | --- |
| 9 | 168 | --- |
|   |     | --- |

1                        <u>PROCEEDINGS</u>

2

3          (Court called to order at 9:48 a.m. in USA v

09:48:35   4    Morales.)

09:48:35   5          (Jury panel sworn.)

09:48:37   6          THE CLERK:  United States of America versus

09:48:38   7    Sherrymae Morales.

09:48:41   8          MR. POTTER:  Good morning, Your Honor.

09:48:42   9    Good morning, members of the jury, of the panel.

09:48:45   10   Good morning, Defense Counsel.

09:48:46   11   Everard Potter on behalf of the United States.

09:48:48   12         THE COURT:  Good morning, Attorney Potter.

09:48:49   13         MR. POTTER:  Good morning, Judge.

09:48:50   14         MR. JUPITER:  Good morning, Your Honor.

09:48:53   15   Good morning, ladies and gentlemen.

09:48:53   16   Good morning, defense -- prosecution table.

09:48:57   17   Omodare Jupiter, who is -- on behalf of Ms.

09:49:01   18   Sherrymae Morales, who is present.  And I also have

09:49:04   19   Ms. Liz Delosa, our paralegal.

09:49:08   20         THE COURT:  Good morning, Attorney Jupiter.

09:49:09   21   Good morning, ladies and gentlemen.

09:49:09   22                      JURY SELECTION

09:49:11   23         THE COURT:  We are here for jury selection.  We

09:49:17   24   are at the stage of the trial that we refer to as voir

09:49:20   25   dire.  That is, I have a series of questions that I need

09:49:23  1    to ask you.

09:49:24  2         If you have a yes answer, that is, an affirmative

09:49:27  3    answer, stand up, hold up your number, then I'll ask you

09:49:30  4    to state what the answer is to the question.

09:49:32  5         All right.  For purposes of voir dire, I only need

09:49:35  6    to hear answers at this time from the people who are in

09:49:38  7    the jury box and the folks on this side of the

09:49:41  8    courtroom.

09:49:41  9         For the rest of you, I don't need your answers at

09:49:44  10   this point.

09:49:44  11        If there is a need for your participation in the

09:49:49  12   jury selection process any further, we'll let you know.

09:49:52  13        But you need to pay attention to the questions,

09:49:54  14   though, because if I do need to call you as a juror,

09:49:59  15   I'll ask you if you had any yes answers to any of the

09:50:02  16   questions that I posed.

09:50:03  17        All right.  We'll begin now with the introduction

09:50:07  18   of the lawyers.

09:50:08  19        You have heard the lawyers introduce themselves to

09:50:11  20   you.

09:50:11  21        Does anyone have a relationship by blood, marriage,

09:50:14  22   or business with Attorney Everard Potter.

09:50:23  23        (No response.)

09:50:23  24             THE COURT:  The defense counsel in this case is

09:50:26  25   Attorney Omodare Jupiter.

09:50:27   1          Does anyone have a relationship by blood, marriage
09:50:30   2     or business with Attorney Jupiter?  He is the Federal
09:50:30   3     Public Defender.
09:50:30   4          (No response.)
09:50:38   5          THE COURT:  Attorney Jupiter, can you once
09:50:40   6     again introduce us to your client, please.
09:50:43   7          MR. JUPITER:  Good morning, again.  Ladies and
09:50:44   8     gentlemen, this is Sherrymae Morales.
09:50:47   9          THE COURT:  Does anyone have a relationship by
09:50:49   10    blood, marriage or business with Ms. Sherrymae Morales?
09:50:56   11         Juror 58.  Stand up and tell us what your
09:50:59   12    relationship is.
09:51:03   13         PROSPECTIVE JUROR:  She was my company
09:51:04   14    commander in the military police unit National Guard.
09:51:07   15         THE COURT:  How long ago was that, sir?
09:51:11   16         PROSPECTIVE JUROR:  A little over ten years
09:51:15   17    ago.
09:51:15   18         THE COURT:  Okay.  Do you maintain a
09:51:16   19    relationship with Ms. Morales at this time?
09:51:19   20         PROSPECTIVE JUROR:  No, sir.
09:51:19   21         THE COURT:  Is there anything in that past
09:51:21   22    relationship that would prevent you from listening to
09:51:24   23    the evidence in this case fairly and impartially?
09:51:25   24         PROSPECTIVE JUROR:  No, sir.
09:51:26   25         THE COURT:  Is there anything in that past

| | | |
|---|---|---|
| 09:51:28 | 1 | relationship that would prevent you from following my |
| 09:51:30 | 2 | instructions on the law? |
| 09:51:31 | 3 | PROSPECTIVE JUROR:  No, sir. |
| 09:51:31 | 4 | THE COURT:  All right.  Thank you.  You can |
| 09:51:34 | 5 | have a seat. |
| 09:51:35 | 6 | This trial is anticipated to last today, tomorrow, |
| 09:51:38 | 7 | and perhaps a portion of Wednesday. |
| 09:51:40 | 8 | Does anyone have any prepaid confirmed travel plans |
| 09:51:45 | 9 | for today, Monday, tomorrow, Tuesday, or Wednesday? |
| 09:51:52 | 10 | Juror 74, stand up and tell us what plans. |
| 09:51:56 | 11 | PROSPECTIVE JUROR:  I have a reservation to St. |
| 09:52:00 | 12 | Thomas for a week with my family. |
| 09:52:02 | 13 | THE COURT:  Those are paid? |
| 09:52:05 | 14 | PROSPECTIVE JUROR:  Yes, Your Honor. |
| 09:52:05 | 15 | THE COURT:  And what day of travel? |
| 09:52:07 | 16 | PROSPECTIVE JUROR:  July 1st to July 7th. |
| 09:52:12 | 17 | THE COURT:  All right.  Thank you. |
| 09:52:18 | 18 | Let me ask the government to bring its witnesses |
| 09:52:21 | 19 | into the courtroom. |
| 09:52:23 | 20 | MR. POTTER:  Yes, Judge. |
| 09:52:58 | 21 | THE COURT:  Let's have the witnesses line up |
| 09:53:00 | 22 | right here along this edge here. |
| 09:53:02 | 23 | Come into the well, witnesses. |
| 09:53:05 | 24 | Attorney Potter, have your agent direct the |
| 09:53:07 | 25 | witnesses into the well, please. |

09:53:19  1          Form a semi-circle so the jurors can see you.

09:53:41  2          Attorney Potter, if you can introduce the witnesses

09:53:44  3    to the jurors, starting with the witness who is closest

09:53:47  4    to me.

09:53:48  5          MR. POTTER:  Yes, Judge.  The adjutant general,

09:53:58  6    Renaldo Rivera, Colonel Linda Lobbenmeick --

09:54:06  7    Lobbenmeier.

09:54:07  8        Colonel Linda Cills.

09:54:17  9          THE COURT:  Why don't we do it this way.  Why

09:54:19  10   don't we have the witnesses introduce themselves.  Just

09:54:22  11   tell us your name.  Raise your hand and introduce

09:54:25  12   yourself to the jury.

09:54:27  13         THE WITNESS:  Good morning.  Renaldo Rivera,

09:54:31  14   the adjutant general.

09:54:33  15         THE WITNESS:  Colonel Deborah Lobbenmeier.

09:54:37  16         THE WITNESS:  Good morning.  Colonel Linda

09:54:38  17   Cills.

09:54:39  18         THE WITNESS:  Diane Mathis, USAA Federal

09:54:43  19   Savings Bank.

09:54:43  20         THE WITNESS:  Good morning.  Marise James.

09:54:45  21         THE WITNESS:  Good morning.  Dazarene Lescott.

09:54:48  22         THE WITNESS:  Baron Hignite, Colonel, and I'm

09:54:53  23   the manager of MPS Corp.

09:54:56  24         THE WITNESS:  Kai Schjang.

09:54:56  25         THE WITNESS:  I'm Aubrey Ruan, Jr.

| | | |
|---|---|---|
| 09:55:03 | 1 | THE COURT:  Any other witnesses, Attorney? |
| 09:55:06 | 2 | MR. POTTER:  We have one more witness, Your |
| 09:55:08 | 3 | Honor.  General Lewis. |
| 09:55:10 | 4 | THE COURT:  You need to give us a full name. |
| 09:55:14 | 5 | MR. POTTER:  Elton Lewis. |
| 09:55:20 | 6 | THE COURT:  All right. |
| 09:55:20 | 7 | Does anyone have a relationship by blood, marriage |
| 09:55:23 | 8 | or business with any of the witnesses who you've just |
| 09:55:28 | 9 | been introduced? |
| 09:55:30 | 10 | Juror 26, tell us your relation. |
| 09:55:34 | 11 | PROSPECTIVE JUROR:  I'm related to Attorney |
| 09:55:37 | 12 | Marise James, is my cousin. |
| 09:55:39 | 13 | THE COURT:  Okay.  Is there anything in that |
| 09:55:41 | 14 | relationship that would prevent you from following my |
| 09:55:43 | 15 | instructions on the law? |
| 09:55:45 | 16 | PROSPECTIVE JUROR:  No, sir. |
| 09:55:45 | 17 | THE COURT:  Is there anything in that |
| 09:55:47 | 18 | relationship that would prevent you from listening to |
| 09:55:48 | 19 | the evidence in this case fairly and impartially? |
| 09:55:50 | 20 | PROSPECTIVE JUROR:  No, sir. |
| 09:55:52 | 21 | THE COURT:  All right.  Thank you. |
| 09:55:53 | 22 | We have another card raised? |
| 09:55:55 | 23 | Juror 80. |
| 09:55:57 | 24 | THE CLERK:  Please stand. |
| 09:56:00 | 25 | PROSPECTIVE JUROR:  Witness number 2 was my |

09:56:05   1    Battalion commander, Lobbenmeier.

09:56:09   2            THE COURT:  Do you know the name of the person?

09:56:11   3            PROSPECTIVE JUROR:  Lobbenmeier.

09:56:12   4            THE COURT:  Is there anything in that

09:56:13   5    relationship that would prevent you from following my

09:56:15   6    instructions on the law?

09:56:16   7            PROSPECTIVE JUROR:  No.

09:56:16   8            THE COURT:  Is there anything in that

09:56:18   9    relationship that would prevent you from listening to

09:56:19   10   the evidence in this case fairly and impartially?

09:56:21   11           PROSPECTIVE JUROR:  No, sir.

09:56:21   12           THE COURT:  Is the relationship that you have

09:56:24   13   one that is ongoing?

09:56:25   14           PROSPECTIVE JUROR:  No, sir.

09:56:26   15           THE COURT:  All right.  When was the last time

09:56:27   16   you had a relationship with the witness?

09:56:29   17           PROSPECTIVE JUROR:  About four to five years

09:56:31   18   ago.

09:56:31   19           THE COURT:  All right.  Thank you.

09:56:35   20       Anyone else from the jury box?

09:56:38   21       Number 38.  Tell us your relation.

09:56:40   22           PROSPECTIVE JUROR:  Well, I don't have a direct

09:56:42   23   relationship, but I'm in the Virgin Islands National

09:56:44   24   Guard as well.

09:56:48   25           THE COURT:  So you have no relation, personal

| 09:56:52 | 1 | or specific with any of the witnesses? |
| 09:56:54 | 2 | PROSPECTIVE JUROR:  (Indicating) No. |
| 09:56:56 | 3 | THE COURT:  Is there anything in your |
| 09:56:57 | 4 | association with the National Guard that would prevent |
| 09:56:59 | 5 | you from following my instructions on the law? |
| 09:57:00 | 6 | PROSPECTIVE JUROR:  No. |
| 09:57:01 | 7 | THE COURT:  Is there anything in your |
| 09:57:03 | 8 | relationship with the National Guard that would prevent |
| 09:57:05 | 9 | you from listening to the evidence in this case fairly |
| 09:57:06 | 10 | and impartially? |
| 09:57:08 | 11 | PROSPECTIVE JUROR:  No. |
| 09:57:08 | 12 | THE COURT:  All right.  Thank you. |
| 09:57:09 | 13 | Anyone else in the jury box? |
| 09:57:11 | 14 | Juror Number 83. |
| 09:57:14 | 15 | PROSPECTIVE JUROR:  Good morning. |
| 09:57:15 | 16 | THE COURT:  Good morning. |
| 09:57:16 | 17 | PROSPECTIVE JUROR:  I was married to General |
| 09:57:19 | 18 | Rivera's wife's nephew.  And I used to work for Elton |
| 09:57:26 | 19 | Lewis. |
| 09:57:30 | 20 | THE COURT:  We'll start with General Rivera. |
| 09:57:37 | 21 | The relationship that you have with General Rivera's |
| 09:57:41 | 22 | other relations, is that an ongoing relationship or a |
| 09:57:46 | 23 | past relationship? |
| 09:57:46 | 24 | PROSPECTIVE JUROR:  Past relationship. |
| 09:57:47 | 25 | THE COURT:  Okay.  And when did that end?  That |

09:57:52  1    is, when was the last time you had any association with

09:57:54  2    General Rivera?

09:57:56  3         PROSPECTIVE JUROR:  I see him on a daily basis

09:57:58  4    sometimes, weekly basis.

09:58:01  5         THE COURT:  All right.  Is there anything in

09:58:03  6    that relationship or past relationship that would

09:58:06  7    prevent you from following my instructions on the law?

09:58:08  8         PROSPECTIVE JUROR:  No.

09:58:08  9         THE COURT:  Is there anything in that

09:58:09  10   relationship that would prevent you from listening to

09:58:11  11   the evidence in this case fairly and impartially?

09:58:13  12        PROSPECTIVE JUROR:  No.

09:58:13  13        THE COURT:  Okay.  And what's your relation

09:58:16  14   with Elton Lewis?

09:58:18  15        PROSPECTIVE JUROR:  Elton Lewis used to be the

09:58:19  16   commissioner for the Police Department.

09:58:22  17        THE COURT:  Okay.  And what is your

09:58:23  18   relationship with Mr. Lewis?

09:58:25  19        PROSPECTIVE JUROR:  I used to work -- well, at

09:58:27  20   the time when he was the commissioner I used to work in

09:58:31  21   Internal Affairs.

09:58:31  22        THE COURT:  Okay.  Do you maintain a

09:58:33  23   relationship with Mr. Lewis?

09:58:36  24        PROSPECTIVE JUROR:  I see him from time to time

09:58:38  25   as well.

|          |    |                                                      |
|----------|----|------------------------------------------------------|
| 09:58:40 | 1  | THE COURT:  Do you have a social relationship        |
| 09:58:41 | 2  | with Mr. Lewis?                                       |
| 09:58:43 | 3  | PROSPECTIVE JUROR:  Only when I see him.              |
| 09:58:46 | 4  | THE COURT:  All right.  Is there anything in          |
| 09:58:48 | 5  | that relationship that would prevent you from following |
| 09:58:50 | 6  | my instructions on the law?                           |
| 09:58:51 | 7  | PROSPECTIVE JUROR:  No, sir.                          |
| 09:58:51 | 8  | THE COURT:  Is there anything in that                 |
| 09:58:52 | 9  | relationship that would prevent you from listening to |
| 09:58:54 | 10 | the evidence in this case fairly and impartially?     |
| 09:58:57 | 11 | PROSPECTIVE JUROR:  No, sir.                          |
| 09:58:57 | 12 | THE COURT:  Okay.  Thank you.                         |
| 09:58:58 | 13 | Juror Number 58.                                      |
| 09:59:04 | 14 | PROSPECTIVE JUROR:  Good morning.                     |
| 09:59:05 | 15 | THE COURT:  Good morning.                             |
| 09:59:06 | 16 | PROSPECTIVE JUROR:  The general and I are             |
| 09:59:07 | 17 | relatives.                                            |
| 09:59:11 | 18 | THE COURT:  Okay.  What is your relation with         |
| 09:59:14 | 19 | General Rivera?                                        |
| 09:59:15 | 20 | PROSPECTIVE JUROR:  Distant family.  Cousins.         |
| 09:59:17 | 21 | THE COURT:  Okay.  Is there anything in that          |
| 09:59:19 | 22 | relationship that would prevent you from following my |
| 09:59:21 | 23 | instructions on the law?                              |
| 09:59:22 | 24 | PROSPECTIVE JUROR:  No, sir.                          |
| 09:59:23 | 25 | THE COURT:  Is there anything in that                 |

09:59:24   1     relationship that would prevent you from listening to

09:59:26   2     the evidence in this case fairly and impartially?

09:59:28   3              PROSPECTIVE JUROR:  No, sir.

09:59:28   4              THE COURT:  Okay.  Thank you, sir.

09:59:30   5              PROSPECTIVE JUROR:  As well as the rest of, you

09:59:32   6     know, personnel beginning with Lobbenmeier and the

09:59:37   7     others, very much familiar with them.

09:59:40   8          Colonel Lewis, as well, was my commissioner in

09:59:40   9     Public Safety.

09:59:43   10         As well as my company commander, battalion

09:59:47   11    commander, Kai Schjang.  He was also my company

09:59:53   12    commander, as well as battalion commander.

09:59:56   13         And Major Marise James, she was my -- she was the

10:00:06   14    brigadier general in the Guard as well.

10:00:10   15             THE COURT:  Okay.

10:00:11   16             PROSPECTIVE JUROR:  So I'm very much familiar

10:00:15   17    with the personnel.  Lobbenmeier, we talk every now and

10:00:18   18    again -- not Lobbenmeier -- Colonel -- what's your name

10:00:23   19    again?  Deborah.

10:00:25   20             THE COURT:  Okay.  Do you currently maintain a

10:00:27   21    relationship with any of those individuals?

10:00:29   22             PROSPECTIVE JUROR:  I see the general very

10:00:31   23    often on -- well, on the road.  Colonel Schjang, we do,

10:00:38   24    see him every now and again.  That's about it.  And

10:00:42   25    Marise James.

| | | |
|---|---|---|
| 10:00:45 | 1 | THE COURT:  All right.  Other than the |
| 10:00:48 | 2 | occasional meetings that you might have with them, is |
| 10:00:50 | 3 | there any other relationship beyond that? |
| 10:00:52 | 4 | PROSPECTIVE JUROR:  No, sir. |
| 10:00:53 | 5 | THE COURT:  Is there anything in those several |
| 10:00:56 | 6 | relationships that would prevent you from following my |
| 10:00:58 | 7 | instructions on the law? |
| 10:00:59 | 8 | PROSPECTIVE JUROR:  No, sir. |
| 10:01:02 | 9 | THE COURT:  Is there anything in those several |
| 10:01:04 | 10 | relations that would prevent you from listening to the |
| 10:01:06 | 11 | evidence in this case fairly and impartially? |
| 10:01:08 | 12 | PROSPECTIVE JUROR:  No, sir. |
| 10:01:08 | 13 | THE COURT:  Okay.  Thank you, sir. |
| 10:01:09 | 14 | Juror Number 16. |
| 10:01:11 | 15 | PROSPECTIVE JUROR:  Good morning, Your Honor. |
| 10:01:11 | 16 | THE COURT:  Good morning. |
| 10:01:12 | 17 | PROSPECTIVE JUROR:  General Lewis was my boss |
| 10:01:15 | 18 | at one point when I was manager for a particular |
| 10:01:20 | 19 | condominium association.  He was a board member.  And |
| 10:01:24 | 20 | I've known -- I know him from interactions in the |
| 10:01:28 | 21 | community. |
| 10:01:28 | 22 | General Rivera, I'm familiar with. |
| 10:01:30 | 23 | And Ms. James, I'm also familiar with from the |
| 10:01:36 | 24 | community. |
| 10:01:36 | 25 | THE COURT:  All right.  Is there anything in |

10:01:37  1    those several relationships that would prevent you from

10:01:43  2    following my instructions on the law?

10:01:46  3                PROSPECTIVE JUROR:  No, sir.

10:01:46  4                THE COURT:  Is there anything in those several

10:01:48  5    relationships that would prevent you from listening to

10:01:50  6    the evidence in this case fairly and impartially?

10:01:52  7                PROSPECTIVE JUROR:  No, sir.

10:01:53  8                THE COURT:  Juror Number 25.

10:01:55  9                PROSPECTIVE JUROR:  Good morning.

10:01:56  10               THE COURT:  Good morning.

10:01:58  11               PROSPECTIVE JUROR:  Related to Kai Schjang.

10:02:00  12               THE COURT:  And what's your relationship?

10:02:02  13               PROSPECTIVE JUROR:  Cousin?

10:02:05  14               THE COURT:  And is that a relationship where

10:02:08  15   you have frequent social interaction?

10:02:10  16               PROSPECTIVE JUROR:  No.

10:02:12  17               THE COURT:  Okay.  Is there anything in that

10:02:14  18   relationship that would prevent you from following my

10:02:16  19   instructions on the law?

10:02:17  20               PROSPECTIVE JUROR:  No, sir.

10:02:18  21               THE COURT:  Is there anything in that

10:02:19  22   relationship that would prevent you from listening to

10:02:21  23   the evidence in this case fairly and impartially?

10:02:24  24               PROSPECTIVE JUROR:  No, sir.

10:02:25  25               THE COURT:  All right.  Thank you.

10:02:29  1        All right.  The witnesses can leave the well of the

10:02:33  2    courtroom.

10:02:56  3        (Sidebar discussion held as follows:)

10:02:56  4            THE COURT:  Does the defense have witnesses?

10:02:59  5            MR. JUPITER:  Yes, Your Honor.

10:03:00  6            THE COURT:  Do you have a list?

10:03:02  7            MR. JUPITER:  Yes, Your Honor.

10:03:02  8            THE COURT:  Okay.  Does Mrs. Brann have the

10:03:06  9    list?

10:03:07  10            MR. JUPITER:  Did my paralegal give you our

10:03:10  11    witness list?

10:03:12  12            THE CLERK:  No.

10:03:13  13            MR. JUPITER:  I'm sorry.

10:03:14  14            THE COURT:  Normally I don't highlight that the

10:03:16  15    defense has witnesses, because you don't have to present

10:03:19  16    any.  So I generally call them up here.  So I'll need a

10:03:24  17    list of them.  So if you give me the list now.

10:03:27  18            MR. JUPITER:  Yes, Your Honor.

10:04:35  19        (Pause)

10:04:35  20            MR. JUPITER:  I apologize, Your Honor.  We do

10:04:37  21    not have the witness list.

10:04:38  22            THE COURT:  Give me the names, then.  Those are

10:04:41  23    them?

10:04:43  24            MR. JUPITER:  Yes.  But I'll ask them to

10:04:45  25    introduce themselves, if you want them to introduce

```
10:04:47   1    themselves.

10:04:48   2              THE COURT:  They're here?

10:04:49   3              MR. JUPITER:  Yes.  They are ready to come into

10:04:51   4    the courtroom.

10:04:51   5              THE COURT:  Have your paralegal bring them in,

10:04:53   6    then.

10:04:53   7              MR. JUPITER:  Yes, Your Honor.

10:04:55   8        (End sidebar discussion, open court as follows:)

10:05:40   9              THE COURT SECURITY OFFICER:  Judge, one of the

10:05:43  10    jurors is out to the bathroom.

10:06:04  11              THE COURT:  All right.

10:06:04  12        There are a few more witnesses.  Let me ask the

10:06:06  13    witnesses, starting with the witness closest to me, you

10:06:09  14    can introduce yourself to the jury and then we'll go

10:06:13  15    around that way.

10:06:14  16              THE WITNESS:  My name is Captain Wanda

10:06:17  17    Williams.

10:06:17  18              THE WITNESS:  Morning.  I'm Mona Barnes.

10:06:20  19              THE WITNESS:  Good morning.  Lieutenant

10:06:20  20    Castillo.

10:06:25  21              THE WITNESS:  Good morning --

10:06:25  22              THE COURT:  You need to go a little bit slower.

10:06:34  23              THE WITNESS:  Zera Louis.  Z-e-r-a L-o-u-i-s.

10:06:34  24              THE WITNESS:  Good morning.  Janice Aelleyne.

10:06:36  25              THE WITNESS:  Good morning.  I'm Lieutenant
```

| | | |
|---|---|---|
| 10:06:39 | 1 | Colonel Kenneth Aelleyne. |
| 10:06:42 | 2 | THE COURT:  All right.  Does anyone have a |
| 10:06:44 | 3 | relationship by blood, marriage or business with any of |
| 10:06:46 | 4 | the witnesses to whom you've just been introduced? |
| 10:06:50 | 5 | THE COURT:  Juror Number 80. |
| 10:06:55 | 6 | PROSPECTIVE JUROR:  I know Mona Barnes, because |
| 10:06:56 | 7 | that was the state command major, and we meet in the |
| 10:07:00 | 8 | community from time to time. |
| 10:07:00 | 9 | And Lieutenant Castillo, she's in my unit and I go |
| 10:07:05 | 10 | to her for school business. |
| 10:07:08 | 11 | THE COURT:  Okay.  You currently have |
| 10:07:10 | 12 | relationships with those witnesses? |
| 10:07:13 | 13 | PROSPECTIVE JUROR:  From time to time if I see |
| 10:07:14 | 14 | them in the community. |
| 10:07:15 | 15 | THE COURT:  Okay.  Is there anything in your |
| 10:07:16 | 16 | relationship with those several witnesses that would |
| 10:07:18 | 17 | prevent you from following my instructions on the law? |
| 10:07:20 | 18 | PROSPECTIVE JUROR:  No, sir. |
| 10:07:21 | 19 | THE COURT:  Is there anything in your |
| 10:07:23 | 20 | relationship with those several witnesses that would |
| 10:07:26 | 21 | prevent you from listening to the evidence in this case |
| 10:07:27 | 22 | fairly and impartially? |
| 10:07:28 | 23 | PROSPECTIVE JUROR:  No, sir. |
| 10:07:29 | 24 | THE COURT:  All right.  Thank you. |
| 10:07:32 | 25 | Juror 29. |

| | | |
|---|---|---|
| 10:07:36 | 1 | PROSPECTIVE JUROR:  Good morning. |
| 10:07:37 | 2 | THE COURT:  Good morning. |
| 10:07:37 | 3 | PROSPECTIVE JUROR:  I am familiar with |
| 10:07:40 | 4 | Ms. Williams.  My daughters and her daughters dance |
| 10:07:45 | 5 | together in the same school, and we frequently have our |
| 10:07:48 | 6 | kids back and forth. |
| 10:07:50 | 7 | THE COURT:  Is there anything in that |
| 10:07:51 | 8 | relationship that would prevent you from following my |
| 10:07:54 | 9 | instructions on the law? |
| 10:07:55 | 10 | PROSPECTIVE JUROR:  No, sir. |
| 10:07:55 | 11 | THE COURT:  Is there anything in that |
| 10:07:57 | 12 | relationship that would prevent you from listening to |
| 10:07:58 | 13 | the evidence in this case fairly and impartially? |
| 10:08:00 | 14 | PROSPECTIVE JUROR:  No, sir. |
| 10:08:01 | 15 | THE COURT:  Thank you. |
| 10:08:03 | 16 | Juror Number 4. |
| 10:08:06 | 17 | PROSPECTIVE JUROR:  The Aelleynes are good |
| 10:08:09 | 18 | customers of mine.  Business. |
| 10:08:11 | 19 | THE COURT:  Is there anything in that |
| 10:08:13 | 20 | relationship that would prevent you from following my |
| 10:08:15 | 21 | instructions on the law? |
| 10:08:16 | 22 | PROSPECTIVE JUROR:  No, sir. |
| 10:08:17 | 23 | THE COURT:  Is there anything in that |
| 10:08:18 | 24 | relationship that would prevent you from listening to |
| 10:08:20 | 25 | the evidence in this case fairly and impartially? |

| | | |
|---|---|---|
| 10:08:21 | 1 | PROSPECTIVE JUROR:  No, sir. |
| 10:08:22 | 2 | THE COURT:  All right.  Thank you. |
| 10:08:25 | 3 | Juror Number 26. |
| 10:08:26 | 4 | PROSPECTIVE JUROR:  Your Honor, Mona Barnes and |
| 10:08:29 | 5 | Mr. Aelleyne are personal friends of mine. |
| 10:08:31 | 6 | THE COURT:  Okay.  Is your relationship one |
| 10:08:35 | 7 | where it is frequent social interaction? |
| 10:08:37 | 8 | PROSPECTIVE JUROR:  No, no. |
| 10:08:38 | 9 | THE COURT:  Is there anything in the |
| 10:08:41 | 10 | relationship that you have with those several witnesses |
| 10:08:44 | 11 | that would prevent you from listening to the evidence in |
| 10:08:46 | 12 | this case fairly and impartially? |
| 10:08:47 | 13 | PROSPECTIVE JUROR:  No, sir. |
| 10:08:48 | 14 | THE COURT:  Is there anything in those |
| 10:08:49 | 15 | relationship that would prevent you from following my |
| 10:08:51 | 16 | instructions on the law? |
| 10:08:52 | 17 | PROSPECTIVE JUROR:  No, sir. |
| 10:08:54 | 18 | THE COURT:  Thank you. |
| 10:08:55 | 19 | Juror Number 83. |
| 10:08:59 | 20 | PROSPECTIVE JUROR:  Your Honor, I went to |
| 10:09:01 | 21 | school with Ms. Williams' husband. |
| 10:09:04 | 22 | I have attended Ms. Barnes' church several times. |
| 10:09:09 | 23 | And Mr. Aelleyne, I met him several times. |
| 10:09:13 | 24 | THE COURT:  Is there anything in those several |
| 10:09:15 | 25 | relationships that would prevent you from following my |

10:09:18  1    instructions on the law?

10:09:19  2                 PROSPECTIVE JUROR:  No.

10:09:19  3                 THE COURT:  Is there anything in those several

10:09:22  4    relationships that would prevent you from listening to

10:09:24  5    the evidence in this case fairly and impartially?

10:09:26  6                 PROSPECTIVE JUROR:  No.

10:09:27  7                 THE COURT:  Thank you.

10:09:28  8          Juror Number 3.

10:09:31  9                 PROSPECTIVE JUROR:  Your Honor, I'm a colleague

10:09:38  10   with Ms. Barnes.

10:09:41  11                THE COURT:  I'm sorry, I missed the first.

10:09:43  12   You're what?  A colleague.

10:09:44  13                PROSPECTIVE JUROR:  We're ministers together.

10:09:46  14                THE COURT:  Is that relationship current?

10:09:48  15                PROSPECTIVE JUROR:  Yes.  I haven't seen her

10:09:50  16   recently, but --

10:09:51  17                THE COURT:  I'm sorry, I missed you, ma'am.

10:09:53  18                PROSPECTIVE JUROR:  I have not seen her or

10:09:54  19   interacted with her recently.

10:09:56  20                THE COURT:  All right.  Is there anything in

10:09:57  21   that relationship that would prevent you from

10:09:59  22   listening -- following my instructions on the law?

10:10:01  23                PROSPECTIVE JUROR:  No, sir.

10:10:02  24                THE COURT:  Is there anything in that

10:10:03  25   relationship that would prevent you from listening to

| | | |
|---|---|---|
| 10:10:06 | 1 | the evidence in this case fairly and impartially? |
| 10:10:08 | 2 | PROSPECTIVE JUROR:  No, Your Honor. |
| 10:10:09 | 3 | THE COURT:  All right.  Thank you. |
| 10:10:13 | 4 | Juror 58. |
| 10:10:15 | 5 | PROSPECTIVE JUROR:  Sergeant Mona Barnes, she |
| 10:10:22 | 6 | was my sergeant major in the Guard as well, and I'm |
| 10:10:27 | 7 | familiar with the other personnel as well. |
| 10:10:29 | 8 | THE COURT:  Is there anything in those several |
| 10:10:31 | 9 | relationships that would prevent you from following my |
| 10:10:33 | 10 | instructions on the law? |
| 10:10:34 | 11 | PROSPECTIVE JUROR:  No, sir. |
| 10:10:34 | 12 | THE COURT:  Is there anything in those several |
| 10:10:38 | 13 | relationships that would prevent you from listening to |
| 10:10:39 | 14 | in evidence this case -- |
| 10:10:40 | 15 | PROSPECTIVE JUROR:  No, sir. |
| 10:10:40 | 16 | THE COURT:  -- fairly and impartially? |
| 10:10:41 | 17 | PROSPECTIVE JUROR:  No, sir. |
| 10:10:42 | 18 | THE COURT:  Okay.  Thank you. |
| 10:10:43 | 19 | Juror 82. |
| 10:10:45 | 20 | PROSPECTIVE JUROR:  I know Ms. Mona Barnes from |
| 10:10:49 | 21 | teaching at her after-school program, Holy Ghost |
| 10:10:56 | 22 | Deliverance Ministries, about five years ago.  I |
| 10:10:59 | 23 | worked -- |
| 10:10:59 | 24 | THE COURT:  You said about five years ago? |
| 10:11:01 | 25 | PROSPECTIVE JUROR:  About that long ago.  I |

10:11:03   1    worked as a reading instructor in the after-school

10:11:07   2    program.

10:11:07   3         THE COURT:  Is there anything in that

10:11:10   4    relationship that would prevent you from following my

10:11:12   5    instructions on the law?

10:11:13   6         PROSPECTIVE JUROR:  No, sir.

10:11:13   7         THE COURT:  Is there anything in that

10:11:14   8    relationship that would prevent you from listening to

10:11:18   9    the evidence in this case fairly and impartially?

10:11:20  10         PROSPECTIVE JUROR:  No, sir.

10:11:24  11         THE COURT:  Thank you.

10:11:26  12    Okay.  The witnesses may leave the well.

10:11:28  13    Thank you.

10:11:48  14    The indictment in this case alleges that the

10:11:50  15    defendant, Sherrymae Morales, was involved in theft of

10:11:56  16    federal program funds between March 2010 through

10:12:04  17    July 2011, and in some occasions used wire fraud to

10:12:08  18    achieve that objective, that is, to steal or defraud the

10:12:16  19    government of federal program funds.

10:12:18  20    Has anyone heard or read anything about this case?

10:12:30  21    Keep your cards up.

10:12:43  22    When I call your number, you can put your card

10:12:46  23    down.  26, 4, 83, 58, 3, 6, 27, 16, 9, 60, 12.

10:13:15  24    All right.  For the next question I'll take your

10:13:17  25    answers -- again, I'm only looking at this group, not

| | | |
|---|---|---|
| 10:13:23 | 1 | anyone in this group. |
| 10:13:24 | 2 | Has anyone -- have you, a relative or a very close |
| 10:13:31 | 3 | friend been involved in the criminal justice system, |
| 10:13:34 | 4 | either as a defendant, a witness, or a victim? |
| 10:13:38 | 5 | If so, raise your card. |
| 10:13:43 | 6 | 26, 41, 83, 16, 76. |
| 10:13:56 | 7 | Okay.  You can put your card down. |
| 10:13:59 | 8 | All right.  Let me see counsel at sidebar. |
| 10:14:29 | 9 | (Sidebar discussion held as follows:) |
| 10:14:30 | 10 | THE COURT:  Juror 26? |
| 10:15:07 | 11 | Good morning.  Tell us your Juror Number, please. |
| 10:15:10 | 12 | PROSPECTIVE JUROR:  26. |
| 10:15:11 | 13 | THE COURT:  You said that you had read or heard |
| 10:15:12 | 14 | something about this case? |
| 10:15:13 | 15 | PROSPECTIVE JUROR:  Yes. |
| 10:15:13 | 16 | THE COURT:  Where is it -- what is it? |
| 10:15:15 | 17 | PROSPECTIVE JUROR:  In the newspaper. |
| 10:15:16 | 18 | THE COURT:  Is there anything that you read or |
| 10:15:17 | 19 | heard that would prevent you from listening to the |
| 10:15:19 | 20 | evidence in this case fairly and impartially? |
| 10:15:21 | 21 | PROSPECTIVE JUROR:  No. |
| 10:15:21 | 22 | THE COURT:  Is there anything that you read or |
| 10:15:23 | 23 | heard that would prevent you from following my |
| 10:15:24 | 24 | instructions on the law? |
| 10:15:25 | 25 | PROSPECTIVE JUROR:  No. |

| | | |
|---|---|---|
| 10:15:25 | 1 | THE COURT:  You also raised your card in |
| 10:15:27 | 2 | response to the question about the criminal justice |
| 10:15:30 | 3 | system.  Tell us why. |
| 10:15:32 | 4 | PROSPECTIVE JUROR:  Well, you asked about, if I |
| 10:15:34 | 5 | have a relative who was a victim. |
| 10:15:36 | 6 | THE COURT:  Right. |
| 10:15:37 | 7 | PROSPECTIVE JUROR:  I have a relative who was |
| 10:15:40 | 8 | murdered in 1969. |
| 10:15:41 | 9 | THE COURT:  Is there anything about that |
| 10:15:43 | 10 | experience that would prevent you from following my |
| 10:15:44 | 11 | instructions on the law? |
| 10:15:45 | 12 | PROSPECTIVE JUROR:  No. |
| 10:15:46 | 13 | THE COURT:  Is there anything in that |
| 10:15:47 | 14 | experience that would prevent you from listening to the |
| 10:15:48 | 15 | evidence in this case fairly and impartially? |
| 10:15:49 | 16 | PROSPECTIVE JUROR:  No. |
| 10:15:51 | 17 | THE COURT:  Okay.  Thank you. |
| 10:15:53 | 18 | Juror 83. |
| 10:16:19 | 19 | Good morning. |
| 10:16:20 | 20 | PROSPECTIVE JUROR:  Good morning. |
| 10:16:20 | 21 | THE COURT:  Tell us your Juror Number, please. |
| 10:16:22 | 22 | PROSPECTIVE JUROR:  Number 83. |
| 10:16:23 | 23 | THE COURT:  Okay.  You indicated that you had |
| 10:16:24 | 24 | read or heard something about this case? |
| 10:16:26 | 25 | PROSPECTIVE JUROR:  Yes.  I heard it on the |

10:16:27  1      news.

10:16:28  2              THE COURT:  Okay.  Is there anything that you

10:16:30  3      read or heard that would prevent you from listening to

10:16:32  4      the evidence in this case fairly and impartially?

10:16:34  5              PROSPECTIVE JUROR:  No, sir.

10:16:34  6              THE COURT:  Is there anything that you read or

10:16:35  7      heard that would prevent you from following my

10:16:37  8      instructions on the law?

10:16:38  9              PROSPECTIVE JUROR:  No, sir.

10:16:38  10             THE COURT:  You also raised your card in

10:16:40  11     response to the question about the criminal justice

10:16:42  12     system.  Tell us why.

10:16:44  13             PROSPECTIVE JUROR:  Because I work for Internal

10:16:46  14     Affairs for the Police Department presently, and in the

10:16:49  15     past, I served as a witness for a case in District Court

10:16:54  16     in 2010, I believe it was, against Franklin Xavier.  I

10:17:02  17     was a witness in that case.

10:17:04  18          I was also a witness for the Ronald Pickard case.

10:17:08  19             THE COURT:  Okay.  You were a government

10:17:10  20     witness in those cases?

10:17:12  21             PROSPECTIVE JUROR:  Yes, I was.

10:17:13  22             THE COURT:  Okay.  Are you an officer?

10:17:15  23             PROSPECTIVE JUROR:  I'm an Internal Affairs

10:17:20  24     agent.

10:17:20  25             THE COURT:  Are you a peace officer?

| | | |
|---|---|---|
| 10:17:22 | 1 | PROSPECTIVE JUROR:  Yes, I do. |
| 10:17:22 | 2 | THE COURT:  You currently are? |
| 10:17:24 | 3 | PROSPECTIVE JUROR:  Yes. |
| 10:17:28 | 4 | THE COURT:  All right.  Is there anything in |
| 10:17:31 | 5 | those several experiences that would prevent you from |
| 10:17:34 | 6 | following my instructions on the law? |
| 10:17:35 | 7 | PROSPECTIVE JUROR:  No, sir. |
| 10:17:35 | 8 | THE COURT:  Is there anything in those several |
| 10:17:39 | 9 | experiences that would prevent you from listening to the |
| 10:17:41 | 10 | evidence in this case fairly and impartially? |
| 10:17:42 | 11 | PROSPECTIVE JUROR:  No, sir. |
| 10:17:43 | 12 | THE COURT:  All right.  Thank you. |
| 10:17:46 | 13 | Juror Number 3. |
| 10:18:17 | 14 | Good morning. |
| 10:18:18 | 15 | PROSPECTIVE JUROR:  Good morning. |
| 10:18:18 | 16 | THE COURT:  Tell us your Juror Number, please. |
| 10:18:20 | 17 | PROSPECTIVE JUROR:  What number is it?  3. |
| 10:18:23 | 18 | THE COURT:  You indicated that you had read or |
| 10:18:25 | 19 | heard something about this case? |
| 10:18:26 | 20 | PROSPECTIVE JUROR:  Yes. |
| 10:18:27 | 21 | THE COURT:  Tell us about that. |
| 10:18:29 | 22 | PROSPECTIVE JUROR:  I read in the -- I think |
| 10:18:32 | 23 | either in the Daily News or the Avis about the case, |
| 10:18:36 | 24 | that the defendant had stolen moneys, I think from the |
| 10:18:41 | 25 | National Guard. |

10:18:42  1             THE COURT:  Is there anything that you read or

10:18:43  2     heard that would prevent you from listening to the

10:18:46  3     evidence in this case fairly and impartially?

10:18:49  4             PROSPECTIVE JUROR:  I think I was -- I am

10:18:52  5     biased.

10:18:53  6             THE COURT:  What do you mean -- what does that

10:18:54  7     mean?

10:18:55  8             PROSPECTIVE JUROR:  I think I assumed what I

10:18:58  9     read in the paper was right.

10:19:00  10            THE COURT:  Okay.  And what is it that you read

10:19:02  11    in the paper?

10:19:03  12            PROSPECTIVE JUROR:  That the defendant had

10:19:04  13    stolen moneys from the National Guard.  I don't know the

10:19:12  14    specific details.

10:19:12  15            THE COURT:  Okay.  Did you -- was it an

10:19:15  16    announcement that the government had charged the

10:19:18  17    defendant, that you had read about?

10:19:24  18            PROSPECTIVE JUROR:  It might have been.  I

10:19:26  19    don't remember the details.

10:19:28  20            THE COURT:  Okay.  And what is it about the

10:19:34  21    case that you do recall, if anything?

10:19:39  22            PROSPECTIVE JUROR:  The presentation that an

10:19:43  23    investigation had taken place.

10:19:45  24            THE COURT:  Okay.

10:19:47  25            PROSPECTIVE JUROR:  And --

```
10:19:48   1              THE COURT:  Go ahead.
10:19:49   2              PROSPECTIVE JUROR:  And that she was -- to my,
10:19:52   3    if I recollect correctly, that she was being charged
10:19:57   4    with having stolen the moneys.
10:19:59   5              THE COURT:  And you said you had believed the
10:20:00   6    article.  What, the part that she had been charged?  You
10:20:05   7    believe that she was charged.
10:20:07   8              PROSPECTIVE JUROR:  I guess I just assumed that
10:20:08   9    the presentation was correct.
10:20:09  10              THE COURT:  Okay.  And as a juror your duty is
10:20:12  11    to listen to the evidence fairly and impartially.
10:20:15  12          Is there anything that you read that would prevent
10:20:17  13    you from doing that?
10:20:21  14              PROSPECTIVE JUROR:  No.
10:20:26  15              THE COURT:  Okay.  Is there anything that you
10:20:28  16    read that would prevent you from following my
10:20:31  17    instructions on the law?
10:20:32  18              PROSPECTIVE JUROR:  No.
10:20:32  19              THE COURT:  Okay.  Thank you, ma'am.
10:20:36  20              MR. JUPITER:  May I inquire, Your Honor?
10:20:38  21              THE COURT:  Not yet.
10:20:38  22          Okay.  Thank you, ma'am.
10:20:40  23              PROSPECTIVE JUROR:  Okay.
10:20:41  24              THE COURT:  Juror 58.
10:20:50  25          58?
```

| | | |
|---|---|---|
| 10:20:51 | 1 | THE CLERK:  Juror Number 58? |
| 10:20:55 | 2 | THE COURT:  I'm going to strike Juror 3 for |
| 10:20:57 | 3 | cause. |
| 10:20:57 | 4 | Is there any objection from the defense? |
| 10:20:59 | 5 | MR. JUPITER:  No, Your Honor. |
| 10:21:00 | 6 | THE COURT:  Any from the government? |
| 10:21:02 | 7 | MR. POTTER:  No, Judge. |
| 10:21:03 | 8 | THE COURT:  Okay. |
| 10:21:17 | 9 | Good morning. |
| 10:21:18 | 10 | PROSPECTIVE JUROR:  Good morning, sir. |
| 10:21:19 | 11 | THE COURT:  Tell us your Juror Number, please. |
| 10:21:21 | 12 | PROSPECTIVE JUROR:  My? |
| 10:21:22 | 13 | THE COURT:  Your Juror Number. |
| 10:21:24 | 14 | PROSPECTIVE JUROR:  58. |
| 10:21:24 | 15 | THE COURT:  You indicated you had read or heard |
| 10:21:26 | 16 | something about this case? |
| 10:21:27 | 17 | PROSPECTIVE JUROR:  Yes.  Actually, in the |
| 10:21:30 | 18 | papers I read about it and it was discussed up at the |
| 10:21:36 | 19 | Boy Scout camp with some friends of mine. |
| 10:21:38 | 20 | THE COURT:  Okay.  Is there anything that you |
| 10:21:39 | 21 | read or discussed that would prevent you from listening |
| 10:21:44 | 22 | to the evidence in this case fairly and impartially? |
| 10:21:45 | 23 | PROSPECTIVE JUROR:  In this case, yes.  Yes, |
| 10:21:48 | 24 | sir. |
| 10:21:48 | 25 | THE COURT:  Okay.  And why is that? |

| | | |
|---|---|---|
| 10:21:50 | 1 | PROSPECTIVE JUROR:  Because I can -- from a |
| 10:21:54 | 2 | police officer standpoint, being a retired police |
| 10:21:57 | 3 | officer, when I read what I read in the article, and the |
| 10:22:03 | 4 | discussion we had, I said to myself, how can she do a |
| 10:22:07 | 5 | thing like that.  In this case, you know, the money, the |
| 10:22:10 | 6 | wire fraud.  So... |
| 10:22:14 | 7 | And I think it would hamper. |
| 10:22:17 | 8 | THE COURT:  All right.  Thank you, sir. |
| 10:22:19 | 9 | PROSPECTIVE JUROR:  Okay. |
| 10:22:20 | 10 | THE COURT:  Juror 27?  27. |
| 10:22:31 | 11 | Any objection from the defense to the Court |
| 10:22:33 | 12 | striking 58 for cause? |
| 10:22:36 | 13 | MR. JUPITER:  No objection. |
| 10:22:37 | 14 | THE COURT:  Attorney Potter? |
| 10:22:38 | 15 | MR. POTTER:  No objection, Judge. |
| 10:22:40 | 16 | THE COURT:  All right. |
| 10:22:56 | 17 | Good morning. |
| 10:22:56 | 18 | PROSPECTIVE JUROR:  Good morning. |
| 10:22:57 | 19 | THE COURT:  What's your Juror Number, please? |
| 10:22:58 | 20 | PROSPECTIVE JUROR:  27. |
| 10:22:59 | 21 | THE COURT:  Okay.  You indicated that you had |
| 10:23:01 | 22 | read something about this case or heard something about |
| 10:23:04 | 23 | it. |
| 10:23:04 | 24 | PROSPECTIVE JUROR:  I -- it was on the news, |
| 10:23:06 | 25 | and I really discussed it with my daughters.  We |

10:23:10  1    discussed it.  We just spoke about how, you know, people

10:23:13  2    think that they can do things and they get away with it.

10:23:16  3    I don't feel I would be comfortable judging -- because

10:23:21  4    I've already placed a judgment on her.

10:23:24  5              THE COURT:  Okay.

10:23:25  6              PROSPECTIVE JUROR:  Because we discussed it.  I

10:23:27  7    discussed it with my daughters.

10:23:28  8              THE COURT:  All right.  Thank you, ma'am.

10:23:30  9              PROSPECTIVE JUROR:  Thank you.

10:23:33  10             THE COURT:  Juror Number 16?

10:23:37  11        Does defense object to the Court striking that

10:23:39  12   juror for cause?

10:23:40  13             MR. JUPITER:  No, Your Honor.

10:23:41  14             THE COURT:  Attorney Potter?

10:23:42  15             MR. POTTER:  No, Judge.

10:23:43  16             THE COURT:  Okay.

10:24:06  17        Good morning.

10:24:07  18        Tell us your Juror Number, please.

10:24:08  19             PROSPECTIVE JUROR:  16.

10:24:09  20             THE COURT:  Okay.  You indicated that you had

10:24:11  21   read or heard something about this case?

10:24:12  22             PROSPECTIVE JUROR:  Yes, sir.

10:24:13  23             THE COURT:  Okay.  What's that?

10:24:14  24             PROSPECTIVE JUROR:  I read in the newspaper the

10:24:16  25   circumstances around it.  I heard it on the news.

10:24:20  1          THE COURT:  Okay.  Is there anything that you

10:24:21  2   read or heard that would prevent you from listening to

10:24:23  3   the evidence in this case fairly and impartially?

10:24:25  4          PROSPECTIVE JUROR:  Absolutely not.

10:24:26  5          THE COURT:  Is there anything that you read or

10:24:28  6   heard that would prevent you from following my

10:24:30  7   instructions on the law?

10:24:31  8          PROSPECTIVE JUROR:  No, sir.

10:24:32  9          THE COURT:  Okay.  You also responded to the

10:24:34  10  question about the criminal justice system.  Tell us

10:24:37  11  why.

10:24:37  12         PROSPECTIVE JUROR:  I had a nephew who was

10:24:40  13  involved in, I believe it was, if I'm correct, two

10:24:49  14  Christmases ago, he was stopped in a police stop and

10:24:52  15  there was gentlemen -- young men in the vehicle that was

10:24:55  16  involved in some kind of activity, and he got caught up

10:24:58  17  into that.

10:24:58  18         THE COURT:  Okay.  When you say he got caught

10:25:00  19  up, what does that mean?

10:25:01  20         PROSPECTIVE JUROR:  He was in the car.  He was

10:25:02  21  the oldest one and the others were under age.  So I

10:25:06  22  guess he was the one that was charged.

10:25:11  23         THE COURT:  Okay.  Is that a case that remains

10:25:13  24  pending?

10:25:14  25         PROSPECTIVE JUROR:  No, sir.

| | | |
|---|---|---|
| 10:25:14 | 1 | THE COURT:  Okay.  What was the result of that? |
| 10:25:16 | 2 | PROSPECTIVE JUROR:  The case was dismissed. |
| 10:25:17 | 3 | THE COURT:  Okay.  What was he charged with? |
| 10:25:20 | 4 | PROSPECTIVE JUROR:  My gosh.  It's not coming |
| 10:25:24 | 5 | to me. |
| 10:25:24 | 6 | THE COURT:  Do you recall what it had to deal |
| 10:25:26 | 7 | with? |
| 10:25:26 | 8 | PROSPECTIVE JUROR:  I beg your pardon? |
| 10:25:28 | 9 | THE COURT:  What did it have to do with? |
| 10:25:31 | 10 | PROSPECTIVE JUROR:  I think the young men were |
| 10:25:33 | 11 | under age and they were driving without proper vehicle |
| 10:25:36 | 12 | identifications or registration, or something of that |
| 10:25:40 | 13 | nature. |
| 10:25:40 | 14 | THE COURT:  Okay.  All right.  Is there |
| 10:25:43 | 15 | anything in that experience that would prevent you from |
| 10:25:46 | 16 | following my instructions on the law? |
| 10:25:47 | 17 | PROSPECTIVE JUROR:  No, sir. |
| 10:25:48 | 18 | THE COURT:  Is there anything in that |
| 10:25:49 | 19 | experience that would prevent you from listening to the |
| 10:25:51 | 20 | evidence in this case fairly and impartially? |
| 10:25:52 | 21 | PROSPECTIVE JUROR:  No, sir. |
| 10:25:53 | 22 | THE COURT:  Okay.  Thank you, sir. |
| 10:25:54 | 23 | Juror Number 6. |
| 10:26:00 | 24 | MR. JUPITER:  Your Honor? |
| 10:26:01 | 25 | THE COURT:  Yes. |

10:26:02  1           MR. JUPITER:  The first response he gave

10:26:05  2    apparently was "absolutely not."

10:26:07  3       I heard "absolutely," but I assume from his

10:26:09  4    subsequent answers that it must have been "absolutely

10:26:12  5    not."

10:26:12  6       Is that the Court's --

10:26:14  7           THE COURT:  I heard "absolutely not."

10:26:17  8           MR. POTTER:  I heard "absolutely not," Judge.

10:26:19  9           THE COURT:  Chandra?

10:26:21  10   Okay.

10:26:22  11   Good morning.  Tell us your Juror Number, please?

10:26:24  12          PROSPECTIVE JUROR:  Six.

10:26:25  13          THE COURT:  Okay.  You indicated that you had

10:26:26  14   read or heard something about this case.  Tell us about

10:26:28  15   that.

10:26:29  16          PROSPECTIVE JUROR:  When it first came out in

10:26:30  17   the newspapers.

10:26:31  18          THE COURT:  Okay.  Is there anything that you

10:26:33  19   read or heard that would prevent you from following my

10:26:35  20   instructions on the law?

10:26:36  21          PROSPECTIVE JUROR:  No.

10:26:37  22          THE COURT:  Is there anything you read or heard

10:26:40  23   that would prevent you from listening to the evidence in

10:26:42  24   this case fairly and impartially?

10:26:44  25          PROSPECTIVE JUROR:  No.

10:26:44  1              THE COURT:  Okay.  Thank you.

10:26:45  2          Juror Number 9.

10:27:12  3          Good morning.  Tell us your Juror Number, please.

10:27:13  4              PROSPECTIVE JUROR:  Nine.

10:27:14  5              THE COURT:  You indicated that you had read or

10:27:16  6      heard something about this case?

10:27:17  7              PROSPECTIVE JUROR:  Initially when it came out

10:27:19  8      in the newspaper, but I have not followed any details of

10:27:22  9      the case.

10:27:24  10             THE COURT:  Okay.  Is there anything that you

10:27:25  11     read or heard that would prevent you from following my

10:27:27  12     instructions on the law?

10:27:28  13             PROSPECTIVE JUROR:  No, Your Honor.

10:27:29  14             THE COURT:  Is there anything that you read or

10:27:30  15     heard that would prevent you from listening to the

10:27:31  16     evidence in this case fairly and impartially?

10:27:33  17             PROSPECTIVE JUROR:  No, Your Honor.

10:27:33  18             THE COURT:  Okay.  Thank you.

10:27:34  19             PROSPECTIVE JUROR:  Thank you.

10:27:35  20             THE COURT:  Juror Number 60.

10:27:59  21             PROSPECTIVE JUROR:  Good morning.

10:28:00  22             THE COURT:  Good morning.  Tell us your Juror

10:28:01  23     Number, please.

10:28:01  24             PROSPECTIVE JUROR:  Number 60.  60.

10:28:03  25             THE COURT:  Okay.  You indicated that you had

10:28:05  1    read or heard something about this case?

10:28:07  2         PROSPECTIVE JUROR:  Yes, sir.  That's one of my

10:28:09  3    daily routines, is the newspapers.  I read the

10:28:17  4    newspapers on a daily basis as part of my routine since

10:28:21  5    I retired.

10:28:22  6         THE COURT:  Is there anything that you read or

10:28:23  7    heard that would prevent you from following my

10:28:25  8    instructions on the law?

10:28:26  9         PROSPECTIVE JUROR:  No, sir.

10:28:27  10         THE COURT:  Is there anything that you read or

10:28:28  11    heard that would prevent you from listening to the

10:28:29  12    evidence in this case fairly and impartially?

10:28:32  13         PROSPECTIVE JUROR:  No, sir.

10:28:32  14         THE COURT:  Okay.  Thank you, sir.

10:28:34  15         PROSPECTIVE JUROR:  If I might add, sir, I had

10:28:38  16    requested an excuse because right now I'm suffering from

10:28:41  17    the results of a chikungunya.  And what happened is I

10:28:46  18    take medication, but this morning I hesitated to take

10:28:48  19    the pain killer because after a little while it makes me

10:28:53  20    drowsy.  But right now I'm in pain.

10:28:56  21         THE COURT:  Okay.  Well, we'll try to make

10:28:59  22    sure, if you are selected, that you can, you can take

10:29:01  23    whatever medication that is necessary for your medical

10:29:05  24    health.  Okay?

10:29:06  25         PROSPECTIVE JUROR:  Okay.  I didn't take it

10:29:08   1    because it makes me drowsy.

10:29:10   2         THE COURT:  Okay.  Thank you, sir.

10:29:12   3         Juror Number 12.

10:29:32   4         Then jury 41 can wait here, and then 76, also.

10:29:42   5         Good morning.

10:29:43   6         Tell us your Juror Number, please.

10:29:45   7              PROSPECTIVE JUROR:  12.

10:29:46   8         THE COURT:  Okay.  You indicated that you had

10:29:48   9    read or heard something about this case?

10:29:49  10              PROSPECTIVE JUROR:  Yes.

10:29:50  11         THE COURT:  Tell us about that.

10:29:52  12              PROSPECTIVE JUROR:  I read in the newspaper

10:29:54  13    about the federal charges against the defendant; just

10:29:59  14    read in the newspaper and made note to that.

10:30:01  15         THE COURT:  Okay.  Is there anything that you

10:30:03  16    read or heard that would prevent you from following my

10:30:06  17    instructions on the law?

10:30:07  18              PROSPECTIVE JUROR:  No.

10:30:07  19         THE COURT:  Is there anything that you read or

10:30:09  20    heard that would prevent you from listening to the

10:30:10  21    evidence in this case fairly and impartially?

10:30:12  22              PROSPECTIVE JUROR:  No.

10:30:13  23         THE COURT:  Okay.  Thank you, ma'am.

10:30:18  24         41?

10:30:24  25         And then 76.

| | | |
|---|---|---|
| 10:30:30 | 1 | Good morning.  Tell us your Juror Number, please. |
| 10:30:32 | 2 | PROSPECTIVE JUROR:  41. |
| 10:30:33 | 3 | THE COURT:  Okay.  You indicated that -- you |
| 10:30:36 | 4 | responded yes to the question about the criminal justice |
| 10:30:39 | 5 | system.  Tell us about that. |
| 10:30:41 | 6 | PROSPECTIVE JUROR:  If I had been a victim of |
| 10:30:43 | 7 | any criminal offense?  Yes. |
| 10:30:45 | 8 | I was molested from the ages of 11 to 14.  And I've |
| 10:30:50 | 9 | had several family members be put behind bars.  My |
| 10:30:57 | 10 | stepfather was also never prosecuted for what happened. |
| 10:31:02 | 11 | THE COURT:  Is there anything in those several |
| 10:31:04 | 12 | experiences that would prevent you from following my |
| 10:31:05 | 13 | instructions on the law? |
| 10:31:06 | 14 | PROSPECTIVE JUROR:  I would follow your |
| 10:31:09 | 15 | instructions.  I'm not sure how my -- |
| 10:31:13 | 16 | THE COURT:  Well, the question isn't whether it |
| 10:31:15 | 17 | would be difficult.  The question is just whether you |
| 10:31:17 | 18 | would follow my instructions. |
| 10:31:18 | 19 | PROSPECTIVE JUROR:  I would. |
| 10:31:19 | 20 | THE COURT:  Would you -- is there anything in |
| 10:31:21 | 21 | those experiences that would prevent you from listening |
| 10:31:23 | 22 | to the evidence in this case fairly and impartially? |
| 10:31:25 | 23 | PROSPECTIVE JUROR:  No. |
| 10:31:30 | 24 | THE COURT:  Okay.  All right.  Thank you. |
| 10:31:37 | 25 | 76. |

```
10:31:49   1                    PROSPECTIVE JUROR:  Good morning.

10:31:49   2                    THE COURT:  Good morning.  Tell us your Juror

10:31:52   3    Number, please.

10:31:52   4                    PROSPECTIVE JUROR:  76.

10:31:53   5                    THE COURT:  Okay.  You responded yes to the

10:31:55   6    question about the criminal justice system.  Tell us

10:31:58   7    why.

10:31:59   8                    PROSPECTIVE JUROR:  I had a case that just, I

10:32:03   9    think was last year -- two years ago, with Alaska versus

10:32:10   10   Virgin Islands -- I mean Virgin Islands versus Isaiah

10:32:19   11   Fox, Alaska money laundering.

10:32:21   12                   THE COURT:  Who was involved in that?

10:32:22   13                   PROSPECTIVE JUROR:  The attorney was --

10:32:24   14                   THE COURT:  I'm sorry.  How were you involved

10:32:26   15   in that?

10:32:26   16                   PROSPECTIVE JUROR:  Oh.  I was at service, I

10:32:30   17   was a defendant, and then the charge against me was

10:32:35   18   dropped.

10:32:36   19                   THE COURT:  Okay.  Is there anything in that

10:32:39   20   experience that would prevent you from following my

10:32:41   21   instructions on the law?

10:32:42   22                   PROSPECTIVE JUROR:  It wasn't a good experience

10:32:47   23   so, yeah, I'll have a problem.

10:32:49   24                   THE COURT:  Okay.  Would you have a problem

10:32:51   25   with following my instructions?
```

| | | |
|---|---|---|
| 10:32:54 | 1 | PROSPECTIVE JUROR:  Well, basically being fair. |
| 10:32:57 | 2 | THE COURT:  Okay.  And why do you say that? |
| 10:32:59 | 3 | PROSPECTIVE JUROR:  Because it wasn't a good |
| 10:33:01 | 4 | experience for me, so I really don't like District |
| 10:33:04 | 5 | Court. |
| 10:33:04 | 6 | THE COURT:  Okay.  All right.  Thank you, |
| 10:33:06 | 7 | ma'am. |
| 10:33:09 | 8 | THE CLERK:  Juror Number 4? |
| 10:33:15 | 9 | THE COURT:  Four? |
| 10:33:27 | 10 | Okay.  Any objections to the Court striking 76 for |
| 10:33:32 | 11 | cause? |
| 10:33:32 | 12 | MR. POTTER:  No, Your Honor. |
| 10:33:34 | 13 | THE COURT:  Attorney Potter? |
| 10:33:35 | 14 | MR. POTTER:  No, Your Honor. |
| 10:33:47 | 15 | THE COURT:  Good morning. |
| 10:33:49 | 16 | PROSPECTIVE JUROR:  Good morning. |
| 10:33:49 | 17 | THE COURT:  Tell us your Juror Number, please. |
| 10:33:51 | 18 | PROSPECTIVE JUROR:  Pardon? |
| 10:33:51 | 19 | THE COURT:  Your Juror Number. |
| 10:33:52 | 20 | PROSPECTIVE JUROR:  Four. |
| 10:33:53 | 21 | THE COURT:  You indicated you had read or heard |
| 10:33:55 | 22 | something about this case. |
| 10:33:56 | 23 | PROSPECTIVE JUROR:  Yeah, been reading in the |
| 10:33:58 | 24 | newspaper. |
| 10:33:58 | 25 | THE COURT:  Tell us about that.  What did you |

```
10:34:00  1   read?

10:34:00  2             PROSPECTIVE JUROR:  Well, I read about the

10:34:02  3   fraud and the allegations in the newspaper and the

10:34:03  4   newspaper article.

10:34:05  5             THE COURT:  Okay.  Is there anything that you

10:34:06  6   read or heard that would prevent you from following my

10:34:08  7   instructions on the law?

10:34:09  8             PROSPECTIVE JUROR:  Not really, no.

10:34:12  9             THE COURT:  Okay.  Is there --

10:34:13  10            PROSPECTIVE JUROR:  Just personal opinion, you

10:34:16  11  know.  I, I own a small business, so I don't take to

10:34:21  12  people taking things for free, granted, you know.  But I

10:34:26  13  have pretty strong feelings about that.

10:34:28  14            THE COURT:  Okay.  You understand that the

10:34:32  15  defendant is not proven to be --

10:34:36  16            PROSPECTIVE JUROR:  Right, I understand that.

10:34:37  17            THE COURT:  Okay.  And you understand that the

10:34:39  18  burden would be on the government to prove beyond a

10:34:41  19  reasonable doubt if there was any guilt?

10:34:42  20            PROSPECTIVE JUROR:  Yeah.  I've been a jury --

10:34:46  21  I've been a jurist before in this courtroom.

10:34:49  22            THE COURT:  Okay.  Is there anything that you

10:34:51  23  read or heard that would prevent you from following my

10:34:53  24  instructions on the law?

10:34:54  25            PROSPECTIVE JUROR:  No.
```

10:34:55  1          THE COURT:  Is there anything that you read or

10:34:56  2  heard that would prevent you from listening to the

10:34:59  3  evidence in this case fairly and impartially?

10:35:00  4          PROSPECTIVE JUROR:  No.

10:35:01  5          THE COURT:  Okay.  You mentioned the word

10:35:03  6  "opinion."  When you mention that word, what -- tell us

10:35:08  7  what you meant by that?

10:35:11  8          PROSPECTIVE JUROR:  Word what?

10:35:12  9          THE COURT:  When you were giving an answer, you

10:35:14  10  said --

10:35:15  11          PROSPECTIVE JUROR:  Well, I have pretty strong

10:35:17  12  feelings.  I mean I, I'm a strong business owner.  Here,

10:35:21  13  that means murder.  I've been in business since 26 years

10:35:26  14  ago.  I'm barely surviving.  I hate to see people

10:35:28  15  getting something for naught.  So I really started to

10:35:31  16  get a very strong opinion on that over the last couple

10:35:35  17  years.

10:35:35  18          THE COURT:  Okay.

10:35:36  19          PROSPECTIVE JUROR:  So, you know --

10:35:39  20          THE COURT:  Do you have an opinion with respect

10:35:41  21  to this --

10:35:42  22          PROSPECTIVE JUROR:  I have not -- I don't know

10:35:43  23  enough about this case, so --

10:35:45  24          THE COURT:  Okay.

10:35:45  25          PROSPECTIVE JUROR:  I mean, I could parse the

| | | |
|---|---|---|
| 10:35:47 | 1 | evidence out after seeing it. |
| 10:35:48 | 2 | THE COURT:  Okay. |
| 10:35:50 | 3 | All right.  Thank you, sir. |
| 10:35:51 | 4 | PROSPECTIVE JUROR:  Thank you. |
| 10:35:55 | 5 | THE COURT:  Okay, Counsel, seven minutes. |
| 10:35:59 | 6 | MR. POTTER:  Judge, I'm not sure that I heard |
| 10:36:02 | 7 | whether or not any one of the panel had a business or |
| 10:36:07 | 8 | personal relationship with the defendant.  I think I |
| 10:36:11 | 9 | heard with respect to Attorney Jupiter, but not -- |
| 10:36:13 | 10 | THE COURT:  I don't understand.  What's your |
| 10:36:14 | 11 | question? |
| 10:36:16 | 12 | MR. POTTER:  Does anyone have a personal |
| 10:36:18 | 13 | relationship with the defendant? |
| 10:36:21 | 14 | THE COURT:  I think that was one of the first |
| 10:36:23 | 15 | questions I asked.  I'm pretty sure I asked -- |
| 10:36:25 | 16 | introduced the defendant and said, "Did you have a" -- |
| 10:36:33 | 17 | first I asked with the lawyers, and then I go to the |
| 10:36:36 | 18 | defendant. |
| 10:36:37 | 19 | MR. JUPITER:  Yes, Your Honor.  And I believe |
| 10:36:38 | 20 | you did do that, but I don't believe you did it with |
| 10:36:40 | 21 | respect to the United States Attorneys's Office.  I |
| 10:36:43 | 22 | think you just said with Mr. Potter. |
| 10:36:46 | 23 | And I -- even though this case does not involve |
| 10:36:50 | 24 | police officers, Your Honor, I would even -- there was |
| 10:36:53 | 25 | still an investigation, an investigation that was |

10:36:56  1    similar to law enforcement investigation, so I would ask

10:37:00  2    that the Court would ask that question, and ask whether

10:37:04  3    or not people are -- find credibility of a law

10:37:09  4    enforcement officer to be more credible than a lay

10:37:15  5    witness.

10:37:18  6         THE COURT:  Okay.  I think my questions have

10:37:19  7    covered some of that basis.  With respect to the U.S.

10:37:22  8    Attorney's Office.

10:37:23  9         One of the jurors who was, I think it was Juror 76,

10:37:27  10   Attorney Potter wasn't involved in that, but she

10:37:29  11   certainly was aware that it was the US Attorney's Office

10:37:35  12   on the other side of her; as every juror has done who

10:37:39  13   has had a connection with the US Attorney's Office,

10:37:42  14   since I've been doing voir dire, they always seem to

10:37:44  15   respond to that question with their connection with the

10:37:46  16   US Attorney's Office.

10:37:48  17        Thank you.

10:37:49  18        MR. JUPITER:  Your Honor, the other -- can I

10:37:51  19   inquire -- there was one juror, and I had a note saying

10:37:56  20   that she was Juror Number 41.  But I don't see -- so

10:38:00  21   unless I wrote the name down wrong, I don't see a 41.

10:38:04  22        THE COURT:  There was a 41 who responded about

10:38:06  23   the criminal justice system.  What is your question?

10:38:23  24   Whether she had come up here?

10:38:25  25        I'll ask her to raise her card, and maybe that will

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:38:29 | 1  | refresh your memory.                                         |
| 10:38:30 | 2  | MR. JUPITER:  I think I know which one she is.               |
| 10:38:32 | 3  | I'm trying to see...   I don't see it on my -- I guess I     |
| 10:38:36 | 4  | don't see it on my paper.                                    |
| 10:38:38 | 5  | What page is 41 on?                                          |
| 10:38:53 | 6  | Okay.  Thank you.                                            |
| 10:38:53 | 7  | THE COURT:  Okay.  Seven minutes.                            |
| 10:45:55 | 8  | (Pause)                                                      |
| 10:45:55 | 9  | THE COURT:  Counsel, come to sidebar.                        |
| 10:45:59 | 10 | (Sidebar discussion held as follows:)                       |
| 10:46:12 | 11 | THE COURT:  Okay.  Counsel, Juror Number 74                  |
| 10:46:15 | 12 | indicated that she has travel on July 1st.  Just to          |
| 10:46:21 | 13 | avoid any possible conflict with the trial, the Court is     |
| 10:46:26 | 14 | inclined to strike her for cause.                            |
| 10:46:28 | 15 | Any objection from the defense?                              |
| 10:46:31 | 16 | MR. JUPITER:  No, Your Honor.                                |
| 10:46:32 | 17 | THE COURT:  From the government?                             |
| 10:46:33 | 18 | MR. POTTER:  No, Judge.                                      |
| 10:46:34 | 19 | THE COURT:  All right.                                       |
| 10:46:34 | 20 | For cause from the government?                               |
| 10:46:40 | 21 | MR. POTTER:  None, Judge.                                    |
| 10:46:41 | 22 | THE COURT:  For cause from the defense?                      |
| 10:46:43 | 23 | MR. JUPITER:  Yes, Your Honor.  Juror Number 62              |
| 10:46:46 | 24 | in seat number 9.                                            |
| 10:47:00 | 25 | THE COURT:  What's the basis?                                |

10:47:09  1          MR. JUPITER:  I think I have that wrong,

10:47:11  2     Your Honor.

10:47:32  3          THE COURT:  Do you have a basis, Attorney?

10:47:34  4          MR. JUPITER:  No, Your Honor.

10:47:35  5          THE COURT:  Okay.  That's denied.

10:47:38  6       Anyone else for cause?

10:47:41  7          MR. JUPITER:  Yes, Your Honor.  It -- I have

10:47:47  8     Juror Number -- Juror Number 41.  And Juror Number 41

10:48:08  9     was hesitant --

10:48:09  10         THE COURT:  In what seat?

10:48:11  11         MR. JUPITER:  In seat number 15.

10:48:13  12         THE COURT:  Okay.

10:48:15  13         MR. JUPITER:  She indicated that she was the

10:48:17  14    victim of a crime, I believe child abuse for several

10:48:22  15    years.  She was very hesitant when the Court asked

10:48:26  16    whether or not she could be fair, and made some remarks

10:48:29  17    that she did not -- she could not -- did not believe

10:48:33  18    that she could go -- that this would be -- something

10:48:38  19    that she could be -- I forgot the exact words.  I don't

10:48:43  20    want to misquote it.  But she did not appear she could

10:48:46  21    presume someone to be innocent.

10:48:48  22       She mentioned that her stepfather was never

10:48:52  23    prosecuted.  And she -- there's no guarantee that she

10:48:56  24    could follow the presumption of innocence.  And I think

10:49:00  25    that she -- I don't think the panel was really asked any

10:49:05   1    questions about being able to presume Ms. Morales's

10:49:12   2    innocence and being able to follow the presumption of

10:49:13   3    innocence.

10:49:14   4              THE COURT:  All right.  The Court had an

10:49:15   5    opportunity to observe Juror 41, who is in seat number

10:49:18   6    15.

10:49:18   7         The juror did answer the Court's questions, the

10:49:23   8    Court thought as best as she could when you're

10:49:26   9    disclosing something like child molestation.

10:49:30  10         And she proceeded, I think, to also mention about

10:49:33  11    other relatives who had been in the system, I believe an

10:49:37  12    uncle or someone who had been convicted as well.  But

10:49:40  13    she seemed to be forthright.

10:49:42  14         What's the government's position?

10:49:44  15              MR. POTTER:  Our position is that she was

10:49:46  16    forthright, Judge, and she did respond to the Court's

10:49:51  17    questions and she did say she can be impartial.  She did

10:49:54  18    say she can follow the Court's instructions.  I see no

10:49:56  19    basis for her for cause.

10:49:57  20              THE COURT:  Okay.  That's denied.

10:49:59  21         Anything else?

10:50:13  22              MR. JUPITER:  The Juror Number 83 --

10:50:16  23              THE COURT:  In what seat?

10:50:17  24              MR. JUPITER:  Seat number 21 has -- is a peace

10:50:31  25    agent, I believe, in Internal Affairs.  She has many

| | | |
|---|---|---|
| 10:50:38 | 1 | connections with several Guard members, I think more so |
| 10:50:42 | 2 | on the government's side.  She -- and my main basis -- |
| 10:50:54 | 3 | actually our basis, Your Honor, is that she is a peace |
| 10:50:59 | 4 | agent.  She is law enforcement.  And we would think that |
| 10:51:01 | 5 | she -- and she also heard this on the news.  So we would |
| 10:51:04 | 6 | ask that she be stricken for cause. |
| 10:51:08 | 7 | MR. POTTER:  What number is she? |
| 10:51:10 | 8 | MR. JUPITER:  Number 83 in seat 21, on page 3. |
| 10:51:26 | 9 | THE COURT:  Well, she said she could be fair |
| 10:51:28 | 10 | and impartial.  And she did say she could listen to the |
| 10:51:31 | 11 | evidence fairly and impartially.  She didn't have any |
| 10:51:35 | 12 | involvement in this case, nor is it a case that's being |
| 10:51:39 | 13 | prosecuted by the Virgin Islands Government. |
| 10:51:42 | 14 | If you're a police officer you have a right to |
| 10:51:44 | 15 | claim an exemption.  That's why I was trying to find out |
| 10:51:50 | 16 | whether she was a police officer.  I guess she said |
| 10:51:53 | 17 | she's an Internal Affairs agent.  She said she's a peace |
| 10:51:57 | 18 | officer.  But she said she could be fair and impartial. |
| 10:51:59 | 19 | What's the government's position? |
| 10:52:01 | 20 | MR. POTTER:  Your Honor, she did say she could |
| 10:52:02 | 21 | be fair and impartial.  I don't think the mere fact that |
| 10:52:05 | 22 | she's a peace officer should prevent her from being able |
| 10:52:08 | 23 | to serve on this jury. |
| 10:52:09 | 24 | THE COURT:  Okay.  That's denied. |
| 10:52:11 | 25 | Anything else? |

10:52:14  1          MR. JUPITER:  No, Your Honor.

10:52:14  2          THE COURT:  Okay.  Let me have your

10:52:16  3    peremptories; simultaneous exchange.

10:52:21  4          MR. JUPITER:  Can I get one minute?

10:52:23  5          THE COURT:  All right.  One minute.

10:52:24  6          MR. POTTER:  Can I have one minute, too, Judge.

10:52:26  7          THE COURT:  One collective minute.

10:52:33  8      I'm sure counsel is familiar with my policies and

10:52:35  9    procedures.  I know that the magistrate went over, and I

10:52:38  10   think I issued an order just last week informing counsel

10:52:41  11   that they had to be familiar with it, which has always

10:52:44  12   been simultaneous exchanges.

10:52:48  13         MR. POTTER:  Of course, Judge.

10:55:49  14      (Pause)

10:55:50  15         THE COURT:  All right.  The government for its

10:55:51  16   peremptories strikes Juror Number 82 in seat 4, 26 in

10:55:56  17   seat 5, 80 in seat 7, 29 in seat 16, 3 in 23 -- who had

10:56:09  18   been struck for cause by the Court -- 16 in seat 29.

10:56:20  19      The defense for its peremptories strikes juror 4 in

10:56:24  20   seat 1, juror 68 in seat 3, juror 80 in seat 7, who the

10:56:33  21   plaintiff -- prosecutor had struck, 42 in seat 8, juror

10:56:39  22   62 in seat 9, juror 38 in seat 13, juror 41 in seat 15,

10:56:50  23   juror 6 in seat 17, juror 40 in seat 20, and juror 83 in

10:57:01  24   seat 21.

10:57:27  25      That brings, by my count, the 12th juror as Juror

10:57:32  1    Number 9 in seat 30.

10:57:36  2        Juror Number 60 in seat 31.  Does the government

10:57:41  3    wish to exercise a peremptory with respect to Juror

10:57:45  4    Number 60 in seat 31?

10:57:56  5        MR. POTTER:  We'll accept 60.

10:57:59  6        THE COURT:  Attorney Jupiter?

10:58:02  7        MR. JUPITER:  I move to strike.

10:58:04  8        THE COURT:  Okay.  That's your -- so defense

10:58:07  9    wishes to use a peremptory -- its alternate peremptory.

10:58:11  10   Okay.

10:58:15  11       Juror 22 in seat 32.  Does the government wish to

10:58:19  12   exercise a peremptory?

10:58:25  13       MR. POTTER:  No, Judge.

10:58:26  14       THE COURT:  Okay.  The defense has no

10:58:28  15   peremptories.  So that's alternate number 1.

10:58:31  16       Two alternates.  One strike.

10:58:38  17       Okay, juror 25 in seat 34, does the government wish

10:58:42  18   to exercise a peremptory as to that person being the

10:58:45  19   second alternate?

10:58:45  20       MR. POTTER:  No, Judge.

10:58:46  21       THE COURT:  Okay.  That's our second alternate.

10:58:48  22       I believe it is one strike for two alternates,

10:58:52  23   correct?

10:58:53  24       MR. JUPITER:  I believe so.

10:58:54  25       THE COURT:  All right.  That's our jury.  Thank

10:58:57  1        you, Counsel.

10:58:57  2                  MR. POTTER:  Thank you, Judge.

10:58:59  3             (End sidebar discussion, open court as follows:)

10:59:09  4                  THE COURT:  If you hear your number, please

10:59:12  5        have a seat in the gallery, in this section or this

10:59:18  6        section.

10:59:18  7             Juror Number 4, 68, 82, 26, 80, 42, 62, 74, 38, 41,

10:59:43  8        29, 6, 40, 83, 83, number 3, 58, 27, 16, 60 -- where is

11:00:31  9        juror 60?

11:00:41  10            Juror 76, 76 -- Juror 12, 44.

11:01:36  11            Juror 5, raise your card.

11:01:40  12            Juror 31.  Juror 21, Juror 21.  Juror 47, raise

11:01:55  13       your card.  47, just raise your card.  You can have a

11:02:02  14       seat.

11:02:02  15            Okay.  53, raise your card.  72, raise your card.

11:02:09  16       15, raise your card.  84, 28, 57, 45, 9, 22, 25.

11:02:41  17            All right.  Ladies and gentlemen of the jury, you

11:02:43  18       will be the jury that will be hearing this case.  Those

11:02:47  19       of you who are sitting in the middle section or that

11:02:52  20       section, you will not be hearing this case.

11:02:57  21            For those of you who were here but weren't

11:03:01  22       selected, let me thank you.  I know the attorneys thank

11:03:04  23       you, the Court thanks you, your community thanks you.

11:03:09  24       They also serve who stand and wait.

11:03:12  25            If there was a need for your services, you would

11:03:15  1    have been called upon.  It's never easy serving as a

11:03:19  2    juror, but when you do make yourself available, you join

11:03:23  3    a distinguished group.

11:03:25  4         The Vice President of the US, Joe Biden, as a

11:03:29  5    sitting Vice President, went to his home state to make

11:03:31  6    himself available for jury service.

11:03:33  7         Oprah Winfrey made herself available for jury

11:03:37  8    service and served.  Elena Kagan, a Justice of the US

11:03:41  9    Supreme Court, made herself available for jury service.

11:03:44  10        It's not something to be avoided, but it's a

11:03:46  11   privilege and an honor to serve your country, your court

11:03:50  12   and your community.

11:03:50  13        So thank you for your patience.  Thank you for your

11:03:54  14   cooperation, those of you who were not selected.

11:03:56  15        For those of you who were selected, we'll begin the

11:03:59  16   trial in the next seven minutes or so.

11:04:01  17        For those of you who were not, you can leave your

11:04:05  18   cards on the benches and you can exit the court.

11:04:13  19        For the rest of you, you can proceed into the jury

11:04:17  20   deliberation room in a moment.

11:04:34  21        Those of who you have been selected, you can

11:04:36  22   proceed into the jury deliberation room.

11:05:46  23        (Jury not present.)

11:05:47  24          THE COURT:  All right.  Counsel, is there

11:05:49  25   anything we need to tend to before we resume in

```
11:05:51    1    five minutes?

11:05:52    2          From the government?

11:05:53    3              MR. POTTER:  Nothing from the government, Your

11:05:55    4    Honor.

11:05:55    5              THE COURT:  Attorney Jupiter?

11:05:56    6              MR. JUPITER:  Well, Your Honor, there are still

11:05:59    7    pending motions.  I don't know if the Court wants to

11:06:03    8    take them up.

11:06:04    9              THE COURT:  Yes, I'm taking them under

11:06:05   10    advisement.

11:06:06   11        I know you have a pending motion that I believe was

11:06:09   12    filed yesterday and another one that was filed before

11:06:11   13    that, covering dismissal.  Yes, it's under advisement.

11:06:15   14    I know the one that was filed yesterday the government

11:06:18   15    has not had an opportunity to file its response yet.  So

11:06:23   16    but it's under advisement.  It's without prejudice to

11:06:26   17    the defendant.

11:06:26   18          All right.  Five minutes, Counsel.

11:06:29   19          (Court in recess, 11:06 a.m.)

11:37:32   20          (After recess, 11:37 a.m., jury present.)

11:37:35   21          (Jury sworn.)

11:37:38   22              THE COURT:  Good morning, again, Members of the

11:37:38   23    Jury.

11:37:38   24                    PRELIMINARY JURY INSTRUCTIONS

11:37:42   25              THE COURT:  Now that you've been sworn, let me
```

11:37:43  1    give you some preliminary instructions that should guide

11:37:45  2    you in your participation in the trial.

11:37:47  3        It will be your duty to find from the evidence what

11:37:50  4    the facts are.  You and you alone will be the judges of

11:37:53  5    the facts.

11:37:54  6        You will then have to apply to those facts the law

11:37:57  7    as the Court will give it to you.  You must follow the

11:38:00  8    law whether you agree with it or not.

11:38:03  9        Nothing the Court may say or do during the course

11:38:05  10   of the trial is intended to indicate, or should be taken

11:38:08  11   by you as indicating, what your verdict should be.

11:38:11  12       The evidence from which you will find the facts

11:38:14  13   will consist of the testimony of witnesses, documents,

11:38:17  14   and other things received into evidence or into the

11:38:21  15   record as exhibits, and any facts that the lawyers agree

11:38:26  16   to or stipulate to, or that I may instruct you to find.

11:38:30  17       Certain things are not evidence and must not be

11:38:32  18   considered by you.  I'll list some of those things for

11:38:35  19   you.

11:38:35  20       Statements, arguments and questions of lawyers are

11:38:38  21   not evidence.

11:38:40  22       Objections to questions are not evidence.  Lawyers

11:38:43  23   have an obligation to their clients to make objections

11:38:46  24   when they believe evidence being offered is improper

11:38:49  25   under the Rules of Evidence.

11:38:50  1        You should not be influenced by the objection or by

11:38:53  2    the Court's ruling on it.  If the objection is

11:38:57  3    sustained, ignore the question.  If it is overruled,

11:39:01  4    treat the answer like any other.

11:39:03  5        If you're instructed that some item of evidence is

11:39:05  6    received for a limited purpose only, you must follow

11:39:08  7    that instruction.

11:39:09  8        Testimony that the Court has excluded or told you

11:39:11  9    to disregard is not evidence and must not be considered.

11:39:15  10       Anything you may have seen or heard outside the

11:39:19  11   courtroom is not evidence and must be disregarded.  You

11:39:22  12   are to decide the case solely on the evidence presented

11:39:27  13   here in the courtroom.

11:39:28  14       There are two kinds of evidence, direct and

11:39:32  15   circumstantial.

11:39:32  16       Direct evidence is direct proof of facts, such as

11:39:34  17   testimony of an eyewitness.

11:39:36  18       Circumstantial evidence is proof of facts from

11:39:38  19   which you may infer or conclude that other facts exists.

11:39:41  20       I'll give you further instructions on these as well

11:39:44  21   as other matters at the end of the case, but keep in

11:39:47  22   mind that you may consider both kinds of evidence.

11:39:50  23       It will be up to you to decide which witnesses to

11:39:53  24   believe, which witnesses not to believe, and how much of

11:39:56  25   any witness's testimony to accept or reject.

11:40:00  1        I'll give you some guidelines for determining the

11:40:03  2    credibility of witnesses at the end of the case.

11:40:05  3        As you know, this is a criminal case.  There are

11:40:09  4    three basic rules about a criminal case that you must

11:40:12  5    keep in mind.

11:40:13  6        First, the defendant is presumed innocent until

11:40:16  7    proven guilty.  The indictment brought by the government

11:40:19  8    against the defendant is only an accusation, nothing

11:40:22  9    more.  It is not proof of guilt or anything else.  The

11:40:25  10   defendant therefore starts out with a clean slate.

11:40:28  11       Second, the burden of proof is on the government

11:40:30  12   until the very end of the case.  The defendant has no

11:40:33  13   burden to prove her innocence or to present any evidence

11:40:36  14   or to testify.

11:40:37  15       Since the defendant has the right to remain silent,

11:40:40  16   the law prohibits you from arriving at your verdict by

11:40:43  17   considering that the defendant may not have testified.

11:40:46  18       Third, the government must prove the defendant's

11:40:48  19   guilt beyond a reasonable doubt.

11:40:50  20       I'll give you further instructions on this point

11:40:53  21   later, but bear in mind that in this respect a criminal

11:40:56  22   case is different from a civil case.

11:40:58  23       Now, a few words about your conduct as jurors.

11:41:01  24       You as jurors must decide this case based solely on

11:41:04  25   the evidence presented here within the four walls of

11:41:07 1    this courtroom.

11:41:08 2         This means that during the trial you must not

11:41:10 3    conduct any independent research about this case, the

11:41:14 4    matters in this case and the individuals involved in

11:41:17 5    this case.  In other words, you must not consult

11:41:22 6    dictionaries or references or search the Internet,

11:41:26 7    websites or blogs.

11:41:27 8         Please do not try to find information of any source

11:41:32 9    outside the confines of this courtroom.

11:41:34 10        Until you retire to deliberate, you may not discuss

11:41:37 11   this case with anyone, even with your fellow jurors.

11:41:39 12        After you retire to deliberate, you may begin

11:41:42 13   discussing the case with your fellow jurors, but you

11:41:44 14   cannot discuss the case with anyone else until you have

11:41:47 15   returned a verdict and the case is at an end.

11:41:51 16        I know that many of you use cell phones,

11:41:55 17   Blackberries, iPhones, smart phones, the Internet and

11:41:59 18   also tools of technology.

11:42:00 19        You must not talk to anyone at any time about this

11:42:04 20   case, or use these tools electronically about anyone

11:42:07 21   about this case.  This includes your family and friends.

11:42:10 22        You may not communicate with anyone about the case

11:42:13 23   on your cell phone, through e-mail, Blackberry, iPhone,

11:42:17 24   text messaging, Twitter, or through any blog or website,

11:42:21 25   including Facebook, Google, MySpace, LinkedIn or

11:42:26   1    Youtube.  You may not use any similar technology of

11:42:29   2    social media, even if I have not specifically mentioned

11:42:32   3    it here.

11:42:33   4         I expect you will perform -- or inform me as soon

11:42:38   5    as you become aware of another juror's violations of

11:42:41   6    these instructions.

11:42:41   7         A juror who violates these restrictions jeopardizes

11:42:45   8    the fairness of these proceedings and a mistrial could

11:42:47   9    result, which would require the entire trial process to

11:42:50   10   start over.

11:42:51   11        Finally, do not form any opinion until all the

11:42:54   12   evidence is in.  Keep an open mind until you start your

11:42:58   13   deliberations at the end of the case.

11:42:59   14        All right.  Now if you want to take notes you can

11:43:03   15   do so, but bear in mind when you take notes you need to

11:43:06   16   strike the appropriate balance so you can also focus on

11:43:10   17   what any witnesses might be testifying to.

11:43:12   18        I'm sure you will be able to strike the appropriate

11:43:15   19   balance.  So you can take notes if you choose to, and

11:43:17   20   also pay attention to what the witness is saying.

11:43:19   21        We'll now begin the case -- one final note about

11:43:24   22   your notes.  They are for your personal use only.  You

11:43:27   23   may not take them home at night.  They're for your use

11:43:30   24   here.

11:43:30   25        We'll now begin the case with the opening statement

```
11:43:32   1      from the government.
11:43:33   2           Attorney Potter?
11:43:34   3             MR. POTTER:  Thank you, Judge.
11:43:34   4              OPENING STATEMENT BY THE GOVERNMENT
11:43:42   5             MR. POTTER:  Members of the Jury, good morning.
11:43:48   6      This case is about greed and it is about deception.
11:43:54   7      Around 1983, the defendant in this case, Sherrymae
11:44:00   8      Morales, begin her employment as a member of the Virgin
11:44:05   9      Islands National Guard.
11:44:10  10           By all accounts --
11:44:11  11             THE COURT:  Stop.
11:44:12  12      Pass those out after the opening statements.  Just
11:44:17  13      hold on to them, sir.
11:44:28  14             MR. POTTER:  Continue, Judge?
11:44:29  15             THE COURT:  Yes, go ahead.
11:44:31  16             MR. POTTER:  And by all accounts she was a good
11:44:38  17      employee.
11:44:39  18           She was a full-time member of the Guard for
11:44:41  19      approximately 20 years, and in those 20 years she held
11:44:45  20      very important positions within the Guard.
11:44:53  21           She was a military technician.  She was a human
11:44:55  22      resource officer.  She was the recruitment and training
11:44:59  23      officer or commander.
11:45:08  24           Somewhere around 2003, the defendant left the
11:45:11  25      National Guard, I think on medical justification.
```

11:45:21  1      Somewhere around 2007, the defendant got a contract

11:45:27  2  with a company called Military Personnel Services

11:45:33  3  Corporation, MPSC.

11:45:41  4      And the MPSC hired Ms. Morales to be what they call

11:45:48  5  an ESGR.  Forgive all these terms.  And ESGR stands for

11:45:54  6  Employee Support for the Guard and Reserve.

11:46:00  7      So from 2007 up until 2010, Morales held this

11:46:09  8  position solely.

11:46:15  9      In 2010, Ms. Morales, the defendant in this case,

11:46:18  10  she asked her supervisor -- I think the testimony will

11:46:23  11  be the supervisor was General Rivera.

11:46:28  12      She told him that she wanted to come back into the

11:46:34  13  Guard.  She wanted to become a full-time member of the

11:46:38  14  Guard.

11:46:38  15      And you will hear testimony in this case that the

11:46:40  16  general told her:  Not a problem; but to come back into

11:46:51  17  the Guard you will have to submit yourself to a

11:46:53  18  background check, and you're going to have to resign the

11:46:55  19  position that you currently hold.

11:47:00  20      And she was holden to understand the ESGR position

11:47:06  21  is a position that works with Guard members who are

11:47:09  22  deployed overseas, and then who come back from

11:47:16  23  deployment, and the ESGR is responsible for assisting

11:47:22  24  them in their return to their full-time job.  So that's

11:47:26  25  kind of what the defendant was doing when she got hired

```
11:47:28   1    in 2007.
11:47:37   2         Now, when the defendant indicated she wanted to
11:47:40   3    come back into the Guard now as a full-time Guard
11:47:43   4    employee, she applied.  She was selected.  And she
11:47:51   5    returned to the Guard in March of -- March of 2010 as a
11:47:59   6    full-time member of the Guard.  And I submit to you,
11:48:12   7    ladies and gentlemen of the jury, this is where the
11:48:13   8    deception and the greed began.
11:48:18   9         Because when the defendant came back into the
11:48:23  10    Guard, remember that the general told her:  You must
11:48:26  11    resign your ESGR position.
11:48:34  12         The facts in this case will be that the defendant
11:48:36  13    did not resign her ESGR position when she was hired as a
11:48:41  14    full-time member of the Guard.
11:48:47  15         The ESGR, you will hear, is a position that works
11:48:51  16    Monday through Friday, 8:00 to 5:00.
11:48:57  17         As a full-time member of the Guard, the defendant
11:49:02  18    works Monday through Friday, 8:00 to 5:00.
11:49:09  19         When the defendant was hired she filled out a
11:49:16  20    direct deposit form that permitted the Guard to put her
11:49:21  21    pay, to wire her pay directly into her bank account.
11:49:27  22         So the evidence would show that in any 40-hour
11:49:34  23    workweek, the defendant was receiving two paychecks, one
11:49:43  24    as an ESGR contract employee, and a second one as a
11:49:49  25    full-time member of the Guard.  In effect, she is
```

11:49:54   1   getting paid for 80 hours in a 40-hour workweek.

11:50:06   2        You will hear through testimony of the witnesses

11:50:09   3   that the defendant went to her supervisor, General Elton

11:50:15   4   Lewis, who at that time was the chief of staff of the

11:50:19   5   National Guard and her direct supervisor.

11:50:29   6        He will tell you that once the defendant came on

11:50:32   7   board in March of 2010, she came to him and she said to

11:50:38   8   him:  I want to keep my ESGR job at the same time that

11:50:46   9   I'm working as a full-time military tech position -- a

11:50:51   10  contract employee.

11:50:56   11       And you will hear the general said he told her:  Of

11:51:00   12  course, you know you can't do that.  You must resign the

11:51:03   13  ESGR position if you want to remain as a full-time

11:51:06   14  member of the Guard.

11:51:13   15       The evidence will show that from March of 2010 up

11:51:18   16  until June of 2010, the defendant did not resign the

11:51:24   17  ESGR position.  She continued to get paid 40 hours from

11:51:33   18  Monday through Friday work for the ESGR, and she got a

11:51:37   19  second paycheck Monday through Friday, 8:00 to 5:00, for

11:51:41   20  the military tech position.

11:51:45   21       Somewhere around June of 2010, three months,

11:51:52   22  three months, the defendant resigned the military -- the

11:51:57   23  ESGR position.  And in September of 2010 she went back

11:52:06   24  and she asked to be reinstated into her ESGR position,

11:52:12   25  which was done.  And, again, she's now rehired into the

11:52:20  1   ESGR position and she is still a full-time member of the

11:52:24  2   National Guard.

11:52:24  3       And you will hear from the ESGR, from the MPSC

11:52:32  4   representative, that he had no idea that while he

11:52:35  5   employed the defendant in the ESGR that she was, in

11:52:38  6   fact, a full-time employee of the National Guard.

11:52:40  7       And you will hear how it came to light that members

11:52:44  8   of the Guard and the representative of the MPSC both

11:52:50  9   found out that this defendant was being paid by both of

11:52:55  10  them for working identical workweeks.

11:53:03  11      That's the substance of what this case is about, in

11:53:05  12  her keeping these two jobs.  You'll find that the

11:53:12  13  defendant made, between March of 2010 and June of 2011,

11:53:16  14  in excess of $200,000 being paid for both jobs.  She got

11:53:22  15  paid approximately $89,000 a year as a military tech

11:53:28  16  employee, and she got paid approximately 62 or $60,000 a

11:53:32  17  year as an ESGR contract worker.

11:53:36  18      It wasn't proper.  It wasn't permitted.  And this

11:53:40  19  is what this case is about.

11:53:42  20      We have charged the defendant with wire fraud.  We

11:53:46  21  have charged the defendant with false statements,

11:53:49  22  producing false time sheets, and we have charged the

11:53:52  23  defendant with committing program fraud against the

11:53:56  24  United States.

11:53:56  25      That's the substance of the government's case.  I

| | | |
|---|---|---|
| 11:53:59 | 1 | ask you to pay close attention to the case as we call |
| 11:54:02 | 2 | the witnesses, and at the end I hope you agree with me |
| 11:54:05 | 3 | that the defendant is guilty as charged.  And we are |
| 11:54:08 | 4 | going to ask you to return to the jury room at that time |
| 11:54:10 | 5 | and return a guilty verdict against this defendant. |
| 11:54:12 | 6 | Thank you. |
| 11:54:14 | 7 | THE COURT:  Thank you, Attorney Potter. |
| 11:54:16 | 8 | Attorney Jupiter. |
| 11:54:41 | 9 | MR. JUPITER:  May it please the Court? |
| 11:54:42 | 10 | THE COURT:  Yes. |
| 11:54:42 | 11 | OPENING STATEMENT BY THE DEFENDANT |
| 11:54:43 | 12 | MR. JUPITER:  Ms. Delosa, Ms. Morales, |
| 11:54:48 | 13 | Mr. Morales, Counsel, ladies and gentlemen of the jury. |
| 11:54:51 | 14 | Good morning. |
| 11:54:53 | 15 | My name is Omodare Jupiter, and I represent |
| 11:54:57 | 16 | Ms. Sherrymae Morales. |
| 11:54:59 | 17 | Ms. Morales never deceived anyone.  She never |
| 11:55:03 | 18 | fooled anyone.  She never tricked anyone.  Ms. Morales |
| 11:55:10 | 19 | worked for the National Guard and she worked for ESGR. |
| 11:55:14 | 20 | And she was recruited for those positions because she |
| 11:55:18 | 21 | knows how to get the job done. |
| 11:55:22 | 22 | She performed well.  She was given raises.  She was |
| 11:55:28 | 23 | commended.  She did all of her work openly.  She earned |
| 11:55:34 | 24 | every penny.  And she did never, ever, try to fool |
| 11:55:41 | 25 | anyone, and nor did she ever steal anything. |

11:55:47   1   Ms. Morales is not guilty.

11:55:48   2       Now, get a little background, before we get to 2007

11:55:54   3   when Ms. Morales became the ESGR, the employer support

11:56:00   4   for the Reserve -- for the Guard and the Reserve, before

11:56:04   5   she became the representative of that area.

11:56:06   6       Mr. Potter is correct, she had a long career early

11:56:11   7   on with the National Guard, and she excelled at

11:56:17   8   everything she did.  And over the years and over her

11:56:20   9   career she became very good at writing, at presenting,

11:56:25  10   and came to specialize in something called change

11:56:31  11   management.  She was a really good organizational

11:56:33  12   person.

11:56:40  13       She also owned real estate company.  And

11:56:46  14   Mr. Morales almost all her adult life has been someone

11:56:48  15   who works from early in the morning to late at night.

11:56:53  16   And the evidence in this case will show that.  And

11:56:57  17   that's why people gravitate towards her.

11:56:59  18       Now, ladies and gentlemen of the jury, I won't go

11:57:01  19   into every piece of this story that is about to unfold

11:57:05  20   before you.  We have a bunch of differences in this

11:57:11  21   case.  But one thing that's going to be clear is that

11:57:13  22   Sherrymae Morales never had any intent to deceive

11:57:17  23   anyone, and for that reason she is not guilty of all of

11:57:19  24   these charges.

11:57:20  25       Now, in 2003 Sherrymae Morales started a realty

11:57:27   1   company right over here on Princess in St. Croix. She

11:57:29   2   grew up in St. Croix. She was part of the National

11:57:32   3   Guard. But she spent a lot of her adult life on the

11:57:35   4   mainland. She was educated on the mainland. She worked

11:57:38   5   over there for various different corporations, and she

11:57:42   6   excelled in her career. She mentored others and brought

11:57:46   7   them into different positions, particularly in the

11:57:49   8   Guard.

11:57:49   9   She came in way back in 1983. She rose through the

11:57:56   10   ranks. She developed her career. She came over here,

11:58:00   11   started her consulting firm. At the same time she

11:58:03   12   started a real estate company. And she did other

11:58:06   13   things. And she would work from 7:30 in the morning

11:58:09   14   till late, late hours in -- at night. And people knew

11:58:13   15   this. She was known in the community very well. She

11:58:22   16   knew how to get things done.

11:58:24   17   So when a position, a contract position became open

11:58:27   18   with the employer support for the Guard and Reserve,

11:58:31   19   ESGR, this is a position that you are technically hired

11:58:39   20   by this private corporation, and I'm just going to call

11:58:42   21   it MPSC, give you the initials, rather than keep saying

11:58:46   22   all of the different titles.

11:58:49   23   But, the people who -- every state as well as every

11:58:55   24   territory has someone who is responsible for being a

11:59:01   25   liaison for people returning from deployments and people

| | | |
|---|---|---|
| 11:59:06 | 1 | who are in the Guard. |
| 11:59:07 | 2 | This position was difficult to fill in St. Croix. |
| 11:59:12 | 3 | It was a contract position.  And when the position |
| 11:59:25 | 4 | became available and MPSC contacted the leadership at |
| 11:59:29 | 5 | the Guard, they recruited Sherrymae Morales. |
| 11:59:31 | 6 | Sherrymae Morales indicated at that time that she |
| 11:59:37 | 7 | had a real estate company, she indicated she had a |
| 11:59:43 | 8 | consulting company, and it was clear she was not going |
| 11:59:51 | 9 | to be able to take that position unless she can continue |
| 11:59:54 | 10 | in -- running those companies. |
| 11:59:56 | 11 | Now, from -- she agreed to take that position, and |
| 12:00:01 | 12 | from 2007 to 2010 she made something out of what was |
| 12:00:08 | 13 | before a dormant position.  And she got to know those |
| 12:00:13 | 14 | duties and how to get that work done, and when that work |
| 12:00:16 | 15 | needed to be done. |
| 12:00:17 | 16 | It entailed building a volunteer base that she had |
| 12:00:21 | 17 | to work -- she had to build it up and work with, and |
| 12:00:25 | 18 | these were volunteers who worked jobs.  So she had to |
| 12:00:29 | 19 | work with them outside of their jobs. |
| 12:00:31 | 20 | She had to work with guardsmen who were having |
| 12:00:35 | 21 | trouble with their employment. |
| 12:00:37 | 22 | She had to do things over the weekend. |
| 12:00:38 | 23 | The duties she had to do were things -- by and |
| 12:00:42 | 24 | large were things that she could do outside of the work |
| 12:00:45 | 25 | hours and, to be honest with you, most of the things had |

12:00:49   1    to be done outside of work hours.

12:00:51   2        She was never told that her work hours for the ESGR

12:00:58   3    position had to be from 8:00 to 5:00.

12:01:03   4        She was never told that she could not work her real

12:01:06   5    estate company or her consulting company.

12:01:10   6        We fast-forward to 2010.  She had been working this

12:01:17   7    ESGR position for close to three years, about two and a

12:01:22   8    half years.

12:01:22   9        Colonel Lewis, the chief of staff at the National

12:01:28  10    Guard, had a strategy plan he wanted to implement while

12:01:33  11    he was there at the Guard.  And in 2010, Caroline Adams

12:01:40  12    was deployed.  She was the military technician.  She was

12:01:44  13    deployed, and her position was going to be open for

12:01:48  14    about a year.  Ms. Morales was recruited again to come

12:01:51  15    back into the Guard and to take the military tech

12:01:56  16    position.

12:01:56  17        Ms. Morales at that time wanted to stop doing --

12:02:00  18    she did take the military tech position.  At that time

12:02:03  19    she wanted to stop doing the ESGR position, not because

12:02:11  20    she couldn't do it, but because it was going to be a big

12:02:15  21    headache for her to keep her real estate company going

12:02:17  22    and for her to continue to do this and also to continue

12:02:20  23    to do the ESGR work.

12:02:25  24        She contacted Baron Hignite, who does the ESGR

12:02:32  25    overseas, all the ESGR people throughout the country,

12:02:36  1    and she told Mr. Hignite that she wanted to stop.

12:02:41  2         He was like:  Sherry, you've been the best thing.

12:02:43  3    We need you to continue doing this.  Can you stay until

12:02:46  4    we get a replacement?

12:02:48  5         She said:  Yes.  As soon as we get a replacement,

12:02:51  6    I'm out of here.

12:02:56  7         She continued to do both positions openly, without

12:03:00  8    any problem, until June, when she got a major assignment

12:03:07  9    from Colonel Lewis.  And that assignment was to do a

12:03:11  10   VING leadership conference, to put it together and run

12:03:14  11   it.  It was going to be a major assignment.

12:03:17  12        She contacted Baron Hignite and said:  I can't go

12:03:21  13   any further.

12:03:22  14        And she resigned from the ESGR because she could

12:03:25  15   not do both at that time.

12:03:28  16        Now, you're going to find out even after that

12:03:33  17   resignation, once again, they couldn't find a

12:03:38  18   replacement for Ms. Morales, even though she tried.

12:03:43  19   Every replacement she tried to bring to them, they said

12:03:46  20   the person didn't have this qualifications, this person

12:03:49  21   wasn't good enough, so on and so forth.

12:03:52  22        So once again, they asked her:  Could you come back

12:03:55  23   and do the ESGR position until we find a replacement?

12:04:02  24        And you'll see, right after the VING leadership

12:04:07  25   conference had taken place --

| | | |
|---|---|---|
| 12:04:10 | 1 | THE CLERK:  One more minute. |
| 12:04:11 | 2 | MR. JUPITER:  -- Ms. Morales resumed as the |
| 12:04:15 | 3 | ESGR person.  And you'll see that the leadership was |
| 12:04:18 | 4 | contacted at the Guard to say that they rehired |
| 12:04:23 | 5 | Ms. Morales.  And you'll see at the Guard that everyone |
| 12:04:26 | 6 | knew Ms. Morales was doing both of those positions. |
| 12:04:31 | 7 | Ladies and gentlemen, the evidence in this case is |
| 12:04:33 | 8 | going to be clear.  She had no intent to deceive anyone. |
| 12:04:37 | 9 | She didn't lie.  She didn't steal.  She's not guilty. |
| 12:04:44 | 10 | THE COURT:  Thank you, Attorney Jupiter. |
| 12:04:46 | 11 | Attorney Potter? |
| 12:04:47 | 12 | MR. POTTER:  Yes, Judge. |
| 12:04:53 | 13 | The government calls Aubrey Ruan, Judge. |
| 12:06:17 | 14 | (Pause.) |
| 12:06:17 | 15 | THE CLERK:  Please stand and raise your right |
| 12:06:18 | 16 | hand to take the oath. |
| 12:06:27 | 17 | THE WITNESS:  Yes, I do. |
| 12:06:29 | 18 | THEREUPON, AUBREY RUAN, JR., having been duly |
| 12:06:31 | 19 | sworn, was examined and testified as follows: |
| 12:06:31 | 20 | DIRECT EXAMINATION |
| 12:06:32 | 21 | BY MR. POTTER: |
| 12:06:33 | 22 | Q.   Good afternoon, sir. |
| 12:06:33 | 23 | A.   Good afternoon. |
| 12:06:34 | 24 | Q.   Could you give us your full name for the record, |
| 12:06:36 | 25 | please.  Spell both your first and your last name for |

| | | |
|---|---|---|
| 12:06:40 | 1 | the court reporter. |
| 12:06:43 | 2 | A.   My full name is Aubrey, A-u-b-r-e-y; middle name is |
| 12:06:49 | 3 | Lionel; last name, Ruan, R-u-a-n, Jr. |
| 12:06:53 | 4 | Q.   And are you currently employed, sir? |
| 12:06:55 | 5 | A.   Yes, I am. |
| 12:06:56 | 6 | Q.   And how are you employed? |
| 12:06:57 | 7 | A.   I'm employed as a contractor with the IIF Data |
| 12:07:02 | 8 | Solutions out of National Guard Bureau, as a contract |
| 12:07:05 | 9 | employee working out of the Joint Operations Center for |
| 12:07:09 | 10 | the National Guard. |
| 12:07:13 | 11 | Q.   And how long have you held that position? |
| 12:07:17 | 12 | A.   I've held that position since October 2012. |
| 12:07:22 | 13 | The first company I worked for was Icoon |
| 12:07:28 | 14 | Corporation, and now I'm with IIF Data Solutions. |
| 12:07:32 | 15 | Q.   And was there a time that you were a full-time |
| 12:07:34 | 16 | member of the Guard, Virgin Islands National Guard? |
| 12:07:36 | 17 | A.   Yes.  I worked for the National Guard for quite -- |
| 12:07:38 | 18 | many years. |
| 12:07:39 | 19 | Q.   And tell us when, when you began. |
| 12:07:43 | 20 | A.   I originally began in 1981 as a recruiter/admin |
| 12:07:52 | 21 | specialist, and I worked my way up from that all the way |
| 12:07:56 | 22 | up to the director of the joint staff in -- up until |
| 12:08:00 | 23 | 2012, September. |
| 12:08:06 | 24 | Q.   Now in -- let me direct your attention to 2007. |
| 12:08:09 | 25 | How were you employed with the Guard in 2007? |

12:08:14  1    A.    In 2007, I left the position of director of

12:08:17  2    operations and was hired as the vice chief of staff for,

12:08:24  3    for the Armory.

12:08:27  4    Q.    In 2007, did you know Sherrymae Morales?

12:08:30  5    A.    I've known Sherrymae Morales from the early '80s.

12:08:36  6    I've known her a long time.

12:08:39  7    Q.    And what position do you know that she held with

12:08:46  8    the Guard?

12:08:48  9    A.    In 2007 she held, I think, the ESGR position.

12:08:55  10   Q.    Was that with the Guard or was that --

12:08:57  11   A.    That's with the contractor, the National Guard

12:09:06  12   Bureau.

12:09:06  13   Q.    And in your position, did you know what the ESGR

12:09:10  14   did?

12:09:11  15   A.    I'm familiar with what they did.  They are a

12:09:16  16   liaison between the military and employers.  They

12:09:20  17   basically go out and educate the employers on what they

12:09:23  18   can do and what they cannot do, based on federal law as

12:09:28  19   it relates to soldiers in the National Guard working for

12:09:32  20   them, and being allowed to attend training and different

12:09:37  21   aspects that military service entails.

12:09:39  22   Q.    And back in 2007, did you have -- between 2007 and

12:09:51  23   between -- did you have knowledge of the work hours of

12:09:53  24   the ESGR contract?

12:09:56  25   A.    I wasn't tracking that hard, as to determine how

12:09:59   1   long the hours were for them to work.  I know it was a

12:10:01   2   full-time position.  The one position was a full-time

12:10:04   3   position with the contractors.  Whether they worked on

12:10:07   4   weekends, overtime, I really wasn't tracking it at that

12:10:12   5   time.

12:10:12   6   Q.   Okay.  Now what position, if any, did you hold with

12:10:23   7   the Guard in 2011?

12:10:24   8   A.   In January 2011, I was hired as a director of the

12:10:28   9   joint staff.

12:10:33   10  Q.   And at that time when you were hired as director of

12:10:36   11  the joint staff, did you know what position, if any,

12:10:39   12  Sherrymae Morales held in the Guard?

12:10:42   13  A.   I -- well, I knew that she had enlisted --

12:10:48   14  reenlisted back into the Guard.  I think she enlisted

12:10:52   15  around February 2010, or around that time frame, early

12:10:57   16  part of 2010, and then later she was hired in a

12:11:00   17  temporary position around March 2010.

12:11:04   18       She later applied for and was awarded as an

12:11:09   19  indefinite, in an indefinite position as the information

12:11:15   20  management plans analyst.

12:11:19   21  Q.   Now, you mentioned earlier in your testimony that

12:11:21   22  you knew that the defendant held a contract position as

12:11:25   23  an ESGR.

12:11:28   24  A.   Yes.

12:11:29   25  Q.   In 2011, what, if anything, did you learn regarding

12:11:47  1    the defendant's employment?

12:11:55  2    A.   Around June, I got an e-mail from Colonel Cills

12:11:59  3    asking me about the full-time employment of the ESGR

12:12:03  4    coordinator.  And I did some investigation to find out

12:12:06  5    if, in fact, it was filled or if it was -- or how to go

12:12:11  6    about the process of filling that position.

12:12:13  7         So I called around to interview, trying to figure

12:12:18  8    out the process to fill that position, and learned that

12:12:20  9    Ms. Morales was still in the position.

12:12:34  10   Q.   Now, when you learned that Ms. Morales was still in

12:12:39  11   her position, what, if anything, did you do?

12:12:41  12   A.   I contacted my superiors and I asked them if they

12:12:44  13   were aware that she was still in the position or not.

12:12:48  14   Q.   Why did you have a need to ask?

12:12:50  15   A.   Well, the reason I asked is when I found out she

12:12:56  16   was still employed, the employment at that time was

12:13:02  17   running -- or at the same time with the time she was

12:13:06  18   also employed with us as a GS-12, step 10 position,

12:13:11  19   which was the indefinite position that she was hired in

12:13:14  20   April of 2011.

12:13:15  21        So the times were running at the same time --

12:13:21  22             MR. JUPITER:  Objection as to opinion, Your

12:13:23  23   Honor.  Move to strike.

12:13:23  24             THE COURT:  Overruled.

12:13:23  25   BY MR. POTTER:

12:13:33  1    Q.   Okay.  So having learned that, what did you do?

12:13:39  2    A.   Well, having learned that, I saw it as a conflict.

12:13:43  3    So I moved to ask the adjutant general to conduct an

12:13:50  4    investigation to determine whether in fact there was any

12:13:53  5    violation being done.

12:13:54  6    Q.   Okay.  Now, who -- if you know, who supervised

12:14:05  7    Sherrymae Morales in 2010 when you changed your position

12:14:12  8    with the Guard?

12:14:13  9    A.   When I was the vice chief of staff, she worked

12:14:17  10   directly, at the time, Colonel Elton Lewis.

12:14:22  11   Q.   And did she ever come under you?

12:14:24  12   A.   She was supposed to come under me in January 2011.

12:14:28  13   And this is the reason why I inquired as to, you know,

12:14:33  14   her employment with the Guard.

12:14:51  15   Q.   So in 2011 -- you said January 2011?

12:14:54  16   A.   2011.

12:14:55  17   Q.   So between January of 2011 and June of 2011 -- or

12:15:04  18   let's say and May of 2011, what positions or position

12:15:09  19   did you think Sherrymae Morales had with the National

12:15:15  20   Guard?

12:15:16  21   A.   What position did I think she had?

12:15:23  22        My understanding at that time, between January 2011

12:15:26  23   and May, was she was the GS-12, step 10 program analyst

12:15:32  24   position.

12:15:40  25   Q.   And up until then, sir --

```
12:15:42   1    A.   Correct.

12:15:44   2    Q.   -- did you have any knowledge that she still had a

12:15:48   3    contract position with the Virgin Islands National

12:15:52   4    Guard?

12:15:52   5    A.   Negative.

12:15:56   6    Q.   With the -- sorry -- with the MPSC?

12:16:00   7    A.   Negative.

12:16:01   8    Q.   Now, you indicated that in 2007, I think it was --

12:16:10   9    correct me if I'm wrong -- that you knew that she was an

12:16:12  10    ESGR?

12:16:14  11    A.   Correct.

12:16:24  12    Q.   Between Two Thousand -- March 2010 when Ms. Morales

12:16:33  13    started full-time again with the National Guard, and May

12:16:37  14    of 2011, did anyone in the National Guard bring to your

12:16:50  15    attention that Sherrymae Morales was also employed as an

12:16:56  16    ESGR?

12:16:57  17    A.   Negative.

12:17:04  18              MR. POTTER:  Court's indulgence, Your Honor?

12:17:07  19              THE COURT:  Yes.

12:17:19  20         (Counsel conferring.)

12:17:20  21    BY MR. POTTER:

12:17:20  22    Q.   And were you the chief of staff in 2011, sir?

12:17:23  23    A.   January 2011, I was director of the joint staff.

12:17:26  24    Q.   Okay.  And in your position as director of the

12:17:30  25    joint staff, do you have personal knowledge of anyone,
```

12:17:37   1   any full-time member of the Guard working a regular 8:00

12:17:42   2   to 5:00, Monday through Friday workweek --

12:17:47   3           MR. JUPITER:  Objection, Your Honor.

12:17:48   4           THE COURT:  Sustained.

12:17:52   5   BY MR. POTTER:

12:17:53   6   Q.   Are you familiar with a position within the Guard,

12:17:58   7   HRO officer?

12:17:59   8   A.   The human resource officer, yes, sir.

12:18:02   9   Q.   And what does that person do?

12:18:05   10          MR. JUPITER:  Objection as to relevance.

12:18:06   11          THE COURT:  Overruled.

12:18:09   12          THE WITNESS:  The HRO officer is the officer in

12:18:12   13  the Virgin Islands National Guard that is responsible

12:18:14   14  for full-time employment of basically all of the

12:18:17   15  employees in the Guard.

12:18:19   16  BY MR. POTTER:

12:18:19   17  Q.   Are you aware, sir, whether or not the defendant in

12:18:24   18  this case ever held the position as HRO?

12:18:28   19  A.   Yes, she did.  For the time period, I can't say,

12:18:33   20  but I know for a fact that she did hold that position.

12:18:43   21  Q.   Do you know why the defendant was -- do you know

12:18:48   22  when the defendant left the National Guard?

12:18:50   23  A.   I believe she left sometime in 2003.

12:18:56   24  Q.   After she was rehired in 2010, do you know when she

12:18:59   25  left the Guard after that?

| | | |
|---|---|---|
| 12:19:01 | 1 | A.    She left the Guard, I think, April of 2011. |
| 12:19:08 | 2 | Q.    And do you know why she left? |
| 12:19:11 | 3 | MR. JUPITER:  Objection. |
| 12:19:11 | 4 | THE COURT:  Sustained. |
| 12:19:12 | 5 | BY MR. POTTER: |
| 12:19:12 | 6 | Q.   Do you have personal knowledge as to why she left |
| 12:19:15 | 7 | the Guard? |
| 12:19:16 | 8 | MR. JUPITER:  Objection. |
| 12:19:17 | 9 | THE COURT:  Sustained. |
| 12:19:22 | 10 | BY MR. POTTER: |
| 12:19:22 | 11 | Q.   What, if anything, do you know regarding the |
| 12:19:27 | 12 | defendant's leaving the Guard? |
| 12:19:30 | 13 | MR. JUPITER:  Objection. |
| 12:19:32 | 14 | THE COURT:  Are you asking if, what the |
| 12:19:34 | 15 | defendant told this witness?  Or are you asking from the |
| 12:19:39 | 16 | universe? |
| 12:19:40 | 17 | MR. POTTER:  I'm asking what he knows |
| 12:19:42 | 18 | personally. |
| 12:19:42 | 19 | THE COURT:  From anyone in the universe or from |
| 12:19:44 | 20 | this defendant? |
| 12:19:46 | 21 | MR. POTTER:  In his position -- |
| 12:19:48 | 22 | THE COURT:  From anyone in the universe or from |
| 12:19:51 | 23 | this defendant? |
| 12:19:52 | 24 | MR. POTTER:  Not from this defendant, from his |
| 12:19:54 | 25 | personal knowledge. |

12:19:55  1              THE COURT:  Sustained.

12:20:04  2              MR. POTTER:  That's all we have, Judge.

12:20:06  3              THE COURT:  Attorney Jupiter?

12:20:08  4                     CROSS-EXAMINATION

12:20:08  5    BY MR. JUPITER:

12:20:14  6    Q.   Good afternoon.  Can you hear me?

12:20:18  7    A.   Yes.

12:20:18  8    Q.   My name is Omodare Jupiter.  I represent Sherrymae

12:20:23  9    Morales.

12:20:24  10        It's Colonel Ruan?

12:20:29  11   A.   Retired.

12:20:29  12   Q.   Retired Colonel Ruan?

12:20:33  13   A.   I prefer mister.

12:20:33  14   Q.   Mr. Ruan, you never worked the ESGR position?

12:20:37  15   A.   Never.

12:20:38  16   Q.   And you never volunteered as the position, did you?

12:20:41  17   A.   Never.

12:20:42  18   Q.   You're not aware of the specifics of how the ESGR

12:20:45  19   work is done?

12:20:46  20   A.   No, I'm not.

12:20:47  21   Q.   And you were there at the Guard from -- during the

12:20:51  22   period that Ms. Morales was the ESGR representative in

12:20:58  23   2007, weren't you?

12:20:59  24   A.   Correct.

12:21:00  25   Q.   And you didn't, you didn't interact with

12:21:02  1    Ms. Morales while she was in that position, did you?

12:21:05  2    A.   I wouldn't say that I didn't react -- interact.  I

12:21:11  3    have seen her doing some of her work, and I've known her

12:21:14  4    for a long time.  So we interact, not necessarily about

12:21:17  5    her work, but we talk -- we've talked.

12:21:19  6    Q.   Okay.  Would you talk on a daily basis?  A weekly

12:21:23  7    basis?

12:21:23  8    A.   No, no, it would be whenever she had to do a

12:21:27  9    training session or she came around the Guard.  Because

12:21:31  10   we work full-time at the headquarters and she would

12:21:34  11   visit off and on.  So whenever she would visit, we would

12:21:37  12   talk.

12:21:37  13   Q.   But you did know she was doing her ESGR work out of

12:21:41  14   her real estate office, did you?

12:21:43  15   A.   I can't confirm or deny that, sir.

12:21:45  16   Q.   Okay.  And when you -- in 2007, what was your

12:21:52  17   position?

12:21:52  18   A.   I was the army chief vice -- chief of staff, Army.

12:21:57  19   Q.   Okay.  So there was nothing in your duties that

12:22:00  20   would require you to -- first of all, certainly you

12:22:03  21   weren't supervising the ESGR person, right?

12:22:06  22   A.   Was not.

12:22:07  23   Q.   Do you know who was supervising the ESGR person?

12:22:10  24   A.   I believe the supervision -- I'm not sure who

12:22:16  25   should supervise her, whether it would be the J1 or

12:22:19  1    director of the joint staff.

12:22:20  2    Q.   And you also know that this contract position is

12:22:23  3    not hired by the National Guard, correct?

12:22:28  4    A.   The National Guard usually is involved in the

12:22:31  5    process by recommending names who might be qualified to

12:22:35  6    hold the position.  But ultimately the decision as to

12:22:38  7    who gets the job is made by the contractor assigned at

12:22:46  8    MSP National Guard Bureau.

12:22:49  9    Q.   And in Two Thousand- -- you said you came on in

12:22:52  10   January as the director of -- is it --

12:22:55  11   A.   The joint staff.

12:22:56  12   Q.   The joint staff?

12:22:57  13   A.   Yes, sir.

12:22:58  14   Q.   Is it January of 2011?

12:23:00  15   A.   Yes, sir.

12:23:00  16   Q.   Are you sure it wasn't June 2011?

12:23:03  17   A.   No, sir.

12:23:03  18   Q.   Okay.  So what was Colonel Lewis's position in

12:23:07  19   January of 2011?

12:23:12  20   A.   Colonel Lewis had been appointed at that point in

12:23:15  21   time by the governor to head the VITEEMA.

12:23:19  22   Q.   Right.

12:23:19  23   A.   Virgin Islands Territorial Management Agency.  And

12:23:24  24   he had also been promoted, I think, to brigadier

12:23:27  25   general.  So he was not assistant adjutant general for

12:23:31  1    the organization.

12:23:32  2    Q.   And who was your superior?

12:23:34  3    A.   At that time my superior was the general himself,

12:23:38  4    which is the adjutant general.  I worked directly for

12:23:42  5    adjutant general.

12:23:43  6    Q.   Adjutant General Rivera?

12:23:47  7    A.   Renaldo Rivera.

12:23:50  8    Q.   And when you say you found out that Ms. Morales

12:23:54  9    was -- let me backpedal a little bit.  While Ms. Morales

12:23:57  10   was in her military technician position in 2010, Colonel

12:24:04  11   Lewis was her supervisor, correct?

12:24:05  12   A.   That's correct.

12:24:06  13   Q.   Okay.  Now after you found out that she was the

12:24:12  14   ESGR person, you say that you contacted Rivera, correct?

12:24:15  15   A.   Contacted both General Rivera and General Lewis by

12:24:20  16   e-mail and asked them were they aware of the fact that

12:24:23  17   she was still in the position, correct.

12:24:24  18   Q.   Right.  And there was a long delay before they

12:24:30  19   responded to you, wasn't there?

12:24:32  20   A.   Correct.

12:24:32  21   Q.   And it wasn't till much later that they said:

12:24:40  22   Well, we weren't aware of this.  Is that correct?

12:24:42  23   A.   Well, I never got a response verbally or in writing

12:24:45  24   from Brigadier General Lewis.  At some point in time,

12:24:49  25   later in August, brig- -- Major General Rivera told me

12:24:53  1    he was not --

12:24:55  2              MR. POTTER:  Objection.

12:24:56  3              THE WITNESS:  -- aware.

12:24:57  4    BY MR. JUPITER:

12:24:57  5    Q.   Okay.  So how many months after your e-mail that

12:25:00  6    you sent out did you get a response as to whether the

12:25:02  7    general and Colonel Lewis, her supervisor, were aware

12:25:07  8    that she was in that position?

12:25:09  9    A.   Originally I asked the question sometime in June,

12:25:12  10   and I didn't really get any type of response, a good

12:25:15  11   response, until about August.

12:25:17  12   Q.   And you contacted Baron Hignite over in MPSC,

12:25:24  13   correct?

12:25:24  14   A.   Correct.

12:25:25  15   Q.   Baron Hignite actually does the hiring for the ESGR

12:25:30  16   position, correct?

12:25:31  17   A.   Yes.  That I'm aware of, yes.

12:25:34  18   Q.   Okay.  And Baron Hignite explained to you that

12:25:39  19   he -- explained to you that Mr. Morales was the ESGR

12:25:44  20   person, correct?

12:25:44  21   A.   That she was still in the position, correct.

12:25:46  22   Q.   All right.  And Baron Hignite, you understood that,

12:25:54  23   just like you would have to concur -- or you would be

12:25:57  24   involved in the hiring of the ESGR person, Mr. Hignite

12:26:03  25   would have been involved with the person in your

```
12:26:07   1    position at the time that she was hired, would have had
12:26:12   2    to consult with that person, right?
12:26:14   3    A.   I understand -- I agree with that.  That's my
12:26:17   4    understanding.
12:26:18   5    Q.   Okay.  And so that person would have been her
12:26:22   6    direct supervisor, then Colonel, now General Elton
12:26:28   7    Lewis, right?
12:26:28   8    A.   It should have been him, yes.
12:26:37   9    Q.   All right.
12:26:38  10         MR. JUPITER:  I beg the Court's indulgence?
12:26:40  11         THE COURT:  Yes.
12:26:46  12    (Counsel conferring)
12:26:49  13         MR. JUPITER:  No further questions, Your Honor.
12:26:50  14         THE COURT:  Any redirect?
12:26:51  15         MR. POTTER:  No redirect, Your Honor.
12:26:52  16         THE COURT:  Mr. Ruan, thank you for your
12:26:56  17    testimony.
12:26:56  18      You may step down.
12:26:56  19      (Witness withdrew from stand.)
12:26:58  20         THE COURT:  Next witness.
12:26:59  21         MR. POTTER:  Court's indulgence.
12:26:59  22      (Pause.)
12:27:09  23         MR. POTTER:  Your Honor, the government calls
12:27:12  24    Kai Schjang.
12:27:45  25         THE CLERK:  Please raise your right hand to
```

12:27:47   1    take the oath.

12:27:48   2         (Witness sworn.)

12:27:50   3            THE WITNESS:  I do.

12:27:50   4            THEREUPON, KAI SCHJANG, having been duly sworn,

12:27:51   5    was examined and testified as follows:

12:27:51   6                     DIRECT EXAMINATION

12:27:52   7    BY MR. POTTER:

12:27:52   8    Q.   Good afternoon, sir.

12:27:53   9    A.   Good afternoon.

12:27:53   10   Q.   Can you give us your full name for the record,

12:27:55   11   please, and please spell your first and your last name

12:27:58   12   for the court reporter.

12:28:00   13   A.   I am Kai Schjang.  First name K-a-i, last name

12:28:06   14   Schjang, S-c-h-j-a-n-g.

12:28:10   15   Q.   And tell us how you're employed?

12:28:12   16   A.   I'm currently employed with the Virgin Islands

12:28:16   17   National Guard.

12:28:21   18   Q.   And tell us how long you've been employed with the

12:28:24   19   National Guard?

12:28:24   20   A.   I've been with the National Guard for about

12:28:29   21   27 years, working full-time now; AGR, the last 14 or so.

12:28:39   22   Q.   And in your present employment, tell us what it is

12:28:43   23   that you do.  Currently, what do you do?

12:28:51   24   A.   Currently called the G1, that is the director of

12:28:55   25   personnel.

12:28:56  1              MR. POTTER:  Court's indulgence, Your Honor?

12:28:58  2              THE COURT:  Yes.

12:29:29  3         (Pause)

12:29:29  4    BY MR. POTTER:

12:29:29  5    Q.   And, sir, do you know Sherrymae Morales?

12:29:32  6    A.   Yes, I do.

12:29:32  7    Q.   And how do you know her?

12:29:33  8    A.   I know her prior to being in the Guards, just being

12:29:37  9    someone here from the islands.  We played in some

12:29:41  10   volleyball leagues and stuff.  And then I also, when I

12:29:45  11   came on to work full-time with the Guards, I came on

12:29:48  12   under her.  She was the recruiting commander and she

12:29:52  13   brought me on full-time, as like an officer recruiter.

12:29:57  14   Q.   And, sir, as part of your current duties are you a

12:30:01  15   records custodian for the National Guard?

12:30:03  16   A.   Yes, I am.

12:30:10  17   Q.   Now, do you know when the defendant was hired

12:30:12  18   full-time with the National Guard?

12:30:16  19   A.   She was hired full-time with the National Guard, to

12:30:22  20   the best of my recollection, I would think it was

12:30:25  21   sometime back in '09, if that's right.

12:30:28  22   Q.   Let me draw your attention to 2010, March of 2010.

12:30:32  23   Do you know, with respect to her employment, what if

12:30:35  24   anything happened in March of 2010?

12:30:38  25   A.   In March of 2010?

12:30:40   1    Q.   Yes.

12:30:42   2    A.   I think she's employed at the -- in the -- as a

12:30:56   3    technician, the -- like a, in the G5 plans and strategy

12:31:04   4    position that -- in that area, what we call like a G5.

12:31:09   5    Q.   Okay.

12:31:09   6         MR. POTTER:  Sir, let me show you what's been

12:31:14   7    marked as Government's Exhibit Number 1.1 for

12:31:22   8    identification.

12:31:28   9         (Government's Exhibit 1.1 marked for

12:31:32  10    identification.)

12:31:32  11    Q.   Do you recognize that, sir?

12:31:41  12    A.   Yeah.  That -- those look like orders appointing

12:31:45  13    her back into the National Guard.

12:31:47  14    Q.   When you say "her," who is "her"?

12:31:48  15    A.   Ms. Morales.

12:31:49  16    Q.   Okay.

12:31:50  17         MR. POTTER:  And let me show you, again just

12:31:53  18    briefly, Government's Exhibit 1.2.

12:31:55  19         (Government's Exhibit 1.2 marked for

12:31:55  20    identification.)

12:31:56  21    BY MR. POTTER:

12:31:56  22    Q.   And ask you if you recognize Government's

12:31:59  23    Exhibit 1.2?

12:32:03  24    A.   Yeah.  That is -- those are documents pertaining to

12:32:13  25    full-time technician position.

12:32:19    1

12:32:19    2          (Government's Exhibit 1.3 marked for

12:32:19    3    identification.)

12:32:20    4    BY MR. POTTER:

12:32:20    5    Q.   And let me show you Government's Exhibit 1.3.

12:32:30    6    A.   Yes, that's a similar document.

12:32:37    7    Q.   Who does it relate to?

12:32:38    8    A.   This document relates to Mrs. Morales as well.

12:32:38    9          MR. POTTER:   And let me show you Government's

12:32:44   10    Exhibit 1.4.

12:32:44   11          (Government's Exhibit 1.4 marked for

12:32:44   12    identification.)

12:32:44   13    BY MR. POTTER:

12:33:00   14    Q.   Do you recognize Government's Exhibit 1.4?

12:33:01   15    A.   It's a memo from, at the time, Corporal Lewis.

12:33:07   16    Q.   Is that related -- related to who?

12:33:12   17    A.   Mrs. Morales, once again.

12:33:15   18          (Government's Exhibit 1.5 marked for

12:33:15   19    identification.)

12:33:16   20    BY MR. POTTER:

12:33:16   21    Q.   And let me show you Exhibit 1.5.

12:33:26   22          Who is 1.5 related to?

12:33:29   23    A.   Major Morales once again, and I guess a memo --

12:33:33   24    this is a memo from myself dealing with technician pay

12:33:39   25    and salary.

12:33:48   1

12:33:48   2          (Government's Exhibit 1.6 marked for

12:33:48   3   identification)

12:33:49   4   BY MR. POTTER:

12:33:49   5   Q.   And Government's Exhibit 1.6?

12:33:51   6   A.   That's what you call a PD, a position description,

12:33:56   7   and gives you all, what the job entitles are and the job

12:34:02   8   requirements for the position.

12:34:03   9   Q.   And what is the position?

12:34:04   10   A.   The position on this is stated "management and

12:34:08   11   program analyst."

12:34:14   12          (Government's Exhibit 1.7 marked for

12:34:14   13   identification.)

12:34:14   14   BY MR. POTTER:

12:34:14   15   Q.   And then Government's Exhibit 1.7.

12:34:16   16          And tell us what, generally, that is.

12:34:35   17   A.   This is -- the top of this is cut off.  It's, it's

12:34:44   18   a selection for the position.

12:34:48   19   Q.   And who does it relate to?

12:34:54   20   A.   This is the position that Mrs. Morales was being

12:35:02   21   considered for.

12:35:07   22          (Government's Exhibit 1.8 marked for

12:35:07   23   identification.)

12:35:07   24   BY MR. POTTER:

12:35:07   25   Q.   And Government's Exhibit 1.8?

```
12:35:15   1   A.   That is a resume for Sherrymae Lee Morales.

12:35:23   2        (Government's Exhibit 1.9 marked for

12:35:23   3   identification.)

12:35:23   4   BY MR. POTTER:

12:35:23   5   Q.   And Government's Exhibit 1.9?

12:35:40   6   A.   This is from a security clearance.  It's a memo to

12:35:43   7   the defendant.  The subject is --

12:35:49   8        MR. JUPITER:  Objection.  Objection, Your

12:35:50   9   Honor.

12:35:50   10       THE COURT:  Sustained.

12:35:51   11       Next question.

12:35:53   12       (Government's Exhibit 1.10 marked for

12:35:57   13   identification.)

12:35:57   14   BY MR. POTTER:

12:35:57   15   Q.   And Government's Exhibit 1 -- 1.10, just generally

12:36:03   16   what this is and who it refers to?

12:36:05   17   A.   It's again, orders for defendant --

12:36:17   18       THE COURT:  Separation orders.

12:36:19   19       Next question.

12:36:19   20       (Government's Exhibit 1.11 marked for

12:36:19   21   identification.)

12:36:19   22   BY MR. POTTER:

12:36:20   23   Q.   And finally -- sorry -- Government's Exhibit 1.11.

12:36:31   24   A.   And that is a, we call that a 30-day notice from

12:36:35   25   the technician employment.  Once you lost your
```

12:36:42  1    eligibility, then you get a 30-day notice memorandum.

12:36:47  2    Q.   And who is referred to in this exhibit?

12:36:52  3    A.   Major Sherrymae Morales.

12:36:59  4         (Government's Exhibit 1.12 marked for

12:36:59  5    identification.)

12:36:59  6    BY MR. POTTER:

12:36:59  7    Q.   And Government's Exhibit 1.12, do you know what

12:37:03  8    that is?

12:37:16  9    A.   I have a little difficulty seeing.  This, it's a

12:37:18  10   little small.

12:37:38  11   Q.   Does that help?

12:37:39  12   A.   That's the calculation, looks like, for severance

12:37:42  13   pay.

12:37:43  14        (Government's Exhibit 1.13 marked for

12:37:43  15   identification).

12:37:44  16   BY MR. POTTER:

12:37:44  17   Q.   And finally, Government's Exhibit 1.13?

12:37:50  18   A.   That's a direct deposit signup form.

12:38:15  19   Q.   Now, sir, Government's Exhibit 1.1 through

12:38:19  20   Government's Exhibit 1.13, where did these documents

12:38:25  21   originate?

12:38:26  22   A.   They would be, they would be a part of the

12:38:30  23   personnel files for the employee, the soldier.

12:38:37  24   Q.   Who is the soldier in this case?

12:38:38  25   A.   Major Morales.

12:38:41  1    Q.   And are these records kept in the regular course of

12:38:45  2    business of the National Guard?

12:38:46  3    A.   Yes.  They're a part of their records.  It would be

12:38:53  4    under HRO section.

12:38:54  5    Q.   And are they made at or near the time, from

12:38:57  6    information transmitted from someone with knowledge?

12:39:00  7    A.   Yes.  Yes, they would.

12:39:02  8    Q.   And is it the regular practice of the National

12:39:06  9    Guard to make and maintain these records?

12:39:13  10   A.   Yes, it is.

12:39:14  11        MR. POTTER:  Your Honor, we move into evidence

12:39:16  12   Government's Exhibit 1.1 through 1.13.

12:39:20  13        THE COURT:  Attorney Jupiter?

12:39:23  14        MR. JUPITER:  No objection to 1.1, 1.2 and 1.3,

12:39:33  15   Your Honor.

12:39:34  16        THE COURT:  All right.  1.1 through 1.13 are

12:39:37  17   admitted.

12:39:38  18        MR. JUPITER:  No, no, no, Your Honor.  I

12:39:42  19   said --

12:39:42  20        You're asking for 1.1 through 1.13?

12:39:46  21        MR. POTTER:  1.1 through 1.13.

12:39:49  22        MR. JUPITER:  No, Your Honor, no objection to

12:39:51  23   1.1, 1.2 and 1.3.

12:39:55  24        THE COURT:  Okay.

12:39:56  25        MR. JUPITER:  We object to the others.

12:39:58  1          THE COURT:  And the government is moving 1.1

12:40:00  2     through 1.13; is that correct?

12:40:02  3          MR. POTTER:  Yes, Judge.

12:40:03  4          THE COURT:  All right.  1.1 through 1.8, 1.13

12:40:08  5     are admitted.

12:40:14  6       (Government's Exhibit 1.1 through 1.8, and 1.13

12:40:28  7     admitted into evidence.)

12:40:28  8          MR. JUPITER:  Your Honor, request permission to

12:40:30  9     make a record as to that objection.

12:40:32  10          THE COURT:  Okay.  At the break.

12:40:33  11       Go ahead.

12:40:40  12  BY MR. POTTER:

12:40:40  13  Q.   Now Colonel Schjang, let me ask you, taking a look

12:40:44  14  at Government's Exhibit 1.1 --

12:40:48  15          MR. POTTER:  Can we publish Government's

12:40:51  16  Exhibit 1.1, Your Honor?

12:41:23  17       (Exhibit published.)

12:41:23  18  BY MR. POTTER:

12:41:24  19  Q.   Colonel Schjang, tell us what Government's

12:41:26  20  Exhibit 1.1 is.

12:41:27  21  A.   This is the orders appointing her as a member of

12:41:33  22  the Virgin Islands National Guard, the grade or rank

12:41:37  23  that the individual will be coming into, the branch and

12:41:40  24  the assignment, like which unit she would belong to.

12:41:56  25  Q.   And what's the date -- the effective date of that?

12:41:58   1    A.    You see down below the effective date would be

12:42:04   2    23 February 2010.

12:42:06   3    Q.    And Government's Exhibit 1.2, tell us what --

12:42:10   4          MR. POTTER:   If we can publish 1.2, Your Honor?

12:42:10   5          (Exhibit published.)

12:42:20   6    BY MR. POTTER:

12:42:20   7    Q.    And tell us what 1.2, is?

12:42:23   8    A.    This is the personnel action where you advertise or

12:42:26   9    you have the positions that are, that the person is

12:42:29   10   intended to go into.  It gives you the GS level, the

12:42:34   11   step, which is the level the step would pay, and

12:42:45   12   basically describes the position.

12:42:51   13   Q.    Does the exhibit show the salary?

12:42:53   14   A.    Yes, it does.  It's a little small.  Like right

12:43:00   15   above, halfway that -- right below the -- yeah.  Yeah,

12:43:06   16   that block.  It gives you the position title and the GS

12:43:12   17   level and step, and the base pay.

12:43:16   18   Q.    And what was the salary for Sherrymae Morales at

12:43:20   19   that time?

12:43:21   20   A.    The base pay is $64,392.

12:43:28   21   Q.    And is there an adjusted pay?

12:43:31   22   A.    And that adds in the locality and all of that.

12:43:36   23   Based on the formula they come up with that.

12:43:40   24   Q.    And how much was that?

12:43:41   25   A.    That's an additional $3,035.

12:43:44   1     Q.   So her total salary was what, sir?

12:43:46   2     A.   $67,327.

12:43:51   3     Q.   And let me show you --

12:43:54   4          MR. POTTER:   If we can publish --

12:43:57   5          (Exhibit published.)

12:43:57   6     BY MR. POTTER:

12:43:58   7     Q.   Government's Exhibit 1.3.  And I ask you if you can

12:44:09   8     tell us what that is.

12:44:10   9     A.   Okay.  I think this is similar to the first one.

12:44:14   10    The first one was for a temporary employment.  Now this

12:44:20   11    one is on the same position.  This time we're bringing

12:44:33   12    her as an indefinite employee.

12:44:35   13    Q.   Was there an increase in pay?

12:44:36   14    A.   Excuse me?

12:44:37   15    Q.   Was there an increase in pay?

12:44:40   16    A.   Well, there was an increase in pay.

12:44:45   17    Q.   So what was -- what is the pay?

12:44:51   18    A.   Well, from the original was first a step --

12:44:54   19    grade 12, step 3; and this one takes her up to a

12:44:58   20    grade 12, step 10.  So you went from basically 67,327 to

12:45:09   21    82,053.

12:45:12   22    Q.   And are you able to determine when, how long it

12:45:20   23    took to go from the 67 to the 82?

12:45:26   24          MR. JUPITER:   Objection to relevance, Your

12:45:29   25    Honor.

| | | |
|---|---|---|
| 12:45:29 | 1 | THE COURT:  Sustained. |
| 12:45:29 | 2 | BY MR. POTTER: |
| 12:45:40 | 3 | Q.   Let me show you -- |
| 12:45:42 | 4 | MR. POTTER:  If I can publish Government's |
| 12:45:43 | 5 | Exhibit 1.4. |
| 12:45:55 | 6 | (Exhibit published.) |
| 12:45:55 | 7 | BY MR. POTTER: |
| 12:45:56 | 8 | Q.   And I ask you if you recognize it? |
| 12:45:57 | 9 | A.   Yes.  It's a memorandum from Colonel Lewis. |
| 12:46:04 | 10 | Q.   And do you know what that memorandum is? |
| 12:46:07 | 11 | A.   Well, this memorandum is what we got to actually |
| 12:46:12 | 12 | pay her at the step, at the step 10, the GS-11, step 10. |
| 12:46:19 | 13 | Q.   And what's the date of that? |
| 12:46:21 | 14 | A.   The date on this is 5 March. |
| 12:46:39 | 15 | MR. POTTER:  Government's Exhibit 1.5.  Can we |
| 12:46:43 | 16 | publish, Judge? |
| 12:46:51 | 17 | (Exhibit published.) |
| 12:46:51 | 18 | BY MR. POTTER: |
| 12:46:51 | 19 | Q.   And tell us what that is? |
| 12:46:52 | 20 | A.   It's a memorandum from myself, just indicating |
| 12:46:57 | 21 | after reviewing the, going over with my personnel and |
| 12:47:03 | 22 | the staff that is classified to go over this, to |
| 12:47:09 | 23 | determine that she was qualified at the GS-12, step 3. |
| 12:47:28 | 24 | MR. POTTER:  And Government's Exhibit 1.6. |
| 12:47:34 | 25 | (Exhibit published.) |

12:47:34   1            THE WITNESS:  Yeah.  This is what we call the

12:47:36   2   PD, position description, the announcement that goes out

12:47:44   3   to -- it gives you the salary range, the personnel that

12:47:49   4   we're looking for, and onto it will give you the basic

12:47:55   5   requirements.

12:48:00   6   BY MR. POTTER:

12:48:00   7   Q.   Okay.  And this would be the job for -- the

12:48:04   8   description for the position the defendant was getting?

12:48:07   9   A.   Correct.  The management and program analyst.

12:48:23  10            MR. POTTER:  Brief indulgence, Judge?

12:48:27  11            THE COURT:  Yes.

12:48:28  12        (Counsel conferring.)

12:48:38  13   BY MR. POTTER:

12:48:38  14   Q.   Now, Colonel Schjang, was this a full-time or

12:48:41  15   part-time position?  Can you tell?

12:48:45  16   A.   This, this is a full-time position.

12:48:54  17   Q.   And for the management and program analyst, do you

12:48:56  18   know what the hours of work for that position would be?

12:48:59  19   A.   Well, all the positions we have in the Guards, we

12:49:02  20   just have one -- the regular working day, from 8:00 to

12:49:05  21   5:00.

12:49:09  22   Q.   And what days of the week?

12:49:10  23   A.   Monday through Friday.

12:49:25  24   Q.   And Government's Exhibit 1.17 -- 1.7.

12:49:30  25            MR. POTTER:  Sorry, Judge.

12:49:42   1            (Exhibit published.)

12:49:42   2    BY MR. POTTER:

12:49:42   3    Q.   Tell us what that is.

12:49:43   4    A.   This is where the selection, I guess, is made by

12:49:47   5    General Lewis, and signed off on approving by General

12:49:55   6    Rivera.

12:49:55   7    Q.   And what's the date of that?

12:49:57   8    A.   The date on this is 15 March.

12:50:03   9    Q.   And who is the approval for?

12:50:08   10   A.   Who is the approval for?

12:50:09   11   Q.   For?  Who are they approving, and what are they

12:50:12   12   approving?

12:50:13   13   A.   I guess they are approving the previous

12:50:16   14   announcement that we saw, Major Morales into the

12:50:22   15   management and program analyst position.

12:50:32   16            MR. POTTER:  Government Exhibit 1.8.

12:50:37   17            (Exhibit published.)

12:50:37   18   BY MR. POTTER:

12:50:38   19   Q.   And can you tell us what that is?

12:50:40   20   A.   That is a resume.

12:50:42   21   Q.   Resume of who?

12:50:44   22   A.   Sherrymae Morales.

12:50:51   23   Q.   And do you know what that resume was for?

12:50:53   24   A.   It's part of the package.  Once you're applying for

12:50:56   25   the position, you attach your resume that goes along

12:51:01   1    with it.

12:51:06   2            MR. POTTER:  And Government's Exhibit 1.9.

12:51:11   3            MR. JUPITER:  Request permission to approach,

12:51:13   4    Your Honor.

12:51:14   5            THE COURT:  Those two -- 1.9 and 1.10 are under

12:51:21   6    advisement.

12:51:22   7         (Government's Exhibits 1.9, 1.10, 1.11, 1.12, under

12:51:32   8    advisement.)

12:51:37   9            MR. POTTER:  Okay, Judge.

12:51:38   10   BY MR. POTTER:

12:51:38   11   Q.   Let me show you Government's Exhibit 1.13.

12:51:38   12        (Exhibit published.)

12:51:55   13   BY MR. POTTER:

12:51:55   14   Q.   And can you tell us what that is?

12:51:57   15   A.   That is the standard direct deposit signup form.

12:52:01   16   This one's specifically for Sherrymae Morales.

12:52:04   17   Q.   And what's the purpose of this form?

12:52:06   18   A.   Everyone in the National Guard signs up for a

12:52:08   19   direct deposit.  That's how you get paid.  We no longer

12:52:11   20   issue checks straight to individuals.  Everything is

12:52:14   21   direct deposit.

12:52:22   22           MR. POTTER:  Thank you.

12:52:24   23        Court's indulgence, Your Honor.

12:52:25   24           THE COURT:  Yes.

12:52:25   25        (Pause.)

12:52:25   1   BY MR. POTTER:

12:52:37   2   Q.   Now, Colonel Schjang, do you -- in 2010, what, if

12:52:45   3   any, knowledge did you have regarding the defendant

12:52:52   4   being a contract employee for the ESGR?

12:52:59   5   A.   I know she was in that position previously.  But

12:53:01   6   the length of time --

12:53:03   7            MR. JUPITER:  Objection.  It's nonresponsive,

12:53:06   8   Your Honor.

12:53:07   9            THE COURT:  Okay.  Overruled.

12:53:14   10           MR. POTTER:  Can I have the witness repeat,

12:53:19   11  Judge?

12:53:19   12           THE COURT:  Rephrase your question.

12:53:21   13  BY MR. POTTER:

12:53:21   14  Q.   Other than the defendant being a full-time military

12:53:28   15  tech employee with the National Guard, do you know of

12:53:31   16  any other employment that she had related to the Guard?

12:53:38   17  A.   At that same time, no.

12:53:54   18  Q.   Now, let's go back briefly to Government's

12:53:58   19  Exhibit 1.8.  Now looking that exhibit, does -- anywhere

12:54:18   20  on the exhibit, does the defendant indicate that she was

12:54:20   21  a full-time employee with the ESGR when she applied for

12:54:24   22  the military tech position?

12:54:36   23           MR. POTTER:  Can we publish, please?

12:54:48   24           THE WITNESS:  I'm not seeing it mentioned any

12:54:50   25  place here.

12:54:58  1          MR. POTTER:  No further questions of the

12:54:59  2  witness, Your Honor.

12:55:00  3          THE COURT:  Attorney Jupiter.

12:55:22  4                  CROSS-EXAMINATION

12:55:22  5  BY MR. JUPITER:

12:55:25  6  Q.   Good afternoon.

12:55:26  7  A.   Good afternoon.

12:55:26  8  Q.   You indicated that -- you just saw Mrs. Morales's

12:55:31  9  resume, correct?

12:55:35  10  A.   Correct.

12:55:35  11  Q.   You weren't going to be the one who would be

12:55:38  12  deciding who was going to fill this position, correct?

12:55:41  13  A.   Correct.

12:55:41  14  Q.   Colonel Lewis was going to be the one deciding who

12:55:44  15  was going to fill the position?

12:55:46  16  A.   He was the selecting individual, correct.

12:55:48  17  Q.   And this resume would have been submitted prior to

12:55:50  18  employment in the position; is that correct?

12:55:53  19  A.   Prior to employment?

12:55:55  20  Q.   Prior to Ms. Morales being employed in the military

12:56:01  21  tech position, the resume would have been submitted

12:56:03  22  prior to employment, right?

12:56:08  23  A.   Correct.

12:56:09  24  Q.   All right.  And prior to her taking the military

12:56:12  25  tech position, do you know who the ESGR person was?

12:56:16  1    A.    No, I wasn't tracking who that person is, no.

12:56:22  2    Q.    You didn't know who the ESGR position was in -- who

12:56:27  3    held the ESGR position in 2010, right?

12:56:31  4    A.    I know we had a number of them.  But for, when one

12:56:35  5    start to when another one took over, at the HR level, I

12:56:41  6    didn't track the contractors in that position, no.

12:56:43  7    Q.    So you're saying you never knew Ms. Morales to have

12:56:46  8    the ESGR position?

12:56:48  9    A.    Yes, at one point I knew she was.

12:56:51  10   Q.    You knew she had the position before she took --

12:56:53  11   in -- you knew she had the position in 2010, didn't you?

12:57:00  12   A.    I said the dates, exact dates, I don't keep that to

12:57:06  13   memory.  I know she was one.  Emmett Hansen was one.

12:57:10  14   Q.    You were not an ESGR volunteer, were you not?

12:57:15  15   A.    No.

12:57:16  16   Q.    You didn't supervise anyone who was on the ESGR

12:57:19  17   contract?

12:57:20  18   A.    No.

12:57:20  19   Q.    You didn't go to ESGR events to support the

12:57:26  20   Guardsmen?

12:57:26  21   A.    No.

12:57:27  22   Q.    You didn't.

12:57:28  23         For instance, like the yellow ribbon ceremony,

12:57:31  24   you're familiar with those?

12:57:31  25   A.    Yes, I am.

12:57:32  1    Q.   And those ceremonies are designed when people are

12:57:35  2    coming back from deployment, right?

12:57:36  3    A.   Correct.

12:57:37  4    Q.   So you go there, you have a ceremony and try to,

12:57:40  5    you know, give some support to the people coming back,

12:57:42  6    right?

12:57:43  7    A.   Correct.

12:57:44  8    Q.   You never attended those, did you?

12:57:47  9    A.   Very infrequently.  Not often, no.

12:57:51  10   Q.   Okay.  And you never saw Mrs. Morales presiding at

12:57:56  11   any of those ceremonies, did you?

12:57:57  12   A.   Yes, I'm sure she was -- I know she was the ESGR at

12:58:02  13   one point.

12:58:04  14   Q.   Okay.  So in terms of when she was applying for

12:58:06  15   this job, you knew she was -- you knew her experience

12:58:10  16   with ESGR, didn't you?

12:58:15  17   A.   I know she was in that position.  She had that

12:58:18  18   position, yes.

12:58:18  19   Q.   Right.  She was applying to the Guard with people

12:58:20  20   like you, who already knew she had that qualifications,

12:58:23  21   didn't she?  Wasn't she?

12:58:25  22   A.   Yes, she was.

12:58:27  23   Q.   Okay.  General Lewis and everyone else would have

12:58:30  24   seen her as ESGR person, right?

12:58:33  25          MR. POTTER:  Objection, Judge.

| | |
|---|---|
| 12:58:34 | 1 |
| 12:58:39 | 2 |
| 12:58:39 | 3 |
| 12:58:41 | 4 |
| 12:58:48 | 5 |
| 12:58:49 | 6 |
| 12:58:53 | 7 |
| 12:59:12 | 8 |
| 12:59:13 | 9 |
| 12:59:14 | 10 |
| 12:59:15 | 11 |
| 12:59:16 | 12 |
| 12:59:17 | 13 |
| 12:59:22 | 14 |
| 12:59:27 | 15 |
| 12:59:29 | 16 |
| 12:59:30 | 17 |
| 12:59:42 | 18 |
| 12:59:42 | 19 |
| 12:59:46 | 20 |
| 12:59:52 | 21 |
| 12:59:53 | 22 |
| 13:00:00 | 23 |
| 13:00:00 | 24 |
| 13:00:05 | 25 |

                    THE COURT:  Sustained.

BY MR. JUPITER:

Q.   And with regard to her position or what she was

going to be doing as military technician, GS-5, right?

A.   Correct.

Q.   It's completely what she does with ESGR, isn't it?

A.   Correct.

         MR. JUPITER:  No further questions, Your Honor.

         THE COURT:  Any redirect?

         MR. POTTER:  Yes, Judge.

                    REDIRECT EXAMINATION

BY MR. POTTER:

Q.   Now, Colonel Schjang, could -- would the National

Guard hire someone as a military tech, knowing that they

were employed somewhere else full-time?

         MR. JUPITER:  Objection, Your Honor.

         THE COURT:  Sustained.

BY MR. POTTER:

Q.   As a full-time military technician, are you

permitted to hold a second full-time job --

         MR. JUPITER:  Objection, Your Honor.

         THE COURT:  Sustained.

BY MR. POTTER:

Q.   What prohibitions, if any, are there for individual

full-time Guard members holding other full-time jobs?

13:00:14   1           MR. JUPITER:  Objection, Your Honor.

13:00:16   2           THE COURT:  All right.  Sustained.  403.

13:00:31   3    BY MR. POTTER:

13:00:31   4    Q.   When Mrs. Morales was hired as a full-time military

13:00:37   5    tech, did you know -- as the HRO, also know she was a

13:00:42   6    full-time contract employee for ESGR?

13:00:45   7           MR. JUPITER:  Objection, asking questions --

13:00:47   8    facts not in evidence.

13:00:48   9           THE COURT:  Okay.  Overruled.

13:00:52   10          MR. POTTER:  You can answer.

13:00:53   11          THE WITNESS:  I can answer that?

13:00:55   12      Once -- you would have to say it again, please?

13:01:11   13          MR. POTTER:  Your Honor, can I have the court

13:01:13   14   reporter please read back?

13:01:14   15          THE COURT:  No.

13:01:19   16   BY MR. POTTER:

13:01:19   17   Q.   If someone is hired as a full-time military tech,

13:01:23   18   you as the HRO, with your knowledge as being an HRO, can

13:01:36   19   that employee also hold another full-time position with

13:01:44   20   the Guard?

13:01:44   21          MR. JUPITER:  Objection, Your Honor.

13:01:45   22          THE COURT:  Sustained.

13:01:46   23   BY MR. POTTER:

13:01:46   24   Q.   Did you know, as the HRO, when Mrs. Morales came on

13:01:54   25   as a full-time military tech, did you have any personal

13:01:57  1    knowledge that she was also a full-time ESGR contract

13:02:03  2    employee?

13:02:03  3    A.   No, I did not.

13:02:09  4    Q.   And if you had learned that when she was hired as a

13:02:14  5    full-time military tech that she was also a full-time

13:02:18  6    ESGR contract employee, you as the HRO, what would you

13:02:23  7    have done?

13:02:24  8         MR. JUPITER:  Objection, Your Honor.

13:02:25  9         THE COURT:  Sustained.

13:02:30  10    Anything else for this witness?

13:02:32  11         MR. POTTER:  No, Judge.  Thank you.

13:02:33  12         THE COURT:  All right.

13:02:34  13    Colonel Schjang, thank you for your testimony.

13:02:35  14    You may step down.

13:02:35  15    (Witness withdrew from stand.)

13:02:37  16         THE COURT:  Ladies and gentlemen, it is time

13:02:38  17    for lunch.

13:02:39  18    We're going to take a 45-minute break, then we'll

13:02:42  19    resume with the trial.

13:03:40  20    (Jury not present.)

13:03:42  21         THE COURT:  All right, Counsel, we're going to

13:03:44  22    take a 45-minute lunch break.  Then we'll resume.

13:03:47  23    Anything we need to tend to before we resume?

13:03:50  24    Attorney Potter?

13:03:51  25         MR. POTTER:  Nothing, Judge.

13:03:52  1                      THE COURT:  Attorney Jupiter?

13:03:53  2                      MR. JUPITER:  No, Your Honor.

13:03:54  3                      THE COURT:  Okay.  Enjoy your lunch.

13:04:20  4              (Court in recess, 1:04 p.m.)

14:12:45  5              (After recess, 2:12 p.m., jury not present).

14:12:48  6                      MR. JUPITER:  Your Honor?

14:12:50  7                      THE COURT:  Yes.

14:12:51  8                      MR. JUPITER:  If the Court has not done so, I

14:12:52  9      would ask for sequestration of witnesses.

14:12:55  10             (Witness sequestration rule invoked.)

14:12:55  11                     THE COURT:  All right.  The government knows

14:12:57  12     the rule.

14:12:57  13                     MR. POTTER:  Yes, Judge.

14:12:58  14                     THE COURT:  All right.

14:13:43  15             (Jury present.)

14:13:44  16                     THE COURT:  Good afternoon, ladies and

14:13:46  17     gentlemen.

14:13:46  18             We're still in the government's case-in-chief.

14:13:48  19             Attorney Potter, are you ready to proceed?

14:13:51  20                     MR. POTTER:  Yes, Judge.

14:13:52  21                     THE COURT:  Go right ahead.

14:13:54  22                     MR. POTTER:  The government calls Colonel

14:13:56  23     Jacqueline (sic) Cills.

14:14:23  24                     THE CLERK:  Please stand and raise your right

14:14:24  25     hand to take the oath.

14:14:26  1          (Witness sworn.)

14:14:29  2               THE WITNESS:  I do.

14:14:31  3               THEREUPON, LINDA A. CILLS, having been duly

14:14:32  4     sworn, was examined and testified as follows:

14:14:32  5                    DIRECT EXAMINATION

14:14:34  6     BY MR. POTTER:

14:14:40  7     Q.   Good afternoon.

14:14:41  8     A.   Good afternoon.

14:14:43  9     Q.   Can you please give us your full name?

14:14:45  10    A.   Linda Agatha Cills.

14:14:48  11    Q.   And spell your first and your last name for the

14:14:50  12    court reporter.

14:14:50  13    A.   L-i-n-d-a, C-i-l-l-s.

14:14:58  14    Q.   And Colonel Cills -- are you a colonel?

14:15:01  15    A.   Yes.

14:15:01  16    Q.   Tell us how you are employed.

14:15:04  17    A.   How?

14:15:04  18    Q.   How you are employed?  Who do you work for?

14:15:07  19    A.   Right now I work for the Army National Guard.  I

14:15:10  20    serve as the chief of staff.

14:15:11  21    Q.   And how long have you been the chief of staff?

14:15:13  22    A.   I started in January of 2012.

14:15:22  23    Q.   And prior to your being the chief of staff, what

14:15:25  24    other positions have you held in the National Guard?

14:15:27  25    A.   Prior to that, I served as the deputy chief of

14:15:33   1    staff of personnel from 2003 until the summer of 2010.

14:15:37   2    And then I came back to that same job in 2010, until I

14:15:42   3    became the chief of staff.

14:15:47   4    Q.   And tell us what a chief of staff does?

14:15:49   5    A.   Basically, the position oversees the day-to-day

14:15:55   6    operation on behalf of the adjutant general, oversees

14:15:59   7    the staff, ensure that things are running, and I provide

14:16:12   8    advice to the adjutant general.

14:16:18   9    Q.   On all issues or just specific issues?

14:16:22   10   A.   I wouldn't say all issues, because he has other

14:16:26   11   persons on his personal staff; but the day-to-day

14:16:28   12   operations.

14:16:34   13   Q.   Do you supervise?

14:16:37   14   A.   Yes.   I supervise what we call the general staff.

14:16:40   15   I have a deputy chief of staff for personnel,

14:16:44   16   operations, logistics, finance.   I also oversee the

14:16:51   17   Human Resources Office and the Facilities Management

14:16:53   18   Office.

14:16:53   19   Q.   And did you also say you were deputy chief of

14:16:57   20   personnel?

14:16:57   21   A.   Deputy chief of staff of personnel.

14:17:00   22   Q.   Okay.   And what does the deputy chief of staff of

14:17:03   23   personnel do?

14:17:04   24   A.   That individual is responsible for overseeing the

14:17:08   25   Military Personnel Office.   They're responsible for

14:17:09   1    overall personnel readiness of the force.

14:17:14   2    Q.   And are you familiar with the position of the human

14:17:17   3    resource officer, HRO?

14:17:19   4    A.   Yes.

14:17:19   5    Q.   Have you ever served in that position?

14:17:21   6    A.   No, I have not.

14:17:22   7    Q.   Do you supervise that position?

14:17:24   8    A.   Right now I do, in my capacity as the chief of

14:17:27   9    staff.

14:17:28   10   Q.   And what does the HRO or human resource officer do?

14:17:32   11   A.   The human resource officer --

14:17:35   12         MR. JUPITER:  Objection, Your Honor.

14:17:36   13         THE COURT:  Overruled.

14:17:40   14   BY MR. POTTER:

14:17:41   15   Q.   Continue.

14:17:41   16   A.   You want me to answer the question?

14:17:42   17   Q.   Yes.

14:17:43   18   A.   The Human Resource Office is responsible for the

14:17:45   19   full-time force.  They do all of the hiring, all of the

14:17:48   20   processing of any actions for the staff, all the way

14:17:51   21   from hiring until termination and anything in between.

14:17:57   22   Q.   Do you have supervision over military technicians,

14:18:03   23   military tech?

14:18:05   24   A.   At the moment --

14:18:06   25   Q.   What we call GS tech?

14:18:10   1    A.   If I have supervision over any?

14:18:12   2    Q.   Yes.

14:18:12   3    A.   Currently, I have some that report to me directly.

14:18:15   4    Q.   And what are the standard hours of work?

14:18:17   5    A.   Their working hours are Monday to Friday, 8:00 to

14:18:20   6    5:00.

14:18:23   7    Q.   And is that the standard working hours for all

14:18:27   8    full-time members of the Guard, or is that just for

14:18:31   9    military?

14:18:34  10    A.   I would say yes, it is.  There are times persons

14:18:39  11    would work beyond 5:00, but generally our hours are

14:18:44  12    Monday to Friday, 8:00 to 5:00.

14:18:47  13    Q.   And if individuals under your command have to work

14:18:52  14    weekly -- or beyond 8:00 to 5:00, what is the protocol?

14:18:57  15    A.   There are different status that individuals would

14:19:00  16    fall under.  They could be working on a weekend on a

14:19:03  17    different status, for example, on military orders.  They

14:19:08  18    could be in a drill status.  They could be doing annual

14:19:15  19    training.  But generally, for the technician force if

14:19:18  20    they're working after hours, they usually work what we

14:19:20  21    call compensatory time.

14:19:28  22    Q.   And under your command, is it ever authorized to

14:19:33  23    work two full-time jobs within the same 8:00 to 5:00

14:19:39  24    time period?

14:19:39  25         MR. JUPITER:  Objection, Your Honor.

14:19:40  1   Irrelevant.

14:19:42  2              THE COURT:  Sustained.

14:19:54  3   BY MR. POTTER:

14:19:54  4   Q.   Do you know Sherrymae Morales?

14:19:59  5   A.   Yes, I do.

14:20:00  6   Q.   And tell us how you know her.

14:20:01  7   A.   She was previously a member of the Army National

14:20:05  8   Guard.

14:20:05  9   Q.   Do you know when she left the National Guard?

14:20:11  10  A.   Around April of 2010.

14:20:19  11  Q.   That's when she left the National Guard?

14:20:21  12  A.   That's my recollection, yes, '10 or '11.

14:20:31  13  Q.   Are you familiar with any contract position that

14:20:33  14  the defendant had with the National Guard?

14:20:36  15  A.   She served as the ESGR coordinator, I think that's

14:20:42  16  the title of the position, the executive director for

14:20:46  17  ESGR.

14:20:46  18  Q.   And do you recall when that was, approximately?

14:20:48  19  A.   When she started?

14:20:49  20  Q.   Yes.

14:20:50  21  A.   I believe it was in 2007.

14:20:55  22  Q.   And do you know when she left that position?

14:20:59  23  A.   I can't say for sure.

14:21:07  24             MR. POTTER:  The Court's indulgence?

14:21:27  25             Let me show you what has been marked as

14:21:38  1   Government's Exhibit Number 1.10 for identification

14:21:52  2   purposes.

14:22:02  3   BY MR. POTTER:

14:22:02  4   Q.   Do you see that document on your screen?

14:22:09  5   A.   No, I do not.  There's nothing there.

14:22:17  6   Q.   Do you see it now?

14:22:18  7   A.   Yes.

14:22:19  8   Q.   Can you tell us what Government's Exhibit 1.10 is?

14:22:26  9   A.   It's a military order separating Mrs. Morales, and

14:22:31  10  it's dated April of 2011.

14:22:34  11  Q.   And does your signature appear on that document?

14:22:38  12  A.   It does, in the signature block.

14:22:48  13  Q.   And is this document kept in the regular course of

14:22:51  14  business at the Virgin Islands National Guard?

14:22:52  15  A.   If it's -- I'm sorry?

14:22:54  16  Q.   Kept in the regular course of business at the

14:22:57  17  Virgin Islands National Guard?

14:22:59  18  A.   It's an electronic document that can be downloaded

14:23:02  19  at any time, yes.

14:23:07  20       MR. POTTER:  Your Honor, we move to admit

14:23:08  21  Government's Exhibit 1.10.

14:23:18  22       MR. JUPITER:  Your Honor, we object.  No

14:23:22  23  foundation.

14:23:23  24       THE COURT:  Okay.  It's under advisement.

14:23:31  25  BY MR. POTTER:

14:23:31  1    Q.   Is it the practice of the Virgin Islands National

14:23:34  2    Guard to create such documents?

14:23:37  3    A.   Yes.

14:23:39  4    Q.   And are such documents kept in the regular course

14:23:42  5    of business --

14:23:42  6    A.   Yes.

14:23:42  7    Q.   -- of the Virgin Islands National Guard?

14:23:44  8    A.   Yes.

14:23:47  9    Q.   And are the documents created at or near a time by

14:23:50  10   someone with knowledge as to the information contained

14:23:54  11   in the document?

14:23:55  12   A.   Yes.

14:24:00  13   Q.   And who you recognize Government's Exhibit 1.10 as

14:24:08  14   relating to?

14:24:09  15   A.   If I recognize it as --

14:24:11  16   Q.   Who it's relating to?

14:24:13  17   A.   Yes.

14:24:14  18   Q.   And who is that person?

14:24:15  19   A.   It's the separation order for Major Morales.

14:24:20  20        MR. POTTER:  Your Honor, I again move for the

14:24:21  21   admission of Government's Exhibit 1.10.

14:24:33  22        MR. JUPITER:  We object again under 403, Your

14:24:36  23   Honor.

14:24:36  24        THE COURT:  Okay.  It's under advisement.

14:24:38  25   BY MR. POTTER:

14:24:38  1    Q.   Now, in 2007, do you know what position the

14:24:41  2    defendant held?

14:24:44  3    A.   I believe that's when she started as the executive

14:24:47  4    director for ESGR.

14:24:49  5    Q.   And did you then have any working relationship with

14:24:55  6    the defendant in her ESGR capacity?

14:24:58  7    A.   In my capacity as the deputy chief of staff for

14:25:01  8    personnel, I was assigned as the program manager for a

14:25:05  9    little over 20 accounts, of which ESGR was one.  And so

14:25:10  10   our communication was -- we communicated to ensure that

14:25:12  11   the funds were expended.

14:25:18  12   Q.   And how, generally, would you communicate with the

14:25:21  13   defendant?

14:25:23  14   A.   Generally via e-mail.

14:25:32  15   Q.   And the ESGR, you said you had some level of

14:25:43  16   knowledge of the ESGR contract?

14:25:47  17   A.   Generally, I know what the position is supposed to

14:25:49  18   do.  Each state and territory has one.  They are tasked

14:25:52  19   with providing a service to service members in the event

14:25:56  20   they are having challenges with their employers for

14:26:00  21   military service, and also to educate employers on the

14:26:03  22   program and to build a core of volunteers.

14:26:11  23   Q.   So the ESGR volunteer is different than the ESGR

14:26:18  24   contract person?

14:26:19  25   A.   Repeat your question.

14:26:20  1    Q.   You mentioned that the position builds a core of

14:26:29  2    ESGR volunteers.   The function of the ESGR volunteer,

14:26:35  3    can you compare that function to the ESGR contractor?

14:26:48  4    A.   It would be difficult for me to differentiate,

14:26:50  5    other than the fact that the full-time person is in

14:26:53  6    charge of overseeing the program to make sure that it

14:26:56  7    runs -- it's effective, that they have an effective

14:26:59  8    core, that the training is done, and that funds sent by

14:27:04  9    ESGR is expended.

14:27:07  10   Q.   Now, did there ever come a time that the defendant

14:27:15  11   was hired back as a full-time National Guard employee?

14:27:25  12   A.   Yes.

14:27:25  13   Q.   Do you know when that would have been,

14:27:26  14   approximately?

14:27:26  15   A.   I think I got my years mixed up before.

14:27:33  16        Around March of 2010.

14:27:41  17   Q.   Now in March of 2010, when the defendant was hired

14:27:47  18   on as the military tech, do you have any knowledge what

14:27:52  19   happened to her ESGR contract position?

14:27:55  20   A.   No, I do not.

14:28:08  21   Q.   As someone -- if Mrs. Morales was hired as a

14:28:16  22   full-time military tech person, would she have been

14:28:20  23   permitted to remain on as a full-time ESGR person?

14:28:26  24            MR. JUPITER:  Objection, Your Honor.

14:28:27  25            THE COURT:  Sustained.

14:28:27  1                    THE WITNESS:  Can I answer?

14:28:29  2                    THE COURT:  No.

14:28:30  3                    THE WITNESS:  Okay.

14:28:32  4      BY MR. POTTER:

14:28:32  5      Q.   Are you aware whether or not, when Mrs. Morales was

14:28:38  6      hired as the military tech person, whether or not she

14:28:45  7      resigned her position with ESGR?

14:28:49  8      A.   I have no knowledge.

14:28:56  9      Q.   Did you have any conversation or communication with

14:29:02  10     Mrs. Morales regarding her -- once she came on board as

14:29:08  11     a military tech, regarding her ESGR contract position?

14:29:14  12     A.   I, at some point, make -- in communicating with

14:29:18  13     her, asked that she pass on the name of the person who

14:29:21  14     would be replacing her, so I could communicate with that

14:29:23  15     person to ensure that the remaining funds were expended.

14:29:28  16     Q.   You said you asked her to pass on the name of the

14:29:30  17     person who was replacing her.  Why were you assuming

14:29:35  18     that she would be replaced?

14:29:36  19                    MR. JUPITER:  Objection, Your Honor.

14:29:37  20                    THE COURT:  Sustained.

14:29:40  21     BY MR. POTTER:

14:29:40  22     Q.   Why did you ask her --

14:29:44  23                    MR. JUPITER:  Same objection, Your Honor.

14:29:46  24                    THE COURT:  Overruled.  Let me hear the

14:29:48  25     question.

14:29:48  1   BY MR. POTTER:

14:29:48  2   Q.   Why did you ask her to give you the name of her

14:29:52  3   replacement?

14:29:53  4        MR. JUPITER:  Same objection, Your Honor.

14:29:54  5        THE COURT:  Overruled.

14:29:57  6        THE WITNESS:  Answer?

14:29:58  7        THE COURT:  Yes.

14:29:59  8        THE WITNESS:  I asked because the assumption

14:30:01  9   was the position was vacated.

14:30:06  10       MR. JUPITER:  Objection.  Move to strike, Your

14:30:10  11  Honor.  It's opinion.

14:30:12  12       THE COURT:  Overruled.

14:30:12  13  BY MR. POTTER:

14:30:13  14  Q.   Now, did you have any communication with

14:30:18  15  Mrs. Morales regarding whether or not she was still

14:30:23  16  remaining in her ESGR position once she came on -- once

14:30:28  17  she was hired on board as the military tech?

14:30:31  18       THE COURT:  No, don't answer that.

14:30:33  19       Rephrase your question.  You're leading this

14:30:36  20  witness.

14:30:38  21       MR. POTTER:  Okay, Judge.

14:30:39  22       THE COURT:  It's your witness.

14:30:47  23  BY MR. POTTER:

14:30:47  24  Q.   What, if any, communication did you have with

14:30:53  25  Mrs. Morales regarding her ESGR contract position?

14:30:59  1    A.    After she came on board?

14:31:06  2    Q.    Yes.

14:31:06  3    A.    As I indicated, at some point in our communication

14:31:09  4    I asked to get the name of the replacement so we could

14:31:12  5    communicate on ensuring that the remaining funds were

14:31:14  6    fully expended.

14:31:16  7    Q.    And how did you make that communication to her?

14:31:19  8    A.    Via -- it was via e-mail.

14:31:21  9          MR. POTTER:  Let me show you what's been marked

14:31:24  10   as Government's Exhibit 10 for identification purposes.

14:31:36  11        (Government's Exhibit 10 marked for

14:31:36  12   identification.)

14:31:36  13   BY MR. POTTER:

14:31:37  14   Q.    And ask if you recognize it.

14:31:37  15   A.    Yes.

14:31:38  16   Q.    And tell us what Government's Exhibit 10 is?

14:31:42  17   A.    It is an e-mail sent by me on 12 April of 2010 to

14:31:51  18   Mrs. Morales, cc Carl Lewis, and a response back from

14:32:01  19   her on the same day.

14:32:02  20   Q.    And this particular e-mail, Government's

14:32:06  21   Exhibit 10, why did you send her this e-mail?

14:32:08  22   A.    Why?

14:32:09  23   Q.    Yes.

14:32:10  24   A.    We were communicating on, on the budget that was

14:32:16  25   remaining, some supplies that she wanted purchased, and,

14:32:23  1    again, for me to find out who the replacement was.

14:32:27  2    Q.   And is Government's Exhibit Number 10 a fair and

14:32:32  3    accurate representation of the e-mail that you --

14:32:35  4    A.   Yes.

14:32:35  5    Q.   -- the e-mail traffic that you had with

14:32:38  6    Mrs. Morales?

14:32:38  7    A.   Yes.

14:32:44  8    Q.   Do you see any evidence that that has been modified

14:32:46  9    or altered in any way?

14:32:48  10   A.   No.

14:32:48  11        MR. POTTER:  Your Honor, we move to admit

14:32:50  12   Government's Exhibit Number 10.

14:32:54  13        MR. JUPITER:  No objection, Your Honor.

14:32:56  14        THE COURT:  All right.  Ten is admitted.

14:33:01  15     (Government's Exhibit 10 admitted into evidence.)

14:33:02  16        MR. POTTER:  Can I publish, Your Honor?

14:33:03  17        THE COURT:  Yes.

14:33:26  18        (Exhibit published.)

14:33:26  19   BY MR. POTTER:

14:33:27  20   Q.   Colonel Cills, I'm going to ask you to read the

14:33:33  21   e-mail that you sent to Mrs. Morales, and then I'll ask

14:33:39  22   you to read her reply.

14:33:45  23   A.   The e-mail reads:

14:33:46  24             Mrs. Morales,

14:33:47  25             I know that you are no longer the ESGR

14:33:50  1      coordinator, but we have a budget of $8,000 to

14:33:53  2      spend for FY-10, and zero has been expended to

14:33:57  3      date.  The income software will be purchased

14:34:00  4      once DF3953 are approved through channels.

14:34:04  5          Please advise if the luncheon is still a

14:34:07  6      go, and whether there's any plans for staff or

14:34:09  7      volunteer training.

14:34:09  8          If you can pass on the ESGR assistant

14:34:14  9      and/or the replacement, that would be helpful

14:34:16  10     as well.  Thanks.

14:34:17  11  Q.  And how did Mrs. Morales respond?

14:34:18  12  A.  The response reads:

14:34:21  13          Colonel Cills,

14:34:22  14          Last I knew we had $3,000.  When did we

14:34:25  15      get an additional $5,000?

14:34:27  16          The award ceremony is still on.  We were

14:34:29  17      waiting on a date from Tang.  He finally gave

14:34:33  18      the date 23, April 10, so we're trying to work

14:34:36  19      with that.  We'll let you know where it ends

14:34:38  20      up, but we'll be adding more names than the 75

14:34:41  21      people initially planned for.

14:34:42  22          As far as ESGR, I will be staying on in a

14:34:46  23      volunteer capacity as the executive director.

14:34:48  24      Baron asked me to expend as much funds as I

14:34:50  25      can so that VING's allotment remains the same

14:34:54  1                    for FY-2011.  We were to expend some moneys on

14:34:58  2                    the GITMO trip, but that was canceled.  I will

14:35:02  3                    reassess and talk to the state chair and let

14:35:04  4                    you know.

14:35:04  5                         Major Morales.

14:35:06  6     Q.   After Ms. Morales responded to your e-mail, what

14:35:12  7     conclusions, if any, did you make with respect to her

14:35:19  8     position as the ESGR coordinator?

14:35:23  9                    MR. JUPITER:  Objection, Your Honor.  Opinion.

14:35:27 10                    THE COURT:  Okay.  Overruled.

14:35:28 11                    THE WITNESS:  I can answer?

14:35:29 12                    MR. POTTER:  Yes.

14:35:30 13                    THE WITNESS:  What conclusions did I come to?

14:35:32 14     That she would be staying on in a voluntary capacity.

14:35:36 15     BY MR. POTTER:

14:35:36 16     Q.   Now as an ESGR volunteer, is a volunteer paid or

14:35:41 17     unpaid?

14:35:42 18     A.   Volunteers are unpaid.

14:35:45 19     Q.   The ESGR coordinator, is that paid or unpaid?

14:35:49 20     A.   That's a paid position.

14:36:00 21     Q.   Now, any time after April of 2010 when this e-mail

14:36:06 22     was written, did you have any knowledge that

14:36:16 23     Mrs. Morales returned?

14:36:17 24     A.   No, I did not.

14:36:22 25     Q.   Based on -- based on the --

14:36:22   1           (Simultaneous discussion.)

14:36:24   2                MR. POTTER:  Well, let me finish my question.

14:36:28   3                THE WITNESS:  Oh, I'm sorry.

14:36:28   4    BY MR. POTTER:

14:36:28   5    Q.   Did you have any knowledge that Mrs. Morales

14:36:34   6    returned to the ESGR position as a paid employee?

14:36:38   7    A.   No, I did not.

14:36:45   8    Q.   Did you have any conversation with anyone within

14:36:49   9    the Guard -- let's just say management within the Guard,

14:36:55  10    that Mrs. Morales had returned to the ESGR as a paid

14:37:03  11    contractor?

14:37:05  12                MR. JUPITER:  Object to leading, Your Honor.

14:37:07  13                THE COURT:  Sustained.

14:37:07  14    BY MR. POTTER:

14:37:08  15    Q.   What, if any, conversation did you have with

14:37:12  16    members -- with management of the Guard that

14:37:16  17    Mrs. Morales had returned as a paid employee?

14:37:18  18                MR. JUPITER:  Object to leading, Your Honor.

14:37:20  19                THE COURT:  Sustained.

14:37:24  20    BY MR. POTTER:

14:37:24  21    Q.   Did you have any conversations with members --

14:37:26  22    what, if any, conversations did you have with any member

14:37:29  23    of the Guard regarding Mrs. Morales's association with

14:37:37  24    ESGR?

14:37:37  25                MR. JUPITER:  Same objection, Your Honor.

| | | |
|---|---|---|
| 14:37:38 | 1 | THE COURT:  All right.  Sustained. |
| 14:37:41 | 2 | MR. POTTER:  Okay.  Thank you, Judge. |
| 14:37:52 | 3 | |
| 14:37:52 | 4 | BY MR. POTTER: |
| 14:37:52 | 5 | Q.   Do you know when Mrs. Morales left the Guard?  Left |
| 14:38:01 | 6 | her military tech position? |
| 14:38:08 | 7 | A.   I'm getting my years mixed up.  2011. |
| 14:38:21 | 8 | Q.   And you say back in 2011, you would have been the |
| 14:38:25 | 9 | deputy chief of staff? |
| 14:38:26 | 10 | A.   In 2011, I was the deputy chief of staff of |
| 14:38:30 | 11 | personnel, yes. |
| 14:38:31 | 12 | Q.   And as the deputy chief of staff for personnel, do |
| 14:38:36 | 13 | you know why Mrs. Morales -- do you know under what |
| 14:38:42 | 14 | circumstances Mrs. Morales left the Guard? |
| 14:38:45 | 15 | MR. JUPITER:  Objection, Your Honor. |
| 14:38:46 | 16 | Relevance, as well as it's speculation and hearsay. |
| 14:38:52 | 17 | THE COURT:  All right.  Overruled. |
| 14:38:56 | 18 | THE WITNESS:  Oh, answer? |
| 14:38:59 | 19 | Mrs. Morales was separated because she did not |
| 14:39:02 | 20 | meet -- |
| 14:39:03 | 21 | THE COURT:  Hold on one second.  Hold on one |
| 14:39:05 | 22 | second. |
| 14:39:06 | 23 | Ask your next question. |
| 14:39:08 | 24 | MR. POTTER:  Can we come to sidebar, Judge? |
| 14:39:10 | 25 | THE COURT:  Not yet.  Thank you. |

14:39:12   1          Next question.

14:39:12   2   BY MR. POTTER:

14:39:25   3   Q.   Colonel Cills, do you know when it was that

14:39:30   4   Mrs. Morales left the Guard?

14:39:31   5          MR. JUPITER:  Objection.  Asked and answered.

14:39:33   6          THE COURT:  Sustained.

14:39:36   7          MR. POTTER:  Court's indulgence, Judge.

14:39:37   8          THE COURT:  Yes.

14:40:25   9   BY MR. POTTER:

14:40:26   10  Q.   Colonel Cills, did you prepare any documents

14:40:28   11  relating to the defendant's separation from the National

14:40:31   12  Guard?

14:40:32   13  A.   I did.

14:40:35   14  Q.   And in the documents that you created, what was the

14:40:45   15  reason for the separation from the National Guard?

14:40:48   16         MR. JUPITER:  Your Honor, I object.

14:40:49   17         THE COURT:  Sustained.

14:41:05   18         MR. POTTER:  Court's indulgence, Judge?

14:41:17   19        That's all I have for the witness at this time,

14:41:23   20  Judge.

14:41:23   21         THE COURT:  Let me see counsel briefly at

14:41:25   22  sidebar.

14:41:31   23        (Sidebar discussion held as follows:)

14:41:32   24         THE COURT:  Let me just have counsel up here.

14:41:41   25        Why is this relevant?

14:41:44   1          MR. POTTER:  It goes to motive, Judge.  It goes

14:41:46   2   to motive for why she held two positions.

14:41:49   3      She was separated from the Guard because she could

14:41:52   4   not get clearance because she had financial

14:41:56   5   difficulties.  And because of her finances, the National

14:41:59   6   Guard terminated her.

14:42:01   7      And I think it's relevant because in our view the

14:42:06   8   reason and the motive behind her having two positions at

14:42:08   9   the same time within the Guard is because she was having

14:42:12  10   financial difficulties.

14:42:13  11          THE COURT:  And you want to establish that by

14:42:16  12   what, having this witness give a conclusory utterance,

14:42:22  13   that they fired her or terminated her because of that?

14:42:25  14      How would that establish that the witness has

14:42:28  15   motive -- I mean that the defendant had motive?

14:42:34  16          MR. POTTER:  I can lay a better foundation.

14:42:36  17          THE COURT:  You still haven't answered my

14:42:37  18   question.  If this witness is going to -- you want this

14:42:40  19   witness to make some conclusory sort of utterance:  We

14:42:43  20   fired her because she had financial difficulties.

14:42:46  21      How does that establish that the defendant had a

14:42:48  22   financial motive to do what she was doing?

14:42:52  23          MR. POTTER:  Well, Judge, it's -- of course

14:42:54  24   it's circumstantial evidence of that motive.

14:42:56  25          THE COURT:  Well, circumstantial evidence would

14:42:59  1    be you have evidence of her being late on her mortgage

14:43:02  2    payments and that sort of stuff, not someone making a

14:43:05  3    conclusory statement.

14:43:08  4         MR. POTTER:  Well, Judge, that's why -- with

14:43:09  5    this witness --

14:43:10  6         THE COURT:  Let me ask you this:  You said she

14:43:13  7    had financial difficulties.  What do you have to

14:43:15  8    establish that she has financial difficulties, that goes

14:43:18  9    towards motive?

14:43:19  10        MR. POTTER:  The fact that she could not pass

14:43:21  11   her background security clearance --

14:43:23  12        THE COURT:  Doesn't that cause us to dig in to

14:43:25  13   why she didn't pass the clearance?

14:43:28  14     What if they're wrong?

14:43:29  15     Do you have something to indicate she wasn't paying

14:43:32  16   her phone bill, she was not getting loans because of

14:43:35  17   insufficient income?

14:43:39  18        MR. POTTER:  Yes.  The denial of her security

14:43:42  19   clearance explains exactly why she is being denied

14:43:46  20   security clearance, and it is because of her

14:43:49  21   indebtedness, of her lack of -- well, because of her

14:43:53  22   indebtedness.

14:43:54  23        THE COURT:  You're getting a third party to

14:43:56  24   bring in something, and there -- and then the jury would

14:43:58  25   have to rely on that third party's assessment in order

14:44:02    1    for the jury to make an assessment.

14:44:05    2            MR. POTTER:  Well, Judge, it's a part of her

14:44:09    3    employment record at the National Guard, and it's a part

14:44:11    4    of her file.  And I see no reason why we can't bring

14:44:15    5    that record in under a business record.

14:44:17    6            THE COURT:  Well, I'm concerned about a 403

14:44:22    7    minitrial on that.  If you had had something that isn't

14:44:26    8    as indirect -- here we have this witness who is going to

14:44:30    9    say something about someone else's conclusion, based on

14:44:34   10    some other source information, correct?

14:44:36   11        That is, she is going to talk about someone else's

14:44:40   12    conclusion, denial of security clearance --

14:44:41   13            MR. POTTER:  Yes.

14:44:42   14            THE COURT:  -- based on that other person who

14:44:43   15    is not here, their assessment of other documents or

14:44:49   16    things.

14:44:50   17        I don't know what they are.  They're not on the

14:44:53   18    record what they are.  I don't know if she was behind on

14:44:55   19    some sort of payment.  I don't know if she was doing

14:44:58   20    something that brought her finances into question.

14:45:00   21            MR. POTTER:  So the only way for us to get that

14:45:02   22    in, Judge, would be -- I'm trying to understand the

14:45:06   23    Court's reasoning -- to bring in the person who actually

14:45:10   24    did --

14:45:10   25            THE COURT:  I'm not telling you how to bring it

14:45:11  1   in.  I'm just telling you the problem with this witness

14:45:14  2   is precisely what I said.  This witness is going to make

14:45:16  3   an utterance.  It is conclusory.  It is going to be an

14:45:21  4   utterance based on someone else's utterance.

14:45:23  5       And that person, who might be a security clearance

14:45:26  6   component of the agency, looked at some information from

14:45:28  7   another person or another entity, that suggested that

14:45:31  8   she has some financial problem.

14:45:39  9       I think it seems that you've got all these indirect

14:45:42  10  things -- and circumstantial evidence is fine as well.

14:45:46  11  But I'm talking about -- it seems to me I'm going -- you

14:45:48  12  want to prove up something that I think would be

14:45:51  13  significant, which is motive, and you're doing it in a

14:45:54  14  way that I think that could create a 403, and perhaps

14:46:02  15  some other evidentiary issues as well.

14:46:04  16      But it runs the risk of, I think, leading to a

14:46:08  17  minitrial on the issue of what underpins those

14:46:14  18  conclusions.  So -- anyway, thank you, Counsel.

14:46:23  19          MR. POTTER:  Thank you, Judge.

14:46:24  20      (End sidebar discussion, open court as follows:)

14:46:49  21  BY MR. POTTER:

14:46:49  22  Q.   Colonel Cills, I have one, one last question.

14:46:56  23      You indicated that you were a deputy personnel

14:47:02  24  director?

14:47:03  25  A.   Deputy chief of staff of personnel, which is

14:47:06   1    overseeing the Military Personnel Office, yes.

14:47:09   2    Q.   And in that position, are you aware of any dual

14:47:31   3    employment for an employee who holds a military tech

14:47:35   4    assignment?

14:47:36   5    A.   No.

14:47:46   6              MR. POTTER:  No further questions Judge.

14:47:48   7              THE COURT:  Attorney Jupiter.

14:47:57   8                        CROSS-EXAMINATION

14:47:58   9    BY MR. JUPITER:

14:47:59  10    Q.   Good afternoon, Colonel Cills.

14:48:01  11    A.   Good afternoon.

14:48:03  12    Q.   Colonel Cills, are you aware whether or not --

14:48:06  13    there's a National Guard technician handbook, isn't

14:48:10  14    there?

14:48:10  15    A.   Yes.

14:48:11  16    Q.   Okay.  If you saw a copy of that handbook, would

14:48:14  17    you be able to identify it?

14:48:17  18    A.   There have been several during the course of my

14:48:20  19    employment, so I'm not sure.

14:48:21  20    Q.   Okay.

14:48:25  21              MR. JUPITER:  May I approach the witness, Your

14:48:26  22    Honor, since this is a several-page document?

14:48:30  23              THE COURT:  How many pages is it?

14:48:32  24         Is it more than four pages?

14:48:34  25              MR. JUPITER:  Yes, Your Honor.

14:48:35   1                   THE COURT:  Okay.  You can approach.

14:48:45   2             (Defendant's Exhibit 7 marked for identification.)

14:48:48   3                   MR. JUPITER:  I'm showing you what's been

14:48:49   4       marked as Defendant's Exhibit Number 7.

14:48:59   5       BY MR. JUPITER:

14:48:59   6       Q.   Can you tell me if that is a National Guard

14:49:05   7       technician handbook?

14:49:07   8                   THE COURT:  Attorney Jupiter, examine from the

14:49:09   9       lectern.

14:49:10  10                   MR. JUPITER:  Yes, sir.

14:49:13  11                   THE WITNESS:  This looks like one that has been

14:49:15  12       issued by the National Guard, yes.

14:49:18  13       BY MR. JUPITER:

14:49:19  14       Q.   Can you see the date on it?

14:49:20  15       A.   It's dated November 2009.

14:49:21  16       Q.   Okay.  And do you know if that particular Guard

14:49:27  17       handbook was in effect in November of 2009?

14:49:32  18       A.   If it says November 2009, I would guess so, yes.

14:49:35  19       Q.   Okay.  Do you see a section on that technician

14:49:40  20       handbook that deals with work hours, I believe on

14:49:43  21       page 5?

14:49:52  22       A.   You want --

14:49:54  23       Q.   Yes.  Can you read to the jury what that says?

14:49:56  24       A.   "The technician workweek" --

14:49:59  25                   MR. POTTER:  Objection, Your Honor.

14:50:00  1          THE COURT:  Sustained.

14:50:02  2  BY MR. JUPITER:

14:50:02  3  Q.   In fact, ma'am, the work hours are not set for a

14:50:06  4  military technician, are they?

14:50:09  5  A.   Not true.

14:50:12  6  Q.   Okay.  Does the handbook indicate that the work

14:50:14  7  hours are not set at 8:00 to 5:00, or does it say it's

14:50:21  8  set at 8:00 to 5:00?

14:50:25  9  A.   The --

14:50:26 10  Q.   Does it state in that --

14:50:28 11          MR. POTTER:  Objection, Your Honor.

14:50:29 12          THE COURT:  Overruled.

14:50:29 13  BY MR. JUPITER:

14:50:30 14  Q.   Does it state in the military tech handbook as to

14:50:34 15  what the workweek hours are?

14:50:35 16  A.   No, because each state would have its own policy.

14:50:38 17  Q.   Does it state in there, they are from 8:00 to 5:00?

14:50:41 18  A.   Does it state in here?  No, it does not.  Because

14:50:44 19  as I said, each state has its own policy.

14:50:47 20  Q.   You testified before about what's the general

14:50:50 21  workweek, right?

14:50:50 22  A.   Correct.

14:50:51 23  Q.   And that was general as to the military, right?

14:50:54 24  A.   I'm sorry?

14:50:55 25  Q.   That's general as to the military --

14:50:57   1    A.   Correct.

14:50:58   2    Q.   -- right?

14:50:58   3    A.   Correct.  Correct.

14:50:59   4    Q.   And that particular handbook regards all of the

14:51:01   5    military, doesn't it?

14:51:03   6    A.   All of the National Guard.

14:51:04   7    Q.   All of the National Guard, right?

14:51:06   8    A.   Correct.

14:51:07   9    Q.   Which the Virgin Islands National Guard would come

14:51:09   10   under, correct?

14:51:09   11   A.   Except that each state also has their individual

14:51:12   12   technician handbook that would establish their

14:51:15   13   individual working hours.

14:51:16   14   Q.   Okay.

14:51:18   15        MR. JUPITER:  Your Honor, I move to admit

14:51:22   16   Defense Exhibit Number 7.

14:51:23   17        MR. POTTER:  Objection, Judge.

14:51:25   18        MR. JUPITER:  Page 5 of Defendant's Exhibit 7.

14:51:27   19        THE COURT:  Under advisement.

14:51:29   20   BY MR. JUPITER:

14:51:29   21   Q.   And, ma'am, just to be clear, that particular book

14:51:33   22   states that you just work 80 hours over a two-week

14:51:38   23   period, doesn't it?

14:51:39   24   A.   On page 5?

14:51:40   25   Q.   Yes.

14:51:41   1    A.   Let me go back.

14:51:44   2            MR. POTTER:  Your Honor, I'm going to object to

14:51:47   3    any reference of that, any specific page of that

14:51:51   4    document.

14:51:52   5            THE COURT:  Sustained.

14:51:53   6        Next question.

14:51:55   7            MR. JUPITER:  Okay.

14:51:55   8    BY MR. JUPITER:

14:51:56   9    Q.   Now, you, in February of -- I'm sorry -- in April

14:52:05   10   of 2010, you were deputy chief of staff, correct?

14:52:10   11   A.   I was, yes.

14:52:11   12   Q.   You reported to General -- then-Colonel Lewis,

14:52:13   13   correct?

14:52:14   14   A.   Correct.

14:52:14   15   Q.   And you did not supervise the ESGR person?

14:52:18   16   A.   No, I did not.

14:52:18   17   Q.   And you did not supervise the military technician

14:52:23   18   person, correct?

14:52:23   19   A.   I had persons on my staff, yes.

14:52:26   20   Q.   You didn't supervise Sherrymae Morales?

14:52:29   21   A.   No, I did not.

14:52:29   22   Q.   You never supervised Sherrymae Morales, did you?

14:52:33   23   A.   No.

14:52:34   24   Q.   But you were familiar -- you had to --

14:52:37   25   Mrs. Morales -- the communication between her and you

14:52:39  1    was just to one specific area, correct, in terms of her

14:52:42  2    duties as the ESGR?

14:52:43  3    A.   As the ESGR that were related, yes.

14:52:48  4    Q.   And part of what the ESGR person had to do, the

14:52:52  5    contract position, the person in that contract position

14:52:59  6    has to make that request for funding, correct?

14:53:02  7    A.   I can't speak to the positions, what the position

14:53:06  8    did.  I just know my role with the position.

14:53:08  9    Q.   And your role was with the budget, wasn't it?

14:53:12  10   A.   Correct.

14:53:14  11   Q.   To make sure the budget --

14:53:15  12   A.   Was expended.

14:53:16  13   Q.   -- was expended?

14:53:17  14   A.   Correct.

14:53:17  15   Q.   And the person who you communicated with, with

14:53:20  16   regards to spending the budget, was the ESGR contract

14:53:25  17   person?

14:53:25  18   A.   Correct.

14:53:25  19   Q.   Not the volunteer, correct?

14:53:26  20   A.   Correct.

14:53:28  21   Q.   And in fact, when Mrs. Morales spoke to you at that

14:53:37  22   time, she was still the ESGR contract person?

14:53:42  23   A.   At which time?

14:53:43  24   Q.   Can I have Exhibit 10 published again?

14:53:43  25        (Exhibit published.)

14:53:43  1    BY MR. JUPITER:

14:54:30  2    Q.   Now, as you stated before, you were having contacts

14:54:38  3    with Mrs. Morales via e-mail --

14:54:40  4    A.   Correct.

14:54:40  5    Q.   -- about spending funds for ESGR, correct?

14:54:44  6    A.   Correct.

14:54:45  7    Q.   And you always had those contacts with the ESGR

14:54:50  8    contract person, Mrs. Morales, didn't you?

14:54:53  9    A.   And her, she also had an assistant at some point,

14:54:57  10   so those two.

14:54:57  11   Q.   Those two paid positions, correct?

14:55:00  12   A.   Correct.

14:55:00  13   Q.   And that's what you're talking about a budget in

14:55:03  14   this e-mail, correct?

14:55:04  15   A.   Correct.  Uhm-hmm.

14:55:05  16   Q.   And at this time she's working as a military

14:55:08  17   technician, correct?

14:55:09  18   A.   Correct.

14:55:10  19   Q.   And also, she -- you were not at this time a person

14:55:17  20   who would be involved in hiring her replacement, would

14:55:21  21   you?

14:55:22  22   A.   No.

14:55:22  23   Q.   That would be something that would come with the

14:55:25  24   concurrence of General Lewis, correct, then-Colonel

14:55:29  25   Lewis?

14:55:30  1    A.    Correct.

14:55:31  2    Q.    And in terms of -- you had no discussions with her

14:55:35  3    in terms of who was going to replace her, correct?

14:55:38  4    A.    Just what you see on the e-mail.

14:55:40  5    Q.    That's the only communication you had, right?

14:55:43  6    A.    Yes.

14:55:43  7    Q.    Okay.  You were not privy to discussions with her,

14:55:47  8    Mr. Hignite or Colonel Lewis regarding --

14:55:52  9    A.    About a replacement?

14:55:53  10   Q.    -- about a replacement?

14:55:55  11   A.    No, I was not.

14:55:56  12   Q.    At that time?

14:55:57  13   A.    No, I was not.

14:55:58  14   Q.    And, in fact, you did not know anyone who stepped

14:56:01  15   into this position for the rest of this year, did you?

14:56:05  16   A.    For the rest of which year?

14:56:07  17   Q.    The rest of 2010?

14:56:09  18   A.    To my knowledge, there was no one in the position

14:56:11  19   full-time.

14:56:15  20   Q.    All right.  Now, it indicates -- Mr. Morales

14:56:18  21   indicated to you in her response, I -- "I'll be staying

14:56:26  22   on in a voluntary capacity," correct?

14:56:28  23   A.    Uhm-hmm.

14:56:28  24   Q.    Now, when she says "I'll be staying," does that

14:56:31  25   indicate to you:  I will be staying?

14:56:36  1          I- apostrophe -l-l, is that:  I will be staying?

14:56:41  2     A.   That's what it means.

14:56:45  3     Q.   Okay.  So in terms of -- you knew she was the ESGR

14:56:49  4     person prior to this e-mail, correct?

14:56:53  5     A.   Correct.

14:56:53  6     Q.   You never heard of her resigning, correct?

14:56:57  7     A.   I wouldn't have, because --

14:56:59  8     Q.   Okay.

14:57:01  9     A.   -- because I was not involved in the selection or

14:57:04  10    replacement process.

14:57:05  11    Q.   Right.  And you never heard of a replacement,

14:57:08  12    correct?

14:57:08  13    A.   This was --

14:57:08  14    Q.   And you never heard of a replacement, did you?

14:57:12  15    A.   This was within a few weeks coming on board as

14:57:16  16    technician, so there was a window there.  Normally we

14:57:18  17    don't bring people on immediately, so normally there

14:57:21  18    would be a window there before --

14:57:23  19    Q.   You wouldn't bring people on period, do you?

14:57:26  20    A.   I wouldn't say I don't bring people on.  In this

14:57:31  21    particular case, no.

14:57:32  22    Q.   And she indicated to you that it would be sometime

14:57:38  23    in the future, she would stay on as a volunteer?

14:57:40  24    A.   I interpret that as, "I will now."

14:57:44  25    Q.   Okay.

14:57:45  1   A.   I -- yeah.

14:57:47  2   Q.   Well, so you're -- at this time you're thinking

14:57:51  3   she's going to get a replacement, correct?

14:57:53  4   A.   Which is why I asked for the name, yes.

14:57:56  5   Q.   Okay.  Well, did you ask for a name in there?

14:57:59  6   A.   In the bottom it says, "If you can pass on to the

14:58:02  7   ESGR and/or your replacement, that would be helpful as

14:58:05  8   well."

14:58:06  9   Q.   You didn't ask for --

14:58:07  10  A.   Well, not a name.

14:58:08  11  Q.   You didn't ask her for a name, did you?

14:58:10  12  A.   No.

14:58:10  13  Q.   Okay.  And the next month you never asked her for a

14:58:14  14  name, did you?

14:58:15  15  A.   No.

14:58:15  16  Q.   And as far as you knew, there was no replacement

14:58:24  17  for the rest of that year?

14:58:25  18  A.   Correct.

14:58:26  19  Q.   And at some point, Baron Hignite -- I want to move

14:58:35  20  you forward to September of 2011.

14:58:37  21       First of all, when did your position change as far

14:58:40  22  as chief of staff?

14:58:41  23  A.   I took this job in January of 2012.

14:58:44  24  Q.   Okay.  When did your position change from being --

14:58:47  25  assistant deputy chief of staff, right?

14:58:52  1          Was --

14:58:52  2     A.   I served from 2007 until the summer of 2010.  I was

14:58:56  3     gone for about six months.  And then I came back into

14:58:59  4     the position for a year, which is 2011.

14:59:02  5     Q.   Okay.  So January 2011, you were a what?

14:59:05  6     A.   2011, I was the deputy chief of staff of personnel.

14:59:11  7     Q.   Okay.  You were deputy chief of staff --

14:59:14  8     A.   In January of 2011, yes.

14:59:16  9     Q.   Okay.  And part of your duties were that you're

14:59:20  10    supposed to oversee this -- see who has this ESGR

14:59:26  11    contract, correct?

14:59:26  12    A.   That was one of about over 20 accounts, yes.

14:59:30  13    Q.   Okay.  And you're saying that between April --

14:59:39  14    between January of 2011 and summer of 2- -- June of

14:59:47  15    2011, you had no knowledge of who the ESGR person was?

14:59:52  16    A.   There was someone that replaced me at the latter

14:59:56  17    part of 2010 to when I came back to the position in

15:00:02  18    January.  Until she departed in April, there was no

15:00:07  19    named person.

15:00:07  20          So just like the person who replaced me, I

15:00:10  21    continued on to -- not communicate with her, I think

15:00:13  22    most of my communication at the time was with

15:00:16  23    Ms. Lescott who was the admin assistant.

15:00:20  24    Q.   Okay.  Is that a no, that you did not know, between

15:00:22  25    January and June -- you're saying you did not know

15:00:25  1    who --

15:00:25  2    A.   Between January and April when she left, there was

15:00:28  3    no named ESGR replacement.

15:00:31  4    Q.   Well, Baron Hignite called you in 2011, didn't he?

15:00:36  5    A.   There was absolutely no communication --

15:00:38  6    Q.   Baron --

15:00:40  7    A.   -- in 2011.

15:00:42  8    Q.   Ma'am, Baron Hignite called you in 2011, didn't he?

15:00:46  9    A.   He did not.

15:00:47  10   Q.   And Mr. Hignite -- as a matter of fact, during that

15:00:50  11   time period Baron Hignite would have to get your

15:00:59  12   concurrence --

15:01:00  13   A.   There was zero communication in 2011 between

15:01:03  14   Mr. Hignite and I.

15:01:07  15   Q.   Okay.  And you -- you participated in ESGR events

15:01:13  16   besides this luncheon?

15:01:15  17   A.    I didn't participate in the luncheon.  My staff --

15:01:18  18   you see a lot of communication with me, but my staff did

15:01:21  19   a lot of the leg work in terms of the orders, the

15:01:24  20   communication with the hotel, the paying of the bills,

15:01:27  21   et cetera.

15:01:27  22   Q.   And the person that you would contact -- that the

15:01:32  23   staff would contact would be Mrs. Morales, correct?

15:01:36  24   A.    It depends on the time frame.  Because a majority

15:01:40  25   of the time it would be Mrs. Lescott, the admin

15:01:45   1   assistant.

15:01:46   2   Q.   And at some point you became aware of -- ma'am, you

15:02:01   3   worked in the same building as Mrs. Morales?

15:02:03   4   A.   We've worked on opposite sides of the building,

15:02:06   5   correct.

15:02:06   6   Q.   On the same floor?

15:02:07   7   A.   All on one level.

15:02:09   8   Q.   But you wouldn't see Mrs. Morales?

15:02:11   9   A.   No, because there were different entrances to

15:02:15  10   different sides of the building.

15:02:16  11   Q.   And you didn't have a personal relationship with

15:02:18  12   Mrs. Morales, correct?

15:02:19  13   A.   No.

15:02:19  14   Q.   And you didn't attend any of the ESGR events

15:02:22  15   besides this luncheon?

15:02:23  16   A.   I did not attend the luncheon.  I did not attend

15:02:26  17   any of the events.

15:02:35  18        MR. JUPITER:  No further questions -- some

15:02:39  19   other questions, Your Honor.

15:02:42  20   BY MR. JUPITER:

15:02:42  21   Q.   You were aware of Mrs. Morales' efforts to get a

15:02:46  22   replacement, weren't you?

15:02:47  23   A.   No, I was not.

15:02:48  24   Q.   Okay.  You were aware of her, in 2011, trying to

15:02:55  25   get Janice Aelleyne to be the replacement, weren't you?

15:02:58 1   A.   No, I did not.

15:02:59 2   Q.   Did you draw a travel order for Ms. Aelleyne to

15:03:03 3   attend an ESGR?

15:03:04 4   A.   There was an order that I found, which was passed

15:03:07 5   on.  It was signed -- just like a lot of other persons

15:03:11 6   that were traveling on ESGR funds, so you will see my

15:03:14 7   signature on all of those orders.

15:03:16 8       My staff would prepare them based on the request

15:03:20 9   that they got, and I would sign them.

15:03:27 10           MR. JUPITER:  I want to show you what I'm

15:03:29 11  marking as Defense Exhibit Number 8.

15:03:31 12       (Defendant's Exhibit 8 marked for identification.)

15:04:06 13           THE COURT:  Why don't we use the Elmo so we can

15:04:08 14  move along.

15:04:09 15           MR. JUPITER:  Yes, Your Honor.

15:04:09 16           THE COURT:  Use the Elmo.

15:04:16 17  BY MR. JUPITER:

15:04:16 18  Q.   Showing you the top of Defendant's Exhibit

15:04:21 19  Number 8, a three-page document --

15:04:23 20  A.   Right.

15:04:24 21  Q.   -- do you recognize that?

15:04:26 22  A.   Yes.  It's an e-mail from me to Mrs. Morales on

15:04:32 23  February 11, '11.

15:04:35 24  Q.   And the second page, is that a continuation of it?

15:04:37 25  Of the e-mail string?

15:04:40   1    A.   Yes.

15:04:41   2    Q.   Okay.

15:04:42   3    A.   There's an e-mail for an invitational travel order.

15:04:47   4    Q.   And the third page of it, is that the -- can you

15:04:51   5    see that?

15:04:52   6    A.   That would have been an invitational travel order

15:04:56   7    drafted by my staff for my signature.

15:04:58   8    Q.   Okay.  And you're saying your staff did that, but

15:05:00   9    you didn't see it?

15:05:01   10   A.   If I -- if you see one with my signature on it,

15:05:06   11   then yes.

15:05:07   12   Q.   So you're saying --

15:05:08   13   A.   Because there are a number of persons that traveled

15:05:10   14   on the ESGR funds for training, so I would sign

15:05:13   15   invitational travel for all of those persons.

15:05:15   16            MR. JUPITER:  Okay.

15:05:16   17       No further questions, Your Honor.

15:05:17   18            THE COURT:  Any redirect?

15:05:19   19            MR. POTTER:  Yes, Judge.

15:05:20   20                    REDIRECT EXAMINATION

15:05:21   21   BY MR. POTTER:

15:05:30   22   Q.   Colonel Cills, when you sent that e-mail --

15:05:35   23            MR. POTTER:  Put back up that e-mail, please.

15:05:38   24   Government's Exhibit 10.

15:05:53   25       And can you highlight the portion, "I know you are

15:05:56  1   no longer the..."

15:06:13  2   BY MR. POTTER:

15:06:13  3   Q.   Now, Colonel Cills, did Mrs. Morales ever correct

15:06:16  4   you and say, "I am still the ESGR coordinator"?

15:06:22  5       You start out your email, "I know you are no longer

15:06:25  6   the ESGR coordinator..."

15:06:28  7       Did she ever say to you, "No, I am still the ESGR

         8   coordinator?

         9   A.   No.  It's indicated in the reply she would be

        10   staying on in a voluntary capacity.

        11   Q.   And comparing her response that was given to your

        12   question, how did you interpret her response --

        13       THE COURT:  All right.  Let's move on.

15:07:21 14       Next question.

15:07:21 15       MR. POTTER:  Yes.

15:07:21 16   BY MR. POTTER:

15:07:22 17   Q.   Did you ever see time sheets to determine --

15:07:24 18   A.   No.

15:07:25 19   Q.   -- ESGR --

15:07:25 20   A.   I would not have seen those, no.

15:07:30 21   Q.   When you returned in -- is it 2011?

15:07:35 22   A.   2011, correct.

15:07:36 23   Q.   The majority of your communications regarding ESGR,

15:07:40 24   who was that with?

15:07:41 25   A.   At that point it was with Ms. Lescott.

15:08:12   1    Q.    Now --

15:08:15   2          MR. POTTER:  Court's indulgence?

15:08:16   3          THE COURT:  Yes.

15:08:16   4       (Pause)

15:08:16   5          MR. POTTER:  Could you put back up Exhibit 10,

15:08:20   6    please.

15:08:36   7       Could you make it bigger, I guess?

15:08:50   8    BY MR. POTTER:

15:08:50   9    Q.    Now, at the bottom of the e-mail Ms. Morales

15:09:00  10    responds to you.  What title does she use in responding

15:09:03  11    to your e-mail?

15:09:05  12    A.    She uses her military rank.

15:09:08  13    Q.    Did she respond to you, "Morales, ESGR

15:09:12  14    coordinator"?

15:09:13  15          MR. JUPITER:  Objection, Your Honor.

15:09:14  16          THE COURT:  Sustained.

15:09:14  17       You're becoming argumentative.  You're leading your

15:09:17  18    witness.

15:09:18  19          MR. POTTER:  Yes, Judge.

15:09:19  20          THE COURT:  Let's move on.

15:09:26  21          MR. POTTER:  That's all I have, Judge.

15:09:29  22          THE COURT:  Colonel Cills, thank you for your

15:09:31  23    testimony.

15:09:32  24       You may step down.

15:09:32  25       (Witness withdrew from stand.)

15:09:33   1           THE COURT:  Ladies and gentlemen, it is time

15:09:35   2   for our afternoon break.  We'll take a 15-minute break

15:09:38   3   and then we'll resume.

15:09:41   4       (Jury out)

15:10:28   5           THE COURT:  Counsel, we'll resume in

15:10:31   6   15 minutes.

15:10:31   7       We'll hear the civil matter in chambers.

15:46:16   8       (Court in recess, 3:10 p.m.)

15:46:16   9       (After recess, 3:46 p.m., jury present)

15:46:22  10           THE COURT:  Call your next witness.

15:46:23  11           MR. POTTER:  Yes, Judge.  The government calls

15:46:26  12   General Elton Lewis.

15:46:51  13       (Witness sworn)

15:46:52  14           THE WITNESS:  I do.

15:47:15  15       (Pause)

15:47:15  16           MR. POTTER:  Your Honor, there seem to be some

15:47:20  17   documents --

15:47:20  18           THE COURT:  If you want to retrieve them, you

15:47:22  19   can retrieve them.

15:47:23  20           MR. POTTER:  I don't know who they belong to.

15:47:26  21           THE COURT:  They're yours, Attorney Jupiter?

15:47:28  22           MR. JUPITER:  Yes, Your Honor.

15:47:29  23           THE COURT:  Okay.  Can you retrieve them?

15:47:30  24           MR. POTTER:  May I proceed, Judge?

15:47:32  25           THE COURT:  Yes.

15:47:32  1              THEREUPON, ELTON LEWIS, having been duly sworn,

15:47:32  2    was examined and testified as follows:

15:47:32  3                        DIRECT EXAMINATION

15:47:32  4    BY MR. POTTER:

15:47:32  5    Q.    Good afternoon, sir.

15:47:33  6    A.    Good afternoon.

15:47:34  7    Q.    Could you give us your full name for the record,

15:47:36  8    please, and then spell your first and your last name for

15:47:39  9    the court reporter?

15:47:40  10   A.    My name is Elton Lewis, spelled E-l-t-o-n, last

15:47:46  11   name Lewis, L-e-w-i-s.

15:47:48  12   Q.    And, sir, do you have a military rank?

15:47:54  13   A.    I do.  My retired rank is brigadier general.

15:48:01  14   Q.    And how are you currently employed?

15:48:03  15   A.    Actually, I am officially retired from the

15:48:06  16   Government of the Virgin Islands.

15:48:15  17   Q.    When you worked for the -- well, did you in fact

15:48:18  18   work for the National Guard?

15:48:19  19   A.    I did.

15:48:20  20   Q.    And how long were you attached to the Virgin

15:48:24  21   Islands National Guard?

15:48:24  22   A.    I retired from the Virgin Islands National Guard

15:48:27  23   after 38 years of service.  I officially retired in

15:48:31  24   August of 2014.

15:48:39  25   Q.    And just briefly, what are some of the positions

15:48:42  1    that you have held in the Guard over those 30-something

15:48:47  2    years?

15:48:47  3    A.   Well, I held numerous positions, from the second

15:48:50  4    lieutenant all the way up to colonel, then a flight

15:48:54  5    officer, meaning the brigadier general, all competitive

15:49:01  6    ranks that required a number of schooling throughout the

15:49:05  7    years.

15:49:06  8    Q.   And let me draw your attention to back in 2007.

15:49:13  9    Were you employed with the Guard in 2007?

15:49:17 10    A.   Yes, sir.  Actually, I came in as the director of

15:49:20 11    the joint staff for the Virgin Islands National Guard in

15:49:23 12    August of 2007.

15:49:26 13    Q.   As director of the joint staff, what are your --

15:49:30 14    what were some of your duties and responsibilities?

15:49:32 15    A.   As the director, I had the overall operational,

15:49:37 16    daily operation of the Guard.  That means I deal with a

15:49:40 17    lot of the administrative logistics and operational

15:49:44 18    matters on a daily basis.

15:49:46 19    Q.   Okay.  Sir, are you familiar with Sherrymae

15:49:50 20    Morales?

15:49:51 21    A.   I am.

15:49:51 22    Q.   And tell us how you know Mrs. Morales.

15:49:56 23    A.   Well, I knew Mrs. Morales from -- from the time,

15:50:01 24    actually, from a young kid.  We probably pretty much

15:50:05 25    grow up in the same neighborhood.

15:50:07   1          Then over a period of time she, I believe, left.

15:50:11   2    And my association again with her was back when she --

15:50:16   3    we were both in the 61st Military Police Company of the

15:50:21   4    Virgin Islands National Guard.

15:50:23   5    Q.   And do you know -- did there come a time that she

15:50:32   6    retired from the Guard, that you know of?

15:50:35   7    A.   Yes.  She did retire, as far as I know.

15:50:38   8    Q.   Do you recall what year that would have been?

15:50:42   9    A.   I don't recollect the year that she would have

15:50:46   10   retired.

15:50:51   11   Q.   Now in 2007, what, if any, position, do you know

15:50:55   12   that Mrs. Morales held related to the National Guard?

15:51:00   13   A.   2007, she held the position with MPSC, the ESG--

15:51:16   14   ESGR, I'm sorry.

15:51:17   15   Q.   What is MPSC?

15:51:18   16   A.   I don't know the acronym or the actual spelling of

15:51:21   17   the name, but it had something to do with the ESGR,

15:51:24   18   which is the Guards and Reserve component.

15:51:34   19   Q.   And do you know how long she held that position?

15:51:39   20   A.   I am not sure how long she held that position.

15:51:47   21   Back in 2007, and I don't recall, regular, how long she

15:51:51   22   would have held that progress.

15:51:53   23   Q.   Now, back in 2007 when she was in the ESGR contract

15:52:00   24   position, did you have any supervisory authority over

15:52:05   25   her?

15:52:06  1    A.    I wouldn't say that I had direct supervisory

15:52:09  2    authority over her.   I was one of those individuals that

15:52:13  3    made the recommendation to hire her through the contract

15:52:18  4    process, when that process -- when that event came, came

15:52:24  5    up.

15:52:32  6    Q.    Now, while Mrs. Morales was employed as an ESGR,

15:52:41  7    what, if any, conversations did you have with her

15:52:45  8    regarding her desire to return to the National Guard?

15:52:55  9    A.    I believe it became a point where there were a

15:53:00  10   number of deployments during that period of time.   And

15:53:05  11   Colonel Adams, who were the G5, meaning the strategic

15:53:12  12   planner at the time, were deployed at Guantanamo Bay.

15:53:20  13   And at that point Morales expressed an interest in that

15:53:23  14   position, to fill the absence of Colonel Adams while she

15:53:27  15   was on deployment.

15:53:30  16   Q.    And after she expressed this interest, what, if

15:53:38  17   anything, did you do to assist her in getting this

15:53:41  18   position?

15:53:41  19   A.    Well, I couldn't assist her in anything.   There's a

15:53:44  20   process that has to be done.   So it's not like because

15:53:47  21   she's interested in it, I have the authority to hire

15:53:50  22   her.   I don't have the authority to hire.   It's a

15:53:52  23   process that she has to go through, a competitive

15:53:54  24   process.

15:53:55  25        A number of people would have applied for the

15:53:56   1    position, and then based on qualifications.  And even up

15:53:59   2    at the end of the qualifications, I still don't have

15:54:03   3    that authority.  I can only recommend.  The final

15:54:06   4    authority of hiring would be based -- would be that of a

15:54:09   5    adjutant general, which is General Rivera.

15:54:21   6    Q.   Are you aware whether or not Mrs. Morales was

15:54:23   7    ultimately hired for a military-type position with the

15:54:28   8    Guard?

15:54:28   9    A.   She was.

15:54:29   10   Q.   To the best of your recollection, do you recall

15:54:33   11   approximately when that was?

15:54:35   12   A.   To the best of my recollection, Attorney, I can't

15:54:38   13   remember exactly what month or what year that would have

15:54:41   14   been.  I would have had -- I would have to see

15:54:44   15   documents.  I just don't remember offhand.

15:54:48   16   Q.   Okay.

15:54:48   17        (Pause)

15:54:58   18        Now, you said you had knowledge of Morales from

15:55:01   19   when she entered the Guard.

15:55:02   20   A.   Correct.

15:55:03   21   Q.   Do you know some of the positions that she held in

15:55:06   22   the Guard?

15:55:06   23   A.   Major Morales held numerous positions in the Guard,

15:55:10   24   that of company commander, that of platoon leader.  And

15:55:14   25   I know that she held for a number of years the HRO,

15:55:19  1   which meaning the human resources officer for the

15:55:24  2   Guards, which has oversight of all personnel action

15:55:28  3   within the Guard.

15:55:30  4       And even with those personnel actions, the ESGR

15:55:37  5   program, also, she would have some limited --

15:55:40  6            MR. JUPITER:  I would object to nonresponsive.

15:55:42  7            THE COURT:  Overruled.

15:55:52  8   BY MR. POTTER:

15:55:53  9   Q.   Now after Morales reentered the Guard, what, if

15:56:02  10  any, request did she make of you?

15:56:04  11  A.   In terms of, of what?

15:56:10  12  Q.   In terms of her --

15:56:11  13           MR. JUPITER:  Object to leading.

15:56:12  14           THE COURT:  Sustained.  You can't lead your own

15:56:14  15  witness.

15:56:14  16           MR. POTTER:  Yes, Judge.

15:56:15  17           THE COURT:  Answer the question as best you

15:56:17  18  can.

15:56:19  19           THE WITNESS:  Attorney, could you repeat that?

15:56:21  20           MR. POTTER:  Yes.

15:56:21  21  BY MR. POTTER:

15:56:26  22  Q.   Once Morales entered the Guard, were you aware that

15:56:30  23  she reentered the Guard?

15:56:32  24  A.   Yes, I did.

15:56:33  25  Q.   Do you know what position she held when she came

15:56:35  1    back on to the Guard?

15:56:36  2    A.    Well, she held two positions.  The first one would

15:56:40  3    have been the ESGR position, and the second one would

15:56:46  4    have been the J5 position.  And so the last position I

15:56:53  5    know that she held was the J5 position.

15:56:59  6    Q.    Now you mentioned the ESGR position.  Is that a

15:57:02  7    position within the National Guard?

15:57:05  8          What was the nature of that --

15:57:07  9          MR. JUPITER:  Objection, Your Honor.  This

15:57:09  10   witness is not qualified to testify to that.

15:57:13  11          THE COURT:  All right.  Let me hear the

15:57:14  12   complete question before I rule on the objection.

15:57:19  13          MR. POTTER:  I'll rephrase the question, Judge.

15:57:21  14          THE COURT:  All right.

15:57:24  15   BY MR. POTTER:

15:57:25  16   Q.    When Mrs. Morales was hired as the, as you say, a

15:57:31  17   G5 --

15:57:32  18   A.    J5.

15:57:33  19   Q.    -- J5, what happened to her ESGR contract position?

15:57:42  20   A.    Well, Major Morales could not have held two

15:57:46  21   positions --

15:57:47  22          MR. JUPITER:  Objection, Your Honor.  First of

15:57:49  23   all, it's not responsive --

15:57:50  24          THE COURT:  Sustained.

15:57:52  25

BY MR. POTTER:

Q.   Did you have any conversations with her regarding her ESGR position?

A.   I remember distinctly at one point Major Morales indicated to me or expressed to me if I would accept her appointing two positions.

     And my response to her was:  No, you can't do that.

     You know, I think my exact words was something to the effect that, "You crazy."

Q.   Now, were you her direct supervisor in her J5 position?

A.   In her J5 position I was her direct supervisor, yes, I was.

Q.   And what did she do as a J5?

A.   A J5, again, is basically a strategic planner position.  And she also have daily responsibility of drafting letters, both for myself and the adjutant general.  She review regulations and policies and that sort of things.

Q.   And what are the hours of work of the J5, under your supervision?

A.   It would be normally -- work officially starts at 8:00, but normally Morales would be there like 7:30 in the morning, until 5:00, or if there are other activities, even after that.

15:59:47  1    Q.    So the regular working hours --

15:59:49  2    A.    Correct.

15:59:53  3    Q.    -- would be what?  The regular working hours?

15:59:56  4    A.    Well, our regular working hours would normally be

15:59:58  5    8:00 to 5:00.

15:59:59  6    Q.    What days of the week?

16:00:01  7    A.    Yeah.

16:00:01  8    Q.    What days of the week?

16:00:02  9    A.    That would be Monday through Friday.

16:00:12  10   Q.    And where was her office located as a J5?

16:00:18  11   A.    J5, her office was located in the La Grande area.

16:00:24  12   We had the old O'Neal building at the time, and she

16:00:27  13   would have occupied an office on the eastern end of the

16:00:31  14   building.

16:00:32  15   Q.    And General, do you see Mrs. Morales here in court

16:00:38  16   today?

16:00:38  17   A.    Yes.

16:00:38  18   Q.    And could you point her out and tell us where she

16:00:42  19   is seated, an article of clothing that she's wearing?

16:00:45  20   A.    Well, I can't see her article of clothing, but

16:00:48  21   she's sitting next to counsel, to your right.

16:00:51  22             THE COURT:  You need to stand up?

16:00:55  23             MR. POTTER:  If you need stand up to see, you

16:00:57  24   can stand up.

16:00:58  25             THE WITNESS:  Major Morales is sitting right

16:01:01  1    next to counsel.  She has a brown suit on with a white

16:01:06  2    blouse, with gold earrings.

16:01:13  3              MR. POTTER:  Your Honor, could the record

16:01:14  4    reflect the identification of Sherrymae Morales?

16:01:17  5              THE COURT:  Yes, the record will reflect that

16:01:19  6    the witness has identified the defendant, Sherrymae

16:01:22  7    Morales.

16:01:32  8    BY MR. POTTER:

16:01:33  9    Q.   Now, General, do you know whether Mrs. Morales

16:01:35  10   resigned the ESGR position?

16:01:37  11             MR. JUPITER:  Object to leading, Your Honor.

16:01:39  12             THE COURT:  Sustained.

16:01:40  13   BY MR. POTTER:

16:01:41  14   Q.   With respect to Ms. Morales ESGR position, what

16:01:50  15   information, if any, do you have regarding whether she

16:01:53  16   kept that position?

16:01:55  17   A.   I am not aware of Major Morales holding or keeping

16:02:01  18   any ESGR position, particularly when she was already

16:02:05  19   hired as the J5.  So she would have had to, had she --

16:02:09  20             MR. JUPITER:  Objection to the witness' -- is

16:02:14  21   nonresponsive, and the witness is about to express

16:02:17  22   opinion.

16:02:18  23             THE COURT:  Well, I haven't heard what he said.

16:02:20  24   I didn't get a sense --

16:02:21  25             Go ahead.

16:02:21  1             THE WITNESS:  I'm sorry?

16:02:23  2             THE COURT:  Wait for the next question.

16:02:26  3       Go ahead.

16:02:44  4   BY MR. POTTER:

16:02:44  5   Q.   What actions, if any, did you take to confirm

16:02:48  6   whether or not Mrs. Morales had resigned the ESGR

16:02:54  7   position?

16:02:56  8   A.   Actually, none.  Because I would imagine, as a

16:03:02  9   senior officer, when you get instructions --

16:03:05  10             MR. JUPITER:  Objection, Your Honor.

16:03:06  11             THE COURT:  Again, don't tell us what you

16:03:09  12   imagine.  Just tell us what you did and what you

16:03:11  13   observed.

16:03:12  14       All right.  Wait for the next question.

16:03:17  15   BY MR. POTTER:

16:03:18  16   Q.   Why did you take no action to verify?

16:03:21  17   A.   Because she was specifically told that there is

16:03:26  18   only one position at any given time.  So once I

16:03:31  19   established that, it is just my assumption that as a

16:03:35  20   senior officer, that is, that is the order.

16:03:56  21   Q.   Now, what conversation did you have with anyone

16:03:58  22   else within the Guard regarding Morales's initial

16:04:04  23   request to you to hold both the ESGR and the military

16:04:09  24   tech position?

16:04:10  25             MR. JUPITER:  Your Honor, I would object.  This

16:04:13   1    witness has testified he doesn't know when --

16:04:16   2            THE COURT:  Stop -- overruled.

16:04:20   3            THE WITNESS:  When that conversation was had, I

16:04:22   4    immediately went and I reported this to General Rivera.

16:04:30   5    And I basically said to General Rivera, you know:  I was

16:04:36   6    asked about this dual process and I am not going to --

16:04:42   7    that's not something that I'm going to sanction.

16:04:47   8        And that was reported to the top, meaning General

16:04:51   9    Rivera, and that was done almost instantaneously.

16:05:09  10    BY MR. POTTER:

16:05:09  11    Q.   Now, did you -- from the period of time

16:05:19  12    Mrs. Morales came into the Guard as the military tech,

16:05:22  13    what contacts, if any, did you have -- what

16:05:31  14    conversation --

16:05:31  15            MR. POTTER:  Let me rephrase, Judge.  Sorry.

16:05:31  16    BY MR. POTTER:

16:05:34  17    Q.   What conversations, if any, did you have with

16:05:38  18    Mrs. Morales regarding any ESGR issues?

16:05:44  19    A.   I don't recall -- I mean, Mrs. Morales would, when

16:05:50  20    she held the position with the ESGR, we will have

16:05:54  21    discussions about the function and where she wanted to

16:06:00  22    take the program and everything.  And I think she also

16:06:04  23    had a young assistant, Ms. Simmonds, at that time.

16:06:09  24        So those are the conversations we would have with

16:06:11  25    respect to the ESGR program.  I had more conversation

16:06:16  1    with her as the J5 than I would -- as opposed to the

16:06:21  2    ESGR program.

16:06:29  3    Q.   Do the Guards have members who volunteer as ESGR?

16:06:35  4    A.   Well, the ESGR program is pretty much a one- or

16:06:41  5    two-person shop, so it depends primarily a lot for

16:06:45  6    activities and volunteers.  So, you know, a lot of

16:06:48  7    volunteers both inside of the Guard and from the general

16:06:51  8    community at large, you could volunteer to support the

16:06:55  9    program.

16:07:21  10             MR. POTTER:  Court's indulgence, Judge.

16:07:24  11             THE COURT:  Yes.

16:07:25  12        (Pause)

16:07:25  13   BY MR. POTTER:

16:07:25  14   Q.   Now, General, are you familiar with Baron Hignite?

16:07:31  15   A.   Baron Hignite, yes, I am.

16:07:33  16   Q.   Tell us how you're familiar with him.

16:07:35  17   A.   At the juncture, I believe the first initial period

16:07:41  18   when we came at the board meeting, myself and General

16:07:44  19   Rivera, the ESGR program were -- had a huge void for a

16:07:48  20   number of years, and it was not filled.  That position

16:07:53  21   was not filled.

16:07:54  22        A recommendation was made, I believe from Major

16:07:59  23   James, to hire Mrs. Morales for that particular program.

16:08:06  24        And I agreed.  Because I thought it was a good fit.

16:08:08  25   She knew, she knew the program.  She served as the HRO

16:08:13  1    for a number of years and knew the regulations, knew the

16:08:16  2    procedures and so forth.  So I had no problem making

16:08:19  3    recommendations to hire her.

16:08:21  4    Q.   Okay.

16:08:22  5    A.   That information was passed on to Mr. Hignite, that

16:08:26  6    the choice for the Virgin Islands ESGR was Mrs. Morales.

16:08:34  7    That was my contact with him.

16:08:35  8    Q.   Did you recall Mr. Hignite ever contacting you

16:08:41  9    again in 2010, September of 2010, regarding Sherrymae

16:08:50  10   Morales?

16:08:51  11   A.   No.  I didn't, no.

16:08:55  12   Q.   Did Sherrymae Morales ever indicate to you that she

16:09:00  13   was interested in returning to the ESGR position?

16:09:06  14   A.   I don't recall myself and Major Morales have any

16:09:11  15   such conversation.

16:09:16  16   Q.   Now, in 2010, you were the chief of staff?

16:09:20  17        What was your position in 2010?

16:09:22  18   A.   It depends, because I left the position of director

16:09:27  19   of joint staff in 2010.

16:09:31  20   Q.   So in March of 2010?

16:09:32  21   A.   In March of 2010, I would have still been serving

16:09:36  22   as director of the joint staff.

16:09:38  23   Q.   And you say you left the Guard when?

16:09:40  24   A.   In December of 2010.

16:09:43  25   Q.   And why did you leave the Guard?

16:09:44   1   A.   I was nominated by the Former Governor John

16:09:50   2   deJongh, Jr., to serve as director of the Virgin Islands

16:09:56   3   Emergency Management Agency, known as VITEEMA.

16:09:57   4   Q.   And in 2010, do you recall when you actually left?

16:10:06   5   A.   I sent out the general farewell notice, I think, on

16:10:12   6   December 3rd.  They should have records of that.  And I

16:10:19   7   officially joined the deJongh Administration in

16:10:24   8   January 6, 2010.

16:10:25   9   Q.   And after you left, did you have any day-to-day

16:10:27   10   control of the Virgin Islands National Guard?

16:10:29   11   A.   No, I did not.  By leaving in 2010 --

16:10:32   12             THE COURT:  Okay.  No.  Let's move on.

16:10:48   13             MR. POTTER:  Court's indulgence?

16:10:49   14             THE COURT:  Yes.

16:10:56   15        (Pause)

16:10:56   16   BY MR. POTTER:

16:10:56   17   Q.   And between -- did you have any knowledge that

16:11:04   18   Morales was employed full-time with the National Guard,

16:11:10   19   Virgin Islands National Guard, and with the MPSC

16:11:17   20   performing -- or ESGR position?

16:11:20   21             MR. JUPITER:  Objection.  Asked and answered.

16:11:21   22   Leading.

16:11:22   23             THE COURT:  Sustained.

16:11:24   24             MR. POTTER:  That's all I have, Judge.

16:11:25   25             THE COURT:  Attorney Jupiter?

16:11:28    1                          CROSS-EXAMINATION

16:11:30    2    BY MR. JUPITER:

16:11:31    3    Q.    Good afternoon.

16:11:32    4    A.    Good afternoon.

16:11:43    5    Q.    General Lewis, you were still the acting chief of

16:11:52    6    joint staff in, at the National Guard in September?

16:11:59    7    Specifically September 27, 2010?

16:12:03    8    A.    September 2010?

16:12:05    9    Q.    Yes.

16:12:05   10    A.    No, I would have been the director of the joint

16:12:08   11    staff, not acting.

16:12:08   12    Q.    Director, director of the joint staff?

16:12:12   13    A.    Correct.

16:12:12   14    Q.    Okay.  And you recall -- well, first of all, every

16:12:19   15    year the National Guard would have an annual -- the

16:12:21   16    Virgin Islands National Guard would have an annual

16:12:23   17    leadership conference?

16:12:25   18    A.    Yes.

16:12:28   19    Q.    Okay.  And they had one in September of 2010?

16:12:36   20    A.    I believe they might have had one -- I don't know

16:12:41   21    which year, but either '09 or '010, Major Morales headed

16:12:49   22    up that particular leadership conference.

16:12:51   23    Q.    Well, in '09 she was not, she was not employed with

16:12:55   24    the Virgin Islands National Guard as a military

16:13:01   25    technician, was she?

16:13:03  1    A.   I wouldn't know.  I would have to, again, defer

16:13:06  2    back to the records.  I wouldn't know that off of my --

16:13:11  3    Q.   Okay.  And also you don't know -- this conversation

16:13:13  4    that you say you had with Major Morales, you don't know

16:13:16  5    what year you had that conversation, do you?

16:13:20  6    A.   It would have had to been in 2010, I believe.

16:13:24  7    Q.   Do you know?

16:13:26  8    A.   Well, I don't know offhand.  Again, records will

16:13:30  9    support that.  But it would have had to been in 2010, I

16:13:33  10   believe, yes.

16:13:34  11   Q.   And you're basing that off of what?

16:13:36  12   A.   Basing that off of the knowledge that I held as the

16:13:43  13   director of the joint staff, and had interaction with

16:13:47  14   Major Morales.

16:13:48  15   Q.   And you don't know what month it was, do you?

16:13:50  16   A.   No, I can't recall what month it was.

16:13:53  17   Q.   Okay.  But you were her direct supervisor at that

16:13:57  18   time?

16:13:57  19   A.   For -- yes.

16:13:58  20   Q.   You were her direct supervisor from the time that

16:14:02  21   she was hired as a military tech to the time that you

16:14:05  22   left, correct?

16:14:06  23   A.   Correct.

16:14:06  24   Q.   And you also -- now, let me ask you this:  Your

16:14:17  25   e-mail address would have been -- in September 2010

16:14:23  1    would have been Elton dot Lewis at US Army -- US dot

16:14:30  2    Army dot mil?

16:14:31  3    A.   If that's what it says.  I wouldn't recall it.

16:14:37  4    Q.   Okay.

16:14:37  5         MR. JUPITER:  I want you to take a look at what

16:14:39  6    I'm marking as Defendant's Exhibit Number 9 on your

16:14:45  7    screen.

16:14:49  8         (Defendant's Exhibit 9 marked for identification.)

16:14:51  9    Q.   Can you see that?

16:14:52  10   A.   Uhm-hmm.

16:14:54  11   Q.   And can you tell me if your e-mail address appears

16:14:57  12   on there, on the "to" column?

16:15:14  13   A.   Yes, I see my -- yes.

16:15:16  14   Q.   Okay.

16:15:17  15   A.   Yes, Army dot mil.

16:15:21  16   Q.   Okay.  And that's an e-mail from Baron Hignite,

16:15:25  17   isn't it?

16:15:25  18   A.   Yes.

16:15:26  19   Q.   Okay.  Major Lewis, in September of 2010, didn't

16:15:31  20   Baron Hignite tell you that he was rehiring Sherry

16:15:35  21   Morales for the ESGR position?

16:15:39  22   A.   I don't remember that conversation, as I said

16:15:42  23   earlier.

16:15:43  24   Q.   Okay.  Well, did he notify you by e-mail?

16:15:50  25   A.   Well, he might have -- I mean, my address is

16:15:52  1   actually there.  That doesn't guarantee that I had

16:15:56  2   received or even read the e-mail.

16:15:58  3   Q.   Okay.  So you're saying you don't think you

16:16:00  4   received this e-mail?

16:16:02  5   A.   I'm not -- that's not what I'm saying.  I'm saying

16:16:05  6   that my e-mail address is there, but this doesn't

16:16:09  7   guarantee that I actually saw or even read the e-mail.

16:16:15  8   Q.   Would you read your e-mails?

16:16:17  9   A.   I normally read my e-mails, yes.

16:16:19  10  Q.   Weren't you aware at this time as to the status of

16:16:22  11  the ESGR position?

16:16:25  12  A.   In what context?

16:16:27  13  Q.   Were you aware that it was vacant?

16:16:30  14  A.   In 2010?

16:16:33  15  Q.   In September of 2010.

16:16:40  16  A.   The position would have been vacant because Major

16:16:44  17  Morales was serving as the joint -- the joint strategic

16:16:50  18  planner.

16:16:50  19  Q.   Okay.  And with that position being vacant, there

16:16:54  20  is no one in the contract position to tend to the duties

16:16:57  21  that the ESGR contract person tends to, correct?

16:17:02  22  A.   That might be so.

16:17:04  23  Q.   All right.  And that's something that, for

16:17:06  24  instance, just like in 2007, when it was vacant and

16:17:13  25  there was a void, as you remarked on direct, one of the

16:17:16   1    things you would do is have contact with Baron Hignite

16:17:21   2    about filling the position, correct?

16:17:23   3    A.    Let me, let me be perfectly clear.

16:17:28   4          In 2007, when Morales was selected or nominated for

16:17:35   5    the position, I made it clear to Mr. Hignite that that

16:17:39   6    would have been -- that's a good fit.  That is the only

16:17:42   7    conversation that I recall having with Mr. Hignite with

16:17:47   8    regards to hiring or rehiring of anyone else.

16:17:52   9    Q.    Okay.  And the reason you thought that she would be

16:17:56   10   a good fit is, number -- you were familiar with her

16:18:00   11   professionalism, right?

16:18:02   12   A.    Correct.

16:18:03   13   Q.    You were familiar with her writing abilities,

16:18:05   14   correct?

16:18:05   15   A.    Correct.

16:18:06   16   Q.    And you were familiar with her ability to work,

16:18:09   17   motivate people such as volunteers to work together,

16:18:12   18   correct?

16:18:12   19   A.    And also aware of her number of years when she

16:18:16   20   served as the HRO person, which she would have great

16:18:21   21   in-depth and knowledge of the rules and regulations of

16:18:24   22   the program.

16:18:26   23   Q.    Okay.  You had no direct contact with the program,

16:18:30   24   did you?

16:18:30   25   A.    No, I did not.

16:18:32   1    Q.   And as you indicated before, you would not -- for

16:18:40   2    instance, you didn't attend ESGR activities, did you?

16:18:43   3    A.   Very seldom, no, I did not.

16:18:48   4    Q.   But nevertheless, you were familiar with the fact

16:18:50   5    that the years preceding here there was a void, right?

16:18:55   6    A.   Correct.   That's the whole purpose that she, that

16:19:02   7    she was hired to begin with, because of the void that

16:19:04   8    had been with the program for a number of years.

16:19:07   9    Q.   And after she came there, all of a sudden things

16:19:10   10   started happening, correct?

16:19:12   11   A.   Again, let me be perfectly clear.

16:19:15   12   Q.   Okay.

16:19:15   13   A.   Major Morales is a very direct person.   She is

16:19:20   14   bright.   Her oral and her written communications are

16:19:23   15   excellent.   And I had no issues with her performance for

16:19:29   16   duties when she served as the -- of the J5 or during

16:19:35   17   that period of time.

16:19:36   18   Q.   Okay.   And you would be the one to assign duties to

16:19:39   19   her, right?

16:19:40   20   A.   That's correct.

16:19:40   21   Q.   Okay.   And every duty you assigned to her, she

16:19:43   22   performed, correct?

16:19:44   23   A.   Again, again, I just want to be clear, that Major

16:19:50   24   Morales is, again, a very competent person.   Every

16:19:54   25   assignment that I had provided to her she did, and she

16:19:59  1    did it in an excellent manner.

16:20:01  2    Q.   Okay.  You come in, when you were working at the

16:20:04  3    National Guard -- probably today, too, but when you were

16:20:08  4    working at the National Guard, you would come in before

16:20:11  5    8:00, would you?

16:20:13  6    A.   I normally was in my office every day at 6:30 in

16:20:16  7    the morning.

16:20:17  8    Q.   And Mrs. Morales would come in, as you say, 7:30,

16:20:22  9    and maybe even earlier than that?

16:20:24  10   A.   The majority of my time, to my recollection,

16:20:29  11   Mrs. Morales would be around 7:30, yeah, 7:30 in the

16:20:33  12   morning.

16:20:33  13   Q.   And, General Lewis, you would work till late at

16:20:35  14   night, wouldn't you?

16:20:36  15   A.   Correct.

16:20:37  16   Q.   And Mrs. Morales would work until late at night,

16:20:40  17   wouldn't she?

16:20:41  18   A.   Occasionally, more time than often, yeah, she

16:20:45  19   worked very late at night, yes.

16:20:47  20   Q.   So it wouldn't be uncommon for her to have 12-,

16:20:51  21   13-, 14-hour days at that office?

16:20:53  22   A.   No, not uncommon.

16:20:57  23   Q.   And you -- and that's one of the -- and, in fact,

16:20:59  24   you indicated that when Carolyn Adams and this position

16:21:06  25   became open, that she expressed some interest in this

16:21:09   1    position?

16:21:09   2    A.   Correct.

16:21:09   3    Q.   But, in fact, you also expressed some interest in

16:21:12   4    her taking that position, correct?

16:21:14   5    A.   Yeah, I can do that.  But again, they still have to

16:21:16   6    go through a hiring process.

16:21:18   7    Q.   Right.  But you were right under General Rivera,

16:21:22   8    right?

16:21:23   9    A.   That doesn't matter.

16:21:24   10   Q.   Okay.  All right.  Okay.

16:21:27   11        Did you make any recommendations to General Rivera?

16:21:31   12   A.   I would have made a recommendation to General

16:21:35   13   Rivera, yes.

16:21:43   14   Q.   Now, did the oversight of this contract position

16:21:46   15   ever go to Linda Cills while you were there?

16:21:49   16   A.   I don't recall or know.  Again, those are personal

16:21:56   17   directorates, and most of those contract stuff probably

16:22:01   18   would not have filtered through me.  They would have

16:22:03   19   been filtered through Colonel Cills as the personal

16:22:10   20   directorate.

16:22:11   21   Q.   You held staff meetings every Tuesday, didn't you?

16:22:14   22   A.   I held staff meetings every day --

16:22:17   23   Q.   Okay.

16:22:17   24   A.   -- in fact, at 8:00.

16:22:21   25   Q.   Okay.

16:22:22    1    A.    And then there was a general staff meeting for the

16:22:25    2    entire staff every Tuesday.

16:22:26    3    Q.    Okay.  And general staff meetings, your staff

16:22:28    4    members were required to submit -- well, heads of

16:22:33    5    certain departments were required to submit briefings,

16:22:36    6    right?

16:22:36    7    A.    Briefing slides.

16:22:40    8    Q.    Briefing slides, correct?

16:22:42    9    A.    Yes.

16:22:42    10    Q.    And those were submitted to, initially, is it your

16:22:45    11    aide?  I don't know the official, Mrs. --

16:22:50    12    A.    They would have been submitted to one or two

16:22:52    13    persons.  One would have been Chief Mitchell, or the

16:22:56    14    other person would have been Sergeant --

16:22:59    15    Q.    Zera Louis?

16:23:01    16    A.    Zera Louis.

16:23:20    17    Q.    Do you remember speaking with Mrs. Morales about

16:23:23    18    her replacement of the ESGR position?

16:23:25    19    A.    There was some discussion, I believe, with regards

16:23:29    20    to that, and the person's name that came up in that

16:23:33    21    process was Mrs., I think, Janice Aelleyne.

16:23:40    22    Q.    Okay.

16:23:40    23    A.    Yes.

16:23:41    24    Q.    And do you -- this Janice Aelleyne was the wife of,

16:23:45    25    at that time, Major Aelleyne, correct?

16:23:47   1    A.   Correct.

16:23:48   2    Q.   All right.  Major Aelleyne had been asking you to

16:23:51   3    leave, correct?

16:23:52   4    A.   To?

16:23:53   5    Q.   To leave, to relocate to be with his wife in

16:24:00   6    Maryland, correct?

16:24:01   7    A.   He -- again, my best recollection, I believe that,

16:24:04   8    yes, he wanted to relocate back to Maryland or the

16:24:10   9    Washington, DC, area.

16:24:13   10   Q.   This was for quite some time, correct?

16:24:15   11   A.   Correct.

16:24:16   12   Q.   Major Aelleyne, though, was someone who was

16:24:18   13   essential to your plans in what you were trying to do at

16:24:22   14   the Guard; is that correct?

16:24:23   15   A.   That's correct.

16:24:23   16   Q.   And you wanted him to stay, correct?

16:24:25   17   A.   I requested of him to stay.  But that is his

16:24:29   18   choice.

16:24:29   19   Q.   You were his superior officer, right?

16:24:31   20   A.   I was his superior officer, yes.  But, again,

16:24:41   21   soldiers have choices.

16:24:44   22   Q.   Did there come a time that you discussed with Major

16:24:46   23   Aelleyne replacing Mrs. Morales with his wife,

16:24:51   24   Mrs. Aelleyne?

16:24:52   25   A.   I don't recall that.  Again, again, Mrs. Aelleyne

16:24:56   1   applied for the position and she would have had to go

16:24:59   2   through the same process just like anybody else applying

16:25:04   3   for position.  There was no favoritism or no

16:25:08   4   preferential treatment to one or the other.

16:25:09   5   Q.   Were you accused of favoritism?

16:25:12   6   A.   If I was?

16:25:13   7   Q.   Yes.

16:25:14   8   A.   I --

16:25:15   9        MR. POTTER:  Objection, Your Honor.

16:25:16   10        THE COURT:  Sustained.

16:25:17   11        THE WITNESS:  I've been accused of many things.

16:25:19   12        THE COURT:  Sustained.

16:25:20   13   BY MR. JUPITER:

16:25:21   14   Q.   Did -- is there an investigation into this matter

16:25:28   15   where there was -- where you were accused of doing

16:25:31   16   something inappropriate?

16:25:32   17        MR. POTTER:  Objection, Your Honor.

16:25:33   18        THE COURT:  Sustained.  403.

16:25:38   19   BY MR. JUPITER:

16:25:39   20   Q.   Now, with regard to Mrs. Aelleyne, do you recall in

16:25:53   21   -- do you recall asking Major Morales to stay on as ESGR

16:25:59   22   until Mrs. Aelleyne could get here?

16:26:03   23   A.   What time period are we talking about?

16:26:11   24   Q.   Before you left in -- shortly before you left in

16:26:13   25   2010?

16:26:19   1    A.    And your question is, again?

16:26:22   2    Q.    Did you ask Mrs. Morales to stay on as the ESGR

16:26:25   3    person until Mrs. Aelleyne could leave -- could get

16:26:28   4    here?

16:26:28   5    A.    It would have been impossible for me to do that.

16:26:32   6    Major Morales was a J5 --

16:26:35   7    Q.    Okay.

16:26:35   8    A.    -- at that time, and that would have been a clear

16:26:38   9    conflict.

16:26:38   10   Q.    Okay.  So any -- and so as far as you know, the

16:26:55   11   ESGR position would have been vacant from March -- from

16:27:10   12   when Mrs. Morales came on as a military technician, all

16:27:14   13   the way until you left at the end of 2010?

16:27:21   14   A.    I would imagine yes, it would have been until we

16:27:25   15   find some suitable person to fill that position.  That

16:27:28   16   would be my assumption.

16:27:31   17   Q.    Did you look -- did Mrs. Morales bring a number of

16:27:35   18   people for you to try to see if you would recommend

16:27:37   19   them?

16:27:42   20   A.    I don't really -- she may or may -- she may or may

16:27:47   21   not.  I don't really recall that.  I know that there was

16:27:49   22   one young lady, Ms. Simmonds, that was one of her

16:27:54   23   colleagues.  I believe she -- she made a recommendation

16:27:57   24   of her, yes.

16:27:58   25   Q.    Okay.  And that was shortly after she got there,

16:28:01  1    right?

16:28:05  2    A.    Shortly, who?

16:28:07  3    Q.    Shortly after Mrs. Morales started the military

16:28:13  4    tech position, she made the recommendation for

16:28:17  5    Mrs. Simmonds?

16:28:17  6    A.    I don't recall.

16:28:18  7    Q.    The ESGR wasn't that important to you, was it,

16:28:21  8    General Lewis?

16:28:22  9    A.    No -- I mean, it's an important position, but my

16:28:25  10   focus was more on my other duties with regards, with

16:28:30  11   regards to troops and troop movements and troop

16:28:33  12   operations.  So I didn't really focus on the ESGR on a

16:28:37  13   daily basis, like I did the operations.

16:28:43  14          MR. JUPITER:  Thank you, General.

16:28:44  15          THE COURT:  Any redirect?

16:28:45  16          MR. POTTER:  Yes, Judge.

16:28:58  17                 REDIRECT EXAMINATION

16:28:59  18   BY MR. POTTER:

16:28:59  19   Q.    General Lewis, you were shown an e-mail -- you were

16:29:10  20   shown an e-mail where you were CC'd on the e-mail,

16:29:18  21   correct?

16:29:19  22   A.    It's a little bit -- it's a little bit blurry, but

16:29:23  23   I think I can make it out.

16:29:26  24   Q.    When is the first time you saw that e-mail, sir?

16:29:29  25   A.    Today.

| | | |
|---|---|---|
| 16:29:35 | 1 | Q.   Now, the e-mail is dated September 27th of 2010. |
| 16:29:44 | 2 | During that time, did Sherrymae Morales come to you and |
| 16:29:52 | 3 | say she just got rehired as the ESGR? |
| 16:29:56 | 4 | MR. JUPITER:  Objection to leading, Your Honor. |
| 16:29:57 | 5 | THE COURT:  Sustained. |
| 16:29:57 | 6 | THE WITNESS:  No -- |
| 16:29:58 | 7 | THE COURT:  Sustained -- |
| 16:30:00 | 8 | THE WITNESS:  -- no, she did not. |
| 16:30:02 | 9 | THE COURT:  Stop. |
| 16:30:03 | 10 | Next question. |
| 16:30:04 | 11 | BY MR. POTTER: |
| 16:30:05 | 12 | Q.   Did you have any -- after September 27th, 2010, did |
| 16:30:08 | 13 | you have any conversations with Mr. Morales regarding |
| 16:30:14 | 14 | the ESGR position? |
| 16:30:22 | 15 | MR. POTTER:  Let me rephrase the question. |
| 16:30:22 | 16 | BY MR. POTTER: |
| 16:30:24 | 17 | Q.   Any -- |
| 16:30:27 | 18 | MR. JUPITER:  Objection, Your Honor.  The |
| 16:30:28 | 19 | witness hasn't answered. |
| 16:30:31 | 20 | THE COURT:  Rephrase the question.  Go ahead. |
| 16:30:32 | 21 | BY MR. POTTER: |
| 16:30:32 | 22 | Q.   Did you have any conversation with Sherrymae |
| 16:30:34 | 23 | Morales regarding this e-mail? |
| 16:30:37 | 24 | A.   No, because this is the first time I'm seeing this |
| 16:30:40 | 25 | e-mail.  I have no knowledge of this e-mail. |

16:30:59   1    Q.   You were Sherrymae Morales's supervisor as the G5?

16:31:03   2    A.   As the J5, correct.

16:31:05   3    Q.   As the J5.

16:31:06   4         While you were her supervisor as a J5, did she come

16:31:09   5    to you and reference her rehire as the ESGR?

16:31:19   6              MR. JUPITER:  Objection --

16:31:19   7              THE WITNESS:  She did not.

16:31:21   8              MR. JUPITER:  Objection.  Move to strike.

16:31:24   9              THE COURT:  All right.  Sustained.

16:31:30   10   BY MR. POTTER:

16:31:30   11   Q.   Did she have any conversation with you about --

16:31:32   12   about this e-mail?

16:31:33   13             MR. JUPITER:  Your Honor --

16:31:34   14             THE COURT:  Sustained.

16:31:35   15             MR. POTTER:  It's a different --

16:31:47   16             THE COURT:  Let's move on.

16:31:48   17             MR. POTTER:  Yes, Judge.

16:31:49   18   BY MR. POTTER:

16:31:49   19   Q.   Do employees at the Guard volunteer to do ESGR

16:31:52   20   functions?

16:31:53   21   A.   Yes.

16:31:54   22   Q.   Is that common?

16:31:55   23   A.   Yes, that's common.

16:32:05   24   Q.   After Sherrymae Morales was hired as the military

16:32:12   25   tech in March of 2010, did you personally observe her

16:32:19   1    doing any volunteer ESGR work?

16:32:25   2    A.   No.  I had Major Morales pretty busy doing J5

16:32:32   3    functions, functionalities.

16:32:38   4    Q.   You mentioned that Mrs. Morales worked long hours

16:32:47   5    at the time.  Do you know what she was working on?

16:32:53   6    A.   Well, she would have been working on projects that

16:32:56   7    was assigned to her by me with regards -- because at

16:32:59   8    that time we were doing a lot of realignment and a lot

16:33:03   9    of policy changes within the National Guard.

16:33:15   10   Q.   Could you, as the chief of staff, authorize a

16:33:18   11   full-time military tech under your supervision to be

16:33:25   12   employed in another full-time 9:00 to 5:00 position?

16:33:34   13   A.   Absolutely not.  I don't have that authority.

16:33:47   14   Q.   Counsel asked you whether or not the ESGR position

16:33:51   15   was -- based on your knowledge, whether the ESGR

16:33:55   16   position was open from March to whenever it was this

16:34:04   17   e-mail, this September 27th e-mail.

16:34:16   18       Do you keep close track -- as the chief of staff,

16:34:19   19   do you keep close track of the ESGR position and who

16:34:25   20   fills it?

16:34:26   21   A.   No.

16:34:27   22   Q.   And have there been periods of time when the ESGR

16:34:32   23   position is open?  That nobody fills it?

16:34:38   24   A.   Yes, there was -- it was -- originally the position

16:34:43   25   was dormant for quite some time.

16:34:45    1         MR. POTTER:  Court's indulgence, Judge?

16:34:48    2         THE COURT:  Yes.

16:34:48    3     (Pause)

16:34:48    4   BY MR. POTTER:

16:35:03    5   Q.   One final question, General.

16:35:06    6      In your position as Sherrymae Morales's supervisor,

16:35:10    7   what, if anything, would you have done if you found she

16:35:12    8   had another full-time position with the same hours as

16:35:16    9   your J5?

16:35:19   10         MR. JUPITER:  Objection, Your Honor.

16:35:20   11         THE COURT:  Sustained.

16:35:21   12         MR. POTTER:  No further questions, Your Honor.

16:35:24   13         THE COURT:  General Lewis, thank you.

16:35:28   14         MR. JUPITER:  Can I have a --

16:35:29   15         THE COURT:  No.  He didn't go beyond.

16:35:31   16     General Lewis, thank you for your testimony.

16:35:36   17     You may step down.

16:35:37   18         THE WITNESS:  Thank you, Your Honor.

16:35:39   19     (Witness withdrew from stand.)

16:35:39   20         THE COURT:  Next witness.

16:35:40   21         MR. POTTER:  Your Honor, the government calls

16:35:42   22   Renaldo Rivera.

16:36:22   23         THE CLERK:  Please step into the witness box.

16:36:30   24     Please raise your right hand to take the oath.

16:36:32   25     (Witness sworn.)

16:36:34  1          THE WITNESS:  I do.

16:36:35  2          THEREUPON, RENALDO RIVERA, having been duly

16:36:38  3   sworn, was examined and testified as follows:

16:36:38  4                  DIRECT EXAMINATION

16:36:40  5   BY MR. POTTER:

16:36:41  6   Q.   Good afternoon, sir.

16:36:42  7   A.   Good afternoon.

16:36:43  8   Q.   Could you give us your full name for the record,

16:36:46  9   please, and spell your first and your last name for the

16:36:51  10  court reporter?

16:36:52  11  A.   Renaldo Rivera, R-e-n-a-l-d-o, R-i-v-e-r-a.

16:36:59  12  Q.   And how are you employed, sir?

16:37:02  13  A.   I'm employed as the adjutant general for the Virgin

16:37:06  14  Islands National Guard.

16:37:07  15  Q.   And how long have you held that position?

16:37:12  16  A.   Eight years, three months.

16:37:17  17  Q.   And how long have you been a member of the Virgin

16:37:21  18  Islands National Guard?

16:37:23  19  A.   As of 14 July, July next month it will be 31 years,

16:37:33  20  sir.

16:37:34  21  Q.   And how long have you been in the military, period?

16:37:42  22  A.   I had two years in Vietnam, active duty in Vietnam,

16:37:50  23  plus these 31; about 34 years in the military, total.

16:38:04  24  Q.   When you say you are the adjutant general of the

16:38:07  25  Virgin Islands National Guard, tell us what the

16:38:13  1    Virgin Islands National Guard is.

16:38:15  2    A.   The Virgin Islands National Guard consists of the

16:38:17  3    army and air guard units.  There are 845 army members

16:38:26  4    and 67 air guard members that make up the Virgin Islands

16:38:32  5    National Guard.

16:38:32  6    Q.   And how does the Virgin Islands Guard -- how does

16:38:38  7    the Virgin Islands National Guard receive its funding?

16:38:41  8    A.   It receives its funding through the federal system

16:38:45  9    at the tune of $45 million, and there is a local

16:38:56  10   appropriation of $1.3 million.

16:38:58  11   Q.   Back in between -- 2011, what was the funding for

16:39:02  12   the National Guard?

16:39:03  13   A.   Approximately $45 million, sir.

16:39:12  14   Q.   Are you familiar, sir, with a position within the

16:39:16  15   Guard known as military technician?

16:39:17  16   A.   Yes, I am.

16:39:18  17   Q.   And tell us what the military technician does.

16:39:21  18   A.   The military technicians are really the backbone of

16:39:28  19   the National Guard, full-time.  They are made up of

16:39:37  20   GS-7's all the way through 15, and they make up the wage

16:39:44  21   rates.  They take care of getting -- of putting the

16:39:47  22   Guard together for the weekend, because we have what you

16:39:49  23   call weekend soldiers, M-Day soldiers.

16:39:58  24   Q.   What's a GS-5?

16:40:00  25   A.   Usually a secretary; and a GS-15 would be higher.

16:40:05   1    Q.   Now for the position of military tech, what is the

16:40:09   2    regular working hours for a military tech person?

16:40:15   3    A.   The regular working hours is 8:00 through 5:00,

16:40:20   4    Mondays through Fridays.

16:40:29   5    Q.   Now, do you know Sherrymae Morales?

16:40:32   6    A.   Yes, I do.

16:40:33   7    Q.   And tell us how you know Sherrymae Morales.

16:40:36   8    A.   I've known her for many, many years.  From the time

16:40:39   9    she came into the Virgin Islands National Guard as a

16:40:42   10   private, as she became a lieutenant, a captain, a first

16:40:47   11   lieutenant and captain and a major.  That's how long I

16:40:50   12   know her.

16:40:50   13   Q.   What would you say her level of competence is?

16:40:53   14   A.   Excellent.  She is one of the best workers -- I

16:40:57   15   would put her against anybody.  She's pretty good.

16:41:01   16   Q.   What would you say her scope of knowledge is with

16:41:04   17   respect to the rules and regulations of Guard

16:41:07   18   membership?

16:41:07   19   A.   Well-versed.

16:41:13   20   Q.   Did she ever serve as your HRO, human resource

16:41:17   21   officer?

16:41:18   22   A.   Not as my HRO.  She served as HRO, but not while I

16:41:24   23   was there as the adjutant general.

16:41:26   24   Q.   Okay.  And what do the HRO or the human resource

16:41:32   25   officers, what are their duties?

16:41:35  1          MR. JUPITER:  Objection as to relevance, Your

16:41:38  2     Honor.

16:41:38  3          THE COURT:  Okay.  Overruled.

16:41:41  4          THE WITNESS:  The HRO is the person responsible

16:41:45  5     to ensure that we have all of the resources available in

16:41:49  6     personnel, to bring them into different sorts of status,

16:41:56  7     such as AGR, Acting Guard Reserve, or military

16:42:03  8     technician.

16:42:07  9     BY MR. POTTER:

16:42:07  10    Q.   Let me take your -- draw your attention back to

16:42:10  11    2007.  Do you -- were you familiar with Sherrymae

16:42:18  12    Morales in 2007, what her job was?

16:42:20  13    A.   Yes, I was.

16:42:21  14    Q.   And tell us what position she held in 2007.

16:42:29  15    A.   In 2007, she was the ESGR coordinator for the

16:42:33  16    Virgin Islands National Guard.

16:42:35  17    Q.   Now, is that a position within the Guard or is that

16:42:38  18    a contract position?

16:42:39  19    A.   It's a contract position.

16:42:43  20    Q.   And who is the contracting agency?

16:42:47  21    A.   I would be guessing.  I don't know who the contract

16:42:52  22    is.

16:42:52  23    Q.   Are you familiar with the MPSC?

16:42:56  24          MR. JUPITER:  Objection, Your Honor, to

16:42:57  25    leading.  And he said he doesn't know.

16:43:04   1            THE COURT:  Sustained.

16:43:05   2    BY MR. POTTER:

16:43:05   3    Q.   What is the MPSC?

16:43:07   4    A.   I don't know, sir.

16:43:13   5    Q.   Are you at all familiar with the name Military

16:43:23   6    Personnel --

16:43:23   7            MR. JUPITER:  Your Honor --

16:43:24   8            THE COURT:  No.

16:43:26   9            MR. POTTER:  Okay, Judge.

16:43:35  10    BY MR. POTTER:

16:43:36  11    Q.   Now, you said you were familiar with Sherrymae

16:43:38  12    Morales in 2007?

16:43:39  13    A.   Yes, sir.

16:43:44  14    Q.   And tell us again how you were familiar with her?

16:43:47  15    A.   She came recommended for the ESGR position by, at

16:43:53  16    that time, Colonel Elton Lewis, who was the director of

16:43:57  17    the joint staff.

16:44:04  18    Q.   And did she in fact fill that position?

16:44:06  19    A.   Yes, but with a caveat, sir.

16:44:11  20    Q.   Let me ask my question next.

16:44:20  21         Now, did there come a time that you had a -- that

16:44:22  22    you recall having a conversation with Sherrymae Morales

16:44:25  23    regarding her ESGR position?

16:44:31  24    A.   I had many, many conversations with her, sir.

16:44:36  25    Q.   In 2010?

16:44:39   1   A.   I don't recall having one with her, and what

16:44:44   2   specific topic we discussed, because there were many.

16:44:54   3   Q.   Do you know when Sherrymae Morales was hired back

16:44:58   4   into the Guard as a full-time member of the National

16:45:01   5   Guard?

16:45:05   6   A.   The year escapes me, sir, but I do know that she

16:45:09   7   wanted to become a technician.  And in becoming a

16:45:15   8   technician, she had to go through a background check --

16:45:17   9   Q.   Well, before you say that --

16:45:19  10   A.   Sorry.

16:45:19  11   Q.   You said -- is this a conversation that you had

16:45:24  12   with Sherrymae Morales?

16:45:26  13   A.   One of the conversations, yes, sir.

16:45:28  14   Q.   Okay.  So go ahead.

16:45:30  15   A.   And because of her --

16:45:33  16          MR. JUPITER:  Your Honor, I object.

16:45:35  17          THE COURT:  Overruled.

16:45:37  18          MR. JUPITER:  Same 403 issue.

16:45:41  19          THE COURT:  All right.  I haven't heard what

16:45:42  20   the witness is saying.

16:45:44  21          THE WITNESS:  Because she wanted to become a

16:45:50  22   temporary technician, which we hired her as, she had to

16:45:53  23   go and get a background check to be back on the force --

16:45:57  24          THE COURT:  All right.  Stop.

16:45:59  25          Next question.

16:45:59    1          THE WITNESS:  Yes, sir.

16:46:00    2    BY MR. POTTER:

16:46:00    3    Q.   Well, aside from that issue, what other

16:46:05    4    conversation did you have with her?

16:46:10    5         Aside from the background issue, did she ask you

16:46:13    6    anything else regarding coming back into the Guard?

16:46:16    7    A.   Yes.  She asked if I could promote her to

16:46:19    8    lieutenant-colonel.

16:46:24    9    Q.   And what, if any, response did you?

16:46:28    10   A.   I indicated at the time that since I didn't receive

16:46:32    11   a favorable clearance from the agency that does it, I

16:46:36    12   couldn't promote her.

16:46:50    13   Q.   Now, prior to her coming into the Guard, when she

16:46:56    14   was still in her ESGR position -- well, when she was

16:47:02    15   still in her ESGR position, did you have any

16:47:06    16   conversation with her or did she have any conversation

16:47:08    17   with you regarding her desire to come back into the

16:47:11    18   Guard?

16:47:12    19   A.   Yes, sir.

16:47:14    20   Q.   Now, I know you mentioned an issue that got an

16:47:23    21   objection sustained --

16:47:25    22          MR. JUPITER:  Your Honor --

16:47:26    23   BY MR. POTTER:

16:47:26    24   Q.   I'm asking you, any other conversation other than

16:47:29    25   that, that you told her regarding her desire to come

16:47:35  1    back into the National Guard?

16:47:36  2    A.   That was the background check.

16:47:37  3    Q.   Was there anything else?

16:47:40  4    A.   Not that I recall, sir.

16:47:41  5    Q.   Okay.  Was she, in fact, hired back into the

16:47:54  6    National Guard?

16:47:54  7    A.   Yes.

16:47:56  8    Q.   Do you know approximately when that was, sir?

16:48:07  9    A.   No, sir.

16:48:09  10   Q.   And when she came in full-time to the National

16:48:12  11   Guard, do you know who her supervisor was?

16:48:14  12   A.   At the time it was Elton Lewis.

16:48:18  13   Q.   And would you know what her hours of work were when

16:48:24  14   she came into the Guard?

16:48:25  15   A.   8:00 to 5:00; 8:00 a.m. to 5:00 p.m.

16:48:29  16   Q.   And what days of the week?

16:48:30  17   A.   Mondays through Fridays.

16:48:43  18   Q.   And, sir, do you know what happened with respect to

16:48:47  19   her ESGR position once she got hired full-time, as a

16:48:51  20   National Guard full-time person?

16:48:53  21   A.   Yes, sir.  In order for her to become the

16:48:57  22   technician, she had to --

16:48:59  23            MR. JUPITER:  Objection.

16:49:00  24            THE WITNESS:  -- resign --

16:49:02  25            MR. JUPITER:  Objection, Your Honor.

16:49:03  1           THE COURT:  Overruled.

16:49:04  2           THE WITNESS:  -- she had to resign the ESGR

16:49:06  3  position, which she did.

16:49:08  4  BY MR. POTTER:

16:49:09  5  Q.   Which she --

16:49:11  6  A.   She did.

16:49:17  7  Q.   And how do you know she resigned the ESGR position?

16:49:21  8  A.   I made sure that I instructed the JAG, Marise

16:49:29  9  James, to make sure she has these, this piece of

16:49:33  10 paperwork.  And it was then confirmed that she did

16:49:38  11 resign from the ESGR.

16:49:40  12 Q.   Do you know when it was that she resigned?

16:49:44  13 A.   What point?

16:49:47  14 Q.   Yes, sir?

16:50:00  15 A.   I don't, no, sir.

16:50:01  16 Q.   And are you aware whether or not she was ever

16:50:05  17 rehired in the ESGR position -- contract position?

16:50:08  18 A.   Not until about a year later, I found out.

16:50:18  19 Q.   And when you found out that she was still employed

16:50:22  20 in the ESGR position, what did you do?

16:50:27  21 A.   I immediately instructed the then-director of joint

16:50:34  22 staff, Aubrey Ruan, to draft up a letter, because, you

16:50:39  23 know, to initiate the investigation to find out what was

16:50:43  24 wrong -- what went wrong.

16:50:49  25 Q.   And why did you find a need to do that, sir?

16:50:53  1    A.    The reason why I found it necessary to do that is

16:50:59  2    because you couldn't be employed as a, on a contractor

16:51:05  3    and a full-time job.  You have to have one employer.

16:51:32  4              MR. POTTER:  Court's indulgence, Judge?

16:51:33  5              THE COURT:  Yes.

16:51:41  6         (Pause)

16:51:41  7              MR. POTTER:  No further questions of the

16:51:43  8    witness at the time, Your Honor.

16:51:45  9              THE COURT:  Attorney Jupiter.

16:51:48  10                     CROSS-EXAMINATION

16:51:48  11   BY MR. JUPITER:

16:51:48  12   Q.    Good afternoon.

16:51:49  13   A.    Good afternoon, sir.

16:51:49  14   Q.    You had very limited contact with the ESGR

16:51:52  15   position, do you?

16:51:53  16   A.    Very little.

16:51:54  17   Q.    Okay.  And at the time in 2010, specifically in

16:52:04  18   April, March, April of 2010, Elton Lewis was working as

16:52:11  19   the director of the joint staff, correct?

16:52:13  20   A.    I believe so.

16:52:14  21   Q.    He -- okay.  When he was working -- and please

16:52:17  22   repeat the correct name for me.  Is it director of joint

16:52:21  23   staff?

16:52:21  24   A.    Director of joint staff.

16:52:22  25   Q.    Okay.  I got it right.

16:52:23   1         At the time that he did work in that position, he

16:52:26   2    worked under you, right?

16:52:27   3    A.   Correct.

16:52:27   4    Q.   He reported to you, correct?

16:52:29   5    A.   Correct.

16:52:29   6    Q.   Okay.  And he directly supervised Mrs. Morales,

16:52:34   7    correct?

16:52:34   8    A.   Yes.

16:52:34   9    Q.   But Mrs. Morales also did things for you, correct?

16:52:37   10   A.   A lot of things.

16:52:38   11   Q.   She would write letters for you?

16:52:39   12   A.   Correct.

16:52:40   13   Q.   She would write speeches for you?

16:52:41   14   A.   Correct.

16:52:42   15   Q.   And she also would get you -- she also would get

16:52:45   16   you involved in some of these ESGR stuff, right?

16:52:49   17   A.   Invited me to some of the events, yes.

16:52:53   18   Q.   All right.  And Mrs. Morales -- but you didn't have

16:52:59   19   direct contact with her very often while she was a

16:53:02   20   military technician, right?

16:53:04   21   A.   Right.

16:53:04   22   Q.   And you didn't have direct contact with her while

16:53:07   23   she was in the ESGR position, except for events she

16:53:11   24   invited you into?

16:53:12   25   A.   Correct.

16:53:16  1    Q.   Okay.  Now with regard to military technicians, as

16:53:19  2    you say, they're the backbone of the operations.  You

16:53:23  3    rely heavily on them, right?

16:53:25  4    A.   Yes, sir.

16:53:26  5    Q.   And you, General Lewis, you all, when you were with

16:53:29  6    the Guard, you all would work long hours, correct?

16:53:32  7    A.   Yes, sir.

16:53:32  8    Q.   You still do work long hours, right?

16:53:35  9    A.   Like today.

16:53:36  10   Q.   Okay.  And Mrs. Morales would work long hours,

16:53:40  11   correct?

16:53:42  12   A.   If it was necessary, yes.

16:53:43  13   Q.   Okay.  And, in fact, General Lewis can vary a

16:53:52  14   military technician's schedule, can he?

16:53:55  15   A.   As the director, yes, he can.

16:53:57  16   Q.   Okay.  And as long as the military technician is

16:54:01  17   working at least 40 hours, General Lewis has discretion

16:54:05  18   to fix those hours, doesn't he?

16:54:08  19             MR. POTTER:  Objection, Judge.

16:54:09  20             THE COURT:  Overruled.

16:54:12  21             THE WITNESS:  Yes.  But there's a caveat to

16:54:16  22   that, sir.

16:54:17  23   BY MR. JUPITER:

16:54:17  24   Q.   Okay.  Now, you indicated that you instructed

16:54:27  25   Mrs. -- instructed Marise James, that's the JAG,

16:54:32  1    correct?

16:54:32  2    A.    Correct.

16:54:33  3    Q.    -- that Mrs. Morales resigned, correct?

16:54:35  4    A.    Correct.

16:54:35  5    Q.    But you don't know when that conversation took

16:54:38  6    place, do you?

16:54:39  7    A.    No.  But it did take place.

16:54:41  8    Q.    And you don't know when Mrs. Morales was hired as

16:54:43  9    military technician, do you?

16:54:45  10   A.    Unless I have the record in front of me, I can't

16:54:52  11   tell you the date, sir.

16:54:54  12   Q.    Okay.  Now you also mentioned that you instructed

16:54:59  13   Aubrey Ruan immediately, when you found out that

16:55:03  14   Mr. Morales had both the contract position and the

16:55:06  15   military tech position; is that right?

16:55:09  16   A.    Yes, sir.

16:55:11  17   Q.    Say that again?

16:55:12  18   A.    Yes, sir.

16:55:12  19   Q.    Okay.  Didn't Aubrey Ruan contact you in June of

16:55:24  20   2011 about this issue?

16:55:32  21   A.    He may have.

16:55:32  22   Q.    And isn't it a fact that you didn't get back to

16:55:35  23   Aubrey Ruan about whether or not you were aware of

16:55:40  24   Mrs. Morales holding those two positions until August?

16:55:45  25   A.    That is not a fact.

16:55:47  1    Q.   So if someone came and testified that -- if

16:55:51  2    Aubrey Ruan came and testified to that, he would be

16:55:53  3    lying?

16:55:54  4              THE COURT:  No.  Stop.

16:55:55  5              MR. POTTER:  Objection.

16:55:56  6              THE COURT:  Sustained.

16:55:58  7         Next question.

16:56:13  8    BY MR. JUPITER:

16:56:13  9    Q.   You never worked as HRO, did you?

16:56:16  10   A.   Never.

16:56:16  11   Q.   You -- with regard to Mrs. Morales working on

16:56:30  12   assignments as a military technician, do you have any

16:56:36  13   information that she worked any less than 80 hours per

16:56:39  14   week (sic) as a military technician?

16:56:43  15   A.   I don't have any information on that, sir.

16:56:45  16   Q.   From the time that she started to the time that she

16:56:48  17   left?

16:56:48  18   A.   She had to work those 80 hours, but I don't have

16:56:53  19   any record to indicate that she worked less hours than

16:56:56  20   that, sir.

16:57:16  21             MR. JUPITER:  Beg the Court's indulgence, sir.

16:57:19  22             THE COURT:  Yes.

16:57:21  23        (Pause)

16:57:21  24             MR. JUPITER:  No further questions, Your Honor.

16:57:22  25             THE COURT:  Any redirect?

```
16:57:26   1                    REDIRECT EXAMINATION
16:57:26   2    BY MR. POTTER:
16:57:27   3    Q.   General, what did you think -- you said that
16:57:29   4    Morales invited you to ESGR functions.  What do you
16:57:34   5    think her role was at the ESGR function?
16:57:40   6    A.   Volunteer at the time.
16:57:48   7    Q.   Did she say or do anything to let you believe that
16:57:56   8    she was being paid for attending that function?
16:58:01   9    A.   No, sir.
16:58:11  10    Q.   Did she ever tell you that she's the ESGR
16:58:14  11    coordinator?
16:58:16  12    A.   When, sir?
16:58:17  13    Q.   After she, after she was hired as a full-time
16:58:20  14    military tech?
16:58:21  15    A.   No.
16:58:28  16    Q.   And if she had told you that, sir, what, if
16:58:31  17    anything, would you have done as the TAG -- the head of
16:58:35  18    the Virgin Islands National Guard?
16:58:37  19              MR. JUPITER:  Objection.
16:58:38  20              THE COURT:  No, that's sustained.
16:58:40  21         Let's move on.
16:58:41  22    BY MR. POTTER:
16:58:41  23    Q.   General, let me show you what's been marked as
16:58:44  24    Government Exhibit 1.2, and ask you -- well, let me ask
16:58:59  25    you, what, if anything -- you indicated you needed to
```

16:59:02  1    see a document that would help you to recollect when

16:59:05  2    Mrs. Morales was hired on board.  What, if anything,

16:59:08  3    would assist you in your recollection?

16:59:14  4    A.   One of the forms that we use to hire the

16:59:18  5    technicians.

16:59:21  6          MR. POTTER:  Let me show you what's been

16:59:22  7    admitted as Government's Exhibit Number 1.2 and ask you

16:59:30  8    if you recognize that.

16:59:35  9          THE WITNESS:  Can I move this, or you can move

16:59:39  10   it?

17:00:04  11       Yes, this is a certification of personnel action.

17:00:09  12   BY MR. POTTER:

17:00:09  13   Q.   Based on Exhibit 1.2, can you tell us when

17:00:13  14   Mrs. Morales started working at the --

17:00:15  15   A.   It's not up here, sir.

17:00:16  16   Q.   Oh, sorry.

17:00:39  17   A.   Could I have it in my hand?  I think I can read it

17:00:42  18   better.

17:00:47  19          MR. POTTER:  Can I approach?

17:00:48  20          THE COURT:  If you need something to be zoomed

17:00:50  21   in, zoom in.

17:00:53  22          THE WITNESS:  Keep zooming.  That's better.

17:01:13  23          THE COURT:  All right.  Let's move on.

17:01:16  24          THE WITNESS:  There should be a date on this.

17:01:18  25          THE COURT:  Sir, hold on.

17:01:19    1            THE WITNESS:  Sorry.

17:01:20    2            THE COURT:  There's items in evidence.  There's

17:01:23    3    no need to ask an argument or something you can argue.

17:01:29    4            MR. POTTER:  Yes.

17:01:30    5            THE COURT:  Let's move on.

17:01:31    6    BY MR. POTTER:

17:01:31    7    Q.   The conversation that you said you had with the JAG

17:01:34    8    in relation to Mrs. Morales's date of hire, when would

17:01:38    9    you have had that conversation with the JAG?

17:01:43   10    A.   Which position, sir?

17:01:46   11    Q.   The conversation that you say you had with the JAG

17:01:49   12    regarding Mrs. Morales and the ESGR?

17:01:51   13    A.   Yes.

17:01:52   14    Q.   In relation to Mrs. Morales's date of hire, when

17:01:56   15    would you have had that conversation?

17:01:59   16    A.   Prior for -- prior to her coming on board.  And

17:02:03   17    that conversation is as follows:  She had a --

17:02:08   18            MR. JUPITER:  Your Honor, object.  This is

17:02:11   19    nonresponsive.

17:02:12   20            THE COURT:  All right.  Overruled.

17:02:14   21            THE WITNESS:  She had a lawsuit against the --

17:02:18   22    BY MR. POTTER:

17:02:18   23    Q.   Don't mention --

17:02:20   24            THE COURT:  Wait for a question.

17:02:23   25            Next question.

17:02:24   1   BY MR. POTTER:

17:02:24   2   Q.   Now, you also mentioned regarding the hours of work

17:02:33   3   and you mentioned there was a caveat.  What was the

17:02:36   4   caveat that you wanted to mention?

17:02:38   5   A.   The caveat was the ESGR position is, she could work

17:02:41   6   from home.

17:03:01   7            MR. POTTER:  Court's indulgence, Judge.

17:03:03   8            THE COURT:  Yes.

17:03:04   9        (Pause)

17:03:04  10            MR. POTTER:  No further questions of the

17:03:05  11   witness, Your Honor.

17:03:06  12            THE COURT:  General Rivera, thank you for your

17:03:09  13   testimony.

17:03:09  14        You may step down.

17:03:09  15        (Witness withdrew from stand.)

17:03:13  16            THE COURT:  Your next witness.

17:03:14  17            MR. POTTER:  The next witness, the government

17:03:16  18   calls Baron Hignite.

17:03:46  19            THE CLERK:  Please stand and raise your right

17:03:48  20   hand to take the oath.

17:03:49  21        (Witness sworn.)

17:03:51  22            THE WITNESS:  So help me God.

17:03:51  23

17:03:51  24

17:03:53  25

17:03:53  1          THEREUPON, BARON HIGNITE, having been duly

17:03:56  2  sworn, was examined and testified as follows:

17:03:56  3                    DIRECT EXAMINATION

17:03:56  4  BY MR. POTTER:

17:03:57  5  Q.   Good afternoon, sir.

17:03:57  6  A.   Good afternoon, sir.

17:03:59  7  Q.   Can you give us your full name for the record,

17:04:01  8  please?

17:04:02  9  A.   It's Baron Guy Hignite, H-i-g-n-i-t-e.

17:04:07  10  Q.   And Mr. Hignite, how are you employed?

17:04:10  11  A.   Employed by Military Personnel Services

17:04:12  12  Corporation.  We're a military Department of Defense

17:04:15  13  contracting firm out of Falls Church, Virginia.

17:04:18  14  Q.   And tell us what your company does?

17:04:20  15  A.   We provide services primarily to the National

17:04:23  16  Guard, to the Army and International Guard and other

17:04:27  17  Department of Defense organizations, to support the

17:04:28  18  service members, their families and their employers.

17:04:34  19  Q.   Mr. Hignite, you speak very fast.  I'll ask you to

17:04:38  20  slow down just a little bit.

17:04:40  21  A.   I sure will.

17:04:42  22  Q.   And what is the relationship, what -- what was the

17:04:46  23  relationship between the MPSC and the Virgin Islands

17:04:49  24  National Guard?

17:04:51  25  A.   We had a national contract that asked us to provide

17:04:56  1    several different positions.  The one that I manage is

17:04:58  2    the employee supported Reserve and Guard contract,

17:05:03  3    professional services person.  And that's someone who

17:05:05  4    works with the employee and Guard, Reserve, that is the

17:05:08  5    organization that is part of the Department of Defense

17:05:10  6    that assists returning service members with any

17:05:13  7    conflicts they may have with their job, to make sure

17:05:15  8    that the job is held for them while they're gone, or

17:05:19  9    that they return to a job that pays what they should

17:05:22  10   have had, or promotions they would have had, while they

17:05:25  11   were away during their war fighting duties.  They also

17:05:28  12   help with employment, if someone needs a job.

17:05:33  13   Q.   Now, what were the prescribed hours for -- or what

17:05:38  14   are the prescribed hours for your ESGR person?

17:05:40  15   A.   All of our folks are assigned to a joint force

17:05:43  16   headquarters at a National Guard location, so therefore

17:05:46  17   they would work the hours that the facility has.

17:05:49  18        For instance, some states, to save on energy, might

17:05:52  19   have four ten-hour days.  If that's the case, the joint

17:05:56  20   force headquarters, our folks would work the same kind

17:05:58  21   of schedule that was held.

17:05:59  22   Q.   What was the schedule for the Virgin Islands?

17:06:01  23   A.   The Virgin Islands, to my knowledge, was a 9:00 to

17:06:05  24   5:00 type of position or 8:00 till 5:00 position,

17:06:07  25   five days a week.

17:06:08  1          And there's no overtime with our positions.  They

17:06:09  2    have to work only a 40-hour week.  If you have something

17:06:13  3    to take place on a Saturday or in the evening, then you

17:06:15  4    would have to take off, during that same time period,

17:06:18  5    that amount of time, because we cannot pay more than

17:06:21  6    40 hours a week.

17:06:29  7    Q.   Do you know Sherrymae Morales?

17:06:30  8    A.   I sure do.  Very well.

17:06:32  9    Q.   Tell us how you know her.

17:06:33  10   A.   I was the national RAC chairman for the recruiting

17:06:37  11   retention for the National Guard, and I got to know each

17:06:39  12   one of the recruiting managers.  And during that time

17:06:42  13   period, the first time I met Sherry she was in charge of

17:06:46  14   recruiting for the Virgin Islands National Guard.

17:06:54  15   Q.   Did you ever hire Sherrymae Morales?

17:06:56  16   A.   I did.  I hired her in November of 2007.  And she

17:07:01  17   came to work for me and worked during that first period

17:07:04  18   of time until, I believe it was June of 2010.  She had a

17:07:14  19   break in that time period.  And I hired her back again

17:07:18  20   on, I believe it was November to June of 2010; and then

17:07:23  21   2007 to 2010, and then she came back on, in September of

17:07:26  22   2010 and stayed until July of 2011.

17:07:30  23   Q.   Okay.  Now, in March -- well, when you hired

17:07:41  24   Ms. Morales, what, if any, conversations did you have

17:07:44  25   with her regarding outside employment?

17:07:48   1    A.    It's standard with our company, we have had, we had

17:07:52   2    a company that had 2,172 employees, so it's a pretty

17:07:57   3    large company.   So as a result we had lots of instances

17:07:59   4    where people work more than the prescribed job.   So it

17:08:02   5    was always --

17:08:03   6              MR. JUPITER:   Your Honor, I would object.   It's

17:08:06   7    irrelevant.   This is regarding MPSC, and they're not

17:08:10   8    considered a victim here.

17:08:11   9              THE COURT:   All right.   Overruled.

17:08:13   10             THE WITNESS:   -- the individual would actually

17:08:15   11   work a 40-hour week, but they were in a position where

17:08:20   12   everyone is explained, "You can't do more than one job."

17:08:23   13   It's actually something when you're hired, you have to

17:08:24   14   sign the handbook that says inside that you've read and

17:08:29   15   understand what's in there, and you must have permission

17:08:31   16   to work more than one job.

17:08:33   17   BY MR. POTTER:

17:08:33   18   Q.    Okay.   And when you hired Ms. Morales, did she ever

17:08:41   19   ask permission to hold more than one job?

17:08:43   20   A.    No.

17:08:44   21             MR. JUPITER:   Objection as to relevance, Your

17:08:46   22   Honor.   Move to strike.

17:08:47   23             THE COURT:   Overruled.

17:09:10   24   BY MR. POTTER:

17:09:10   25   Q.    Now, the -- was Sherrymae Morales the only ESGR

17:09:15   1   person that you have hired in the Virgin Islands?

17:09:17   2   A.   No.   We have hired several that have been in that

17:09:21   3   position.   It was a little problematic of getting

17:09:25   4   someone who had the qualifications to do the job, so we

17:09:27   5   had a bit of a turnover.   We had Emmett Hansen, Janice

17:09:32   6   Aelleyne, Sherry Morales.   We also hired Dazarene

17:09:38   7   Lescott.   She was the administrative support technician,

17:09:41   8   and she worked for the St. Thomas area, primarily.

17:09:46   9   Q.   Okay.

17:09:47   10   A.   I interviewed her.

17:09:48   11   Q.   Wait for my question.   Sorry.

17:10:02   12       In March of 2010, was Sherrymae Morales still

17:10:06   13   employed with you as an ESGR?

17:10:08   14   A.   She was.

17:10:14   15   Q.   In March of 2010, did Sherrymae Morales indicate to

17:10:22   16   you that she had also been hired to work as a full-time

17:10:25   17   military tech employee with the National Guard?

17:10:29   18   A.   I understood that she was being recalled to active

17:10:31   19   duty or to another position.   That has happened many

17:10:34   20   times in the past during the war fight effort --

17:10:37   21   Q.   I'm talking about in March of 2010.

17:10:39   22   A.   In 2010?

17:10:41   23   Q.   March of 2010.

17:10:43   24   A.   She -- yes.

17:10:48   25   Q.   She told you that she was being rehired -- that she

17:10:51  1   was going back as a full-time military tech?

17:10:53  2   A.   She was going back in uniform, yes.

17:11:04  3   Q.   And what, if any, conversations did you have with

17:11:07  4   her regarding the ESGR position, if she was going back

17:11:14  5   into the Guard as a military tech?

17:11:17  6   A.   I asked her for assistance on somebody that had the

17:11:19  7   same skill sets and the qualifications to be able to do

17:11:22  8   that job, and any assistance she could give me would be

17:11:25  9   appreciated.

17:11:27  10  Q.   Was she still a full-time employee of your company,

17:11:31  11  MPSC?

17:11:32  12  A.   She was up until June of 2010.

17:11:35  13  Q.   So between June -- between March of 2010 and June

17:11:40  14  of 2010, she worked for you full-time and she worked for

17:11:49  15  the National Guard full-time?

17:11:52  16  A.   I only knew that she worked for me full-time.  I

17:11:54  17  did not know about her employment with the National

17:12:09  18  Guard.  We wouldn't have allowed that.

17:12:10  19         THE COURT:  Wait for a question.

17:12:20  20  BY MR. POTTER:

17:12:20  21  Q.   How did Sherrymae Morales get paid?

17:12:25  22  A.   Sir?

17:12:25  23  Q.   How did she get paid?

17:12:26  24  A.   She was paid twice a month on the -- it was on the

17:12:29  25  8th and the 23rd of each month.

17:12:31   1    Q.   And what, if anything, did she submit to you to get

17:12:34   2    paid?

17:12:35   3              MR. JUPITER:   Your Honor, objection.   Once

17:12:36   4    again, the charges only relate to her payments from the

17:12:39   5    Virgin Islands National Guard.

17:12:42   6              THE COURT:   Overruled.

17:12:45   7              THE WITNESS:   She -- we have the best payroll

17:12:48   8    system in the nation.   That's Deltek.   And Deltek is

17:12:53   9    signed and it's approved, and then the payment goes into

17:12:56  10    the payroll and she receives the check and automatic

17:12:59  11    deposit.

17:13:10  12              MR. POTTER:   Court's indulgence, Judge?

17:13:12  13              THE COURT:   Yes.

17:13:12  14         (Pause.)

17:13:21  15              MR. POTTER:   Now, let me show you what's been

17:13:23  16    marked as Government's Exhibit 5.2 for identification

17:13:29  17    purposes.

17:13:34  18         (Government's Exhibit 5.2 marked for

17:13:34  19    identification.)

17:13:34  20    BY MR. POTTER:

17:13:39  21    Q.   And ask you if you recognize it?

17:13:39  22    A.   Yes.   That's the resignation letter that she sent

17:13:50  23    me.

17:13:50  24    Q.   And do you know approximately when you received

17:13:52  25    that letter, sir?

17:13:53    1    A.    I received it approximately that same date, the

17:13:56    2    30th of June, 2010.

17:13:57    3    Q.    And your name appears on the letter?

17:13:59    4    A.    It is.  It came to me.

17:14:02    5    Q.    And does the letter seem to be an accurate

17:14:06    6    reflection of the letter that you received -- the

17:14:08    7    resignation letter that you received from Sherrymae

17:14:12    8    Morales in June -- well, effective June 30th, 2010?

17:14:18    9    A.    Yes, sir.

17:14:21    10           MR. POTTER:  Your Honor, can we publish -- can

17:14:23    11   we move for -- to admit Government's Exhibit 5.2?

17:14:30    12           THE COURT:  Attorney Jupiter.

17:14:31    13           MR. JUPITER:  No objection, Your Honor.

17:14:32    14           THE COURT:  Exhibit 5.2 is admitted.

17:14:35    15       (Government's Exhibit 5.2 admitted into evidence.)

17:14:35    16           MR. POTTER:  Can we publish, Your Honor?

17:14:42    17       (Exhibit published.)

17:14:42    18   BY MR. POTTER:

17:14:43    19   Q.    Mr. Hignite, looking at Government's Exhibit 5.2,

17:14:53    20   what was the reason that Sherrymae Morales gave that she

17:14:56    21   was resigning from your organization?

17:15:05    22   A.    I understood that she was resigning to go back on

17:15:08    23   an active duty tour, or take a civil service military

17:15:11    24   technician, which would put her back in uniform on a

17:15:15    25   full-time basis with the Virgin Islands National Guard.

17:15:17  1     Q.   And she had that conversation with you?

17:15:19  2     A.   She did.

17:15:26  3     Q.   And Government's Exhibit 5.2, did she send you this

17:15:28  4     before or after -- well, the testimony that you just

17:15:31  5     gave, was that a verbal communication between you and

17:15:37  6     Sherrymae Morales?

17:15:37  7     A.   We did.  We had a good relationship and she kept me

17:15:41  8     informed.  She told me she was taking her position back

17:15:44  9     with the National Guard, leaving my employment.

17:15:46  10    Q.   Yes.

17:15:46  11         And Government Exhibit 5.2, did you receive that

17:15:50  12    before or after your conversation with Sherrymae

17:15:52  13    Morales?

17:15:52  14    A.   It was after the conversation.

17:15:55  15    Q.   And do you recall what month she actually had the

17:15:59  16    conversation with you?

17:16:03  17    A.   I believe it was first of June, but I can't tell

17:16:06  18    you the exact date, sir.

17:16:22  19    Q.   Now, did there come -- after Sherrymae resigned her

17:16:32  20    position -- shortly after the defendant resigned her

17:16:34  21    position, did there come a time that you rehired her?

17:16:38  22    A.   I had a telephone call from the chief of staff at

17:16:41  23    the time, Colonel Ruan.  And Colonel Ruan contact me to

17:16:45  24    ask about the expenditure of funds and filling a

17:16:48  25    position in the Virgin Islands --

17:16:50   1                    MR. JUPITER:  Objection.

17:16:50   2                    THE COURT:  Sustained.

17:16:51   3   BY MR. POTTER:

17:16:51   4   Q.   Did there come a time after June of 2010 that

17:16:56   5   you -- that Ms. Morales expressed an interest to come

17:17:01   6   back to be an ESGR employee, contract employee?

17:17:05   7   A.   She did, after I contacted her.

17:17:08   8   Q.   And tell us when that was.

17:17:10   9   A.   Timing was, it must have been pretty close to the,

17:17:18   10  must have been August, before the month of September.

17:17:23   11  And we had not filled the position, and I had difficulty

17:17:26   12  in finding someone that had this skills set.

17:17:28   13       And I contacted her and asked if she would do a

17:17:31   14  couple things for me.  One is prepare the PEPAS report,

17:17:35   15  which is a report that is required under the contract

17:17:36   16  for the Department of Defense ESGR program.  No one else

17:17:39   17  knew how to do that.  I asked her to do that.

17:17:41   18       And she said she would.

17:17:42   19  Q.   Okay.  That's fine.

17:17:49   20       Did you in fact rehire her?

17:17:51   21  A.   I did rehire her.

17:17:52   22  Q.   And when you rehired her, sir, did she tell you

17:17:55   23  that she was still a full-time member of the Virgin

17:17:58   24  Islands National Guard?

17:17:59   25                   MR. JUPITER:  I object to leading.

17:18:00　1　　　　　　　　　THE WITNESS:  No, sir.

17:18:01　2　　　　　　　　　THE COURT:  Sustained.

17:18:01　3　　　　　　　　　THE WITNESS:  She did not.

17:18:05　4　BY MR. POTTER:

17:18:05　5　Q.　What, if anything, did she relate to you regarding

17:18:10　6　her then-current employment?

17:18:13　7　A.　She related she's going to be able to come back and

17:18:16　8　take the position and work for me.  She said it was not

17:18:19　9　as challenging or as rewarding as she thought it was

17:18:22　10　going to be, and she would be happy to come back.

17:18:25　11　　　　And I said I would, as long as I get approval from

17:18:27　12　her chain of command.

17:18:28　13　Q.　And which position wasn't as challenging or

17:18:32　14　rewarding?

17:18:33　15　A.　I assumed it was the position she had as a military

17:18:36　16　position.

17:18:46　17　Q.　And prior to -- or after you hired her, did she

17:18:55　18　tell you that she had resigned from her military

17:18:59　19　position?

17:19:00　20　A.　Yes, I think she did.  And the reason she would is

17:19:04　21　because --

17:19:04　22　　　　　　　　MR. JUPITER:  Objection, Your Honor.  Move to

17:19:06　23　strike.

17:19:06　24　　　　　　　　THE COURT:  Sustained, just as to the second

17:19:10　25　part.

17:19:11  1          Go ahead.  Next question.

17:19:11  2          (Pause.)

17:19:30  3              THE COURT:  Anything else for this witness?

17:19:32  4              MR. POTTER:  Yes, Judge.

17:19:33  5   BY MR. POTTER:

17:19:34  6   Q.   Did there come a time that the defendant stopped

17:19:37  7   working for the MPSC?

17:19:40  8   A.   She did.  She left us in June of 2011.

17:19:52  9   Q.   And did she tell you why she was leaving?

17:19:55  10  A.   She had two series of health issues.  One was her

17:19:58  11  daughter that had some kind of an eye problem.  I can't

17:20:01  12  remember what it was --

17:20:02  13             MR. JUPITER:  Your Honor, I object to

17:20:03  14  relevance.

17:20:05  15             THE COURT:  Overruled.

17:20:06  16             THE WITNESS:  And the second was, I recall she

17:20:07  17  had breast cancer, I had been told --

17:20:11  18             MR. POTTER:  Let me show you --

17:20:12  19             THE WITNESS:  -- and had been moved to the

17:20:13  20  mainland --

17:20:14  21             THE COURT:  Wait for a question.

17:20:15  22             MR. POTTER:  Let me show you what has been

17:20:17  23  marked as Government Exhibit 5.3 for identification, and

17:20:20  24  ask you if you recognize it.

17:20:23  25

17:20:23  1          (Government's Exhibit 5.3 marked for

17:20:23  2     identification.)

17:20:41  3     BY MR. POTTER:

17:20:41  4     Q.   Do you recognize that, sir?

17:20:42  5     A.   I do recognize it.  It's hard for me to see.  It's

17:20:47  6     a little small.  But it has "medical prognosis."

17:20:50  7     Q.   Let me try and blow it up for you.

17:20:53  8          Does that help?

17:20:53  9     A.   Yes, sir.  Very much sir.

17:20:55  10    Q.   So, what is Government Exhibit 5.3?  What is it?

17:21:01  11    A.   It is the reason that -- letter of resignation is

17:21:06  12    because of medical --

17:21:08  13              MR. JUPITER.  Objection.  It is not in

17:21:09  14    evidence.

17:21:09  15    BY MR. POTTER:

17:21:09  16    Q.   Just tell us what it is.

17:21:11  17    A.   What is written here --

17:21:13  18    Q.   Did you receive that, sir?

17:21:14  19    A.   I did, sir.

17:21:15  20    Q.   And who did you receive that from?

17:21:17  21    A.   I received that from Sherrymae Morales.

17:21:20  22    Q.   And does your title appear on the letter?

17:21:22  23    A.   Absolutely.  Yes, I received that.

17:21:23  24    Q.   And does the letter accurately -- is it an accurate

17:21:26  25    representation of the letter you received from

17:21:28  1    Sherrymae Morales regarding her resignation?

17:21:31  2    A.   Yes, sir.

17:21:38  3         MR. POTTER:  We move to admit Government's

17:21:41  4    Exhibit 5.3.

17:21:42  5         THE COURT:  Attorney Jupiter.

17:21:43  6         MR. JUPITER:  I object as irrelevant.

17:21:44  7         THE COURT:  It's under advisement.

17:21:46  8         MR. JUPITER:  May I -- yes, Your Honor.

17:21:49  9         THE COURT:  403.

17:21:50  10        Next question.

17:21:57  11        MR. POTTER:  Court's indulgence, Your Honor?

17:21:59  12        THE COURT:  Yes.

17:22:08  13        (Pause.)

17:22:08  14   BY MR. POTTER:

17:22:08  15   Q.   What date did she finally resign from the MPSC?

17:22:12  16   A.   She was -- she left us in July of 2011.

17:22:36  17   Q.   Now, did Ms. Morales -- in the time that she worked

17:22:40  18   for you, did she ever come and request to work outside

17:22:48  19   the Monday to Friday, 8:00 to 5:00, work schedule?

17:22:52  20   A.   No.

17:23:11  21        MR. POTTER:  Now, let me show you what's been

17:23:13  22   marked Government Exhibit 5.4 for identification

17:23:18  23   purposes.

17:23:19  24        (Government's Exhibit 5.4 marked for

17:23:19  25   identification.)

17:23:21   1    BY MR. POTTER:

17:23:21   2    Q.   Do you recognize Government's Exhibit 5.4?

17:23:23   3    A.   I do recognize it, sir.  It's our handbook,

17:23:27   4    employee handbook.

17:23:31   5    Q.   And does Government Exhibit 5.4 -- is it a fair and

17:23:36   6    accurate representation of your handbook?

17:23:38   7    A.   Yes.

17:23:44   8    Q.   And with respect to all employees of, all contract

17:23:50   9    employees with ESGR, what, if anything, do you do with

17:23:55  10    this handbook?

17:23:56  11         MR. JUPITER:  Objection, Your Honor.  It's not

17:23:57  12    in evidence.

17:24:00  13         THE COURT:  Overruled.  The question is:  What

17:24:03  14    do you do with the handbook?

17:24:05  15         MR. JUPITER:  Oh, I'm sorry.

17:24:06  16         THE COURT:  Overruled.

17:24:07  17         THE WITNESS:  It's a direct guidance for each

17:24:10  18    employee on what is allowed and what is not allowed

17:24:13  19    within the scope of their job, and their duties through

17:24:17  20    their performance statement and to their position

17:24:21  21    description.

17:24:22  22         MR. POTTER:  Your Honor, we move to admit

17:24:24  23    Government's Exhibit 5.4.

17:24:26  24         THE COURT:  Attorney Jupiter?

17:24:28  25         MR. JUPITER:  Your Honor, we object.

17:24:29   1          THE COURT: All right. It's under advisement.

17:24:30   2     Next question.

17:24:44   3   BY MR. POTTER:

17:24:44   4   Q. Can someone begin work for MPSC without having

17:24:51   5   obtained and signed for the handbook?

17:24:53   6   A. No, they cannot.

17:24:59   7   Q. Do you, sir, have personal knowledge of when

17:25:03   8   Mr. Morales was hired and giving her a copy of your

17:25:08   9   handbook?

17:25:08   10   A. She would have received one at the end process of

17:25:11   11   both the 2007 November date and also at the reemployment

17:25:16   12   that started again in 2010.

17:25:30   13          MR. POTTER: Your Honor, again we move for

17:25:36   14   admission of Government's Exhibit 5.4.

17:25:38   15          THE COURT: It's under advisement.

17:25:49   16          MR. POTTER: Brief sidebar, Your Honor.

17:25:50   17          THE COURT: Not now. Thank you.

17:25:58   18          MR. POTTER: Court's indulgence?

17:26:00   19          THE COURT: Yes.

17:26:00   20     (Pause.)

17:26:17   21          MR. POTTER: Your Honor, pursuant to Federal

17:26:21   22   Rules of Evidence 803.6 and Federal Rules of Evidence

17:26:27   23   902.11, we are moving for the admission of certain

17:26:31   24   documents pursuing -- pursuant to a declaration of

17:26:36   25   authentication of business records that the government

17:26:39  1    has.  That's Government's Exhibit 5A.

17:26:39  2         (Government's Exhibit 5A marked for

17:26:39  3    identification.)

17:26:45  4         MR. POTTER:  They are related to the business

17:26:46  5    records of the MPSC, related to Sherrymae Morales.  And

17:26:57  6    we ask for their admission.  The specific documents,

17:27:07  7    Judge --

17:27:07  8         THE COURT:  All right.  It's under advisement.

17:27:25  9         MR. POTTER:  Court's indulgence, Your Honor?

17:27:26  10        THE COURT:  Yes.

17:27:35  11        (Pause.)

17:27:35  12   BY MR. POTTER:

17:27:36  13   Q.   Now, Mr. Hignite, are you familiar with Dazarene

17:27:39  14   Lescott?

17:27:40  15   A.   Yes.  She was an employee of ours.

17:27:40  16   Q.   And when did you hire Dazarene Lescott?

17:27:42  17   A.   She interviewed in September of 2010 and I hired

17:27:45  18   her in October of 2010.

17:27:46  19   Q.   Who, if anyone, recommended Ms. Lescott to your

17:27:50  20   employ?

17:27:51  21   A.   She was one of a group that we interviewed, and she

17:27:54  22   was highly recommended by Mrs. Morales.

17:27:59  23   Q.   And what were the duties of Ms. Lescott?

17:28:02  24   A.   Sir?

17:28:03  25   Q.   What were her duties?

17:28:06  1    A.    She was the administrative support technician.

17:28:08  2    Since we had two employees working the ESGR program,

17:28:12  3    Sherry Morales took the Christiansted side in St. Croix,

17:28:19  4    and Dazarene had St. Thomas, took St. Thomas.  It was a

17:28:27  5    larger business opportunity to develop for the employer

17:28:30  6    side of the contract.

17:28:33  7    Q.    And during the time that Mrs. Morales was ESGR, who

17:28:38  8    supervised her?

17:28:39  9    A.    By regulation, a contractor may not supervise

17:28:42  10   another contractor.  However, you have a lead contractor

17:28:46  11   that can give guidance on what activities you do, so in

17:28:48  12   that case --

17:28:48  13   Q.    No.  Who supervised Ms. Morales?

17:28:51  14   A.    I did.

17:28:51  15   Q.    And how is it that you supervised Ms. Morales?

17:28:55  16   A.    Through reports, primarily.  Monthly -- progress

17:28:59  17   reports and the PEPAS report.

17:29:02  18   Q.    Were you present in the Virgin Islands at the time

17:29:03  19   of her supervision?

17:29:04  20   A.    No, sir.  We do it remotely.  We have national

17:29:07  21   contracts with 54 locations.

17:29:12  22   Q.    And how often would you get the reports?

17:29:15  23   A.    Always on time, always bimonthly.

17:29:23  24   Q.    And did you get any reports from Ms. Lescott?

17:29:28  25   A.    She did reports that also came through

17:29:31  1    Mrs. Morales, and Mrs. Morales would forward them to me.

17:29:33  2    And they would also go in directly to the ESGR office.

17:29:58  3             MR. POTTER:  Court's indulgence, Your Honor?

17:30:00  4             THE COURT:  Yes.

17:30:22  5             MR. POTTER:  That is...

17:30:42  6         (Pause.)

17:30:42  7    BY MR. POTTER:

17:30:44  8    Q.   Let me show you what's been marked Government's

17:30:47  9    Exhibit 5.2 and Government's Exhibit 10.

17:31:19  10        Now, Mr. Hignite, in 2010, April of 2010, did you

17:31:29  11   have any conversation with Mrs. Morales -- yes.  In

17:31:36  12   April of 2010, did you have any conversation with

17:31:41  13   Mrs. Morales regarding the expenditure of ESGR funds as

17:31:49  14   a volunteer?

17:31:50  15   A.   Not as a volunteer.  You cannot be a volunteer and

17:31:52  16   be a contract employee for the Department of Defense.

17:32:02  17   Q.   In April of 2010, was Ms. Morales still a full-time

17:32:19  18   employee?

17:32:20  19   A.   Yes.  And we had a conversation --

17:32:27  20            THE COURT:  Wait for a question.

17:32:47  21   BY MR. POTTER:

17:32:47  22   Q.   Did anyone from the National Guard contact you in

17:32:51  23   April of 2010 and indicate to you that Ms. Morales had

17:32:59  24   indicated she had, she was now a volunteer for the ESGR?

17:33:03  25            MR. JUPITER:  Leading, Your Honor.

17:33:04  1                    THE COURT:  Sustained.

17:33:18  2                    MR. POTTER:  Can I publish

17:33:20  3    Government's Exhibit 5.2 and Government's Exhibit 10?

17:33:20  4    BY MR. POTTER:

17:33:42  5    Q.   Mr. Hignite, let me show you Government's

17:33:47  6    Exhibit 10 and ask you if you could read --

17:34:03  7                    THE COURT:  No, let's move on.

17:34:05  8                    MR. POTTER:  That's all I have at this time for

17:34:07  9    this witness.

17:34:08  10                   THE COURT:  Attorney Jupiter?

17:34:26  11                        CROSS-EXAMINATION

17:34:27  12   BY MR. JUPITER:

17:34:27  13   Q.   Good afternoon.

17:34:28  14   A.   Good afternoon, sir.

17:34:29  15   Q.   Mr. Hignite, you were in contact with the

17:34:33  16   leadership at the Virgin Islands National Guard before

17:34:38  17   you -- in 2007, just before you hired Ms. Morales?

17:34:44  18   A.   Yes, sir.

17:34:44  19   Q.   And you received a recommendation from Colonel

17:34:47  20   Lewis and JAG Marise James, recommending Ms. Morales?

17:34:54  21   A.   I did receive a recommendation.

17:34:56  22   Q.   And you were already familiar with Ms. Morales when

17:35:00  23   they talked to you?

17:35:01  24   A.   Very much.

17:35:02  25   Q.   Is it fair to say by the time you talked to

17:35:06  1    Mrs. Morales, as long as she was willing to accept, it

17:35:09  2    was a done deal?

17:35:10  3    A.   We still had protocols to go through.  We had other

17:35:13  4    people that were being considered.  But after interviews

17:35:15  5    were conducted and after talking to Ms. Morales, I felt

17:35:18  6    she was the best for the position.  We hired her,

17:35:21  7    brought her on board.

17:35:21  8    Q.   And prior to that, there was a problem in terms of

17:35:27  9    getting the ESGR work done at the -- in the Virgin

17:35:30  10   Islands, correct?

17:35:31  11   A.   We had someone briefly in the job, but, yes, there

17:35:35  12   was, lacking in the output and expectations I had.

17:35:38  13   Q.   Part of the duties is that you're supposed to have

17:35:41  14   a certain number of volunteers working in the ESGR,

17:35:44  15   correct?

17:35:44  16   A.   It's supposed to be a committee in each one of the

17:35:47  17   areas, and that includes the Virgin Islands.

17:35:48  18   Q.   Okay.  And the person before Ms. Morales didn't

17:35:52  19   have very many volunteers, correct?

17:35:55  20   A.   Not as many as I expected.

17:35:57  21   Q.   And you're supposed to have outreach programs for,

17:36:00  22   to make sure that Guard and Reserve members know who you

17:36:03  23   are and that you're there to help, right?

17:36:05  24   A.   Yes.

17:36:06  25   Q.   And it wasn't a whole bunch of activities going on

17:36:08    1    before Ms. Morales came on, correct?

17:36:12    2    A.   There were activities going on.  I can't tell you

17:36:15    3    the same amount, but they weren't at the levels we

17:36:18    4    expected.

17:36:18    5    Q.   And those activities increased when Mrs. Morales

17:36:22    6    came on board, correct?

17:36:23    7    A.   That's correct.

17:36:23    8    Q.   And the volunteer activities -- the volunteer

17:36:27    9    trainings increased, correct?

17:36:28   10    A.   There was also a state chairman appointed at that

17:36:31   11    time, so that certainly did increase because of the

17:36:34   12    added activity between several people.

17:36:37   13    Q.   Okay.  Now you had -- in this discussion you had

17:36:42   14    with Mrs. Morales before she was hired, this telephone

17:36:45   15    interview, she explained to you that she had a realty

17:36:48   16    company, didn't she?

17:36:48   17    A.   She did.

17:36:49   18    Q.   And she told you that she would -- actually --

17:36:52   19         THE COURT:  No, stop.

17:36:58   20         MR. JUPITER:  Okay.

17:36:58   21    BY MR. JUPITER:

17:36:58   22    Q.   Now, she was hired -- after she was hired, you were

17:37:03   23    her supervisor, correct?

17:37:04   24    A.   Yes.

17:37:04   25    Q.   All right.  And at that time she did not have an

17:37:08  1    assistant, did she?

17:37:09  2    A.   She did not.

17:37:10  3    Q.   And she worked, worked in that position all the way

17:37:16  4    through, as we saw, through June of 2010 --

17:37:20  5    A.   2010.

17:37:21  6    Q.   -- correct?

17:37:22  7    A.   Correct.

17:37:23  8    Q.   Okay.  And then you actually rehired, and as a

17:37:28  9    matter of fact, you said prior to that you had a

17:37:32  10   conversation with her about the position she had, the

17:37:37  11   fact that she was going back to the Guard, right?

17:37:40  12   A.   Yes.

17:37:41  13   Q.   Okay.  And at this point you asked her to stay on

17:37:49  14   until you can get a replacement, didn't you?

17:37:54  15   A.   I don't recall that conversation.

17:37:56  16   Q.   Okay.  Now she didn't resign until June of 2010,

17:38:04  17   right?

17:38:04  18   A.   June 30th.

17:38:05  19   Q.   Okay.  And she continued to do the work all the way

17:38:12  20   up to June 30th, 2010, correct?

17:38:14  21   A.   She did.

17:38:15  22   Q.   All right.  And you recall that she also told you

17:38:21  23   prior to this, prior to her resignation, that --

17:38:28  24            MR. POTTER:  Objection, Your Honor.

17:38:30  25            THE COURT:  Sustained.

17:38:41  1    BY MR. JUPITER:

17:38:42  2    Q.   At any rate, she stopped in June of 2010, correct?

17:38:44  3    A.   Yes.

17:38:45  4    Q.   And she was trying to help you find a replacement,

17:38:49  5    wasn't she?

17:38:50  6    A.   Yes, she was.

17:38:51  7    Q.   Okay.  And the people that she was giving you, you

17:38:54  8    weren't pleased with them?  You didn't feel they met the

17:38:59  9    qualifications?

17:39:01  10   A.   Yes.

17:39:01  11   Q.   And so by September of 2010, you asked her to come

17:39:09  12   back on, correct?

17:39:11  13   A.   Sometime in August I called her and told her I

17:39:14  14   needed someone.  I had not been able to fill it.

17:39:16  15        And she said she was not as happy with the position

17:39:18  16   she had, and she would entertain returning back to my

17:39:23  17   position.

17:39:23  18   Q.   Okay.  And you contacted Colonel Lewis, correct?

17:39:27  19   A.   Yes, sir.

17:39:28  20   Q.   And you made sure that it was okay with Colonel

17:39:30  21   Lewis that she continued to work on as ESGR -- in the

17:39:37  22   contract position?

17:39:37  23   A.   I would have done it through the chain.  I would

17:39:39  24   have started with the J1, which I believe was Colonel

17:39:42  25   Cills at the time, and then after that conversation move

17:39:44  1    to, the next highest person would have been Colonel then

17:39:48  2    later Brigadier General Lewis, yes.

17:39:50  3    Q.   And both of them concurred that Mrs. Morales could

17:39:53  4    work in that position at ESGR, correct?

17:39:57  5    A.   Yes.

17:39:58  6    Q.   Now you indicated that when someone is hired with

17:40:00  7    MPSC, there's a handbook that they're supposed to sign,

17:40:05  8    correct?

17:40:05  9    A.   Yes.

17:40:05  10   Q.   And then you keep a copy of that signed handbook?

17:40:07  11   A.   Yes, sir.

17:40:08  12   Q.   And you keep that in your filings?

17:40:10  13   A.   I do not, no.

17:40:11  14   Q.   It goes to MPSC?

17:40:13  15   A.   Yes.

17:40:13  16   Q.   And you also indicated that there's a letter of

17:40:15  17   intent that they have to sign?  Or did you testify to

17:40:20  18   that?

17:40:20  19   A.   Letter of intent for what?

17:40:21  20   Q.   Let me ask you, isn't there a letter of intent that

17:40:24  21   they have to sign that says that they will not work at

17:40:27  22   any outside employment?

17:40:28  23   A.   That is part of the handbook.  When they sign the

17:40:31  24   handbook they are admitting that they have read it and

17:40:34  25   they understand, and they can't do more than one job at

17:40:37  1    the time.

17:40:37  2    Q.   Isn't there something in addition?  Isn't the

17:40:42  3    letter of intent an additional --

17:40:44  4    A.   I don't think so.

17:41:14  5    Q.   Okay.  Do you remember testifying before a grand

17:41:17  6    jury in this matter on December 4th, 2014?

17:41:22  7    A.   I do.

17:41:25  8         THE COURT:  Use the Elmo so we can all see.

17:41:38  9    BY MR. JUPITER:

17:41:39  10   Q.   And do you remember testifying, as you stated,

17:41:43  11   about them signing a handbook, as well as -- and then

17:41:47  12   later saying they also have to sign a letter of intent?

17:41:50  13   A.   The letter of intent is for employment.  It's to

17:41:53  14   take the job.  It's not to say, "I'm going to work one

17:41:55  15   or two jobs."

17:41:56  16   Q.   Okay.  Did you --

17:41:57  17   A.   It also has my name misspelled on the front of that

17:42:02  18   page.  That may go to its accuracy.

17:42:04  19   Q.   Okay.  Did you testify before the grand jury, "So

17:42:09  20   as a result they have to sign a letter of intent that

17:42:11  21   says they will not work some place else"?

17:42:13  22   A.   That is included in the handbook.

17:42:15  23   Q.   Did you testify to that?

17:42:16  24   A.   I did.

17:42:18  25   Q.   Okay.  And --

17:42:18   1    A.   But it's not a separate letter.  When they signed a

17:42:21   2    handbook, that says they've read and understand they

17:42:26   3    can't work more than one job at a time.

17:42:29   4    Q.   But did you testify a few paragraphs higher up,

17:42:34   5    "When we hire somebody, they have to sign a handbook,

17:42:36   6    and the handbook says they may not hold more than one

17:42:39   7    job"?

17:42:39   8    A.   I said that.

17:42:40   9    Q.   Okay.  And then later on you talked about a letter

17:42:43   10   of intent?

17:42:44   11   A.   Letter of intent is to accept the position and

17:42:46   12   understand what the duties and requirements are.  It is

17:42:48   13   not the intent on working one or two jobs.  Everyone

17:42:52   14   knows you can't work but one job if you're a Department

17:42:56   15   of Defense contractor.

17:42:56   16   Q.   All I'm trying to make clear is that, as your

17:42:59   17   testimony was December 4th, 2014, you talked about two

17:43:02   18   different documents, correct?

17:43:03   19   A.   I don't see any --

17:43:06   20        MR. POTTER:  Objection, Your Honor.

17:43:08   21        THE WITNESS:  -- difference to what you just

17:43:10   22   said.

17:43:10   23        THE COURT:  Sustained.  It's argumentative.

17:43:14   24   Next question.

17:43:16   25        MR. JUPITER:  Your Honor, I don't have any

17:43:18   1   further questions.

17:43:19   2         THE COURT:  Redirect?

17:43:20   3         MR. POTTER:  Court's indulgence, Judge?

17:43:32   4     (Pause.)

17:43:32   5            REDIRECT EXAMINATION

17:43:33   6   BY MR. POTTER:

17:43:42   7   Q.  Mr. Hignite, when you hired the defendant, you had

17:43:55   8   a specific conversation with her regarding outside

17:44:01   9   employment?

17:44:01  10   A.  I did.

17:44:10  11   Q.  That would have been the initial time in 2007?

17:44:12  12   A.  Yes, sir.

17:44:18  13   Q.  Is it also your testimony in 2010 you had the very

17:44:24  14   same conversation with her regarding outside employment?

17:44:28  15   A.  Yes, sir.

17:44:29  16   Q.  And when she had that conversation -- when you had

17:44:32  17   that conversation with her, did she admit to you that

17:44:37  18   she had outside employment?

17:44:40  19         MR. JUPITER:  Your Honor, I object.  This is

17:44:42  20   what Mr. Potter objected to on my cross, and it's

17:44:47  21   leading.

17:44:47  22         THE COURT:  Sustained.

17:44:54  23   BY MR. POTTER:

17:44:55  24   Q.  Would you have hired the defendant back in

17:45:00  25   September of 2010 if she had outside employment?

17:45:10  1          MR. JUPITER:  Objection.

17:45:17  2          THE WITNESS:  Absolutely --

17:45:19  3          THE COURT:  Sustained.

17:45:21  4          THE WITNESS:  -- not.

17:45:22  5          THE COURT:  Sustained.

17:45:28  6          MR. POTTER:  Court's indulgence, Judge.

17:45:31  7      (Pause.)

17:45:31  8  BY MR. POTTER:

17:45:31  9  Q.   In your communication with Mrs. Morales, did she

17:45:42 10  ever use her rank, her military rank --

17:45:47 11          MR. JUPITER:  Objection.  Outside the scope.

17:45:52 12          THE COURT:  Let me hear the question.

17:45:53 13  Overruled.

17:45:54 14  BY MR. POTTER:

17:45:54 15  Q.   In your e-mail or other communications -- well, in

17:45:58 16  your e-mail communications or letter communications with

17:46:00 17  Mrs. Morales, did she ever use her military rank?

17:46:03 18  A.   She did.  There's an e-mail that I sent out to

17:46:07 19  everyone as a result, and said that you may not --

17:46:10 20          MR. JUPITER:  Objection, Your Honor.

17:46:10 21          THE WITNESS:  -- give the appearance of --

17:46:12 22          THE COURT:  Okay.  Stop.  Sustained.

17:46:24 23  BY MR. POTTER:

17:46:24 24  Q.   So you indicated she did use her military --

17:46:28 25          THE COURT:  Stop going over the -- don't

17:46:30  1    repeat.

17:46:32  2         Next question.

17:46:33  3         MR. POTTER:  I thought he objected to something

17:46:37  4    different.  I'm sorry.

17:46:38  5         No further questions, Judge.

17:46:40  6         THE COURT:  Mr. Hignite, thank you for your

17:46:43  7    testimony.

17:46:43  8         You may step down.

17:46:44  9         (Witness withdrew from stand.)

17:46:44  10        THE COURT:  Ladies and gentlemen, we're going

17:46:46  11   to end for the evening.  Let me thank you for your

17:46:48  12   patience.  We were able to cover a good bit of ground

17:46:55  13   today.

17:46:55  14        Tomorrow we start at 8:45.  You should try to be

17:46:58  15   here early because we cannot start if everyone isn't

17:47:04  16   here.  Try to be here on time.  We'll get in a lunch

17:47:07  17   order, we'll make sure it's full lunch as opposed to

17:47:10  18   something that is more rushed, that we always have to do

17:47:14  19   on the first day.

17:47:15  20        And we will try to move as quickly as possible with

17:47:18  21   the testimony, so that you can have the evidence before

17:47:20  22   you as soon as possible.

17:47:23  23        Before you leave for the evening, bear in mind that

17:47:25  24   you're not to discuss this case with anyone.

17:47:28  25        If anyone attempts to discuss it with you, bring it

17:47:30  1    to the Court's attention promptly.  We take that very

17:47:33  2    seriously.

17:47:34  3        Do not do any research into any matters that you

17:47:36  4    heard discussed here today.  The only evidence you are

17:47:39  5    to consider is the evidence that comes in through the

17:47:41  6    witness stand or other items that I allow into evidence.

17:47:44  7        Please keep an open mind.  The evidence is still

17:47:47  8    coming in.

17:47:48  9        The time to discuss and deliberate is not yet at

17:47:52  10   hand.  That is at the end of the case after you get the

17:47:55  11   instructions on the law.

17:47:55  12       All right.  With that, let me wish you a pleasant

17:47:58  13   evening, and we'll see you tomorrow at 8:45 a.m., we'll

17:48:02  14   start.

17:48:02  15       Have a good evening.

17:48:04  16       (Jury not present.)

17:48:54  17        THE COURT:  All right, Counsel.  We're going to

17:48:55  18   resume tomorrow at 8:45.

17:48:57  19       Let me remind counsel about a few things.

17:49:02  20       One, leading questions are generally not permitted

17:49:05  21   on direct exam.  So I'm going to ask counsel to please

17:49:10  22   avoid using leading questions.

17:49:13  23       Also, fact witnesses -- and we have only had fact

17:49:18  24   witnesses here -- can only speak as to what they did,

17:49:20  25   what they observed, what they in some instances heard

17:49:24  1    from the defendant.  They're not here to opine or to

17:49:28  2    give -- answer hypotheticals.

17:49:32  3         Let me remind counsel about cumulative evidence.

17:49:35  4    403 does not contemplate, in letter or spirit,

17:49:37  5    cumulative evidence.  So if you have two witnesses who

17:49:43  6    testify to a certain thing, or three witnesses who have

17:49:47  7    done it, having the fourth, fifth and sixth witness say

17:49:50  8    the same thing gets us to the point where it's arguably

17:49:54  9    cumulative and again perhaps running afoul of 403.

17:50:05  10         Let me remind counsel that utterances of a party

17:50:10  11   opponent are non-hearsay.  It's utterances of a party

17:50:16  12   opponent, not of your own -- the party that you

17:50:21  13   represent.  And getting it into a question doesn't make

17:50:27  14   it any less objectionable.

17:50:28  15         Does the government plan to call Lescott,

17:50:35  16   Ms. Lescott?

17:50:37  17             MR. POTTER:  Yes, Judge.

17:50:38  18             THE COURT:  All right.  Let me urge counsel if

17:50:38  19   you're going to bring in someone who is going to testify

17:50:41  20   about things -- if I recall, there were about five

17:50:44  21   questions about Ms. Lescott, who I suspect the

17:50:45  22   government is going to ask those identical questions.

17:50:48  23         So I urge counsel to just be as mindful of 403 and

17:50:55  24   not be cumulative, so that the jury can hear the

17:51:00  25   evidence in a way that is, that keeps their attention so

17:51:06  1    that they are as focused on the evidence as everyone

17:51:09  2    wants them to be.

17:51:10  3         Anything we need to cover, Attorney Potter?

17:51:15  4             MR. POTTER:  Nothing, Judge.

17:51:16  5             THE COURT:  Attorney Jupiter?

17:51:17  6             MR. JUPITER:  No, Your Honor.

17:51:19  7             THE COURT:  All right, Counsel.  Have a

17:51:20  8    pleasant evening.

17:51:21  9         I'll see you tomorrow morning.

17:51:41  10        (Court in recess, 5:51 p.m.)

17:51:41  11

          12                        ---

          13

          14                    CERTIFICATE

          15

          16         This document is hereby certified

          17        to be a true and accurate transcript

          18         of the foregoing proceedings.

          19

          20

          21    /s_____    _____
                        Chandra Kean, RMR              DATE
          22        Official Court Reporter

          23

          24

          25