IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

---

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )
                                     )
09:27:42    vs.                      )    CRIM. NO. 2014-54
                                     )
                                     )
SHERRYMAE MORALES,                   )
                                     )
                    Defendant.       )
_____ )

REPORTER'S TRANSCRIPT

DAY TWO

JURY TRIAL

08:35:44              Tuesday, June 30, 2015

---

BEFORE:      THE HONORABLE CURTIS V. GOMEZ
             District Judge

APPEARANCES: OFFICE OF THE UNITED STATES ATTORNEY
08:41:56     BY: EVERARD POTTER, AUSA
             5500 Veterans Drive Suite 260
             St. Thomas, Virgin Islands 00802

                 For the Government

             OFFICE OF THE FEDERAL PUBLIC DEFENDER
             BY: OMODARE B. JUPITER, FPD
             1115 Strand Street, Suite 201
             Christiansted, VI 00820-5073

                 For Defendant

                 ---

COURT REPORTER:   CHANDRA R. KEAN, RMR
                  Official Court Reporter
                  Virgin Islands District Court
                  St. Thomas, Virgin Islands

1                           INDEX

2

3        PRELIMINARY MATTERS                                    4

4        WITNESS (Government)    DIRECT  CROSS  REDIRECT  RECROSS

5        Deborah Lobbenmeier       8      24      29       31

6        Diane Mathis             33     ---     ---      ---

7        Marise James             48      56     ---      ---

8        Dazarene Lescott         62      69      77      ---

9        Gina Galle               79     ---     ---      ---

10       RULE 29 MOTION BY THE DEFENDANT                       88

11       WITNESS (Defendant)    DIRECT  CROSS  REDIRECT  RECROSS

12       Wanda Williams           97     105     107      ---

13       Zera Louis              109     ---     ---      ---

14       Mona Barnes             118     ---     ---      ---

15       Kenneth Aelleyne        123     ---     ---      ---

16       Sherrymae Morales       133     165     189      ---

17       RULE 29 MOTION BY THE DEFENDANT                      196

18       JURY INSTRUCTIONS BY THE COURT                       197

19       CLOSING ARGUMENT BY THE GOVERNMENT                   219

20       CLOSING ARGUMENT BY THE DEFENDANT                    227

21       REBUTTAL ARGUMENT BY THE GOVERNMENT                  240

22

23          (Court recessed)

24                      ---

25

```
 1                        EXHIBITS

 2
         GOVERNMENT'S
 3       EXHIBIT NO.        MARKED        ADMITTED

 4       2.1                 10           ---

 5       2.2 to 2.30         10            14

 6       9.2 to 9.20         34            38 (9.2 to 9.19)

 7       9.21                40           ---

 8       13                  55           ---

 9       11                  67            69

10       3a                  81            84

11       3.1 to 3.30         82            84

12       5a                  85            88

13       5.1 to 5.6          85           (see below)

14       6.1 to 6.28         85           (see below)

15       7.1, 7.2            85           ---

16       6.23, 6.28                        87

17       5.1, 5.5                          88

18
         DEFENDANT'S
19       EXHIBIT NO.        MARKED        ADMITTED

20       1                  148           ---

21       8                  155           196

22       9                  191           192

23                               ---

24

25
```

<pre>
     1                     PROCEEDINGS

     2

     3          (Court called to order at 8:48 a.m. in USA v

     4    Morales.)

     5          (Jury not present.)

08:48:51  6          MR. POTTER:  Good morning, Your Honor.

08:48:53  7          THE COURT:  Good morning.

08:48:53  8                  PRELIMINARY MATTERS

08:49:04  9          THE COURT:  Has the -- how many more witnesses

08:49:06 10    does the government have?

08:49:07 11          MR. POTTER:  The government has four more

08:49:09 12    witnesses, Your Honor.

08:49:13 13          THE COURT:  These are non-cumulative witnesses?

08:49:22 14          MR. POTTER:  That's correct, Judge.

08:49:24 15          THE COURT:  All right.  I know the defense

08:49:25 16    doesn't have to put on any witnesses.  Does the defense

08:49:29 17    thinks it's inclined to put on any witnesses?

08:49:32 18          MR. JUPITER:  Yes, Your Honor.

08:49:33 19          THE COURT:  About how many do you think?

08:49:35 20          MR. JUPITER:  I can estimate anywhere from five

08:49:38 21    to seven, Your Honor, but most of them will be very

08:49:41 22    short.

08:49:41 23          THE COURT:  Okay.  All right.

08:49:43 24       I notice on the proposed exhibit list the

08:49:47 25    government has a number of exhibits that seem to be of
</pre>

08:49:49   1    the kind and species.  Is the government planning to do

08:49:56   2    that in bulk?  For instance, the exhibits with the

08:50:00   3    number 4 all seem to be orders.  And those with the

08:50:06   4    number 3 as the prefix.  Most of them seem to be pay

08:50:10   5    periods, I suspect pay period documents or sheets.  And

08:50:21   6    the ones with a two...

08:50:30   7      That is, I don't anticipate the government is going

08:50:33   8    to go through each one by one.

08:50:35   9         MR. POTTER:  It's a declaration, and we just

08:50:37  10    want to get to --

08:50:38  11         THE COURT:  You need to speak into the

08:50:39  12    microphone.

08:50:41  13         MR. POTTER:  Sorry.  Government's Exhibit 3

08:50:43  14    comes with the certification of authenticity, and we

08:50:49  15    just want to move those in as --

08:50:52  16         THE COURT:  Okay.  Ordinarily there's a witness

08:50:54  17    who usually says what the thing is, not counsel

08:50:57  18    testifying.  When counsel says what it is that you

08:51:03  19    proffer and then, for instance, a witness might indicate

08:51:06  20    that, they will say it's a certificate of whatever, and

08:51:15  21    then I suspect there will be no objection from the

08:51:17  22    defense as to the certificate under, under the series of

08:51:25  23    Rules of Evidence, and whether it's a business record or

08:51:27  24    public record or whatever theory you're bringing it

08:51:29  25    under.

08:51:29   1          Are you going to have someone on the stand saying

08:51:34   2     what it is, as opposed to you saying what it is?

08:51:36   3          MR. POTTER:  That's not our intention, Judge.

08:51:37   4     We would just indicate the certification and move the

08:51:40   5     documents in, which we believe is a popular way to get

08:51:53   6     them in, Judge.

08:52:33   7          With respect to 3, Judge, I believe I have a

08:52:35   8     witness who can say what they are and then move them in

08:52:38   9     in that fashion, if that's the Court's preference.

08:52:47   10          THE COURT:  It appears we're a juror short.

08:52:51   11     That's why we're not starting on time.  So as soon as

08:52:54   12     that one arrives we'll start.

08:52:59   13          Yes, Attorney Jupiter.

08:53:01   14          MR. JUPITER:  Your Honor, with respect to

08:53:02   15     Government's Exhibit 3.28 through 3 point --

08:53:10   16          THE COURT:  Please close the door.

08:53:13   17          MR. JUPITER:  -- 3.28 through 3.30, these are

08:53:18   18     related to severance pay.  And we would object with

08:53:23   19     regard to relevance, as these were not payments

08:53:27   20     regarding the salary, I think that the government, I

08:53:36   21     think, has not laid a foundation for.

08:53:39   22          And similarly, with respect to payments that were

08:53:43   23     made between --

08:53:45   24          THE COURT:  You're saying that -- let's deal

08:53:46   25     with them.  3.29 and 3.30 has a parenthetical that says

08:53:52   1    "severance."  Are you saying that they are post- the

08:53:56   2    alleged crime?

08:54:05   3              MR. JUPITER:  They're not, I don't think they

08:54:07   4    are post- -- some of them -- yes, Your Honor.  They are

08:54:11   5    post- the crime --

08:54:12   6              THE COURT:  All right.

08:54:13   7         Attorney Potter, if the crime is already completed,

08:54:15   8    why do you need that evidence in?

08:54:17   9              MR. POTTER:  I don't believe that they are

08:54:18   10   post- the crime, Your Honor.  This does represent

08:54:23   11   severance pay.  And the only reason that this defendant

08:54:27   12   was able to get this severance pay, we are alleging, is

08:54:31   13   because she committing fraud by coming back into the

08:54:34   14   guard.  Other than that, she would not have been

08:54:36   15   entitled to the severance pay reflected in 3.28 and

08:54:43   16   3.30.

08:54:46   17             THE COURT:  All right.

08:54:46   18        Attorney Jupiter.

08:54:47   19             MR. JUPITER:  Yes, Your Honor.  I don't think

08:54:48   20   that there's been -- I would ask that the Court, if the

08:54:52   21   government seeks to admit these, that the Court would at

08:54:54   22   least take those under advisement and -- because I don't

08:55:00   23   think the government has sufficiently laid the

08:55:02   24   foundation for that.

08:55:05   25             THE COURT:  We'll deal with it when we get to

08:55:07  1      it, then.

08:55:07  2           I think the juror is here, so we can get...

08:55:59  3           (Jury present.)

08:56:00  4            THE COURT:  Good morning, ladies and gentlemen.

08:56:01  5       As you know, we're still in the government's

08:56:04  6      case-in-chief.  The government is still presenting

08:56:07  7      testimony.

08:56:07  8           Is the government -- good morning, Counsel.

08:56:11  9           Is the government ready to proceed?

08:56:15  10            MR. POTTER:  Can the government have one

08:56:17  11     second, Your Honor?

08:56:17  12            THE COURT:  Yes.

08:56:35  13           (Pause.)

08:56:35  14            THE COURT:  Call your next witness, Attorney

08:56:37  15     Potter.

08:56:38  16            MR. POTTER:  Yes, Your Honor.

08:56:44  17       Your Honor, the government's first witness is

08:56:47  18     Colonel Lobbenmeier.

08:57:28  19           (Witness sworn.)

08:57:29  20            THE WITNESS:  Yes.

08:57:31  21            THEREUPON, DEBORAH LOBBENMEIER, having been

08:57:32  22     duly sworn, was examined and testified as follows:

08:57:32  23                      DIRECT EXAMINATION

08:57:33  24     BY MR. POTTER:

08:57:34  25     Q.   Good morning.

08:57:35   1    A.    Good morning.

08:57:36   2    Q.    Could you please give us your full name for the

08:57:40   3    record, and spell your first and your last name for the

08:57:42   4    court reporter?

08:57:44   5    A.    Deborah Lobbenmeier, D-e-b-o-r-a-h,

08:57:57   6    L-o-b-b-e-n-m-e-i-e-r.

08:58:01   7    Q.    And how are you employed, Ms. Lobbenmeier?

08:58:04   8    A.    I am currently employed as the United States

08:58:09   9    property and fiscal officer for the Virgin Islands

08:58:12   10   National Guard.

08:58:12   11   Q.    And how long have you held that position?

08:58:15   12   A.    I was appointed to that position 1 November 2014.

08:58:19   13   Q.    And how long have you been a member of the Guard?

08:58:22   14   A.    Approximately 22 years.

08:58:24   15   Q.    You said you were the fiscal officer.  What exactly

08:58:33   16   are your duties and responsibilities?

08:58:35   17   A.    As the United States property and fiscal officer, I

08:58:38   18   am the only Title 10 officer that can receive the

08:58:42   19   federal funds and federal equipment for the Virgin

08:58:45   20   Islands National Guard.

08:58:54   21   Q.    And in your position, are you considered the

08:58:56   22   custodian of records?

08:58:57   23   A.    Yes, sir.

08:58:58   24   Q.    Were you subpoenaed to retrieve certain documents

08:59:02   25   related to a Sherrymae Morales?

08:59:04  1    A.   Yes.

08:59:13  2              MR. POTTER:  Let me show you Government's

08:59:16  3    Exhibit 2 and ask you if you recognize it.

08:59:30  4              THE COURT:  Take it off.

08:59:35  5         (Government's Exhibit 2.1 marked for

08:59:37  6    identification.)

08:59:37  7    BY MR. POTTER:

08:59:37  8    Q.   Do you see Government's Exhibit 2?

08:59:39  9    A.   I think it's coming up.  Yes.  Yes.

08:59:42  10   Q.   Government's Exhibit 2 through Government's

08:59:58  11   Exhibit 2.27.

08:59:58  12        (Government's Exhibits 2.2 through 2.30 marked for

08:59:58  13   identification.)

09:00:21  14   BY MR. POTTER:

09:00:21  15   Q.   I ask -- tell us if you recognize those.

09:00:23  16   A.   Yes.  Those are time and attendance sheets.

09:00:26  17   Q.   And time and attendance sheet for who?

09:00:29  18   A.   For Sherrymae Morales.

09:00:34  19             MR. POTTER:  And actually, I think it's up to

09:00:37  20   2.30.

09:00:48  21   BY MR. POTTER:

09:00:48  22   Q.   And all of the time sheets for Sherrymae Morales,

09:00:53  23   do you recall the period that those documents covered?

09:01:01  24   A.   A period on -- from 2010 through '11.

09:01:21  25   Q.   And are those records, are they kept in the regular

09:01:24  1    course of business?

09:01:25  2    A.   Yes.

09:01:29  3    Q.   And is it the regular course -- is it the regular

09:01:32  4    practice of the Virgin Islands National Guard to keep

09:01:33  5    such records?

09:01:34  6    A.   Yes.  That is the practice of my office.  We have

09:01:37  7    to maintain those records.

09:01:41  8    Q.   And are the records made at a time by someone with

09:01:48  9    knowledge of the information contained therein?

09:01:52  10   A.   I'm sorry, could you repeat that question?

09:01:55  11   Q.   The records, are they made at or near a time by

09:02:01  12   someone with knowledge of the information contained in

09:02:04  13   the records?

09:02:14  14   A.   Is it --

09:02:14  15   Q.   How are the records made?

09:02:16  16   A.   How are the records made?

09:02:19  17        So, my office produces the time and attendance

09:02:23  18   sheets every two weeks, and they are sent out to the

09:02:27  19   supervisors; the supervisors, then, in turn, the

09:02:32  20   employees that they do supervise, they're the one that

09:02:36  21   would document their employees' time and attendance.

09:02:39  22   And once they sign off on that, that comes back to my

09:02:44  23   office to certify the pay to DFAS, to the Defense

09:02:51  24   Finance and Accounting.

09:02:52  25   Q.   And is that a regular practice of the Virgin

09:02:55    1    Islands National Guard?

09:02:56    2    A.   Yes.

09:02:56    3    Q.   And those records are kept in the regular course of

09:03:01    4    business of the Virgin Islands National Guard?

09:03:03    5    A.   Yes.

09:03:04    6    Q.   And they are made at or near the time of

09:03:08    7    information transmitted from someone with knowledge

09:03:11    8    about what those --

09:03:13    9    A.   Yes.

09:03:17    10            MR. POTTER:  Your Honor, we move for the

09:03:18    11   admission of Government's Exhibit 2.1 to 2.30.

09:03:42    12            MR. JUPITER:  May I voir dire the witness, Your

09:03:44    13   Honor?

09:03:44    14            THE COURT:  No.  Do you object, Attorney --

09:03:47    15            MR. JUPITER:  Excuse me?

09:03:48    16            THE COURT:  Do you have an objection.

09:03:49    17            MR. JUPITER:  Yes, Your Honor.  I have an

09:03:51    18   objection to them at this time.  Proper foundation as to

09:03:56    19   it being a record of my client.  I would like to voir

09:04:00    20   dire just to establish that.

09:04:01    21            THE COURT:  All right.  I'm going to take it

09:04:03    22   under advisement.

09:04:09    23       Go ahead, Attorney Potter.

09:04:10    24   BY MR. POTTER:

09:04:11    25   Q.   Mr. Lobbenmeier, the documents 2.1 to 2.30, who are

09:04:19  1    they records of?

09:04:21  2    A.    Sherrymae Morales.

09:04:22  3    Q.    And where were the documents taken from?

09:04:26  4    A.    From my office -- the -- you're talking about the

09:04:31  5    time and attendance?

09:04:34  6    Q.    Yes.

09:04:35  7    A.    Yes.

09:04:36  8    Q.    And you have personal knowledge of that?

09:04:37  9    A.    Yes.

09:04:41  10            MR. POTTER:  Your Honor, again we move for

09:04:42  11   admission of Government's Exhibits --

09:04:44  12            THE COURT:  Colonel, what does the time and

09:04:47  13   attendance reflect?

09:04:48  14            THE WITNESS:  I'm sorry?

09:04:50  15            THE COURT:  What does a time and attendance

09:04:53  16   record reflect?

09:04:54  17            THE WITNESS:  It reflects on the time that an

09:04:59  18   employee worked throughout the day.  Our work schedule

09:05:04  19   is from 8:00 to 5:00, so it would reflect on the time

09:05:06  20   that the employee worked.

09:05:11  21            THE COURT:  All right.  Attorney Jupiter?

09:05:15  22            MR. JUPITER:  May I inquire on that, Your

09:05:17  23   Honor, in terms of whether my client --

09:05:19  24            THE COURT:  No.

09:05:23  25            MR. JUPITER:  My objection is -- my objection

09:05:24  1    is, is that it's entered as a record of my client, and

09:05:28  2    there's no evidence that my client has --

09:05:31  3          THE COURT:  All right --

09:05:32  4          MR. JUPITER:  -- doesn't --

09:05:34  5          THE COURT:  I understand.  Okay.  Exhibits 2

09:05:37  6    point -- put 2.1 on.

09:05:52  7          MR. POTTER:  Sorry, 2.2, Your Honor.

09:05:54  8          THE COURT:  All right.  Exhibits 2.2 to 2.30

09:06:00  9    are admitted.

09:06:00  10       (Government's Exhibits 2.2 through 2.30 admitted

09:06:10  11   into evidence.)

09:06:10  12         MR. POTTER:  Can we publish 2.2 to the jury?

09:06:21  13       (Exhibit published.)

09:06:21  14   BY MR. POTTER:

09:06:22  15   Q.   Mrs. Lobbenmeier, looking at Government's

09:06:27  16   Exhibit 2.2, tell us what that document is.

09:06:31  17   A.   So this is a time sheet where it reflects on, that

09:06:38  18   the employee worked 80 hours for that time period,

09:06:43  19   and --

09:06:44  20   Q.   Who is the employee?

09:06:45  21   A.   Sherrymae Morales, which was certified by the

09:06:52  22   supervisor, Aubrey Ruan.

09:06:58  23   Q.   Does it show regular time of employment?

09:07:01  24   A.   Yes.

09:07:01  25   Q.   And where does it show that?

09:07:06   1   A.   If you -- if you look at where --

09:07:23   2           MR. POTTER:  Excuse me, Your Honor.  Is there a

09:07:27   3   pointer that the witness can use?

09:08:11   4           THE COURT:  I don't believe we have one right

09:08:13   5   now, but we'll make sure that is taken care of.

09:08:15   6       You can proceed.

09:08:17   7   BY MR. POTTER:

09:08:17   8   Q.   Does Government's Exhibit 2.2 reflect regular hours

09:08:20   9   worked?

09:08:21   10   A.   Yes.

09:08:22   11   Q.   And referring to the left -- or right side of the

09:08:29   12   exhibit, which --

09:08:31   13   A.   Would be my left.  And if you move over to the

09:08:36   14   second column, you would see the 80 hours reflected.

09:08:43   15   Q.   Okay.

09:08:44   16   A.   And "RG" depicts regular.  That means the employee

09:08:49   17   worked those hours.

09:08:55   18   Q.   Now, is that time sheet signed?

09:08:57   19   A.   Yes.  It was signed by the supervisor.

09:09:02   20   Q.   So the signature on the top right?

09:09:05   21   A.   Aubrey Ruan's signature.

09:09:14   22   Q.   And who actually submitted the time sheet?

09:09:16   23   A.   The supervisor submits them to our office.

09:09:30   24   Q.   And once you get the time sheets, what do you do

09:09:32   25   with them?

09:09:33  1    A.    The pay is certified with DFAS, the Defense Finance

09:09:39  2    and Accounting agency, and the employee will in turn be

09:09:47  3    paid.

09:09:53  4    Q.    Now Government's Exhibit 2.2 through 2.28, with

09:10:03  5    respect to time sheets, are they all -- does it work the

09:10:06  6    same day, when documents are submitted --

09:10:08  7              MR. JUPITER:  Objection.  Leading.

09:10:09  8              THE COURT:  Sustained.

09:10:13  9    BY MR. POTTER:

09:10:14  10   Q.    With respect to the other Government Exhibits, 2.2

09:10:19  11   to 2.28, how are those processed through your

09:10:23  12   department?

09:10:26  13   A.    Same manner.  So what is -- okay.  So if an

09:10:43  14   employee takes leave, the employee would then sign a

09:10:48  15   leave slip.  And I think that was shown just now.  The

09:10:52  16   timekeeper annotates on the time sheet whatever time

09:10:55  17   that the employee on -- may take.

09:11:00  18        Once that process is completed, the time is entered

09:11:03  19   into the system, where that time card that is reflected

09:11:07  20   there is produced and it's signed by the supervisor.

09:11:11  21   And it all gets submitted to our office for final

09:11:16  22   processing.

09:11:19  23   Q.    And the time sheet itself, with respect to the

09:11:26  24   hours worked, who certifies the hours worked?

09:11:33  25   A.    The supervisor.

09:11:36   1    Q.   And where does the supervisor get the information

09:11:41   2    from?

09:11:42   3    A.   Where does the supervisor get the information from?

09:11:44   4         Well --

09:11:45   5              MR. JUPITER:  Objection, Your Honor.

09:11:46   6              THE COURT:  Sustained.  Ask the -- go ahead.

09:11:52   7    Sustained.

09:11:52   8    BY MR. POTTER:

09:11:56   9    Q.   With respect to, with respect to pay, how does the

09:12:07   10   supervisor determine what hours to place on the time

09:12:13   11   sheet?

09:12:14   12              MR. JUPITER:  Objection, Your Honor.

09:12:15   13              THE COURT:  Sustained.

09:12:39   14              MR. POTTER:  Court's indulgence, Your Honor?

09:12:41   15              THE COURT:  Yes.

09:13:07   16   BY MR. POTTER:

09:13:07   17   Q.   How do employees get paid?

09:13:12   18   A.   Employees?  So, the Virgin Islands National Guard

09:13:18   19   work schedule is from 8:00 to 5:00.  And a two-weeks

09:13:26   20   period as a military technician, you would get paid for

09:13:31   21   80 hours, if those 80 hours were worked, and the

09:13:37   22   supervisor quoted as such on the time sheet.

09:13:41   23        Once that supervisor quote that employee as present

09:13:44   24   for duty, we in turn -- because the supervisor is the

09:13:49   25   one letting me know that that employee did work those

09:13:53   1    80 hours for that two-week pay period, we in turn would

09:14:01   2    release the paper for that employee.

09:14:11   3    Q.   It seemed like a basic question, but the

09:14:14   4    supervisor -- what role does the employee play?

09:14:27   5    A.   The role that the employee play is, I would say

09:14:33   6    show up to work and do their work, and the supervisor

09:14:36   7    who is supervising is the one attesting that they're

09:14:42   8    present on -- at work.

09:14:50   9    Q.   Thank you.

09:14:54   10        Now you mentioned DFAS?

09:14:57   11   A.   Yes.

09:14:57   12   Q.   And tell us what DFAS is.

09:15:01   13   A.   DFAS is the Defense Finance and Accounting agency

09:15:06   14   that process all the pay for the National Guard.  So all

09:15:10   15   our payment of our employees, my office is the vehicle

09:15:15   16   to submit.

09:15:18   17       If I do not submit that final payment to DFAS, the

09:15:26   18   employee or whoever the individual may be will not be

09:15:34   19   paid.  So we call the Disbursing Office to disburse the

09:15:39   20   funds to the employee.

09:15:40   21   Q.   And how is that disbursement made?

09:15:42   22   A.   The disbursement is made by way of electronic fund

09:15:46   23   transfer, because the Federal Government believes in

09:15:54   24   sure pay, and one of the ways to guarantee sure pay is

09:15:58   25   by way of electronic fund transfer.

09:16:16   1          MR. POTTER:  Okay.  Court's indulgence, Your

09:16:17   2   Honor?

09:16:17   3          THE COURT:  Yes.

09:16:18   4      (Pause.)

09:16:18   5   BY MR. POTTER:

09:16:18   6   Q.   Let me show you again Government's Exhibit 2.2, the

09:16:30   7   second page and the third page.

09:16:39   8          Let's go back to the second page.

09:16:41   9          Tell us what the second page is.

09:16:42   10   A.   The second page is what is considered like a time

09:16:49   11   sheet.  It's like a worksheet.  It's what would -- our

09:16:56   12   office produces that to the supervisor or -- in advance

09:17:00   13   of the pay period.  And so they use that to annotate as

09:17:06   14   the employee take or may not take leave.

09:17:13   15   Q.   Okay.  And the signature to the foot of the page?

09:17:17   16   A.   Aubrey Ruan.

09:17:32   17   Q.   And let me show you the third page.  And tell us

09:17:39   18   what that is?

09:17:39   19   A.   That is a leave slip.  It's when an employee is

09:17:44   20   requesting for an approved absence from their work from

09:17:48   21   their supervisor.

09:17:49   22   Q.   Okay.  So, a leave slip for who?

09:17:51   23   A.   For Sherrymae Morales.

09:18:01   24   Q.   And do you see a signature of the employee on that

09:18:05   25   document?

09:18:06  1    A.   Yes.  It is signed by the employee and the

09:18:08  2    supervisor.

09:18:16  3    Q.   Thank you.

09:18:23  4         Now, let me show you 2.20, and ask you if you

09:18:32  5    recognize it, and tell us what that is.

09:18:37  6              MR. JUPITER:  Your Honor, object.  That has not

09:18:39  7    been entered into evidence.

09:18:55  8              THE COURT:  2.2 to 2.30 are in evidence.  I

09:19:00  9    think that's what the government moved.

09:19:01  10        Go ahead.

09:19:02  11   BY MR. POTTER:

09:19:02  12   Q.   And tell us what 2.20 is.

09:19:07  13   A.   2.20 is the approved time sheet that was actually

09:19:14  14   entered into the system from the worksheet previously.

09:19:20  15   Then the system would produce on the time sheet as to

09:19:24  16   what was actually entered into our case system.

09:19:30  17   Q.   Okay.  And again that's for whom?

09:19:33  18        Which employee is that for?

09:19:35  19   A.   Sherrymae Morales.

09:19:39  20   Q.   And page 2?

09:19:46  21   A.   It's the worksheet of time and attendance.

09:20:04  22              MR. POTTER:  Court's indulgence?

09:20:12  23        (Pause.)

09:20:12  24   BY MR. POTTER:

09:20:12  25   Q.   Now, what does that reflect?

09:20:15   1          The entry at the --

09:20:16   2   A.    It reflects eight hours of annual leave.  "LA" is

09:20:26   3   the code for annual leave.

09:20:28   4   Q.    And again, for which employee?

09:20:30   5   A.    Sherrymae Morales.

09:20:59   6   Q.    Now, let me show you --

09:21:02   7          MR. POTTER:  Court's indulgence.

09:21:15   8   BY MR. POTTER:

09:21:15   9   Q.    -- the third page of 2.20.  And tell us what that

09:21:22   10  is.

09:21:22   11  A.    It is a leave slip -- a request for approved

09:21:27   12  absence for Sherrymae Morales, which was signed by the

09:21:31   13  supervisor, Aubrey Ruan.

09:21:38   14  Q.    And does Sherry Morales's signature appear?

09:21:42   15  A.    Yes, sir.

09:21:48   16  Q.    Now, with respect to all of these exhibits, 2.2 --

09:21:57   17  2.2 to 2.30 -- 2.28, sorry, does the process work the

09:22:16   18  same, time sheet, the leave request form is attached?

09:22:22   19  A.    So the process work -- how the process works, like

09:22:24   20  I said, my office would produce the worksheet for the

09:22:31   21  time and attendance.

09:22:35   22          Once the employee request leave, they do so with a

09:22:41   23  request for leave of absence.  And once the supervisor

09:22:44   24  goes into the system and input our -- the time for that

09:22:48   25  pay period, then I think that was Exhibit 2.2, that's

09:22:55  1    what would produce the certified time sheet.

09:22:58  2         And that all comes to my office as a package to

09:23:03  3    substantiate pay for that, to certify the pay for that

09:23:07  4    employee.

09:23:07  5    Q.   And are employees required to certify their time

09:23:15  6    sheets?

09:23:15  7    A.   Employees are not required to certify their time

09:23:19  8    sheets.  The certification is done by the supervisor.

09:23:22  9    Because the supervisor is the one that's attesting to

09:23:26  10   that, if that employee was present for duty or not.

09:23:30  11   Q.   So the employee merely submits the time sheets?

09:23:33  12   A.   Yes.

09:23:34  13        MR. JUPITER:  Objection.

09:23:35  14        THE COURT:  Sustained.

09:23:37  15        MR. JUPITER:  Move to strike the answer.

09:23:41  16        THE COURT:  The jury knows what to do when the

09:23:43  17   Court sustains an objection.

09:23:51  18   BY MR. POTTER:

09:23:51  19   Q.   I still have to come back to one of my earlier

09:23:55  20   questions.  And -- the supervisor certifies the time.

09:24:10  21   That was your testimony.

09:24:12  22        The time that is placed on the time sheet for the

09:24:17  23   supervisor to certify, who places that time?

09:24:23  24        Who says, "These are the hours that I worked"?

09:24:29  25   A.   If the employee did not submit a time -- a request

09:24:34  1    for time and attendance, as the supervisor, or if my

09:24:43  2    employee was present for the --

09:24:45  3              MR. JUPITER:  Object to the --

09:24:48  4              THE WITNESS:  -- two weeks --

09:24:50  5              THE COURT:  Hold on.

09:24:51  6         Go ahead.  Ask your next question.

09:24:51  7    BY MR. POTTER:

09:25:09  8    Q.   Now, the exhibit, Government Exhibit 2.20, the

09:25:16  9    third page, the leave that's requested, what's the date

09:25:21  10   requested for the leave?

09:25:22  11   A.   February 25th, 2011.  And that was for eight hours.

09:25:48  12             MR. POTTER:  That might be all I have, Judge.

09:25:51  13   Court's indulgence?

09:25:52  14             THE COURT:  Yes.

09:26:38  15        (Pause.)

09:26:38  16   BY MR. POTTER:

09:26:39  17   Q.   So if an employee is requesting time off, that

09:26:42  18   information is related to the supervisor?

09:26:44  19             MR. JUPITER:  Objection.  Leading.

09:26:45  20             THE COURT:  Sustained.

09:26:47  21             MR. POTTER:  Thank you, Judge.

09:26:48  22   BY MR. POTTER:

09:26:48  23   Q.   How is information relayed to a supervisor, if an

09:26:52  24   employee requires time off?

09:26:53  25   A.   The employee is required to fill out an -- a form

09:27:02   1    for approved absence of leave, and the supervisor in

09:27:09   2    turn either approve or disapprove.  That's the process.

09:27:15   3    Q.   Is there any document with respect to basic time

09:27:20   4    and attendance, is there any document that an employee

09:27:25   5    fills out?

09:27:29   6    A.   Yes.

09:27:29   7    Q.   And what's that document?

09:27:31   8    A.   The one that's on the screen currently, the request

09:27:38   9    for leave or approved absence.

09:27:43   10   Q.   But just -- forget leave.  Just regular attendance,

09:27:47   11   time and attendance?

09:27:49   12   A.   For regular time and attendance, no, not that I'm

09:27:53   13   aware of.

09:28:03   14              MR. POTTER:  I think that's all I have, Judge.

09:28:05   15              THE COURT:  Attorney Jupiter?

09:28:17   16              MR. JUPITER:  Good morning.

09:28:19   17                     CROSS-EXAMINATION

09:28:20   18   BY MR. JUPITER:

09:28:21   19   Q.   Good morning.

09:28:21   20   A.   Good morning.

09:28:35   21              MR. JUPITER:  Could you put up 2.20 again?

09:28:35   22   BY MR. JUPITER:

09:28:49   23   Q.   Is it Major Lobbenmeier?

09:28:52   24   A.   It's Colonel Lobbenmeier.

09:28:57   25   Q.   You indicated that what we're seeing here on 2.20

09:29:02  1    is a leave of certification of hours for Ms. Morales,

09:29:08  2    correct?

09:29:08  3    A.   Yes.

09:29:09  4    Q.   Okay.  And Ms. Morales, as you indicated, does not

09:29:18  5    submit this, right?

09:29:18  6    A.   No.  The supervisor submits it.

09:29:20  7    Q.   As a matter of fact, it's not shown to her, is it?

09:29:22  8         Let me backtrack a little bit.

09:29:24  9         This document is produced by a computer program,

09:29:27  10   right?

09:29:27  11   A.   Yes.

09:29:28  12   Q.   Okay.  And it's based on data that's input -- put

09:29:35  13   into the computer program, right?

09:29:37  14   A.   Yes.

09:29:38  15   Q.   And that data, only certain people have access to

09:29:41  16   that computer program, correct?

09:29:44  17   A.   Yes.

09:29:45  18   Q.   Not the employee?

09:29:46  19   A.   No.

09:29:47  20        THE COURT:  Excuse me for one minute.  Attorney

09:29:50  21   Jupiter, tap your mike.

09:29:52  22        Go ahead.

09:29:54  23        MR. JUPITER:  Is this better?

09:29:56  24        THE COURT:  Yes.

09:29:56  25

09:29:56   1   BY MR. JUPITER:

09:29:57   2   Q.   So the employee doesn't have access to put this

09:29:59   3   data in, correct?

09:30:01   4   A.   No.   There are controls in the system that does not

09:30:04   5   allow one's self to input their own time and attendance.

09:30:09   6   Q.   Right.   And the employer doesn't have, even have

09:30:14   7   the ability to access this information through computer,

09:30:18   8   right?   The employee?

09:30:21   9   A.   Who -- for employee, no.   The employee doesn't have

09:30:27   10  the ability to access their own information.

09:30:29   11  Q.   This isn't submitted through an e-mail to an

09:30:36   12  employee.   It is only submitted to the employee's

09:30:39   13  supervisor?

09:30:39   14  A.   That's correct.

09:30:39   15  Q.   And the employee's supervisor is the only one who

09:30:42   16  certifies this?

09:30:43   17  A.   That is correct.

09:30:45   18  Q.   Okay.

09:30:45   19       MR. JUPITER:   Now, can I have the next page of

09:30:47   20  that?

09:30:47   21  BY MR. JUPITER:

09:30:53   22  Q.   This is the second page of Government Exhibit 2.20.

09:30:57   23  And this is also produced by computer program, correct?

09:31:05   24  A.   That is correct.

09:31:06   25  Q.   And is the computer program -- if you can look at

09:31:10  1    that top right-hand corner, that hours worked, 800 to

09:31:15  2    1700, military time for 8:00 a.m. to 5:00 p.m., right?

09:31:21  3    A.   Yes.

09:31:21  4    Q.   That is the only time in that computer program,

09:31:24  5    correct?

09:31:25  6    A.   The time is set based on the organization work

09:31:31  7    schedule.  So for the Virgin Islands National Guard, our

09:31:37  8    schedule is from 8:00 to 5:00.

09:31:39  9    Q.   Okay.

09:31:40  10   A.   Hence the system is set up as such.  If we had a

09:31:45  11   different work schedule, then that would have been

09:31:49  12   reflected on that particular, on those time sheets.

09:31:51  13   Q.   And that relates to every employee at the Virgin

09:31:54  14   Islands National Guard?

09:31:54  15   A.   Those are the set hours for the Virgin Islands

09:31:57  16   National Guard.

09:31:57  17   Q.   Okay.  So in terms of, for instance, if someone is

09:32:03  18   employed by the National Guard and works under their

09:32:06  19   supervisor under a varied schedule, that couldn't be

09:32:13  20   reflected in this system, couldn't it?

09:32:15  21   A.   It would have to be approved by personnel.  They in

09:32:18  22   turn send the information over to us, so the system

09:32:21  23   would then have to be updated to reflect such.

09:32:27  24   Q.   And if someone works either before or past

09:32:29  25   8:00 a.m. or 5:00 p.m., that's not going to be put into

09:32:32   1   the system, correct, even if they do that every day?

09:32:35   2   A.   If they do that every day, no.  However, the

09:32:40   3   employee may request what is called comp time,

09:32:43   4   compensatory time, and then that gets annotated on a

09:32:47   5   separate form.

09:32:48   6   Q.   Including upper level employees?

09:32:55   7   A.   It's up to the supervisor.  I can't say.

09:33:01   8   Q.   In terms of, you don't know --

09:33:03   9   A.   I don't.

09:33:04   10   Q.   Okay.  For instance, you have salaried employees

09:33:07   11   there, correct?

09:33:09   12       I mean, they're salaried according to their grade

09:33:12   13   and step, right?

09:33:13   14   A.   We do not have salaried employees.  They all are on

09:33:17   15   general schedule.

09:33:18   16   Q.   All right.  But in terms of the lines that have the

09:33:29   17   days of the week, Sunday, Monday, Tuesday, Wednesday --

09:33:32   18   can you see that?

09:33:33   19   A.   Yes.

09:33:34   20   Q.   And you see below each one of those days, Monday

09:33:38   21   through Friday, AAAA?

09:33:42   22   A.   Yes.

09:33:43   23   Q.   Those are preset by the computer program, correct?

09:33:47   24   A.   Again, that is based on the Virgin Islands National

09:33:50   25   Guard work schedule.

09:33:51  1    Q.   Okay.  What I'm saying is, this is something that

09:33:53  2    is part of this, this is preset by the computer.  Nobody

09:33:57  3    has to change it.  This is the default setting, right?

09:34:00  4    A.   It is set that way because of how the Virgin

09:34:05  5    Islands National Guard established their work schedule.

09:34:08  6    Q.   And this document is not sent to the employee, to

09:34:13  7    the particular employee, is it?

09:34:14  8    A.   No.  It goes to the supervisor and the timekeeper.

09:34:25  9    Q.   So in terms of these records, with the exception of

09:34:31  10   the leave that's taken, the employee has no interaction

09:34:36  11   with the submission or the certification of those

09:34:40  12   records?

09:34:41  13   A.   No.

09:34:46  14        MR. JUPITER:  Your Honor, once again I ask the

09:34:48  15   Court to reconsider the admission of these records as

09:34:52  16   the records of Sherrymae Morales.

09:34:54  17        THE COURT:  Okay.  Very good.  Thank you.

09:34:57  18        MR. JUPITER:  No further questions.

09:34:58  19        THE COURT:  Any redirect?

09:34:59  20        MR. POTTER:  Yes, Judge.

09:35:01  21                    REDIRECT EXAMINATION

09:35:02  22   BY MR. POTTER:

09:35:11  23   Q.   You mentioned comp time.

09:35:16  24   A.   Yes, sir.

09:35:16  25   Q.   In reviewing the payroll of Sherrymae Morales, did

09:35:20  1    you see any --

09:35:21  2             THE COURT:  Attorney Potter, can you speak into

09:35:23  3    the microphone?

09:35:25  4    BY MR. POTTER:

09:35:25  5    Q.   In reviewing the records of Sherrymae Morales, did

09:35:29  6    you see any request that she made for comp time?

09:35:32  7    A.   No, I did not recall seeing any request for comp

09:35:38  8    time.

09:35:38  9    Q.   And was it your testimony that comp time has to be

09:35:41  10   approved by the supervisor?

09:35:43  11   A.   Yes.

09:35:51  12   Q.   And you again repeated that the regular work hours

09:35:57  13   is 8:00 to 5:00, Monday through Friday?

09:35:59  14             THE COURT:  Okay.  Let's not repeat this.

09:36:01  15   We've been over this already.

09:36:17  16        (Pause.)

09:36:17  17   BY MR. POTTER:

09:36:18  18   Q.   Now, from your knowledge of the system, if the

09:36:20  19   defendant worked beyond 5:00 p.m. on any given date,

09:36:25  20   what should happen?

09:36:27  21   A.   The employee can request full compensatory time,

09:36:34  22   and then that would be documented on the time sheet.

09:36:39  23   And that gets submitted on to our office, also.  So the

09:36:43  24   time sheets would reflect the compensatory time, if the

09:36:47  25   employee requests it.

09:37:02   1         MR. POTTER:  That's all I have, Judge.

09:37:04   2         THE COURT:  I'll let you recross on the

09:37:08   3   compensatory time issue, if you wish to avail yourself.

09:37:15   4         MR. JUPITER:  Thank you, Your Honor.  Very

09:37:17   5   briefly.

09:37:18   6                  RECROSS-EXAMINATION

09:37:18   7   BY MR. JUPITER:

09:37:18   8   Q.   You said if the employee requested compensatory

09:37:21   9   time?

09:37:21  10   A.   Yes.

09:37:22  11   Q.   If the employee just works late all the time and

09:37:24  12   she doesn't -- that employee doesn't have to request

09:37:27  13   compensatory time, correct?

09:37:29  14   A.   That is correct.

09:37:29  15   Q.   And if the employee has an understanding, a working

09:37:35  16   relationship with their supervisor in terms of how

09:37:38  17   they're going to get their work done, as long as they

09:37:41  18   work eight hours a day, that's within the guidelines of

09:37:44  19   the Virgin Islands National Guard; is that correct?

09:37:47  20   A.   I cannot answer that question.  That's more the

09:37:54  21   personnel side.

09:37:55  22   Q.   But you, in terms of when you talked about the

09:37:58  23   hours being restricted to 8:00 to 5:00, you're not

09:38:02  24   trying to say that if an employee works 80 hours in -- a

09:38:06  25   military technician, for instance, works 80 hours in a

09:38:10  1    two-period week, you're not trying to say that that

09:38:14  2    would be in violation of Virgin Islands National Guard

09:38:17  3    guidelines, are you?

09:38:18  4    A.    Can you repeat that question, please?

09:38:23  5    Q.    You're not trying to say if an employee works more

09:38:26  6    than 80 hours, particularly a military technician, works

09:38:32  7    more than 80 hours in a two-week pay period, that this

09:38:35  8    would be in violation of Virgin Islands National Guard?

09:38:39  9           MR. POTTER:  Objection, Your Honor.

09:38:41  10           THE COURT:  Overruled.  If she knows.

09:38:43  11   BY MR. POTTER:

09:38:44  12   Q.    Yes?

09:38:44  13   A.    No, no, it would not be in violation of the Virgin

09:38:47  14   Islands National Guard policy.

09:38:49  15   Q.    Thank you.

09:38:54  16           THE COURT:  Any re-redirect?

09:38:58  17           MR. POTTER:  Can we come to sidebar briefly,

09:39:00  18   Judge?

09:39:00  19           THE COURT:  Not yet.  Thank you.

09:39:04  20           MR. POTTER:  Then I would have no further

09:39:05  21   questions of this witness --

09:39:07  22           THE COURT:  Okay.  Thank you.

09:39:08  23      Colonel Lobbenmeier, thank you for your testimony.

09:39:11  24      You may step down.

09:39:11  25      (Witness withdrew from stand.)

| | | |
|---|---|---|
| 09:39:12 | 1 | THE COURT:  Next witness. |
| 09:39:20 | 2 | MR. POTTER:  The next witness is Diane Mathis. |
| 09:40:04 | 3 | THE CLERK:  Please stand and raise your right |
| 09:40:05 | 4 | hand to take the oath. |
| 09:40:06 | 5 | (Witness sworn.) |
| 09:40:12 | 6 | THE WITNESS:  I do. |
| 09:40:14 | 7 | THEREUPON, DIANE MATHIS, having been duly |
| 09:40:23 | 8 | sworn, was examined and testified as follows: |
| 09:40:23 | 9 | DIRECT EXAMINATION |
| 09:40:24 | 10 | BY MR. POTTER: |
| 09:40:24 | 11 | Q.   Good morning. |
| 09:40:25 | 12 | A.   Good morning. |
| 09:40:27 | 13 | Q.   Can you please give us your full name for the |
| 09:40:30 | 14 | record? |
| 09:40:30 | 15 | A.   Diane Mathis. |
| 09:40:33 | 16 | Q.   And then spell your first and your last name for |
| 09:40:35 | 17 | the court reporter? |
| 09:40:36 | 18 | A.   D-i-a-n-e, M-a-t-h-i-s. |
| 09:40:45 | 19 | Q.   And how are you employed? |
| 09:40:46 | 20 | A.   I'm employed by USAA Federal Savings Bank in San |
| 09:40:53 | 21 | Antonio, Texas. |
| 09:40:54 | 22 | Q.   And tell us what you do there. |
| 09:40:55 | 23 | A.   I'm the custodian of records specialist.  As the |
| 09:40:59 | 24 | custodian of records specialist, we process all incoming |
| 09:41:03 | 25 | subpoenas and requests on behalf of the bank. |

| | | |
|---|---|---|
| 09:41:06 | 1 | Q.   Were you issued a subpoena to research certain |
| 09:41:09 | 2 | documents for this court today? |
| 09:41:10 | 3 | A.   Yes. |
| 09:41:19 | 4 | Q.   And did you in fact do that? |
| 09:41:21 | 5 | A.   Yes. |
| 09:41:29 | 6 | MR. POTTER:  Let me show you Government's |
| 09:41:38 | 7 | Exhibit 9.2 through Government's Exhibit 9.20, and ask |
| 09:41:50 | 8 | you if you recognize it. |
| 09:41:50 | 9 | (Government's Exhibits 9.2 through 9.20 marked for |
| 09:41:50 | 10 | identification.) |
| 09:41:50 | 11 | BY MR. POTTER: |
| 09:42:04 | 12 | Q.   Do you see the documents on the screen? |
| 09:42:06 | 13 | A.   Yes. |
| 09:42:19 | 14 | Q.   2.3 [sic]? |
| 09:42:21 | 15 | A.   Yes. |
| 09:42:23 | 16 | Q.   2.4 [sic]? |
| 09:42:29 | 17 | 2.5 [sic]? |
| 09:42:30 | 18 | THE COURT:  Are you saying "2"? |
| 09:42:33 | 19 | MR. POTTER:  Sorry, 9.5.  Sorry, Judge. |
| 09:42:44 | 20 | 9.6. |
| 09:42:45 | 21 | THE COURT:  Attorney Potter, do you need to go |
| 09:42:47 | 22 | through them or you have your technician go through the |
| 09:42:50 | 23 | numbers serially without you? |
| 09:42:52 | 24 | MR. POTTER:  Okay. |
| 09:44:37 | 25 | THE COURT:  What are you showing to the |

09:44:39   1   witness?

09:44:40   2                   MR. POTTER:  9 point --

09:44:41   3                   THE COURT:  I thought you said 9.2 to 9.20.

09:44:45   4                   MR. POTTER:  9.20.

09:44:47   5   BY MR. POTTER:

09:44:48   6   Q.   Do you recognize those documents?

09:44:51   7   A.   Yes, sir.

09:44:51   8   Q.   And what are those documents?

09:44:54   9   A.   These are the monthly pay statements for the

09:44:59  10   accounts of Sherrymae Morales or Sherry Morales with

09:45:03  11   USAA Federal Savings Bank.

09:45:14  12   Q.   And those documents, are they kept in the course of

09:45:18  13   business --

09:45:18  14   A.   Yes.

09:45:19  15   Q.   -- at your bank, USAA Bank?

09:45:21  16   A.   Yes, sir.

09:45:24  17   Q.   And tell us, where is your bank located?

09:45:26  18   A.   It is located in San Antonio, Texas.

09:45:31  19   Q.   And is it the regular practice of your bank to keep

09:45:36  20   those records in the regular course of business

09:45:40  21   activity?

09:45:41  22   A.   Yes.

09:45:41  23   Q.   And is a record of activities made at or near the

09:45:46  24   time, by or from information transmitted with someone of

09:45:51  25   knowledge?

09:45:51   1    A.   Yes.

09:45:52   2    Q.   And is it the regular practice of your bank to make

09:45:57   3    and keep such records?

09:45:59   4    A.   Yes.

09:46:01   5            MR. POTTER:  Your Honor, we move for the

09:46:03   6    admission of Government's Exhibit 9.2 to 9.20.

09:46:14   7            THE COURT:  Is the government going to inquire

09:46:15   8    as to why the documents are relevant, time-wise?

09:46:19   9            MR. POTTER:  Okay.

09:46:20   10   BY MR. POTTER:

09:46:20   11   Q.   The documents -- what's the time period that those

09:46:28   12   documents reflect?

09:46:32   13   A.   This statement I am looking at is -- can you

09:46:38   14   enlarge it a little, please?

09:46:50   15           MR. POTTER:  Let's go back to Government's

09:46:53   16   Exhibit 9.2.

09:46:53   17           THE WITNESS:  August 11, 2011.

09:47:01   18   BY MR. POTTER:

09:47:02   19   Q.   I want to show you Government's Exhibit 9.2 and

09:47:05   20   tell me -- 2.3 [sic].

09:47:16   21       Okay.  Can you tell me the time period of that

09:47:18   22   exhibit?

09:47:19   23           THE COURT:  Did you say 2.3?

09:47:21   24           MR. POTTER:  9.3.

09:47:26   25           THE WITNESS:  This is the monthly statement

09:47:27  1    from March 11, 2010.

09:47:31  2    BY MR. POTTER:

09:47:33  3    Q.   And the, and that's the date of the first exhibit?

09:47:36  4    A.   Yes.

09:47:36  5    Q.   Now, the last entry that you researched, do you

09:47:42  6    recall what date that was for?

09:47:59  7    A.   August 11, 2011.

09:48:01  8    Q.   And is that the period that you did your research

09:48:04  9    for, with respect to the subpoena request for Sherrymae

09:48:07  10   Morales?

09:48:08  11   A.   Yes.

09:48:14  12        MR. POTTER:  The government moves for the

09:48:15  13   admission, Your Honor.

09:48:16  14        THE COURT:  Attorney Jupiter?

09:48:17  15        MR. JUPITER:  Your Honor, we object on -- we

09:48:19  16   object generally on 403.  We also object with regard to

09:48:23  17   9.18, 9.19 and 9.20, as they're not relevant to the

09:48:32  18   charge -- there's no proper foundation for those.  So

09:48:39  19   they're not relevant, at least at this time.

09:48:49  20        THE COURT:  Which ones does the government seek

09:48:51  21   to have admitted?  Is it 9.3?

09:49:05  22        Attorney Potter?  Which ones did the government

09:49:09  23   seek to have admitted?

09:49:12  24        MR. POTTER:  9.2 to 9.20.

09:49:20  25        THE COURT:  Put 9.2 on the screen.

09:49:58  1        All right.  9.3 to 9.19 are admitted.

09:49:58  2        (Government's Exhibits 9.3 through 9.19 admitted

09:49:58  3   into evidence.)

09:50:05  4            THE COURT:  9.20 is under advisement, as is

09:50:12  5   9.2.

09:50:12  6        (Government's Exhibits 9.2, 9.20 under advisement.)

09:50:20  7            THE COURT:  Go ahead.

09:50:24  8   BY MR. POTTER:

09:50:26  9   Q.   Ms. Mathis, let me show you Government's

09:50:31  10  Exhibit 9.2 for identification.  And tell me what that

09:50:35  11  is.

09:50:43  12  A.   This is a signature card for Sherry D. Morales, or

09:50:52  13  Rosa Shari Morales.  They are account holders for USAA

09:50:58  14  Federal Savings account.

09:51:06  15  Q.   And within the body of Government's Exhibit 9.2,

09:51:12  16  are there signatures?

09:51:13  17  A.   Yes.  The signatures are for Sherrymae D. Morales

09:51:19  18  or Rosa Shari Morales.

09:51:28  19            MR. POTTER:  Move for the admission of

09:51:30  20  Government's Exhibit 9.2, Judge.

09:51:32  21            THE COURT:  Attorney Jupiter?

09:51:33  22            MR. JUPITER:  No objection, Your Honor.

09:51:34  23            THE COURT:  9.2 is admitted.

09:51:37  24        (Government's Exhibit 9.2 admitted into evidence.)

09:51:42  25

09:51:42   1    BY MR. POTTER:

09:51:42   2    Q.   Ms. Mathis, let me show you

09:51:45   3    Government's Exhibit 9.2.

09:51:47   4          MR. POTTER:  Can we publish, please.

09:51:47   5       (Exhibit published.)

09:51:57   6    BY MR. POTTER:

09:51:57   7    Q.   Looking at Government's Exhibit 9.2 again, tell us

09:52:00   8    what that is?

09:52:01   9    A.   This is a signature card amendment --

09:52:04   10          THE COURT:  Hold on one second.

09:52:05   11       I think it is time for our morning break, ladies

09:52:08   12    and gentlemen.  So we're going to break for ten minutes

09:52:11   13    and then we'll resume.  All rise.

09:53:07   14       (Jury out.)

09:53:08   15          THE COURT:  Ms. Mathis, we're going to take a

09:53:11   16    ten-minute break.  Do not discuss your testimony during

09:53:15   17    the break.  Do you understand?

09:53:16   18          THE WITNESS:  Yes.

09:53:16   19          THE COURT:  You need to be back on the witness

09:53:18   20    stand in ten minutes.  Do you understand?

09:53:21   21          THE WITNESS:  Yes, sir.

09:53:22   22          THE COURT:  Okay.  Counsel, ten minutes.

10:09:18   23       (Court in recess, 9:53 a.m.)

10:09:18   24       (After recess, 10:09 a.m., jury present.)

10:09:21   25       (Witness resumed stand.)

| | | |
|---|---|---|
| 10:09:21 | 1 | THE COURT:  Go right ahead. |
| 10:09:29 | 2 | DIRECT EXAMINATION (Continued) |
| 10:09:29 | 3 | BY MR. POTTER: |
| 10:09:30 | 4 | Q.   Good morning again, Ms. Mathis. |
| 10:09:33 | 5 | A.   Good morning. |
| 10:09:34 | 6 | Q.   Now, Government's Exhibit 9.3 to Government's |
| 10:09:44 | 7 | Exhibit 9.19, what do they show? |
| 10:09:52 | 8 | A.   These are the monthly bank statements for the |
| 10:09:56 | 9 | deposit account of Sherry D. Morales or Rosa Shari |
| 10:10:05 | 10 | Morales.  What they represent is all deposits and |
| 10:10:07 | 11 | credits to the account on a monthly basis. |
| 10:10:14 | 12 | Q.   And when you presented these documents, |
| 10:10:17 | 13 | Government's Exhibit 9.2 to .9.19 -- let me show you for |
| 10:10:34 | 14 | identification purposes Government's Exhibit 9.21. |
| 10:10:39 | 15 | (Government's Exhibit 9.21 marked for |
| 10:10:47 | 16 | identification.) |
| 10:10:47 | 17 | MR. JUPITER:  Your Honor, that has been |
| 10:10:49 | 18 | admitted, I believe. |
| 10:10:50 | 19 | THE COURT:  What's your statement? |
| 10:10:52 | 20 | MR. JUPITER:  I thought it was about to be |
| 10:10:53 | 21 | published, Your Honor.  I withdraw the objection. |
| 10:10:57 | 22 | BY MR. POTTER: |
| 10:10:58 | 23 | Q.   And tell us what Exhibit 9.21 is? |
| 10:11:02 | 24 | A.   Could you enlarge it, please? |
| 10:11:12 | 25 | This is the deposit information into the account of |

10:11:17 1    Sherry D. Morales.  These are various deposit items for

10:11:23 2    various dates from DFAS Cleveland into her account at

10:11:34 3    USAA Federal Savings Bank in San Antonio, Texas.

10:11:48 4    Q.   With respect to Government's Exhibit 9.3 to

10:11:51 5    Government's Exhibit 9.19, how does 9.21 relate to those

10:11:57 6    exhibits, or those documents?

10:12:01 7    A.   This document outlines the deposits received into

10:12:07 8    the account from DFAS Cleveland, deposited -- electronic

10:12:15 9    deposits from DFAS Cleveland into the account of

10:12:19 10   Sherrymae Morales at USAA Federal Savings Bank for the

10:12:23 11   time period -- I need it enlarged.

10:13:06 12       It represents deposits from the time period

10:13:09 13   April 7th, 2010, through July 13th, 2011.  These

10:13:17 14   deposits were made to USAA Federal Savings Bank account

10:13:22 15   number 1028022 for Sherrymae Morales.

10:13:29 16   Q.   And where did you get Exhibit 9.21?

10:13:33 17   A.   Government 9.21 has been received from the HCH

10:13:39 18   department of the bank.  It's the area within the bank

10:13:42 19   that receives electronic deposits.  And they have

10:13:47 20   researched each account to determine where the deposit

10:13:51 21   was originated.

10:13:58 22       MR. POTTER:  Your Honor, we move for the

10:14:00 23   admission of Government's Exhibit 9.21.

10:14:02 24       MR. JUPITER:  Your Honor, we object with

10:14:04 25   respect to 403, to have --

10:14:06  1          THE COURT:  All right.  It's under advisement.

10:14:15  2    BY MR. POTTER:

10:14:16  3    Q.   Would Government's Exhibit 9.21 aid in your

10:14:19  4    presentation of the information contained in

10:14:23  5    Government's Exhibit 9.3 through Government's

10:14:29  6    Exhibit 9.19?

10:14:39  7    A.   Excuse me.  What were those numbers again?  9.3?

10:14:45  8    Q.   9.3 through 9.19?

10:14:49  9          MR. JUPITER:  I'm a little bit uncertain as to

10:14:55  10   what records he's referring.  In the reverse order?

10:14:59  11          THE COURT:  Overruled.  The question is for the

10:15:00  12   witness.

10:15:00  13          THE WITNESS:  Yes.  These deposits support the

10:15:04  14   monthly statements.  These are deposits reflected on the

10:15:07  15   monthly statements.

10:15:21  16   BY MR. POTTER:

10:15:21  17   Q.   Now, let's look at Government's Exhibit 9.3?

10:15:24  18          MR. POTTER:  Can we publish, Your Honor?

10:15:26  19       (Exhibit published.)

10:15:26  20   BY MR. POTTER:

10:15:37  21   Q.   And tell us what Government's Exhibit 9.3 is.

10:15:40  22   A.   This is the March 11, 2010, monthly bank statement

10:15:43  23   for the account of Sherry D. Morales, or Rosa Shari

10:15:48  24   Morales.

10:15:53  25   Q.   And on that document, referring you to the date

10:16:03  1   February 11th, 2011, what does that entry reflect?

10:16:22  2   A.   The -- there's a deposit into the account on

10:16:27  3   February 11th, 2010, in the amount of $1,806.90 from

10:16:38  4   military person direct.

10:16:53  5        (Pause.)

10:16:53  6        MR. POTTER:  Court's indulgence, Your Honor?

10:16:55  7        THE COURT:  Yes.

10:16:55  8        (Pause.)

10:16:55  9   BY MR. POTTER:

10:17:12  10   Q.   Now, let me show you Government's Exhibit 9.4.  And

10:17:22  11   tell us what that document is.

10:17:26  12   A.   This is the monthly statement dated April 12th,

10:17:31  13   2010, for the deposit account of Sherry D. Morales or

10:17:35  14   Rosa Shari Morales.

10:17:37  15   Q.   And referring you to the date April 7th, what does

10:17:44  16   that transaction -- what does that entry reflect?

10:17:49  17   A.   On April 7th, 2010, there was a deposit into the

10:17:55  18   account in the amount of $1,389.58, from DFAS Cleveland

10:18:09  19   fed salary.

10:18:23  20   Q.   And let me draw your attention to the entry dated

10:18:29  21   April 8th.  What does that entry reflect?

10:18:36  22        MR. JUPITER:  Objection as to relevance, Your

10:18:39  23   Honor.

10:18:39  24        THE COURT:  Overruled.

10:18:46  25        THE WITNESS:  There's a deposit dated

10:18:49    1    April 8th, 2010, in the amount of $1,806.90 from

10:19:00    2    military person direct deposit.

10:19:08    3    BY MR. POTTER:

10:19:08    4    Q.    And the designation, "ACH"?

10:19:11    5    A.    An ACH deposit is an electronic transaction where

10:19:17    6    the account holder has provided -- in our instance we

10:19:23    7    are the receiving bank of the deposit.  They had

10:19:26    8    provided the originating bank the information where to

10:19:30    9    send the money.  They provide the account number and the

10:19:32   10    routing number for the bank, so they can electronically

10:19:36   11    transfer the funds into the account.

10:19:41   12    Q.    And you said electronic transfer.  Is there another

10:19:44   13    word that you sometimes use in place of "electronic

10:19:48   14    transfer"?

10:19:49   15    A.    Yes.  It's referred to as an ACH transfer.

10:19:59   16    Q.    And where is the DFAS -- if you can tell us from

10:20:03   17    the document, where is the DFAS bank located?

10:20:06   18    A.    Cleveland.

10:20:06   19    Q.    And where is your bank, USAA, located?

10:20:12   20    A.    San Antonio, Texas.

10:20:19   21    Q.    And let me show you Government's Exhibit 9.5.  And

10:20:36   22    let me draw your attention to May 5th.  Do you see that

10:20:44   23    entry?

10:20:44   24    A.    Yes.

10:20:46   25    Q.    And tell us what that entry represents.

```
10:20:49   1    A.   On May 5th, 2010, there was a deposit in the amount
10:20:54   2    of $3,417.40 from DFAS Cleveland fed salary.
10:21:09   3    Q.   You said "DFAS Cleveland."  Do you know what state?
10:21:12   4    A.   Cleveland is in Ohio.
10:21:15   5    Q.   Now, the entry May 6th -- sorry -- yeah, May 6th,
10:21:21   6    what does that entry represent?
10:21:23   7              MR. JUPITER:  Object as to relevance.
10:21:26   8              THE COURT:  Overruled.
10:21:31   9              THE WITNESS:  On May 6, 2010, there was a
10:21:34   10   deposit into the account in the amount of $1,806.90 from
10:21:43   11   military person direct deposit.
10:21:54   12             THE COURT:  Let me see counsel at sidebar.
10:21:58   13             MR. POTTER:  Yes, Judge.
10:21:59   14        (Sidebar discussion held as follows:)
10:22:04   15             THE COURT:  Attorney Potter, it seems that
10:22:06   16   there are two entries, two ACH entries on every bank
10:22:14   17   statement from 9.3 to 9.19.  Is there not a more
10:22:19   18   efficient way to address this?
10:22:22   19        These documents are already in evidence.  You're
10:22:25   20   just having this person, through a method that's taking
10:22:29   21   quite some time, just read what is already in evidence.
10:22:33   22   She's doing it two times per each item.  I suspect you
10:22:37   23   will go up to .19 with this.
10:22:39   24             MR. POTTER:  Yes, Judge.
10:22:40   25             THE COURT:  Is there a more efficient way to do
```

10:22:41  1    this?

10:22:42  2              MR. POTTER:  Yes, Judge.

10:22:43  3              THE COURT:  Okay.  Let's try that.

10:22:45  4         (End sidebar discussion, open court as follows:)

10:22:59  5    BY MR. POTTER:

10:22:59  6    Q.   Now, Ms. Mathis, with respect to Government's

10:23:03  7    Exhibit 9.6 to Government's Exhibit 9.19, do they all

10:23:18  8    contain electronic transfers?

10:23:26  9    A.   Yes.

10:23:37  10   Q.   And do they all contain the designation "DFAS

10:23:40  11   Cleveland"?

10:23:47  12   A.   Yes.

10:23:48  13        I am looking at the May 11th, 2010 statement.  Can

10:23:52  14   you please pull up the next page, in the next page?

10:23:56  15   Q.   Well, without going through each -- well, yes.  Can

10:24:00  16   you go through each of the exhibits and just verify

10:24:08  17   whether or not there are wire transfers, and the

10:24:10  18   specific date, and where they originated and where they

10:24:14  19   ended?

10:24:16  20   A.   Yes.  On July 12, 2010, there was a June 14th,

10:24:36  21   2010, -- I'm sorry, it's July -- June 16th, 2010, there

10:24:42  22   is a $3,037.08 deposit from DFAS Cleveland fed salary.

10:24:54  23        On June 17th, 2010, there is a $1,806.90 deposit

10:25:07  24   from military person direct.

10:25:19  25        June 30th, 2010, 3,037.09 from DFAS Cleveland fed

10:25:27  1    salary.

10:25:28  2         On July 1st, there's a deposit in the amount of

10:25:33  3    $1,805.10 from military person direct.

10:25:52  4              THE COURT:  Ms. Mathis, is it your testimony

10:25:54  5    that every place in these several bank statements where

10:25:57  6    we see -- where there's the three letter combination

10:26:03  7    ACH, that that is an electronic transfer?

10:26:06  8              THE WITNESS:  Yes, sir.

10:26:07  9              THE COURT:  Okay.

10:26:07  10        Anything else.

10:26:10  11             MR. POTTER:  That's all we have.

10:26:12  12             THE COURT:  Attorney Jupiter?

10:26:13  13             MR. JUPITER:  We have no questions, Your Honor.

10:26:14  14             THE COURT:  Ms. Mathis, thank you for your

10:26:16  15    testimony.

10:26:16  16        You may step down.

10:26:19  17             THE WITNESS:  Sir, Your Honor, am I excused?

10:26:21  18             THE COURT:  Is there any further need for

10:26:23  19    Ms. Mathis, Attorney Jupiter?

10:26:26  20             MR. JUPITER:  No, Your Honor.

10:26:27  21             THE COURT:  Attorney Potter?

10:26:28  22             MR. POTTER:  No, Your Honor.

10:26:30  23             THE COURT:  Ms. Mathis, you're excused.  Thank

10:26:33  24    you.

10:26:33  25             THE WITNESS:  Thank you.

10:26:34  1          (Witness excused.)

10:26:34  2              THE COURT:  Next witness.

10:26:34  3              MR. POTTER:  The next witness is Marise James.

10:27:09  4              THE CLERK:  Please step into the witness box.

10:27:12  5          (Witness sworn.)

10:27:17  6              THE WITNESS:  I do.

10:27:18  7              THEREUPON, MARISE JAMES, having been duly

10:27:19  8      sworn, was examined and testified as follows:

10:27:19  9                          DIRECT EXAMINATION

10:27:21  10     BY MR. POTTER:

10:27:25  11     Q.   Good morning.

10:27:26  12     A.   Good morning, sir.

10:27:27  13     Q.   Give us your full name for the record.  Spell your

10:27:29  14     first and your last name for the court reporter.

10:27:32  15     A.   My name is Marise James, M-a-r-i-s-e, James,

10:27:40  16     J-a-m-e-s.

10:27:40  17     Q.   And tell us how you're employed.

10:27:42  18     A.   I'm employed at the Virgin Islands National Guard.

10:27:45  19     Q.   And what is your position there?

10:27:47  20     A.   At the Guard, I am the JAG advocate and ethics

10:27:54  21     counselor.

10:27:54  22     Q.   And how long have you been associated with the

10:27:56  23     Virgin Islands National Guard?

10:27:58  24     A.   I joined in -- well, I took the oath in October of

10:28:05  25     2002, and then I became full-time in January of 2004.

10:28:13  1    Q.   Do you know Sherrymae Morales?

10:28:18  2    A.   Yes, I do.

10:28:19  3    Q.   And tell us how you know her.

10:28:21  4    A.   Well, I know her from growing up in Shepherd

10:28:26  5    Project first.  And then I knew her later on around

10:28:34  6    1982.  And then I came to know her when I entered the

10:28:40  7    Guard.  So it's been a long time.

10:28:43  8    Q.   Now, let me take you back to 2007.  Were you

10:28:48  9    working with the Guard in 2007?

10:28:50  10   A.   I was.  I was full-time judge advocate or attorney.

10:29:00  11   Q.   I should ask you, as the judge advocate, what are

10:29:03  12   your role -- what's your role?

10:29:05  13   A.   As the staff judge advocate, I provide advice to

10:29:11  14   the adjutant, the United States property and fiscal

10:29:16  15   officer, the commanders and the different directors for

10:29:20  16   the staff.

10:29:21  17        I also supervise two part-time attorneys, and we

10:29:24  18   provide legal assistance, we provide briefings to

10:29:28  19   soldiers.  Anything that involves the Guard, I'm the

10:29:32  20   person who would address the legal issues that come out

10:29:36  21   of anything in the Guard.

10:29:38  22   Q.   In 2007, do you know how Ms. Morales was employed?

10:29:46  23   A.   Yes, I do.

10:29:49  24   Q.   How was she employed, from your knowledge?

10:29:52  25   A.   She was employed as the ESGR coordinator in

10:29:57   1    November of 2007.

10:29:58   2    Q.   Do you know how she came to get that position?

10:30:02   3    A.   Yes, I do.

10:30:03   4    Q.   And how did she?

10:30:06   5    A.   At the time Elton Lewis was the chief of staff --

10:30:12   6    or director of joint staff.  And at the time he was a

10:30:15   7    colonel.  So Colonel Lewis came into my office and he

10:30:17   8    said that --

10:30:18   9    Q.   You can't tell us what Colonel Lewis said,

10:30:21   10   particularly.

10:30:21   11        What happened -- as a result of him saying what he

10:30:27   12   said, what did you do?

10:30:28   13   A.   I recommended Sherrymae Morales as the ESGR

10:30:32   14   candidate.

10:30:39   15   Q.   And do you know what happened to your

10:30:41   16   recommendation?

10:30:41   17   A.   He went to the person who called him on the phone

10:30:45   18   and asked -- and told --

10:30:48   19   Q.   Okay.

10:30:49   20   A.   Okay.

10:30:50   21   Q.   You can't tell us what anybody said.

10:30:51   22        Was she hired, as far as you know?

10:30:53   23   A.   She was.  She was hired as the ESGR coordinator.

10:31:05   24   Q.   And between 2010 -- sorry.  Between 2007 and 2010,

10:31:15   25   did she hold that ESGR position, as far as you know?

10:31:23  1   A.   Did she hold the position as ESGR from 2007 until

10:31:30  2   2010?

10:31:31  3        Not as far as I know.  I deployed in 2009.

10:31:42  4   October 2009, I was not in the National Guard.  I

10:31:45  5   belonged to the President of the United States at that

10:31:47  6   point.

10:31:47  7        So from 2007 until I deployed in October of 2009,

10:31:55  8   she was the ESGR coordinator.

10:32:02  9   Q.   And you said you deployed.  Where did you deploy

10:32:05  10  to?

10:32:05  11  A.   I deployed to GITMO, to Guantanamo Bay.

10:32:09  12  Q.   How long were you there?

10:32:10  13  A.   I was there until November of 2010.

10:32:16  14  Q.   And in December of 2010, tell us what happened --

10:32:22  15  A.   Well, in --

10:32:23  16  Q.   -- with respect to your deployment.

10:32:26  17  A.   Well, we came back home in -- we came back home

10:32:32  18  November of 2010.  And when I returned to the Virgin

10:32:37  19  Islands National Guard, at that point she was Major

10:32:46  20  Morales, working full-time for the Virgin Islands

10:32:47  21  National Guard.

10:32:48  22  Q.   Do you know what position she held?

10:32:54  23  A.   The, at that time she was the, I believe she was

10:32:59  24  the 5, the planner, strategic planning.

10:33:09  25  Q.   Now, when you deployed from Cuba, did you have

10:33:13  1    contact with the defendant?

10:33:16  2    A.   I wouldn't have contact with her during the week,

10:33:22  3    unless a legal issue came up.

10:33:24  4         The only other time that I -- early on, the only

10:33:27  5    other contact I had with her was when I came back home

10:33:32  6    from the deployment, we had a 30-day reintegration

10:33:41  7    training on St. Thomas, at Sugar Bay Resort, a 30-day

10:33:45  8    reintegration.  And Major Morales, the TAG and a number

10:33:51  9    of people came over for the reintegration, the 30-day

10:33:57  10   reintegration.

10:33:57  11   Q.   And what year do you recall this to be?  The month

10:34:00  12   and year?

10:34:01  13   A.   The month and year?  December -- it was actually

10:34:05  14   December 4th and 5th of 2010.  It was the 30-day

10:34:11  15   reintegration after we came back from the deployment,

10:34:14  16   November 2010.  So 30 days after we had the

10:34:16  17   reintegration.  And I saw -- they came over to do the

10:34:21  18   briefings to the soldiers who were back, and I was one

10:34:26  19   of the soldiers.

10:34:29  20   Q.   And what, if any, conversation did you have with

10:34:33  21   the defendant at that time?

10:34:34  22   A.   Well, when the TAG and Major Morales and others

10:34:40  23   came in, I said to her, "What are you doing here?"

10:34:44  24   Q.   And what was her response?

10:34:45  25   A.   She said she was an ESGR volunteer.

10:34:51  1    Q.    Now, what was the reason that you would ask her,

10:34:54  2    "What are you doing here?"

10:34:55  3    A.    Because when I came back in November, from November

10:35:00  4    to December, I returned to work.  And she was the -- a

10:35:07  5    staff member.  And a lot of the staff members, you don't

10:35:09  6    see them at the -- unless they're, for example, finance

10:35:13  7    or personnel, you wouldn't normally see somebody who is

10:35:17  8    in planning, or you wouldn't see the construction

10:35:19  9    facility officer at the reintegration.  You would just

10:35:25  10   see certain people at the reintegration training.

10:35:34  11   Q.    Okay.  And did you have -- once she indicated that

10:35:38  12   response to you, did you have any further discussions

10:35:40  13   with her at that time?

10:35:41  14   A.    No.  Because I was a volunteer, too.  I was an ESGR

10:35:45  15   volunteer.  So it wasn't an unusual response to me,

10:35:50  16   because I knew she was working full-time now.  And when

10:35:54  17   I was working full-time, I was an ESGR volunteer.  So I

10:35:58  18   was like, oh, okay.  And that was it.  And then she did

10:36:02  19   the presentation, which, as always, was excellent.

10:36:14  20   Q.    Now, in your role as the JAG, are you familiar with

10:36:24  21   the regular working hours for the National Guard?

10:36:27  22   A.    Yes, I am.

10:36:29  23              MR. JUPITER:  Objection, Your Honor.

10:36:31  24              THE COURT:  Overruled.

10:36:34  25              THE WITNESS:  8:00 to 5:00; 8:00 a.m. to

| | | |
|---|---|---|
| 10:36:38 | 1 | 5:00 p.m. |
| 10:36:40 | 2 | BY MR. POTTER: |
| 10:36:41 | 3 | Q.   And -- |
| 10:36:41 | 4 | A.   Unless you're, unless you're AGR, which means that |
| 10:36:47 | 5 | -- an AGR soldier, an active guard reserve, you're 24/7. |
| 10:36:55 | 6 | You're always available. |
| 10:36:55 | 7 | Q.   And was Ms. Morales an AGR? |
| 10:36:59 | 8 | A.   No.  She was a technician. |
| 10:37:00 | 9 | Q.   Now, the hours of work, the regular hours of work |
| 10:37:01 | 10 | for the National Guard, is that reflected anywhere? |
| 10:37:04 | 11 | A.   Yes. |
| 10:37:06 | 12 | Q.   And where is that reflected?  Where would it be |
| 10:37:10 | 13 | reflected? |
| 10:37:10 | 14 | A.   Reflected? |
| 10:37:14 | 15 |      MR. JUPITER:  Your Honor, I would object as to |
| 10:37:16 | 16 | foundation for this, as well as relevance. |
| 10:37:17 | 17 |      THE COURT:  Sustained. |
| 10:37:26 | 18 | BY MR. POTTER: |
| 10:37:26 | 19 | Q.   Let me show you -- |
| 10:37:39 | 20 |      MR. POTTER:  Can I have a Government's Exhibit |
| 10:37:42 | 21 | sticker, if possible? |
| 10:37:50 | 22 |    May I approach, Your Honor? |
| 10:37:53 | 23 |      THE COURT:  Yes. |
| 10:38:09 | 24 |      MR. POTTER:  Let me show you what I will mark |
| 10:38:10 | 25 | as Government's Exhibit 13, and ask you if you recognize |

10:38:21  1     it.

10:38:21  2          (Government's Exhibit 13 marked for

10:38:21  3     identification.)

10:38:21  4     BY MR. POTTER:

10:38:30  5     Q.   Do you recognize Government's Exhibit 13?

10:38:33  6          It should be in front of you.

10:38:35  7     A.   Oh.  Yes, I do.

10:38:36  8     Q.   And tell us what that is.

10:38:37  9     A.   That's the labor management relations agreement for

10:38:41  10    the technicians.

10:38:47  11    Q.   And how are you familiar with Government's

10:38:52  12    Exhibit 13?

10:38:53  13    A.   I am familiar with it because whenever there's an

10:38:56  14    issue with technicians, and because I am the lawyer at

10:39:00  15    the Virgin Islands National Guard, this is the agreement

10:39:03  16    that I would look to if we have to resolve any legal

10:39:08  17    issues that we may have, like absenteeism, performance.

10:39:16  18    I would look to make sure that we are following the

10:39:19  19    procedures in this agreement.

10:39:20  20    Q.   And did you have occasion to review this

10:39:23  21    Government's Exhibit and determine whether or not that

10:39:26  22    was in existence in 2010?

10:39:29  23    A.   Yes, it was.

10:39:36  24    Q.   And in your reviewing it, were you able to

10:39:39  25    determine if it is, if it accurately reflects the labor

| | | |
|---|---|---|
| 10:39:44 | 1 | management agreement as you know it to exist -- |
| 10:39:51 | 2 | A.   Yes -- |
| 10:39:51 | 3 | Q.   -- in 2010? |
| 10:39:52 | 4 | A.   Yes, it does, for the technicians. |
| 10:40:00 | 5 | MR. POTTER:  Your Honor, we move for admission |
| 10:40:01 | 6 | of Government's Exhibit 13. |
| 10:40:03 | 7 | THE COURT:  Attorney Jupiter? |
| 10:40:04 | 8 | MR. JUPITER:  Yes, Your Honor.  We object based |
| 10:40:06 | 9 | on -- |
| 10:40:06 | 10 | THE COURT:  Under advisement.  403. |
| 10:40:15 | 11 | MR. POTTER:  Brief Court's indulgence, Your |
| 10:40:18 | 12 | Honor? |
| 10:40:19 | 13 | THE COURT:  Yes. |
| 10:40:40 | 14 | (Pause.) |
| 10:40:40 | 15 | MR. POTTER:  That's all we have for the |
| 10:40:42 | 16 | witness, Your Honor. |
| 10:40:42 | 17 | THE COURT:  Attorney Jupiter? |
| 10:40:44 | 18 | CROSS-EXAMINATION |
| 10:40:45 | 19 | BY MR. JUPITER: |
| 10:40:45 | 20 | Q.   Good morning. |
| 10:40:46 | 21 | A.   Good morning. |
| 10:40:47 | 22 | Q.   You are the, you advise the adjutant general at the |
| 10:40:55 | 23 | Virgin Islands National Guard? |
| 10:40:55 | 24 | A.   Say that again, sir? |
| 10:40:57 | 25 | Q.   Do you -- you advise the adjutant general at the |



10:41:00   1   Virgin Islands National Guard?

10:41:01   2   A.   Yes, I do.

10:41:02   3   Q.   Okay.  And you, you're responsible for the, you're

10:41:11   4   responsible for also advising commanders at the Virgin

10:41:18   5   Islands National Guard?

10:41:18   6   A.   Yes, I do.  If they ask for advice, I provide

10:41:24   7   advice.  But they must first ask for it.

10:41:26   8   Q.   Now with regard to -- you indicated that you were

10:41:30   9   aware that Ms. Morales had taken the ESGR position in

10:41:38  10   2007, correct?

10:41:39  11   A.   Yes.

10:41:40  12   Q.   And when you left in 2009, she still had that

10:41:46  13   position?

10:41:46  14   A.   Yes, she did.

10:41:47  15   Q.   And when you came back, I believe you said November

10:41:50  16   or December?

10:41:51  17   A.   No, November of 2010.

10:41:53  18   Q.   2010?

10:41:53  19   A.   Yes.

10:41:54  20   Q.   You said Ms. Morales was working as a military

10:41:57  21   tech, correct?

10:41:57  22   A.   Yes, she was.

10:41:58  23   Q.   And she was a member in the Guard, correct?

10:42:00  24   A.   Yes, she was.

10:42:01  25   Q.   And this was not a -- she was not a civilian

10:42:04  1   technician, correct?  Or she was not --

10:42:09  2   A.   She was a civilian employee wearing the uniform.

10:42:13  3   So she was a military technician.

10:42:15  4   Q.   Okay.

10:42:16  5   A.   Okay.

10:42:17  6   Q.   And the ESGR position, as far as you knew, always

10:42:23  7   had a director, correct?

10:42:25  8   A.   Yes.  As far as I knew, there was always a

10:42:29  9   director.

10:42:29  10  Q.   All right.  And you're familiar with the ESGR

10:42:33  11  contract, are you not?

10:42:35  12  A.   No.

10:42:35  13  Q.   You're not familiar with the ESGR contract?

10:42:38  14  A.   No.  When you say "familiar," the only time that I

10:42:41  15  saw the contract was as part of an investigation that

10:42:46  16  was done.

10:42:47  17  Q.   Okay.  Now, and you were tasked with -- what was

10:42:53  18  your role in that investigation?

10:42:55  19  A.   Legal review.

10:42:56  20  Q.   Okay.  And you were to report to the adjutant

10:43:01  21  general with regards to that investigation?

10:43:03  22  A.   I just do the legal review and I signed off on it.

10:43:07  23  Q.   And who does that legal review go to?

10:43:09  24  A.   To the adjutant general.

10:43:10  25  Q.   Okay.

10:43:11   1    A.    He -- the appointed authority is the adjutant

10:43:15   2    general for that investigation.

10:43:17   3    Q.    Okay.  You didn't do that investigation, did you?

10:43:19   4    A.    I can't do investigations.

10:43:22   5    Q.    Right.

10:43:22   6    A.    I cannot.

10:43:23   7    Q.    And you didn't?

10:43:24   8    A.    No.  No.  I did not.

10:43:26   9    Q.    And you -- but you did discuss it with the adjutant

10:43:34  10    general?

10:43:35  11          You discussed -- prior to your report you discussed

10:43:38  12    it with the adjutant general, correct?

10:43:40  13    A.    No.

10:43:41  14              MR. POTTER:  Objection, Your Honor.

10:43:43  15              THE WITNESS:  No, I did not.

10:43:45  16          Discuss the investigation?

10:43:46  17              MR. JUPITER:  Yes.

10:43:46  18              THE WITNESS:  No.  I would only be discussing

10:43:47  19    the investigation with the investigating officer.

10:43:52  20    BY MR. JUPITER:

10:43:52  21    Q.    Okay.  And -- so that would mean you would not, you

10:43:55  22    would not discuss it with anyone other than the

10:43:57  23    investigating -- thank you.

10:44:00  24    A.    Right.

10:44:00  25    Q.    Okay.  Now I want to go back to November 2007.

10:44:04  1    A.   Okay.

10:44:09  2    Q.   Colonel Lewis contacted you about the ESGR

10:44:12  3    position, right?

10:44:12  4    A.   Yes, he did.

10:44:13  5    Q.   All right.  And did he indicate that he needed

10:44:15  6    someone right away for the position?

10:44:16  7    A.   He did.

10:44:17  8    Q.   Okay.  Now -- and were you privy to the

10:44:27  9    conversation on the telephone between Colonel Lewis and

10:44:30  10   Ms. Morales?

10:44:31  11   A.   No, I was not.

10:44:35  12   Q.   And after Ms. Morales took that position, you're

10:44:43  13   aware -- there was no space for her over at the VING

10:44:47  14   office, correct -- for her to work out of the Virgin

10:44:50  15   Islands National Guard headquarters at that time,

10:44:53  16   correct?

10:44:56  17   A.   I wouldn't know.  I wouldn't know that.  But

10:44:59  18   contract workers don't necessarily have to work out of

10:45:03  19   the headquarters.

10:45:10  20   Q.   And do you know that Ms. Morales did the ESGR work

10:45:14  21   out of her realtor office?

10:45:17  22           MR. POTTER:  Objection.

10:45:19  23           THE WITNESS:  No, didn't know, didn't know

10:45:20  24   that.

10:45:20  25           THE COURT:  Sustained.

10:45:20  1    BY MR. JUPITER:

10:45:36  2    Q.   And after -- when you came back in 2010, you didn't

10:45:39  3    have, you didn't have any interaction -- besides this

10:45:46  4    reintegration workshop, you didn't have any interaction

10:45:50  5    on a daily basis with Mr. Morales, did you?

10:45:56  6    A.   The only interaction I would have on a daily basis

10:46:01  7    with any officer at the Guard is if they need my advice,

10:46:04  8    if they come to my office and need advice on anything.

10:46:07  9    So I would see everybody daily.  You would see everybody

10:46:10  10   daily.  But I'm in my office.

10:46:28  11          MR. JUPITER:  No further questions, Your Honor.

10:46:30  12          THE COURT:  Okay.

10:46:30  13      Any redirect?

10:46:31  14          MR. POTTER:  No redirect, Your Honor.

10:46:32  15          THE COURT:  Okay.

10:46:33  16      Attorney James, thank you for your testimony.

10:46:34  17      You may step down.

10:46:35  18          THE WITNESS:  Thank you sir.

10:46:38  19      (Witness withdrew from stand.)

10:46:38  20          THE COURT:  Next witness.

10:46:40  21          MR. POTTER:  The government calls Dazarene

10:46:43  22   Lescott.

10:47:13  23          THE CLERK:  Please stand and raise your right

10:47:15  24   hand to take the oath.

10:47:17  25          (Witness sworn.)

10:47:20    1              THE WITNESS:  So help me God, yes.

10:47:25    2              THEREUPON, DAZARENE LESCOTT, having been duly

10:47:25    3    sworn, was examined and testified as follows:

10:47:25    4                    DIRECT EXAMINATION

10:47:26    5    BY MR. POTTER:

10:47:26    6    Q.   Good morning.

10:47:26    7    A.   Good morning.

10:47:27    8    Q.   Can you give us your full name for the record,

10:47:30    9    please, and spell your first and your last name for the

10:47:31   10    court reporter?

10:47:32   11    A.   My name is Dazarene, it's spelled D-a-z-a-r-e-n-e.

10:47:40   12    Last name is Lescott; it's spelled L-e-s-c-o-t-t.

10:47:44   13    Q.   And Ms. Lescott, where do you currently work?

10:47:48   14    A.   I'm sorry?

10:47:49   15    Q.   Where do you currently work?

10:47:50   16    A.   I work with the Virgin Islands National Guard.

10:47:52   17    Q.   And what position do you hold there?

10:47:53   18    A.   I am currently their physical security specialist.

10:48:00   19    Q.   And as a physical security specialist --

10:48:03   20    A.   Physical security specialist.

10:48:05   21    Q.   -- what do you do?

10:48:06   22         What are your duties?

10:48:07   23    A.   Physical, for overseeing the Guard program, the

10:48:10   24    security guard program currently there.  And also I

10:48:15   25    write and implement policies as it pertains to physical

10:48:20  1    security.

10:48:24  2    Q.   Are you familiar with a company called the MPSC,

10:48:33  3    Military Personnel Services Corp.

10:48:33  4    A.   Yes.

10:48:34  5    Q.   And tell us how you are familiar with it.

10:48:36  6    A.   I worked for MPSC from October 2010 through

10:48:46  7    August 2011, as their administrator support technician.

10:48:54  8    Q.   As the administrative support technician, what did

10:48:58  9    you do?

10:48:59  10   A.   I was part of the administrative support for the

10:49:04  11   ESGR program for that company.

10:49:10  12   Q.   And how did you come to get that job?

10:49:13  13   A.   I came back from deployment back in July 2010, and

10:49:21  14   attended our yellow ribbon program over at Divi Carina.

10:49:28  15   And Major Morales, she was the ESGR person that gave us

10:49:32  16   our ESGR briefing as we came back from deployment.

10:49:36  17        And I kind of explained to her that I was going

10:49:40  18   through some issues with my current job.  So she

10:49:45  19   basically -- we spoke and she more or less kind of said

10:49:50  20   that --

10:49:51  21   Q.   Don't tell us -- well --

10:49:52  22   A.   Okay.

10:49:53  23   Q.   No, go ahead.  Tell us what she said.

10:49:57  24   A.   She spoke and said that possibly there was

10:49:59  25   something in the pipelines, that the ESGR program was

10:50:01   1   working on getting a position on St. Thomas.  And

10:50:06   2   because there was also an ESGR position on St. Croix, so

10:50:13   3   more than likely having two people, ESGR personnel on

10:50:15   4   both islands.

10:50:16   5   Q.   Okay.  And you were ultimately hired?

10:50:18   6   A.   Yes.

10:50:19   7   Q.   Who hired you?

10:50:20   8   A.   Mr. Hignite.

10:50:22   9   Q.   And how did that hiring occur?

10:50:27   10   A.   Major Morales, I forwarded her my resume, and in

10:50:33   11   turn she forwarded it to Mr. Hignite and Mr. Hignite

10:50:37   12   contacted me.  And we had an interview via phone for the

10:50:41   13   position.

10:50:43   14   Q.   And do you recall what month and year it was that

10:50:47   15   you had this interview with Mr. Hignite?

10:50:51   16   A.   The interview was contacted, say, the later part of

10:50:56   17   December 2010.  My official start date was -- not

10:51:02   18   August -- October 4th, 2010.

10:51:07   19   Q.   And were you full-time?

10:51:08   20   A.   Yes.

10:51:09   21   Q.   And what were your hours of work?

10:51:12   22   A.   Monday through Friday, 8:00 to 5:00.

10:51:18   23   Q.   And either at the time of your hire or prior to

10:51:24   24   your hire, was there any discussion with Mr. Hignite or

10:51:28   25   anyone else regarding what your hours of work would be?

10:51:35  1    A.    I don't recall Mr. Hignite going over, say, the

10:51:43  2    hours possibly, not before.  But after it was outlined

10:51:48  3    it would be 8:00 to 4:00, Monday through Friday, and

10:51:53  4    everything over it would be voluntarily.

10:51:55  5    Q.    Did you have any conversation with Sherrymae

10:51:58  6    Morales regarding what the hours of work would be?

10:52:03  7    A.    This was, as I said, too, after she more or less

10:52:07  8    outlined to say:  Hey, we work 8:00 to 5:00, and if

10:52:11  9    anything over it will always be voluntarily.  It's a

10:52:16  10   contract, and as contract employees we can't go over

10:52:21  11   40 hours a week.

10:52:25  12   Q.    And what were the days of the week?

10:52:26  13   A.    The days were basically Monday through Friday.

10:52:30  14   Q.    And were you told anything with respect to working

10:52:36  15   outside of Monday through Friday?

10:52:38  16   A.    If we did work outside Monday through Friday, it

10:52:40  17   would be on a voluntary purpose.

10:52:51  18   Q.    Now, once you started -- let me ask you -- so you

10:52:58  19   were on St. Thomas?

10:52:59  20   A.    Yes, I was.

10:53:00  21   Q.    And Ms. Morales was on St. Croix?

10:53:03  22   A.    Correct.

10:53:06  23   Q.    And how often would you communicate with

10:53:10  24   Ms. Morales regarding work?

10:53:12  25   A.    Myself and Major Morales, we usually communicated

10:53:16  1    daily, whether it be an e-mail or via telephone; but the

10:53:21  2    majority of the time via e-mail.

10:53:23  3    Q.   And what would be the hours that you would

10:53:26  4    communicate with Ms. Morales when you're at work?

10:53:32  5    A.   Between the hours of 8:00 to 5:00.

10:53:38  6    Q.   And with respect to the days of the week, what

10:53:40  7    would be the days of the week that you would have

10:53:43  8    regular communications with Ms. Morales?

10:53:46  9    A.   Regular communication is usually Monday through

10:53:50  10   Friday.  If there's like any voluntary thing over the

10:53:54  11   weekend, but mainly Monday through Friday.

10:54:07  12   Q.   And what were your -- as the -- you said AP --

10:54:12  13   A.   AST.

10:54:18  14   Q.   AST.  So as the administrative support technician,

10:54:21  15   on a daily basis what would you do?

10:54:23  16   A.   As the admin support technician, basically, more or

10:54:28  17   less try to organize, where I'll go out and meet or try

10:54:32  18   to bring in or educate employers, give them, make them

10:54:39  19   aware of what's going on with the ESGR program.  I would

10:54:43  20   do some of the reports, get the reports ready.  We would

10:54:47  21   call -- well, we do quarterly, like a PEPAS report, that

10:54:54  22   we have to support to the ESGR headquarters out in

10:54:58  23   Virginia.

10:54:58  24   Q.   Who created the PEPAS report?

10:55:00  25   A.   The PEPAS report, it came down from --

10:55:04  1          THE COURT:  No, let's move on.

10:55:08  2   BY MR. POTTER:

10:55:08  3   Q.   The work that you did for ESGR, who did you report

10:55:15  4   to?

10:55:16  5   A.   The reports that I did, I forwarded to Major

10:55:20  6   Morales, which she in turn looked over and forwarded on,

10:55:24  7   or sent it back to me to forward on.

10:55:26  8   Q.   Okay.

10:55:39  9          MR. POTTER:  Let me show you what's been marked

10:55:40  10  as Government's Exhibit 11 for identification, and ask

10:55:51  11  you if you recognize it.

10:55:54  12      (Government's Exhibit 11 marked for

10:55:54  13  identification.)

10:56:05  14  BY MR. POTTER:

10:56:05  15  Q.   Do you recognize Government's Exhibit 11?

10:56:26  16  A.   Yeah.

10:56:27  17  Q.   Tell us what that is.

10:56:28  18  A.   It's monthly report that we --

10:56:35  19          THE COURT:  Speak into the microphone, please.

10:56:37  20  You can pull it down towards you.

10:56:39  21          THE WITNESS:  It's a monthly report that we

10:56:42  22  usually did at the end of every month, to show our

10:56:45  23  activity here within the territory, what goes on within

10:56:50  24  the town.

10:56:51  25

BY MR. POTTER:

Q.   Were those report limited to St. Thomas, or St. Thomas and St. Croix?

A.   It was combined, a combined report for both islands.  Whatever we did, we combined everything on that report.

Q.   Did you ever travel to St. Croix for work?

A.   Yes.

Q.   How often would that be?

A.   Sometimes every month, or every other month, if it's -- depends on the funding that we have.

Q.   Let's go back to Government's Exhibit 11.  You recognize that -- well, what do you recognize it as?

A.   An e-mail that I sent to Major Morales, asking her to look over the report.

Q.   And does Government's Exhibit 11 accurately reflect -- is it a fair and accurate representation of the e-mail that you sent to Ms. Morales?

A.   Yes.

Q.   Any indication that it has been tampered with or altered in any way?

A.   No.

        MR. POTTER:  Your Honor, we move to admit Government's Exhibit 11.

        THE COURT:  Attorney Jupiter?

10:58:20   1           MR. JUPITER:  Your Honor, with redaction of the

10:58:21   2   top part, we don't object.  I think the top --

10:58:27   3           THE COURT:  Yes, I agree.  All right.

10:58:29   4   Exhibit 11 is admitted, insofar as it reflects the

10:58:41   5   communications between the witness and Ms. Morales only.

10:58:59   6       (Government's Exhibit 11 admitted into evidence.)

10:58:59   7           MR. POTTER:  May we publish, Your Honor?

10:58:59   8       (Pause.)

10:59:50   9           MR. POTTER:  Can we publish now, Your Honor?

10:59:53   10          THE COURT:  Yes.

10:59:57   11      (Exhibit published.)

10:59:57   12  BY MR. POTTER:

10:59:57   13  Q.   So Ms. Lescott, tell us again what Government's

11:00:01   14  Exhibit 11 is?

11:00:01   15  A.   It's a monthly report that I sent to Major Morales,

11:00:04   16  so she can look over for us to submit.

11:00:25   17          MR. POTTER:  I think that's all I have, Your

11:00:28   18  Honor.

11:00:28   19          THE COURT:  Attorney Jupiter?

11:00:30   20                      CROSS-EXAMINATION

11:00:30   21  BY MR. JUPITER:

11:00:48   22  Q.   I think it's afternoon by now -- no.  Good morning.

11:00:53   23  A.   Good morning.

11:00:54   24  Q.   This Government's Exhibit Number 11, this is an

11:00:57   25  e-mail that you submitted to a government agent?

| | | |
|---|---|---|
| 11:01:01 | 1 | A.    Yeah. |
| 11:01:05 | 2 | Q.    And this was submitted to government agent at |
| 11:01:08 | 3 | government agent request, correct? |
| 11:01:10 | 4 | A.    Correct. |
| 11:01:11 | 5 | Q.    And you were contacted with reference to this |
| 11:01:14 | 6 | particular case, correct? |
| 11:01:15 | 7 | A.    Correct. |
| 11:01:16 | 8 | Q.    And you were told there was a criminal |
| 11:01:18 | 9 | investigation going on, correct? |
| 11:01:19 | 10 | A.    Correct. |
| 11:01:26 | 11 | Q.    And were you advised that there was some type of |
| 11:01:30 | 12 | illegality with regard to outside employment? |
| 11:01:39 | 13 | A.    I'm sorry? |
| 11:01:40 | 14 | Q.    Were you advised -- as part of the criminal |
| 11:01:42 | 15 | investigation, were you advised there was some |
| 11:01:45 | 16 | illegality with regard to outside employment? |
| 11:01:48 | 17 |           MR. POTTER:  Objection, Your Honor. |
| 11:01:49 | 18 |           THE COURT:  Sustained. |
| 11:01:51 | 19 |           MR. JUPITER:  Goes to bias, Your Honor. |
| 11:01:53 | 20 |           THE COURT:  403.  Rephrase. |
| 11:01:58 | 21 |           MR. JUPITER:  Okay. |
| 11:01:58 | 22 | BY MR. JUPITER: |
| 11:01:59 | 23 | Q.    You were a -- you were an employee of Military |
| 11:02:04 | 24 | Personnel, MPSC, correct? |
| 11:02:06 | 25 | A.    Correct. |

11:02:07  1    Q.   All right.  And you had other employment at that

11:02:11  2    time?

11:02:12  3    A.   No.  I was -- if you're speaking in regards to my

11:02:17  4    membership in the Virgin Islands National Guard, I was

11:02:23  5    an entering soldier.

11:02:26  6    Q.   Okay.  And in regards to -- if you did -- you

11:02:31  7    indicated if you did work over the weekend, that would

11:02:34  8    be volunteer?

11:02:35  9    A.   That would be voluntary.

11:02:36  10   Q.   Okay.  Now you had a system in which you did

11:02:39  11   timekeeping --

11:02:39  12   A.   Correct.

11:02:41  13   Q.   -- for MPSC, correct?

11:02:43  14   A.   Correct.

11:02:44  15   Q.   And weren't -- you couldn't put in time that you

11:02:49  16   did over the weekend, correct?

11:02:52  17   A.   No.

11:02:53  18        MR. POTTER:  Objection, Your Honor.

11:02:54  19        THE COURT:  Overruled.

11:02:58  20   BY MR. JUPITER:

11:02:58  21   Q.   You couldn't, right?

11:02:59  22   The system didn't allow you to put in your weekend

11:03:02  23   hours, right?

11:03:03  24   A.   You had to put in 40 hours.

11:03:05  25   Q.   Right?

11:03:05  1    A.    Yeah.

11:03:06  2    Q.    So if you did part of those 40 hours over the

11:03:08  3    weekend, did Mrs. Morales advise you that you needed to

11:03:13  4    put it in during the week?

11:03:15  5           MR. POTTER:  Objection, Your Honor.

11:03:16  6           THE COURT:  Sustained.

11:03:18  7    BY MR. JUPITER:

11:03:18  8    Q.    Weren't you -- when you -- couldn't you put in

11:03:22  9    hours that you worked -- if you worked part of those

11:03:27  10   40 hours --

11:03:28  11   A.    Uhm-hmm.

11:03:28  12   Q.    -- outside of that 8:00 to 5:00 at the time,

11:03:31  13   couldn't you put it in as eight hours -- for that Monday

11:03:36  14   to Friday week?

11:03:39  15   A.    Uhm-hmm.

11:03:40  16   Q.    There was no violation for you saying -- for

11:03:42  17   instance -- as a matter of fact, let's look at this.

11:03:45  18   The top part indicates that this e-mail was sent by

11:03:50  19   Ms. Morales at 4:37 a.m., correct?

11:03:54  20   A.    Correct.

11:03:54  21   Q.    That wasn't at 8:00 -- that was before 8:00 in the

11:03:58  22   morning, right?

11:03:59  23   A.    Yes.

11:03:59  24   Q.    Okay.  And the e-mail below that of June 6, 2011,

11:04:08  25   was at 7:55 p.m., correct?

| | | |
|---|---|---|
| 11:04:11 | 1 | A.   Correct. |
| 11:04:12 | 2 | Q.   And this was not -- this was work that you were |
| 11:04:16 | 3 | getting credit for, for your 40 hours a week, right? |
| 11:04:19 | 4 | A.   Correct. |
| 11:04:19 | 5 | Q.   And you would just put that in under the Deltek |
| 11:04:25 | 6 | system, you would just get credited for it during |
| 11:04:28 | 7 | 8:00 -- as part of your 8:00 to 5:00 hours, right? |
| 11:04:31 | 8 | A.   Correct.  I don't see anything wrong with, if I |
| 11:04:34 | 9 | wanted to submit -- if a report is late and we wanted to |
| 11:04:38 | 10 | get it in, I don't see what's the issue if I decide to |
| 11:04:42 | 11 | send it at that time.  But for that Deltek system, |
| 11:04:46 | 12 | 40 hours had to be in that Deltek system. |
| 11:04:49 | 13 | Q.   Right. |
| 11:04:49 | 14 | A.   Yes. |
| 11:04:50 | 15 | Q.   And so you weren't lying when you said, "I did |
| 11:04:54 | 16 | eight hours," even though you did it outside of 8:00 to |
| 11:04:56 | 17 | 5:00, right? |
| 11:04:57 | 18 | A.   Oh, no. |
| 11:04:58 | 19 | Q.   Okay. |
| 11:04:58 | 20 | A.   No. |
| 11:04:59 | 21 | Q.   And, for instance, if this were -- similarly, as |
| 11:05:03 | 22 | part of that time was spent on the weekend, just because |
| 11:05:06 | 23 | the system didn't allow you to put part of your |
| 11:05:09 | 24 | eight hours on the weekend, you still put eight hours |
| 11:05:12 | 25 | in, if you did all 40 hours, right, even if part of that |

11:05:16    1    was during the weekend, right?

11:05:17    2    A.    During week?

11:05:18    3    Q.    On the weekend?

11:05:19    4    A.    On the weekend, as long as I did my 40 hours during

11:05:22    5    the week, the extra hours on the weekend was voluntary.

11:05:26    6    Nothing was recorded into that Deltek system.

11:05:33    7    Q.    Now, you were -- your duties, number one -- first

11:05:49    8    of all, you were on St. Thomas this whole time, correct?

11:05:51    9          You only met with Ms. Morales face to face once a

11:05:55   10    month or once every other month; is that correct?

11:05:58   11    A.    Uhm-hmm.

11:05:59   12    Q.    You have to say yes or no.

11:06:01   13    A.    Yes.

11:06:02   14    Q.    Okay.  And that meeting would generally last about

11:06:05   15    15, 30 minutes; is that correct?

11:06:11   16    A.    When?  Over here?

11:06:12   17    Q.    Yeah.

11:06:13   18    A.    No.

11:06:13   19    Q.    How long did that meeting last?

11:06:15   20    A.    Usually when I come over, I meet with Ms. Morales,

11:06:17   21    and we usually stay there until the afternoon hours, and

11:06:20   22    then I take a flight back over to St. Thomas.

11:06:24   23    Q.    And with regard to your preparation of the reports,

11:06:30   24    you wouldn't do that with Ms. Morales, you would do that

11:06:33   25    by yourself, right?

| | | |
|---|---|---|
| 11:06:34 | 1 | A.   I did that in St. Thomas and I send it over to |
| 11:06:38 | 2 | Ms. Morales via e-mail for her to look over. |
| 11:06:40 | 3 | Q.   Okay.  And you weren't aware when she would, when |
| 11:06:44 | 4 | she would review your reports, were you? |
| 11:06:45 | 5 | A.   No. |
| 11:06:46 | 6 | Q.   Okay.  And you also indicated -- and so your -- you |
| 11:06:55 | 7 | would also do events with Ms. Morales, correct? |
| 11:07:01 | 8 | A.   Correct. |
| 11:07:02 | 9 | Q.   You participated -- and those, would you say the |
| 11:07:06 | 10 | majority of those events were over the weekend? |
| 11:07:09 | 11 | Correct? |
| 11:07:10 | 12 | A.   Correct. |
| 11:07:16 | 13 | Q.   You would communicate with Ms. Morales over the |
| 11:07:18 | 14 | phone, correct? |
| 11:07:19 | 15 | A.   Yes. |
| 11:07:19 | 16 | Q.   Those phone calls would usually be a couple minutes |
| 11:07:22 | 17 | long, wouldn't it? |
| 11:07:23 | 18 | A.   Yeah. |
| 11:07:37 | 19 | Q.   With respect to your -- who was your supervisor? |
| 11:07:39 | 20 | A.   My supervisor, as I saw it, it was Major Morales. |
| 11:07:43 | 21 | Q.   Okay.  But actually it was supposed to be |
| 11:07:45 | 22 | Mr. Hignite, correct? |
| 11:07:47 | 23 | A.   I wouldn't say that he was my direct supervisor. |
| 11:07:53 | 24 | He was basically the program manager for the contract. |
| 11:07:58 | 25 | Q.   Okay. |

11:07:58  1    A.    So I saw Major Morales more as my supervisor.

11:08:02  2    Q.    Okay.  Now, these weren't the only e-mails that you

11:08:05  3    had with Mrs. Morales, were they?

11:08:09  4    A.    No.

11:08:09  5    Q.    These are the only ones you submitted, right?

11:08:13  6    A.    I --

11:08:15  7    Q.    To the investigator?

11:08:16  8    A.    Uhm-hmm.  Yes.

11:08:17  9    Q.    Okay.  And now you're a member of the -- a

11:08:30  10   full-time employee of the National Guard?

11:08:32  11   A.    I'm the federal technician, correct.

11:08:34  12   Q.    And you work in St. Thomas?

11:08:36  13   A.    I work on St. Croix.

11:08:37  14   Q.    You work on St. Croix?

11:08:38  15   A.    Yes.

11:08:38  16   Q.    And how long have you been working that position?

11:08:40  17   A.    I started that position October of last year.

11:08:43  18   Q.    And who is your -- October of last year?

11:08:46  19   A.    Yes.

11:08:47  20   Q.    Okay.  And who is the TAG?

11:08:50  21   A.    The TAG is General Rivera.

11:08:54  22         MR. JUPITER:  No further questions.

11:08:55  23         THE COURT:  Any redirect?

11:08:57  24         MR. POTTER:  Yes, Judge.

11:09:04  25

REDIRECT EXAMINATION

BY MR. POTTER:

Q.   You indicated that Ms. Morales supervised -- was
your supervisor?

A.   Yes.  That's how I had her, as my supervisor, yes.

Q.   And what hours of the day would she supervise you?

A.   Not really to say she would supervise me.  She
would just say, "We have this to do," and she gave me
the assignment, I run with it and then present it to
her.  She makes whatever corrections or whatever, tell
me if it's good or not, and that's about it.

Q.   And you say there were sometimes that there were
events on the weekends?

A.   There were some events on the weekends, and that
was all voluntary.

Q.   And how often would that have been?

A.   That usually happens if there is like a unit
returning from deployment, if we have, say, yellow
ribbon.  There were some other events, but we had those
events during the week, so, if they didn't basically
interfere with our workweek.

Q.   And when you came to St. Thomas to meet with
Ms. Morales, where would you meet her?

A.   We would meet at the headquarters at VING.  This is
down at Four Corners.

| | | |
|---|---|---|
| 11:10:30 | 1 | Q.   And when you met her, how would she be dressed? |
| 11:10:32 | 2 | A.   She was in uniform. |
| 11:10:34 | 3 | Q.   Military uniform? |
| 11:10:36 | 4 | A.   Plaid V's, correct. |
| 11:10:43 | 5 | Q.   As an employee of the MPSC, do you wear a military |
| 11:10:48 | 6 | uniform? |
| 11:10:48 | 7 | A.   No.  I wear civilian clothes. |
| 11:10:59 | 8 | Q.   When you saw Ms. Morales in her military uniform, |
| 11:11:04 | 9 | did you ever ask her, "Why are you in military uniform?" |
| 11:11:08 | 10 | A.   No, not really.  Because -- |
| 11:11:12 | 11 |       THE COURT:  Wait for the next question. |
| 11:11:14 | 12 |       THE WITNESS:  Okay. |
| 11:11:30 | 13 | BY MR. POTTER: |
| 11:11:31 | 14 | Q.   In performing your function, did you speak to the |
| 11:11:35 | 15 | employers and employees on St. Croix, also? |
| 11:11:40 | 16 | A.   Major Morales, she, she more or less handled |
| 11:11:46 | 17 | St. Croix. |
| 11:11:56 | 18 | Q.   And finally, and when you were interviewed by |
| 11:12:03 | 19 | Mr. Hignite, and ultimately when you were hired, what, |
| 11:12:07 | 20 | if any -- did -- were there any discussions regarding |
| 11:12:11 | 21 | outside employment? |
| 11:12:14 | 22 | A.   Basically -- |
| 11:12:16 | 23 |       THE COURT:  Stop.  You're asking if she had |
| 11:12:18 | 24 | discussions with someone other than Mrs. Morales? |
| 11:12:22 | 25 |       MR. POTTER:  Correct, Judge. |

| | | |
|---|---|---|
| 11:12:24 | 1 | THE COURT:  All right.  Let's move on. |
| 11:12:35 | 2 | BY MR. POTTER: |
| 11:12:35 | 3 | Q.   When you were hired, did you have any discussions |
| 11:12:37 | 4 | with Mrs. Morales concerning outside employment? |
| 11:12:39 | 5 | A.   Only if we go over the 40 hours, it would be |
| 11:12:44 | 6 | considered voluntary. |
| 11:12:49 | 7 | Q.   And at the time that you worked with Morales, did |
| 11:12:56 | 8 | she ever tell you that she was also a full-time Guard |
| 11:13:00 | 9 | member? |
| 11:13:01 | 10 | A.   No. |
| 11:13:11 | 11 | Q.   And how long -- when did you ultimately -- I think |
| 11:13:18 | 12 | your testimony is you were hired in September? |
| 11:13:20 | 13 | A.   I was -- my official start date, October 4th, 2010. |
| 11:13:28 | 14 | Q.   And when you were hired in October, how long did |
| 11:13:30 | 15 | you work with Mrs. Morales? |
| 11:13:35 | 16 | A.   I worked with Major Morales through the ending of |
| 11:13:39 | 17 | July 2011. |
| 11:13:42 | 18 | MR. POTTER:  Court's indulgence, Judge? |
| 11:13:44 | 19 | THE COURT:  Yes. |
| 11:13:56 | 20 | (Pause) |
| 11:13:56 | 21 | MR. POTTER:  No further questions, Judge. |
| 11:13:58 | 22 | THE COURT:  All right. |
| 11:14:00 | 23 | Ms. Lescott, thank you for your testimony. |
| 11:14:03 | 24 | You may step down. |
| 11:14:03 | 25 | (Witness withdrew from stand.) |

11:14:05  1              THE COURT:  Next witness?

11:14:07  2              MR. POTTER:  The government calls Gina Galle.

11:14:12  3              MR. JUPITER:  Request permission to approach,

11:14:14  4      Your Honor?

11:14:14  5              THE COURT:  Not yet, thank you.

11:14:23  6              MR. JUPITER:  This is not one of the witnesses.

11:14:32  7      We object to this witness.  She is not on the witness

11:14:34  8      list.

11:14:34  9              THE COURT:  All right.

11:14:35  10         (Witness sworn.)

11:14:43  11             THE WITNESS:  I do.

11:14:45  12             THEREUPON, GINA GALLE, having been duly sworn,

11:14:46  13      was examined and testified as follows:

11:14:46  14                          DIRECT EXAMINATION

11:14:46  15      BY MR. POTTER:

11:14:47  16      Q.   Good afternoon.

11:14:47  17      A.   Good afternoon.

11:14:49  18      Q.   Can you give us your full name for the record?

11:14:51  19      A.    My name is Gina Galle.  Last name is spelled

11:14:58  20      G-a-l-l-e.

11:14:58  21      Q.   How are you employed?

11:15:00  22      A.    I'm employed by the U.S. Army, Criminal

11:15:03  23      Investigations Command, the Major Procurement Fraud

11:15:06  24      Unit.

11:15:06  25      Q.   And you're the agent on this case?

11:15:08  1    A.    That's correct.

11:15:09  2    Q.    And did you serve subpoenas --

11:15:13  3    A.    I did.

11:15:14  4    Q.    -- as a result of this case?

11:15:16  5         MR. POTTER:  Let me show you Government's

11:15:27  6    Exhibit 3a for identification purposes.

11:15:42  7         (Government's Exhibit 3a marked for

11:15:42  8    identification.)

11:15:45  9    BY MR. POTTER:

11:15:45  10   Q.    Can you tell us what Government's Exhibit 3a is?

11:15:51  11   A.    This is a business records declaration from the

11:15:54  12   Defense Finance and Accounting Services.

11:16:00  13   Q.    And how did you get that document?

11:16:02  14   A.    I requested it from Defense Finance and Accounting

11:16:06  15   Services to certify time sheets -- I'm sorry -- payroll

11:16:09  16   records that they had.

11:16:19  17   Q.    And does the document, Government's Exhibit 3a

11:16:23  18   accurately reflect -- is it an accurate representation

11:16:27  19   of the affidavit you received from the, from DFAS?

11:16:36  20   A.    Yes, it is.

11:16:40  21   Q.    Have there been any modifications or corrections to

11:16:43  22   it in any way?

11:16:44  23   A.    No.

11:16:47  24        MR. POTTER:  And Government's Exhibit 3.1 to

11:16:53  25   Government's Exhibit 3.30.

11:16:53  1          (Government's Exhibits 3.1 through 3.30 marked for

11:16:53  2     identification.)

11:16:57  3          THE WITNESS:  That's correct.

11:16:58  4     BY MR. POTTER:

11:16:58  5     Q.   What are those?

11:17:01  6     A.   This is the master pay history provided to me from

11:17:05  7     the Defense Finance and Accounting Services for

11:17:08  8     Sherrymae Morales, beginning March 13th, 2010.

11:17:17  9     Q.   And do those exhibits accurately reflect the

11:17:20  10    documents that you received from DFAS with respect to

11:17:23  11    your subpoena?

11:17:24  12    A.   They do.

11:17:27  13          MR. POTTER:  Your Honor, we move for the

11:17:28  14    admission of Government's Exhibit 3a, and 3.1 through

11:17:37  15    3.30.

11:17:38  16          THE COURT:  Attorney Jupiter?

11:17:40  17          MR. JUPITER:  Your Honor, no objection to 3a.

11:17:45  18    We object to 3.29 through 3.30.  That is

11:17:56  19    irrelevant, improper -- no foundation.

11:18:00  20          And we object to the records for the periods

11:18:15  21    between June 30th, 2010, and September 27th, 2010, as

11:18:32  22    improper foundation -- I'm sorry -- as irrelevant and

11:18:45  23    improper foundation.

11:18:47  24          THE COURT:  You say from June 30th, 2010, until

11:18:51  25    what period?

| | | |
|---|---|---|
| 11:18:52 | 1 | THE WITNESS:  September 27th, 2010. |
| 11:19:07 | 2 | THE COURT:  So that would be 3.9 and 3.10? |
| 11:19:22 | 3 | MR. JUPITER:  That would be 3.9, 3.10. |
| 11:19:32 | 4 | THE COURT:  In addition to 3.29 and 3.30; is |
| 11:19:37 | 5 | that right? |
| 11:19:38 | 6 | MR. JUPITER:  Yes, Your Honor. |
| 11:19:40 | 7 | THE COURT:  All right.  3.9, 3.10, 3.29, 3.30 |
| 11:19:47 | 8 | are under advisement. |
| 11:19:49 | 9 | The rest are admitted. |
| 11:20:03 | 10 | Let me see counsel briefly at sidebar. |
| 11:20:17 | 11 | THE COURT:  Okay.  3.9 and 3.10, does that |
| 11:20:21 | 12 | cover a period when she wasn't with the Guard? |
| 11:20:30 | 13 | MR. POTTER:  It's a period when she -- oh, I'm |
| 11:20:34 | 14 | sorry. |
| 11:20:34 | 15 | (Pause.) |
| 11:20:38 | 16 | She had left the Guard, but the pay still reflects |
| 11:20:42 | 17 | pay that she received from the Guard for her period of |
| 11:20:45 | 18 | employment. |
| 11:20:46 | 19 | THE COURT:  Okay.  What about 3.29 and 3.30? |
| 11:20:49 | 20 | MR. POTTER:  Same thing, Your Honor.  It |
| 11:20:51 | 21 | reflects pay that she received from the Guard for her |
| 11:20:57 | 22 | employment. |
| 11:20:57 | 23 | THE COURT:  Okay.  You're saying your client |
| 11:20:59 | 24 | didn't receive pay for those periods? |
| 11:21:02 | 25 | MR. JUPITER:  No.  She received for -- |

11:21:04   1          THE COURT:  For pay period --

11:21:05   2          MR. JUPITER:  For the last ones?  Which pay

11:21:08   3   period are you talking about?

11:21:09   4          THE COURT:  3.9, July 3rd, 2010, and July 17th,

11:21:14   5   2010.

11:21:14   6          MR. JUPITER:  Your Honor, this is a period

11:21:17   7   that, where she was MPSC-- she was not employed with

11:21:21   8   MPSC.

11:21:22   9          THE COURT:  Okay.

11:21:23   10          MR. JUPITER:  And the other --

11:21:28   11          THE COURT:  And the severance one, you have

11:21:30   12   issue with.

11:21:32   13          MR. JUPITER:  The severance, yes, Your Honor.

11:21:34   14          THE COURT:  All right.  I'm going to allow 3.9,

11:21:37   15   3.10, 3.29, 3.30.  I think defense's argument goes to

11:21:41   16   weight, not admissibility, at this point, given the

11:21:44   17   government's proffer.

11:21:45   18      All right.  Thank you.

11:21:46   19          MR. JUPITER:  Okay.

11:21:48   20      (End sidebar discussion, open court as follows:)

11:21:35   21      (Government's Exhibits 3a, 3.1 through 3.30

11:21:53   22   admitted into evidence.)

11:21:53   23          THE COURT:  All right.  Anything else for this

11:21:55   24   witness?

11:21:56   25          MR. POTTER:  Yes, Judge.

11:22:06   1        Agent Galle, let me show you what's been marked

11:22:10   2   Government's Exhibit 5a for identification.

11:22:10   3        (Government's Exhibit 5a marked for

11:22:10   4   identification.)

11:22:10   5   BY MR. POTTER:

11:22:17   6   Q.   Do you recognize that?

11:22:18   7   A.   I do.

11:22:19   8   Q.   Tell us what that is.

11:22:21   9   A.   This is a business records declaration from the

11:22:26  10   Military Personnel Services Corporation for records I

11:22:28  11   obtained from them.

11:22:29  12   Q.   And did you serve a subpoena on them?

11:22:33  13   A.   They voluntarily provided the records.

11:22:35  14   Q.   And these -- Government's Exhibit 5.a, does it

11:22:43  15   accurately reflect -- and is it an accurate

11:22:47  16   representation of the document that you received from

11:22:50  17   the MPSC--

11:22:55  18   A.   Yes.

11:22:56  19   Q.   -- for documents?

11:23:01  20        MR. POTTER:  And Government's Exhibit 5.1

11:23:08  21   through 5.6.  And Government's Exhibit 6.1 through 6.28.

11:23:29  22   And then Government's Exhibit 7.1 and 7.2.

11:23:29  23        (Government's Exhibits 5.1 through 5.6, 6.1 through

11:23:29  24   6.28, 7.1, 7.2, marked for identification.)

11:23:29  25

11:23:29    1    BY MR. POTTER:

11:23:37    2    Q.   Are those documents that you received with respect

11:23:39    3    to the request that you made from the MPSC?

11:23:45    4    A.   Yes.

11:23:49    5    Q.   And are those documents reflected on the

11:23:51    6    certification that you received from MPSC, Government's

11:23:56    7    Exhibit 5a?

11:23:57    8    A.   They are.

11:24:12    9    Q.   And do the records accurately reflect the documents

11:24:14   10    that you received?

11:24:14   11    A.   They do.

11:24:15   12    Q.   Do you have any indication that they have been

11:24:17   13    altered, modified or changed in any way?

11:24:20   14    A.   No.

11:24:27   15    Q.   And with respect to Government's Exhibit 5a, is

11:24:30   16    that the extent of the documents that you received from

11:24:35   17    MPSC?

11:24:38   18    A.   Yes.

11:24:40   19          MR. POTTER:  Your Honor, we move for the

11:24:41   20    admissions of Government's Exhibit 5a -- sorry -- 5a,

11:24:52   21    5.1 to 5.6, 6.1 to 6.28, and 7.1 and 7.2.

11:25:23   22          THE COURT:  Attorney Jupiter?

11:25:24   23          MR. JUPITER:  Your Honor, we object to

11:25:29   24    Government's Exhibit 3 -- we do not object to

11:25:37   25    Government's Exhibit 5a, but we do object to it through

```
11:25:44   1    this witness, Your Honor.
11:25:45   2         We object to it.  It's not proper foundation.  We
11:25:49   3    object to the records in regard to relevance and with
11:25:54   4    regard to 403.
11:26:03   5         We have -- with respect to 5.6, and we have a Rule
11:26:13   6    16 objection.
11:26:16   7         With respect to 5.4, we object with regard to
11:26:22   8    relevance.  And we have a general objection with regard
11:26:38   9    to authentication of all of the records.
11:26:58  10              THE COURT:  Enlarge 5a.
11:27:00  11              MR. POTTER:  I didn't hear the question, Judge.
11:27:02  12              THE COURT:  Enlarge 5a.
11:29:39  13         All right.  6.23, 6.28 are admitted.
11:29:47  14         7.1 and 7.2 are under advisement.
11:30:00  15         Let me see 5.6.
11:30:06  16         (Government's Exhibit 6.23, 6.28 admitted into
11:30:18  17    evidence.)
11:30:18  18              THE COURT:  And the same issues with all of
11:30:20  19    this.  They're all small so...
11:31:13  20         All right.  I believe 5.2 is already in.  Is that
11:31:37  21    not already admitted?
11:31:51  22         All right.  5a.  5.1.  5.2 is already in.  5a and
11:31:58  23    5.1 are admitted.  5.3 and 5.4 and 5.6 are under
11:32:13  24    advisement.
11:32:16  25         5.5, put that on the screen, please.
```

11:33:32   1          All right.   5.5 is admitted also.

11:33:35   2          (Government's Exhibits 5a, 5.1, 5.5 admitted into

11:33:41   3     evidence.)

11:33:41   4          Anything else for this witness?

11:33:45   5              MR. POTTER:  No, Your Honor.

11:33:45   6              THE COURT:  Attorney Jupiter?

11:33:55   7              MR. JUPITER:  No, Your Honor.

11:33:56   8              THE COURT:  Ms. Galle, thank you for your

11:33:58   9     testimony.

11:33:58   10         You may step down.

11:33:58   11         (Witness withdrew from stand.)

11:34:00   12             THE COURT:  Next witness?

11:34:06   13             MR. POTTER:  I think that concludes the

11:34:08   14    government's case, Your Honor.

11:34:09   15         The government rests.

11:34:10   16             THE COURT:  Ladies and gentlemen, the

11:34:10   17    government rests.  That means that all the evidence in

11:34:13   18    this government's case-in-chief is now before you.

11:34:15   19         There's a brief matter I need to tend to, and then

11:34:18   20    we'll resume.

11:34:19   21         Let me see counsel at sidebar.

11:34:43   22         (Sidebar discussion held as follows:)

11:34:44   23             RULE 29 MOTION BY THE DEFENDANT

11:34:44   24             THE COURT:  Attorney Jupiter, you want to be

11:34:46   25    heard?

11:34:47   1                MR. JUPITER:  Yes, Your Honor.

11:34:48   2         At this time, pursuant to Rule 29 of the Federal

11:34:52   3   Rules of Evidence -- sorry -- Rule 29 of the Federal

11:34:56   4   Rules of Criminal Procedure, we ask for a motion of

11:34:58   5   dismissal as to all counts of the indictment.

11:35:04   6         With respect to counts 1 and 2 of the indictment,

11:35:12   7   they charge violations of 18 United States Code, Section

11:35:16   8   666, embezzlement of public money.

11:35:20   9         We, first of all, would reurge our motion to

11:35:26  10   dismiss those counts because these -- especially after

11:35:30  11   the testimony in this case, that Mrs. Morales was hired

11:35:34  12   to be a technician.

11:35:36  13         This was a hiring process that took place.  She

11:35:41  14   applied for the position through the regular course of

11:35:46  15   how someone would be hired for the position.  And she

11:35:50  16   was hired based on her qualifications.  In fact, she was

11:35:55  17   the only applicant who was qualified.

11:35:59  18         There was also testimony that she performed her job

11:36:03  19   very well.

11:36:04  20         There was also testimony that she worked -- in

11:36:08  21   fact, Colonel Lewis, the government's witness, testified

11:36:11  22   that she worked far more than 80 hours, and at the time

11:36:16  23   that she went working was time that was spent working on

11:36:20  24   this government work.

11:36:21  25         The government has not shown that this is anything

| | | |
|---|---|---|
| 11:36:26 | 1 | other than payment for a salary. |
| 11:36:29 | 2 | This particular, under 18 USC, Section 666(c), |
| 11:36:39 | 3 | these two counts, when there's a bona fide salary as to |
| 11:36:47 | 4 | make up the amount, both thresholds with regard to the |
| 11:36:52 | 5 | program, the government program, as well as the amount |
| 11:36:54 | 6 | in controversy, excluded from that amount, is anything |
| 11:36:58 | 7 | of a bona fide salary. |
| 11:37:01 | 8 | So for those reasons and more we would ask for the |
| 11:37:07 | 9 | dismissal of those two counts. |
| 11:37:08 | 10 | We further ask for dismissal of those counts |
| 11:37:10 | 11 | because -- as well as all other counts, because there's |
| 11:37:14 | 12 | been no showing that Mrs. Morales obtained these, |
| 11:37:19 | 13 | obtained -- committed, oh -- I'm sorry -- committed |
| 11:37:25 | 14 | these offenses with any intent to defraud. |
| 11:37:27 | 15 | That would go, I believe, to all of the counts, but |
| 11:37:30 | 16 | particularly it would go to Counts 3 to -- although the |
| 11:37:34 | 17 | wire fraud counts would be Counts 3 through 36. |
| 11:37:38 | 18 | With respect to that, the government has to prove, |
| 11:37:41 | 19 | among other things, that there was a specific intent to |
| 11:37:45 | 20 | defraud.  The defendant in this case, throughout -- |
| 11:37:49 | 21 | through government's witnesses, the government spent a |
| 11:37:52 | 22 | great deal of time bringing in testimony regarding |
| 11:37:57 | 23 | Mrs. Morales's work with MPSC. |
| 11:38:00 | 24 | We would ask that the Court would note that in |
| 11:38:03 | 25 | response to his bill of particulars, the government has |

11:38:06  1    stated that the victim in this case is the Virgin

11:38:09  2    Islands National Guard.

11:38:10  3         We would also indicate -- that was also indicated

11:38:13  4    in the indictment.

11:38:16  5         We also reurge the fact that in the indictment, the

11:38:20  6    government has not named what material misrepresentation

11:38:31  7    that they are relying on in this scheme to defraud.  The

11:38:35  8    government says that the scheme to defraud began in

11:38:40  9    March or April of 2010, when Ms. Morales took the

11:38:47  10   military technician job.

11:38:51  11        The government's witness, Baron Hignite, indicated

11:38:56  12   that Mrs. Morales indicated at that time that she was

11:39:00  13   taking the military technician job in March of 2010.

11:39:09  14   And this would be consistent with someone who has

11:39:14  15   innocent intent.

11:39:16  16        The -- further, there's information showing that

11:39:21  17   there's no, there's no -- the Court cannot, I guess,

11:39:29  18   measure what the government is going on with respect to

11:39:34  19   the material misrepresentation, based on what's in the

11:39:40  20   indictment, because there was no material

11:39:43  21   misrepresentation named in the indictment.

11:39:46  22        Further, the indictment didn't indicate the

11:39:48  23   government was going to proceed or the grand jury

11:39:49  24   indicted on any type of material omission.

11:39:53  25        So the Court should not -- that should not enter

11:39:56   1       into the Court's analysis, because for Counts 3 through

11:39:59   2       36 there is -- the government obviously was not going

11:40:05   3       forward on material omission.

11:40:07   4             So any testimony about Mrs. Morales failing,

11:40:11   5       omitting something, some type of information, should not

11:40:13   6       be considered.

11:40:16   7             With respect to causing the wire to be made, this

11:40:23   8       goes with respect to the, Counts 3 through 36 as well as

11:40:31   9       Counts 37 and 38.

11:40:33   10            The testimony from Ms. Lobbenmeier indicated that

11:40:47   11      the employee has no role in the submission of the

11:40:50   12      documents regarding the documents with regarding to time

11:40:57   13      sheets.  So certainly Counts 37 and 38 should be

11:41:04   14      dismissed, because Mrs. Morales, in terms of time sheet

11:41:09   15      for payment, plays no role in that.  That is done -- she

11:41:13   16      doesn't even get a copy of it.

11:41:20   17            So the exhibits that the government submitted has

11:41:22   18      no relationship to anything that she did or caused to be

11:41:25   19      done, as the government's witness clearly establishes.

11:41:33   20                  THE COURT:  Okay.  Thank you.

11:41:34   21            Attorney Potter, what's your position in response

11:41:37   22      to Counts 37 and 38?

11:41:47   23                  MR. POTTER:  With respect to those counts, Your

11:41:48   24      Honor, the defendant -- viewing the evidence in the

11:41:52   25      light most favorable to the government, the defendant

11:41:58  1    signed her leave slips, which are attached to the time

11:42:02  2    sheets, and she submitted those documents for payment.

11:42:06  3    And that alone is sufficient -- if nothing else, that

11:42:12  4    alone is sufficient for the charge to be sustained, Your

11:42:20  5    Honor.

11:42:20  6        She also wired -- the system at the V.I. National

11:42:26  7    Guard appears to be a solely electronic-generated

11:42:33  8    system.  The supervisor affirmed that the person worked,

11:42:39  9    and those time sheets were submitted on behalf of the

11:42:44  10   defendant.

11:42:46  11       I think that's sufficient.  The documents were

11:42:49  12   submitted on behalf of the defendant.  She didn't

11:42:52  13   object.  She didn't say, "Wait, no.  I didn't, I

11:42:55  14   didn't -- I don't deserve it.  I didn't earn that."

11:42:59  15       She affirmed it when the documents were submitted

11:43:03  16   by her supervisor for payment, and she received those

11:43:06  17   payments.  And if -- and she knows when she received

11:43:10  18   that money, when she accepted that money, that would

11:43:13  19   have been a false document that caused her to be paid.

11:43:16  20           THE COURT:  All right.  At this stage, the

11:43:18  21   Court is required to view the evidence in the light

11:43:21  22   most --

11:43:21  23           MR. JUPITER:  Your Honor, can I respond --

11:43:22  24           THE COURT:  -- favorable to the government --

11:43:24  25           MR. JUPITER:  I wasn't finished my argument

11:43:27  1   with respect to all of the counts.

11:43:31  2        Your Honor, with respect to the counts regarding

11:43:38  3   Counts Thirty- --

11:43:38  4        THE COURT:  I thought you did.  You said that

11:43:41  5   with respect to 37 and 38, you added that in with 36,

11:43:46  6   didn't you?

11:43:47  7        You have more to add on 37 and 38?

11:43:50  8        MR. JUPITER:  No, I have more to add with

11:43:51  9   respect to the severance counts, the counts that relate

11:43:54  10  to severance pay.

11:43:55  11       There's been no foundation by the government

11:43:57  12  showing that the severance pay is in any way related to

11:44:01  13  this so-called scheme to defraud, because there's been

11:44:06  14  no attachments to what that severance pay is based on.

11:44:08  15       Further, they are counts -- the counts that relate

11:44:10  16  to payments made between June 30th and September 27th

11:44:17  17  are, if -- are counts that relate to the time period

11:44:25  18  when she wasn't working at MPSC.

11:44:29  19       THE COURT:  All right.

11:44:30  20       Before the Court is the defense motion for Rule 29

11:44:32  21  relief.  The Court is required to view the evidence in

11:44:34  22  the light most favorable to the government and give the

11:44:36  23  government all favorable inferences.

11:44:38  24       Using that standard, the Court finds that the

11:44:46  25  offenses alleged from Counts 1 through 36, those counts

| | | |
|---|---|---|
| 11:44:50 | 1 | will survive Rule 29 scrutiny.  And so the petition is |
| 11:44:54 | 2 | denied with respect to those counts. |
| 11:44:56 | 3 | With respect to Counts 37 and 38, the Court will |
| 11:44:59 | 4 | grant the defense petition for Rule 29 relief. |
| 11:45:03 | 5 | All right.  Thank you, Counsel. |
| 11:45:05 | 6 | MR. JUPITER:  I didn't hear what you said; the |
| 11:45:06 | 7 | last two. |
| 11:45:07 | 8 | THE COURT:  I granted your petition on the last |
| 11:45:09 | 9 | two. |
| 11:45:09 | 10 | Now, Attorney Jupiter, as I informed you, my |
| 11:45:16 | 11 | typical practice is to tell the jury that the defense |
| 11:45:19 | 12 | has no burden to present any evidence.  Even so, to the |
| 11:45:25 | 13 | extent defense wishes to present any matters to them, we |
| 11:45:28 | 14 | do so.  That's what I'm going to do.  Then I'll turn to |
| 11:45:31 | 15 | you and ask if you have anything to present. |
| 11:45:34 | 16 | MR. JUPITER:  Can I get two minutes, Your |
| 11:45:39 | 17 | Honor, to look at my witness and see where my witnesses |
| 11:45:43 | 18 | are? |
| 11:45:44 | 19 | THE COURT:  You can have your paralegal do |
| 11:45:48 | 20 | that.  Two minutes.  It's hard to herd everyone after we |
| 11:45:51 | 21 | break, so... |
| 11:45:53 | 22 | (End sidebar discussion, open court as follows:) |
| 11:46:57 | 23 | MR. JUPITER:  Your Honor -- |
| 11:47:00 | 24 | THE COURT:  Yes? |
| 11:47:03 | 25 | MR. JUPITER:  -- can she use the bathroom? |

| | | |
|---|---|---|
| 11:47:04 | 1 | THE COURT:  Yes. |
| 11:47:07 | 2 | (Defendant not present.) |
| 11:47:51 | 3 | THE COURT:  Let me see counsel briefly at |
| 11:47:53 | 4 | sidebar. |
| 11:48:04 | 5 | (Sidebar discussion held as follows:) |
| 11:48:04 | 6 | THE COURT:  Attorney Jupiter, does your client |
| 11:48:07 | 7 | give permission to at least proceed with the preliminary |
| 11:48:10 | 8 | part, that you don't have to put on a case, while she's |
| 11:48:13 | 9 | not here? |
| 11:48:15 | 10 | MR. JUPITER:  I -- |
| 11:48:17 | 11 | THE COURT:  If she didn't, we'll just -- |
| 11:48:19 | 12 | MR. JUPITER:  She didn't. |
| 11:48:20 | 13 | THE COURT:  Okay.  Then hopefully she'll be |
| 11:48:29 | 14 | back shortly, so we can resume in her presence. |
| 11:50:15 | 15 | (Pause.) |
| 11:50:15 | 16 | (Defendant present.) |
| 11:50:17 | 17 | THE COURT:  Attorney Jupiter, your client is in |
| 11:50:21 | 18 | court? |
| 11:50:21 | 19 | MR. JUPITER:  Yes, sir. |
| 11:50:21 | 20 | THE COURT:  Very good. |
| 11:50:22 | 21 | Ladies and gentlemen, the government has rested. |
| 11:50:25 | 22 | That means all the evidence in the government's case is |
| 11:50:27 | 23 | now before you. |
| 11:50:28 | 24 | You may recall that the government has the burden |
| 11:50:30 | 25 | in a criminal case.  The government always has the |

| | | |
|---|---|---|
| 11:50:32 | 1 | burden.  It never shifts. |
| 11:50:33 | 2 | That is, the defense never has to present any |
| 11:50:36 | 3 | evidence or any testimony for you during the course of |
| 11:50:42 | 4 | the case.  That is because the burden is on the |
| 11:50:44 | 5 | government. |
| 11:50:45 | 6 | Even though we give defense an opportunity, if the |
| 11:50:47 | 7 | defense chooses to, to present any matters for your |
| 11:50:51 | 8 | consideration, this does not switch -- the burden does |
| 11:50:54 | 9 | not shift.  The burden still remains with the |
| 11:50:57 | 10 | government. |
| 11:50:57 | 11 | Okay.  Having said that... |
| 11:50:59 | 12 | Attorney Jupiter? |
| 11:51:00 | 13 | MR. JUPITER:  Thank you, Your Honor.  Your |
| 11:51:01 | 14 | Honor, we call Captain Wanda Williams. |
| 11:51:24 | 15 | THE CLERK:  Please stand and raise your right |
| 11:51:25 | 16 | hand to take the oath. |
| 11:51:30 | 17 | (Witness sworn.) |
| 11:51:31 | 18 | THE WITNESS:  I do. |
| 11:51:32 | 19 | THEREUPON, WANDA WILLIAMS, having been duly |
| 11:51:40 | 20 | sworn, was examined and testified as follows: |
| 11:51:40 | 21 | DIRECT EXAMINATION |
| 11:51:41 | 22 | BY MR. JUPITER: |
| 11:51:41 | 23 | Q.   Good morning. |
| 11:51:41 | 24 | A.   Good morning, sir. |
| 11:51:42 | 25 | Q.   Could you tell us your name? |

| | | |
|---|---|---|
| 11:51:43 | 1 | A.   Captain Wanda Williams. |
| 11:51:45 | 2 | Q.   And Captain Wanda Williams, where are you employed? |
| 11:51:47 | 3 | A.   Say that again. |
| 11:51:48 | 4 | Q.   Where do you work? |
| 11:51:49 | 5 | A.   Virgin Islands Army National Guard. |
| 11:51:50 | 6 | Q.   And are you a member of the Army National Guard? |
| 11:51:53 | 7 | A.   Yes, sir. |
| 11:51:53 | 8 | Q.   And what is your rank? |
| 11:51:55 | 9 | A.   I'm a captain. |
| 11:51:56 | 10 | Q.   And what do you do? |
| 11:51:57 | 11 | A.   Currently, I'm the force integration readiness |
| 11:52:00 | 12 | officer. |
| 11:52:01 | 13 | Q.   How long have you been in the Guard? |
| 11:52:04 | 14 | A.   I've been in the Guard since December of 1997. |
| 11:52:07 | 15 | Q.   And during -- in 2007, where were you? |
| 11:52:14 | 16 | A.   I was here -- I was in Puerto Rico, assigned at |
| 11:52:21 | 17 | MEPS, San Juan MEPS. |
| 11:52:22 | 18 | Q.   What's MEPS? |
| 11:52:23 | 19 | A.   Military Entrance Processing Station. |
| 11:52:25 | 20 | Q.   Do you know Sherrymae Morales? |
| 11:52:27 | 21 | A.   Yes, I do. |
| 11:52:27 | 22 | Q.   Do you see her in court today? |
| 11:52:29 | 23 | A.   Yes, I do. |
| 11:52:29 | 24 | Q.   Can you point her out? |
| 11:52:30 | 25 | A.   She's right there (indicating). |

11:52:31  1    Q.   And Mrs. Morales -- how long you have known

11:52:34  2    Mrs. Morales?

11:52:35  3    A.   I've known her for quite a while.  She's familiar

11:52:38  4    to me through my mother.  She worked with my mother.  My

11:52:42  5    mother worked at the Superior Court -- that's now the

11:52:46  6    Superior Court.  She worked at the Territorial Court.

11:52:49  7    I've known her for quite a while.

11:52:51  8    Q.   Did there come a time when you came to work -- you

11:52:54  9    came to leave Puerto Rico?

11:52:56  10   A.   Yes, I did.

11:52:57  11   Q.   Okay.  And what did you -- what were you -- where

11:53:02  12   did you go?

11:53:02  13   A.   When I left San Juan as the MEPS guidance

11:53:05  14   counselor, I came back to St. Croix, reassigned to

11:53:09  15   St. Croix at the joint forces headquarters, where I

11:53:12  16   transitioned from an enlisted soldier to an officer, and

11:53:17  17   I was assigned as the officer branch chief for the

11:53:20  18   Virgin Islands National Guard.

11:53:20  19   Q.   The officer branch chief?

11:53:21  20   A.   Yes, sir.

11:53:22  21   Q.   What were your duties as officer branch chief?

11:53:24  22   A.   My responsibility was to manage and maintain all

11:53:26  23   officer records for the Virgin Islands National Guard.

11:53:28  24   Q.   Okay.  And what year was this?

11:53:32  25   A.   This was in 2009.  I was commissioned in 2008.

11:53:37   1    Q.   Okay.  What, if any, role -- well, let me ask you,

11:53:42   2    did you come into contact with Ms. Morales in terms of,

11:53:45   3    at the Virgin Islands National Guard after you returned?

11:53:48   4    A.   Yes, I did.

11:53:49   5    Q.   And was that in 2009?

11:53:52   6    A.   Yes, I did.

11:53:52   7    Q.   Okay.  And what was she doing at that time?

11:53:54   8    A.   She was the ESGR person.  I saw her at the

11:54:01   9    headquarters building.  And somewhere thereabouts,

11:54:05  10    towards the later part of that year, she was getting

11:54:08  11    ready to transition back into the Guard.  She's a former

11:54:12  12    Guard member at that time.

11:54:17  13    Q.   Okay.  Now are you familiar with regard to what the

11:54:22  14    ESGR person does?

11:54:23  15    A.   Yes.

11:54:23  16    Q.   How are you familiar with that?

11:54:25  17    A.   A former recruiter, that's what I did for

11:54:27  18    eight years for the Guard.  Part of my job was to be

11:54:30  19    familiar with the ESGR program and its requirements, so

11:54:33  20    that I can further advise or assist soldiers in terms

11:54:37  21    of, if they had any type of employer conflicts or any

11:54:41  22    issues in terms of the military service duties.

11:54:45  23    Q.   Okay.  Now when you came to work, came back and she

11:54:48  24    was in the ESGR position, was she stationed -- where did

11:54:52  25    she do her work, if you knew?

11:54:54  1    A.    At Mahogany Realty, down the street from the

11:54:57  2    headquarters building in Princess.

11:55:00  3    Q.    Okay.  And when you -- did you have occasion to

11:55:04  4    visit her over there, over that time period?

11:55:07  5    A.    I believe I did, once or twice at the office, just

11:55:10  6    stopping by, or I would go to lunch in that area,

11:55:13  7    because there's a restaurant right next door.  Then I

11:55:15  8    would stop in.

11:55:16  9    Q.    Did there come a time when she was -- became

11:55:20  10   employed in another position at the Virgin Islands

11:55:23  11   National Guard?

11:55:24  12   A.    Yes, she did, sir.

11:55:25  13   Q.    And around when -- when was that?

11:55:27  14   A.    Sometime in 2010, I believe she was reappointed

11:55:35  15   into the Army National Guard as a traditional soldier.

11:55:38  16   And then she obtained full-time employment as a -- we

11:55:42  17   call it the G5, where she worked as the strategic plans

11:55:48  18   and initiative officer.

11:55:50  19   Q.    In regard to her role as the ESGR person, did you

11:55:53  20   see her continue to perform her duties as the ESGR

11:55:58  21   contractor?

11:55:58  22   A.    At one point she was.  But I know there was a lull

11:56:02  23   because she had gotten employment with the Guard.  So I

11:56:09  24   guess she was transitioning out.  And I also knew

11:56:12  25   because she -- there was an advertisement put out to

11:56:18  1    hire an ESGR person.

11:56:21  2    Q.   Was she hired -- okay.  Not getting to that part

11:56:24  3    yet, but in terms of when she became employed at the

11:56:29  4    Guard, did she continue to do her ESGR duties?

11:56:38  5    A.   Yes.

11:56:40  6              MR. POTTER:  Objection, Your Honor.

11:56:40  7              THE COURT:  Sustained.

11:56:41  8    BY MR. JUPITER:

11:56:41  9    Q.   Now after she was hired -- what was she hired as at

11:56:46  10   the Guard?

11:56:46  11   A.   Strategics and initiative plans officer.  That's

11:56:50  12   her title.

11:56:51  13   Q.   Where was your office located with respect to her?

11:56:54  14   A.   It was on the other side of the building.

11:56:57  15        Her office was -- if you're entering from the

11:57:04  16   outside of the building, her office was on the outside

11:57:06  17   and my office as closer to -- there was a restaurant

11:57:11  18   once by the headquarters building at Five Corners.

11:57:14  19   Q.   And how long -- well, let me ask you this:  Would

11:57:17  20   you be aware of how late she would work?

11:57:19  21   A.   Yes, sir.

11:57:19  22   Q.   How long would she be there till?

11:57:21  23   A.   Sometimes till 8:00, 9:00 at night.

11:57:25  24   Q.   How do you know that?

11:57:25  25   A.   Because I was there until 8:00, 9:00 at night.

11:57:28  1    Q.   And with respect to her, you said prior to that you

11:57:33  2    were familiar with her.  After she was hired?

11:57:37  3    A.   Yes.

11:57:38  4    Q.   Okay.  With respect to the ESGR position, did she

11:57:44  5    continue to hold that position?

11:57:45  6    A.   Yes, she did.

11:57:47  7    Q.   And how do you know she continued to hold that

11:57:49  8    position?

11:57:49  9    A.   She would, from time to time -- I was also -- I was

11:57:52  10   the branch chief, but I was also like assistant to the

11:57:55  11   personnel, director of personnel.

11:58:00  12        So from time to time my boss was not able to attend

11:58:04  13   staff meetings, I would go in and brief or represent her

11:58:06  14   at whatever meetings, or him, whoever it was at the

11:58:09  15   time.

11:58:09  16        And she would be in there.  And depending on what

11:58:13  17   status she was in, she would be in there briefing on

11:58:18  18   ESGR.

11:58:19  19   Q.   Okay.  Now talking about these briefings, are these

11:58:22  20   the briefings -- this is during 2010.  Who was the chief

11:58:26  21   joint staff at that time?

11:58:28  22   A.   I want to say it was George, Kelvin George.  And

11:58:36  23   they transitioned into Elton Lewis, Colonel Lewis.

11:58:39  24   Q.   Okay.  And when would these staff meetings occur?

11:58:43  25   A.   Every Tuesday at 8:30.

11:58:45   1    Q.   All right.  And what would -- what areas would

11:58:51   2    Ms. Morales brief on?

11:58:54   3    A.   She would brief on the G5, which is the position

11:58:57   4    that she held as a technician.  And I have heard her

11:59:00   5    brief on ESGR matters.

11:59:04   6    Q.   Now, with respect to whether or not -- while she

11:59:07   7    had the military tech position, who was her supervisor?

11:59:18   8    A.   As far as the military technician position?

11:59:21   9    Q.   Yes.

11:59:21   10   A.   The full-time post is managed by the chief of

11:59:25   11   staff, whoever that was at that time.

11:59:38   12   Q.   Would you -- during this time period after she was

11:59:44   13   hired as a military tech position, were you familiar

11:59:49   14   with any other ESGR work she continued to do?

11:59:52   15   A.   Yes.  I took part in a bus lift event that took

11:59:59   16   place in San Juan, Puerto Rico, Camp Salinas -- Camp

12:00:04   17   Santiago in Salinas, Puerto Rico.

12:00:07   18        And then there was also an event over there at The

12:00:10   19   Palms, I think that's what it's called now, where she

12:00:12   20   had an employer, I guess, appreciation luncheon.

12:00:17   21   Q.   Okay.  And your understanding was she was

12:00:21   22   holding --

12:00:24   23        MR. POTTER:  Objection, Your Honor.  Leading.

12:00:25   24        THE COURT:  Sustained.

12:00:28   25

12:00:28  1    BY MR. JUPITER:

12:00:29  2    Q.   What was your understanding with regard to her role

12:00:33  3    as ESGR?

12:00:34  4    A.   She was still participating in that program and

12:00:36  5    still functioning as the ESGR rep.

12:00:40  6             MR. JUPITER:  I tender the witness, Your Honor.

12:00:41  7             THE COURT:  Attorney Potter?

12:00:44  8                     CROSS-EXAMINATION

12:00:44  9    BY MR. POTTER:

12:00:51  10   Q.   Good morning, Captain.

12:00:51  11   A.   Good morning, sir.

12:00:59  12   Q.   The time frame that you are referencing in your

12:01:02  13   testimony, what time frame is it?

12:01:05  14   A.   Which time frame?

12:01:07  15   Q.   Yes.  When you testified that she's performing ESGR

12:01:13  16   functions as well as military tech functions?

12:01:16  17   A.   Yes.

12:01:17  18   Q.   What time frame is she doing this?

12:01:19  19   A.   That was, had to be between 2010 -- because I came

12:01:23  20   from Puerto Rico in 2009.  So anywhere between late

12:01:28  21   2009, when I came back from my officer basic course, all

12:01:32  22   the way up until 2010 time frame.

12:01:37  23   Q.   And she never told you that she was being paid for

12:01:41  24   both positions, did she?

12:01:44  25   A.   I don't think we've ever had that kind of

12:01:48  1   discussion.

12:01:55  2   Q.   Is it unusual for individuals who performed ESGR

12:02:01  3   functions within the Guard to at times volunteer to

12:02:05  4   perform certain activities?

12:02:07  5   A.   I don't understand your question.

12:02:09  6        THE COURT:  Are you asking the witness for an

12:02:11  7   opinion?  Or just testify on facts, since she's a fact

12:02:18  8   witness?

12:02:20  9        MR. POTTER:  Yes, Judge.

12:02:21  10  BY MR. POTTER:

12:02:21  11  Q.   You are aware, aren't you, that members of the

12:02:24  12  Guard volunteer ESGR functions?

12:02:28  13  A.   Yes.  As a matter of fact, the chairman at that

12:02:31  14  time, who was Mitchell, he was a traditional guardsman,

12:02:36  15  and he was actually, I guess, the chairman of the ESGR.

12:02:41  16  But we currently have board members that volunteer for

12:02:44  17  the ESGR.

12:02:57  18        MR. POTTER:  No further questions -- one

12:03:00  19  second, Judge.

12:03:00  20     (Pause)

12:03:03  21        MR. POTTER:  No further questions of the

12:03:04  22  witness, Your Honor.

12:03:04  23        THE COURT:  Any redirect?

12:03:04  24

12:03:08  25

REDIRECT EXAMINATION

BY MR. JUPITER:

Q.   What -- the functions that you saw Mrs. Morales

doing were with respect, with respect to ESGR, were they

volunteer activities, or were they for the contract

position?

          MR. POTTER:  Objection.  Leading, Your Honor.

          THE COURT:  Sustained.

BY MR. JUPITER:

Q.   How would you characterize what you observed

Mrs. Morales doing in the ESGR position after she was

hired --

          MR. POTTER:  Objection.

BY MR. JUPITER:

Q.   -- by -- as a military technician?

          THE COURT:  Okay.  Overruled.

          THE WITNESS:  She, she was performing as an

ESGR representative.  I saw her doing everything that

was required to make sure that the program was being

carried out.  She was maintaining all the functions for

the Guard members and any employer that may have

conflicts.  She was functioning as an ESGR rep, and she

was hired to.

BY MR. JUPITER:

Q.   And -- that she was hired to by, as ESGR rep?

12:04:44  1    A.    Yes, by the contractor.

12:04:45  2    Q.    And this was after she was hired in her military

12:04:49  3    tech position?

12:04:49  4    A.    That's correct, sir.

12:04:52  5          MR. JUPITER:  Okay.

12:04:52  6       No further questions, Your Honor.

12:04:53  7          THE COURT:  Captain Williams, thank you for

12:04:55  8    your testimony.

12:04:55  9       You may step down.

12:04:57  10         MR. POTTER:  Can I?

12:05:00  11         THE COURT:  Can you what?

12:05:01  12         MR. POTTER:  Can I inquire?

12:05:02  13         THE COURT:  Hold on, Captain Williams.

12:05:04  14      I don't think he went beyond the scope.

12:05:10  15         MR. POTTER:  Thank you, Judge.

12:05:11  16         THE COURT:  All right.  Thank you, Captain

12:05:12  17    Williams.

12:05:12  18      (Witness withdrew from stand.)

12:05:13  19         THE COURT:  Next witness?

12:05:31  20         MR. JUPITER:  I call Zera Louis, Your Honor.

12:06:00  21         THE CLERK:  Please stand and raise your right

12:06:01  22    hand to take the oath.

12:06:02  23      (Witness sworn.)

12:06:07  24         THE WITNESS:  Yes.

12:06:09  25

12:06:09    1          THEREUPON, ZERA LOUIS having been duly sworn,

12:06:12    2    was examined and testified as follows:

12:06:12    3              DIRECT EXAMINATION

12:06:12    4    BY MR. JUPITER:

12:06:16    5    Q.   Good afternoon.  Would you please tell us your

12:06:17    6    name?

12:06:18    7    A.   Zera Louis.

12:06:19    8    Q.   Ms. Louis, where are you employed?

12:06:22    9         THE COURT:  Before you go on, Ms. Louis, would

12:06:25   10    you spell your name, please.

12:06:25   11         THE WITNESS:  Z-e-r-a, L-o-u-i-s.

12:06:32   12         THE COURT:  Go ahead.

12:06:35   13         THE WITNESS:  Virgin Islands National Guard.

12:06:36   14    BY MR. JUPITER:

12:06:36   15    Q.   How long have you been employed with the Virgin

12:06:38   16    Islands National Guard?

12:06:38   17    A.   Eight years.

12:06:39   18    Q.   And what is your current assignment?

12:06:41   19    A.   HR specialist.

12:06:43   20    Q.   Before -- you say you've been employed.  So you've

12:06:47   21    been employed since 2007?

12:06:49   22    A.   Yes.

12:06:49   23    Q.   All right.  In 2007, what capacity did you work in

12:06:54   24    the National Guard?

12:06:54   25    A.   I was an administrative assistant to the chief of

12:06:57  1    staff.

12:06:57  2    Q.   And who was that chief of staff at that time?

12:07:00  3    A.   Elton Lewis.

12:07:02  4    Q.   And with regard to -- did you have the duties --

12:07:08  5    first of all, what duties did you have with respect to,

12:07:14  6    with respect -- what duties did you have with respect to

12:07:19  7    staff meetings?

12:07:21  8    A.   Can you repeat the question?

12:07:23  9    Q.   Okay.  Did -- Elton Lewis was the chief of staff,

12:07:27 10    correct?

12:07:28 11    A.   Yes, he was.

12:07:29 12    Q.   Okay.  Did he have staff meetings, weekly staff

12:07:31 13    meetings?

12:07:32 14             MR. POTTER:  Objection, Your Honor.

12:07:33 15             THE WITNESS:  Yes, he did.

12:07:34 16             THE COURT:  Overruled.

12:07:35 17    BY MR. JUPITER:

12:07:35 18    Q.   Okay.  And with respect to staff meetings, when

12:07:39 19    were they held?

12:07:40 20    A.   Every Tuesday.

12:07:41 21    Q.   Did you have any particular duties with respect to

12:07:46 22    preparation for those staff meetings?

12:07:48 23    A.   Compile slides.

12:07:50 24    Q.   Okay.  Do you know Sherrymae Morales?

12:07:52 25    A.   Yes, I do.

| | | |
|---|---|---|
| 12:07:53 | 1 | Q.   Okay.  Do you see her in court today? |
| 12:07:55 | 2 | A.   Yes, I do. |
| 12:07:56 | 3 | Q.   Could you point her out? |
| 12:07:59 | 4 | A.   Right there (indicating). |
| 12:08:00 | 5 | Q.   In 2007, did you know what -- when you first got |
| 12:08:05 | 6 | there -- November 2007, do you know what Ms. Morales was |
| 12:08:11 | 7 | hired to do? |
| 12:08:14 | 8 | A.   I can't particularly remember. |
| 12:08:16 | 9 | Q.   Okay.  Are you familiar with a position that's |
| 12:08:22 | 10 | called the ESGR contractor? |
| 12:08:25 | 11 | A.   Yes, I am. |
| 12:08:30 | 12 | Q.   And in 2007, do you recall anyone being hired to |
| 12:08:33 | 13 | that position while General Lewis was there? |
| 12:08:36 | 14 | A.   I can't remember dates. |
| 12:08:39 | 15 | Q.   Okay. |
| 12:08:40 | 16 | A.   I can't remember. |
| 12:08:41 | 17 | Q.   Do you -- with regard to Mrs. Morales, what |
| 12:08:43 | 18 | positions have you known her to hold with respect to the |
| 12:08:47 | 19 | National Guard? |
| 12:08:48 | 20 | A.   ESGR. |
| 12:08:49 | 21 | Q.   Okay.  Now, any other position do you know her to |
| 12:08:54 | 22 | hold? |
| 12:08:54 | 23 | A.   Yes.  I can't remember the title, but yeah, she |
| 12:08:57 | 24 | held another position. |
| 12:08:58 | 25 | Q.   All right.  And who was her supervisor for that |

12:09:01  1   other position?

12:09:02  2   A.   I'm not quite sure.

12:09:07  3   Q.   Okay.  Did you ever have any interaction with her

12:09:14  4   prior to, prior to -- you mentioned that you prepare

12:09:24  5   panel slides, correct?

12:09:26  6   A.   Slides, briefing slides.

12:09:28  7   Q.   Who would you do that for?

12:09:30  8        Who would you do that for?

12:09:31  9   A.   For Elton Lewis.

12:09:32  10  Q.   Okay.  And when you would prepare them, who would

12:09:37  11  you contact to prepare those slides?

12:09:41  12       MR. POTTER:  Objection.  Leading, Your Honor.

12:09:42  13       THE COURT:  Overruled.

12:09:43  14       THE WITNESS:  The directorates.

12:09:52  15  BY MR. JUPITER:

12:09:52  16  Q.   Okay.  And anyone -- was Mrs. Morales someone you

12:09:56  17  would contact?

12:09:58  18       MR. POTTER:  Object- --

12:10:00  19       THE WITNESS:  Yes.

12:10:01  20  BY MR. JUPITER:

12:10:01  21  Q.   Now, in terms of briefings that occurred in 2010,

12:10:09  22  do you remember, do you remember meetings during that

12:10:11  23  time?

12:10:13  24  A.   Yes.  They're held every Tuesday.

12:10:16  25  Q.   Okay.  Would you receive any of these files from

12:10:24  1    Mrs. Morales?

12:10:26  2         MR. POTTER:  Objection.  Leading.

12:10:27  3         THE COURT:  Sustained.

12:10:27  4      Stop leading your witness.

12:10:28  5    BY MR. JUPITER:

12:10:29  6    Q.   With regard to Mrs. Morales's position, you

12:10:34  7    mentioned she had an ESGR position?

12:10:36  8    A.   Yes.

12:10:36  9    Q.   Okay.  And at another point, did she get any other

12:10:39  10   positions?

12:10:41  11   A.   I can't remember.

12:11:08  12   Q.   Do you remember -- do you remember if

12:11:19  13   Mrs. Morales -- this is not the first time we've met,

12:11:32  14   Mrs. Louis?

12:11:34  15   A.   No, this is not the first time that we've met.

12:11:36  16   Q.   And we've discussed Mrs. Morales before, correct?

12:11:40  17        MR. POTTER:  Objection, Your Honor.  Leading.

12:11:41  18        THE COURT:  Sustained.

12:11:42  19        THE WITNESS:  Yes, we have.

12:11:49  20        THE COURT:  Mrs. Louis, wait for the next

12:11:52  21   question.

12:11:56  22   BY MR. JUPITER:

12:11:56  23   Q.   And we've discussed with myself and Ms. Delosa,

12:12:02  24   would come and talk to you about this case?

12:12:05  25   A.   Yes, we have.

| | | |
|---|---|---|
| 12:12:07 | 1 | Q.   Okay.  And have we talked about two positions |
| 12:12:10 | 2 | that -- |
| 12:12:11 | 3 | MR. POTTER:  Objection, Your Honor.  Leading. |
| 12:12:13 | 4 | THE COURT:  Sustained. |
| 12:12:18 | 5 | Wait for the next question. |
| 12:12:26 | 6 | BY MR. JUPITER: |
| 12:12:26 | 7 | Q.   What have we discussed with regard to |
| 12:12:29 | 8 | Mrs. Morales's position or positions? |
| 12:12:30 | 9 | MR. POTTER:  Objection, Your Honor.  Leading. |
| 12:12:33 | 10 | THE COURT:  Sustained.  And also there's |
| 12:12:39 | 11 | some -- it sounds to me like you're getting into hearsay |
| 12:12:41 | 12 | as well. |
| 12:12:45 | 13 | MR. JUPITER:  Using it for impeachment, Your |
| 12:12:48 | 14 | Honor. |
| 12:12:48 | 15 | THE COURT:  All right.  So there's another -- |
| 12:12:50 | 16 | all right.  Come to sidebar. |
| 12:13:03 | 17 | (Sidebar discussion held as follows:) |
| 12:13:03 | 18 | THE COURT:  I'm not sure what it is you're |
| 12:13:05 | 19 | trying to impeach. |
| 12:13:07 | 20 | MR. JUPITER:  Your Honor, I'm quite honest with |
| 12:13:09 | 21 | you, I'm very surprised -- |
| 12:13:10 | 22 | THE COURT:  You want to treat her as a hostile |
| 12:13:12 | 23 | witness; is that what you're trying to say? |
| 12:13:14 | 24 | MR. JUPITER:  I don't think I can -- have to |
| 12:13:16 | 25 | treat her as a hostile, which is to impeach her -- |

12:13:19  1         THE COURT:  What is it that she said that is

12:13:21  2     contrary to something else she said?

12:13:23  3         Tell me specifically what it is she said.

12:13:26  4         MR. JUPITER:  She said she doesn't remember if

12:13:27  5     she -- she doesn't remember if she had -- what her other

12:13:33  6     position was.  She doesn't remember whether or not she

12:13:35  7     received information from her, on briefing slides from

12:13:39  8     her.

12:13:40  9         THE COURT:  But why isn't that a current

12:13:43  10    recollection problem, as opposed to a statement contrary

12:13:46  11    to one previously uttered?

12:13:48  12        She's saying she doesn't remember.  That's not

12:13:51  13    uncommon for witnesses to say, "I don't remember."  That

12:13:53  14    doesn't mean that they're trying to go against what

12:13:59  15    you -- they just don't remember.

12:14:00  16        You want to impeach her, but she just currently

12:14:04  17    cannot recollect something, is what I heard, which is

12:14:07  18    what I thought you just said.  She said she can't

12:14:10  19    remember.

12:14:11  20        If she had told you, "I know the light was red,"

12:14:16  21    and today she is saying, "I don't know the light was

12:14:19  22    red," then that's certainly something to impeach.  If

12:14:23  23    she's saying, "I can't recall the color," that's a

12:14:27  24    different story, though.

12:14:29  25        I don't know if perhaps there's something you were

| 12:14:32 | 1 | intending to refresh her recollection with.  I don't |
| 12:14:35 | 2 | know if she made a written statement.  I don't know if |
| 12:14:37 | 3 | there's something that would refresh her recollection, |
| 12:14:40 | 4 | and you can go through that protocol. |
| 12:14:43 | 5 | But what you're doing is just putting the words in |
| 12:14:46 | 6 | her mouth.  All she's going to say is yes or no. |
| 12:14:50 | 7 | But significantly, it's going to seem like you're |
| 12:14:52 | 8 | the one who's testifying:  Didn't I talk to you about |
| 12:14:55 | 9 | blah, blah, blah?  Didn't my assistant talk to you about |
| 12:15:01 | 10 | X, Y, Z? |
| 12:15:02 | 11 | You know, if you want to refresh recollection, |
| 12:15:04 | 12 | there's a protocol to go through.  All right. |
| 12:15:07 | 13 | MR. JUPITER:  Yes, Your Honor. |
| 12:15:08 | 14 | THE COURT:  Thank you. |
| 12:15:09 | 15 | (End sidebar discussion, open court as follows:) |
| 12:15:26 | 16 | BY MR. JUPITER: |
| 12:15:27 | 17 | Q.   Ms. Louis, you're saying you can't recall back |
| 12:15:32 | 18 | in -- is that your recollection is not fresh with regard |
| 12:15:35 | 19 | to the events that occurred in 2010 and 2011? |
| 12:15:40 | 20 | A.   That's correct. |
| 12:15:57 | 21 | Q.   Do you have any recollection of your interaction |
| 12:16:00 | 22 | with Mrs. Morales during that time period? |
| 12:16:05 | 23 | A.   Yes.  We spoke. |
| 12:16:07 | 24 | Q.   Okay.  And were you -- you remember her -- do you |
| 12:16:14 | 25 | remember -- you indicated you remember her having the |

12:16:16    1    ESGR position?

12:16:18    2              MR. POTTER:  Objection.  Leading, Your Honor.

12:16:19    3              THE COURT:  Sustained.

12:16:20    4    BY MR. JUPITER:

12:16:20    5    Q.   And to when did she have that ESGR position?

12:16:25    6    A.   I can't remember the date.

12:16:27    7    Q.   Okay.  And with respect to, with respect to her,

12:16:35    8    after her hire, do you remember her having the ESGR

12:16:45    9    position?

12:16:48   10              MR. POTTER:  Objection again.  Leading, Your

12:16:51   11    Honor.

12:16:51   12              THE COURT:  Sustained.

12:16:53   13    BY MR. JUPITER:

12:16:54   14    Q.   Can you tell me relatively to -- relatively to any

12:16:58   15    event that you know, any change in events that you know

12:17:04   16    of when she continued to -- when she left this ESGR

12:17:07   17    position?

12:17:07   18    A.   I can't remember the date.

12:17:10   19              MR. JUPITER:  Okay, Ms. Louis.

12:17:12   20        No further questions, Your Honor.

12:17:13   21              THE COURT:  Attorney Potter?

12:17:14   22              MR. POTTER:  No questions, Your Honor.

12:17:15   23              THE COURT:  Ms. Louis, thank you for your

12:17:17   24    testimony.

12:17:18   25        You may step down.

12:17:18  1          (Witness withdrew from stand.)

12:17:20  2               THE COURT:  Next witness.

12:17:55  3               MR. JUPITER:  Your Honor, we call Sherry [sic]

12:18:06  4     Barnes.

12:18:36  5               THE CLERK:  Please raise your right hand to

12:18:38  6     take the oath.

12:18:38  7          (Witness sworn.)

12:18:43  8               THE WITNESS:  I do.

12:18:44  9               THEREUPON, MONA L. BARNES, having been duly

12:18:48  10    sworn, was examined and testified as follows:

12:18:48  11                     DIRECT EXAMINATION

12:18:49  12    BY MR. JUPITER:

12:18:52  13    Q.    Good afternoon.

12:18:52  14    A.    Good afternoon, sir.

12:18:53  15    Q.    Could you tell us your name?

12:18:55  16    A.    My name is Mona L. Barnes.

12:18:58  17    Q.    Mona Barnes.

12:18:59  18          And Ms. Barnes, where are you currently employed?

12:19:04  19    A.    Presently, I am the director and the Homeland

12:19:09  20    Security adviser for the Virgin Islands Territorial

12:19:13  21    Emergency Management Agency, better known as VITEEMA.

12:19:15  22    Q.    You've been an employee of the Virgin Islands

12:19:18  23    National Guard?

12:19:19  24    A.    I have, sir.

12:19:20  25    Q.    When were you employed by the Virgin Islands

12:19:22   1   National Guard?

12:19:22   2   A.   I started with the National Guard in 1987, and I

12:19:31   3   retired in February 28th of 2015.

12:19:35   4   Q.   So just this year?

12:19:36   5   A.   Yes.

12:19:37   6   Q.   Okay.  Have you had occasion -- well, let me ask

12:19:41   7   you this:  During 2007, where were you stationed?

12:19:45   8   A.   2007, I was the first sergeant for the weapons of

12:19:49   9   mass destruction, civil support team, in the Virgin

12:19:53   10   Islands National Guard, active duty.

12:19:56   11   Q.   Where did you, where did you work?

12:19:58   12   A.   I worked out of Spratt Hall.

12:20:01   13   Q.   And did there come a time when you worked -- when

12:20:06   14   you came to work at the Virgin Islands National Guard

12:20:08   15   headquarters?

12:20:09   16   A.   Yes, sir.

12:20:10   17   Q.   And when was that?

12:20:11   18   A.   2010, I was appointed as the state command sergeant

12:20:17   19   major, and my office moved to headquarters at High

12:20:21   20   Point.

12:20:21   21   Q.   Do you know what month was that in 2010?

12:20:25   22   A.   I moved in May.

12:20:26   23   Q.   May of 2010?

12:20:29   24   A.   Yes.

12:20:29   25   Q.   Do you know Sherry Morales?

12:20:31  1    A.    I do.

12:20:31  2    Q.    How do you know Sherry Morales?

12:20:33  3    A.    She's my cousin.  She's also been my colleague in

12:20:37  4    the Virgin Islands National Guard.

12:20:40  5    Q.    And in regards to May of 2010, do you recall any

12:20:45  6    time after that, her being hired at the Virgin Islands

12:20:49  7    National Guard?

12:20:50  8    A.    I do, sir.

12:20:50  9    Q.    All right.  How was her -- what was her position at

12:20:55  10   the end of 2010 with the Virgin Islands National Guard?

12:20:59  11   A.    I don't quite remember the date, but I know she was

12:21:02  12   the ESGR rep for the Virgin Islands National Guard.  And

12:21:06  13   then subsequently she became our J5.

12:21:10  14   Q.    Okay.  When she became the J5, with respect to her

12:21:13  15   duties with the ESGR, did she continue to do that?

12:21:17  16   A.    Yes, sir.

12:21:20  17   Q.    And what did you observe her doing in that role?

12:21:23  18   A.    Well, as the state command sergeant major and as

12:21:25  19   the senior adviser, we had weekly meetings.  And so

12:21:29  20   different departments had to brief on their departments.

12:21:33  21   And so Mrs. Morales from the time would brief J5 and

12:21:37  22   ESGR.

12:21:37  23   Q.    She would brief both positions?

12:21:39  24   A.    Yes.

12:21:39  25   Q.    At the same meeting?

```
12:21:40   1    A.    Yes, sir.

12:21:41   2    Q.    And these were meetings that were conducted by who?

12:21:43   3    A.    The chief of staff.

12:21:44   4    Q.    And who was that?

12:21:45   5    A.    When I first came to the Guard it was -- he was

12:21:50   6    Colonel, now General Lewis, retired.  And then it was

12:21:53   7    also Colonel Ruan.

12:22:01   8    Q.    Did there come a time where you came to assist

12:22:05   9    Mrs. Morales with regard to anything pertaining to ESGR?

12:22:10  10          MR. POTTER:  Objection.  Leading, Your Honor.

12:22:12  11          THE COURT:  Sustained.

12:22:22  12          Rephrase.

12:22:29  13    BY MR. JUPITER:

12:22:29  14    Q.    What interaction did you have with Mrs. Morales

12:22:32  15    pertaining to the ESGR position?

12:22:34  16          MR. POTTER:  Objection.  Leading, Your Honor.

12:22:36  17          THE COURT:  Overruled.

12:22:37  18          THE WITNESS:  They had had what we call

12:22:40  19    functions for ESGR.  I remember there was one that was

12:22:43  20    held at The Palms.  And as the state command

12:22:49  21    sergeant-major, as I recall, Major Morales was heading

12:22:53  22    the function, and I attended as the state command

12:22:57  23    sergeant-major.

12:22:57  24    BY MR. JUPITER:

12:22:57  25    Q.    With regard -- did you assist her with anything
```

12:22:59  1    else?

12:22:59  2    A.   Nothing more than conversation, knowing that it was

12:23:02  3    going to have a function, and based on my position I was

12:23:05  4    requested to be there and I attended.

12:23:08  5    Q.   Is there anything else you learned about the ESGR

12:23:11  6    position that she was holding?

12:23:13  7    A.   I'm sorry?

12:23:14  8    Q.   Was there anything else that you learned about the

12:23:16  9    ESGR position that she was holding?  That she was

12:23:19  10   holding?

12:23:20  11        MR. POTTER:  Objection.

12:23:20  12        THE COURT:  Sustained.

12:23:21  13     Are you asking what is it she learned from anyone

12:23:29  14   in the universe, including the defendant?

12:23:31  15        MR. JUPITER:  Yes, Your Honor.

12:23:32  16        THE COURT:  Okay.  Sustained.

12:23:35  17   BY MR. JUPITER:

12:23:36  18   Q.   What -- do you know anyone named Deirdre Clark?

12:23:49  19   A.   I do.

12:23:49  20   Q.   Did you do anything with respect to Deirdre Clark

12:23:53  21   regarding this ESGR position?

12:23:54  22   A.   Yes.

12:23:55  23   Q.   What was that?

12:23:56  24   A.   Deirdre Clark is my adopted daughter, and she

12:24:01  25   relocated from Chicago and was seeking employment.  And

12:24:03  1    I learned that the ESGR position that Major Morales was

12:24:08  2    holding was going to be advertised, and so I got her

12:24:11  3    resume.  I spoke to Major Morales about the position and

12:24:16  4    I got her resume and I gave it to Major Morales.

12:24:19  5    Q.    Okay.  And was -- all right.

12:24:30  6              MR. JUPITER:  No further questions, Your Honor.

12:24:32  7              THE COURT:  Attorney Potter?

12:24:33  8              MR. POTTER:  No questions, Your Honor.

12:24:35  9              THE COURT:  Ms. Barnes, thank you for your

12:24:37  10   testimony.

12:24:40  11        You may step down.

12:24:41  12             THE WITNESS:  You're welcome.

12:24:45  13        (Witness withdrew from stand.)

12:24:45  14             THE COURT:  Next witness?

12:25:07  15             MR. JUPITER:  Mr. Aelleyne.

12:26:48  16        (Witness sworn.)

12:26:49  17             THE WITNESS:  I do.  Yes.

12:26:54  18             THEREUPON, KENNETH AELLEYNE, having been duly

12:26:56  19   sworn, was examined and testified as follows:

12:26:56  20                        DIRECT EXAMINATION

12:26:57  21   BY MR. JUPITER:

12:26:59  22   Q.   Please tell us your name, and spell your first and

12:27:02  23   last name.

12:27:02  24   A.    Yes.  My name is Lieutenant-Colonel K-e-n-n-e-t-h,

12:27:07  25   Aelleyne, A-e-l-l-e-y-n-e.

12:27:10  1   Q.   And Lieutenant-Colonel Aelleyne, where are you

12:27:13  2   employed?

12:27:13  3   A.   Employed at the Virgin Islands National Guard.

12:27:15  4   Q.   How long have you been -- are you active duty?

12:27:18  5   A.   I'm AGR active duty with the Virgin Islands

12:27:21  6   National Guard.

12:27:22  7   Q.   What do you do?

12:27:22  8   A.   I'm a strategic planner J5.

12:27:22  9   Q.   What does a J5 strategic planner do?

12:27:27  10   A.   I'm responsible for all the plans for the adjutant

12:27:32  11   general; also development, dealing with the community,

12:27:38  12   interagency development plans, policies that would

12:27:43  13   maintain the organization and support the territory.

12:27:45  14   Q.   How long have you been associated with the National

12:27:48  15   Guard, Virgin Islands National Guard?

12:27:49  16   A.   Approximately ten years now.

12:27:51  17   Q.   So back to 2005?

12:27:55  18   A.   I returned home in 2005, correct.

12:27:57  19   Q.   And when you returned in 2005, what were you doing

12:28:00  20   at that time?

12:28:01  21   A.   I was the deputy commander of the 23rd, weapons of

12:28:07  22   mass destruction civil support team.

12:28:11  23   Q.   And do you know Sherrymae Morales?

12:28:14  24   A.   Yes, I do.

12:28:14  25   Q.   How do you know Mrs. Morales?

12:28:16   1    A.   Mrs. Morales was a colleague of mine at the

12:28:20   2    Virgin Islands National Guard, and we worked on a lot of

12:28:23   3    projects together for the adjutant general and for

12:28:26   4    General Lewis as well.

12:28:27   5    Q.   So you worked on a lot of projects for General

12:28:31   6    Lewis.

12:28:31   7         Let me ask you this:  Was he -- was General

12:28:35   8    Lewis -- in 2010 through 2011, what relationship did he

12:28:40   9    have with you?

12:28:41   10   A.   2010 to 2011?  He would have been my immediate

12:28:45   11   supervisor.

12:28:45   12   Q.   Okay.  And in -- after -- in 2009 -- let me ask you

12:28:56   13   this:  Are you married?

12:28:57   14   A.   I am.  Happily married, yes.

12:28:59   15   Q.   And what's your wife's name?

12:29:01   16   A.   My wife's name is Janice.

12:29:03   17   Q.   Janice Aelleyne?

12:29:04   18   A.   Janice Aelleyne, yes, sir.

12:29:06   19   Q.   Now, in 2009, were you all living in the same area?

12:29:12   20   A.   No.  I believe, if I remember correctly -- it's

12:29:16   21   been a back and forth -- Janice was in the States in

12:29:19   22   2009 and I was here in 2009.

12:29:21   23   Q.   And what is, what does she do?

12:29:24   24   A.   My wife is a schoolteacher.

12:29:29   25   Q.   Were you -- what was your intent in terms of

12:29:34  1    whether you were going to stay or leave St. Croix?

12:29:39  2    A.   Yes, it was my -- well, it was my intent to leave

12:29:42  3    the Virgin Islands National Guard and return to the

12:29:45  4    mainland, before 2009.  And then also in 2009, because

12:29:51  5    we had another meeting for where I was discussing to

12:29:55  6    receive a transfer, a release from the Virgin Islands

12:29:58  7    National Guard to return back to the mainland to be with

12:30:00  8    my family.

12:30:01  9    Q.   What happened?  Did you ever leave?

12:30:04  10   A.   Never left, no, sir.

12:30:06  11   Q.   And why didn't you leave?

12:30:08  12   A.   The leadership felt that based on the team that

12:30:15  13   they had assembled, that we were, we were producing and

12:30:21  14   we were gaining some -- we were gaining a tremendous

12:30:26  15   amount of success in the projects that we were

12:30:28  16   undertaking, trying to move the organization forward

12:30:32  17   with a low amount of change that was coming down through

12:30:36  18   National Guard and the Army side.

12:30:37  19        And pretty much they told me that they -- it was a

12:30:41  20   critical time for --

12:30:43  21             MR. POTTER:  Objection, Your Honor.

12:30:44  22             THE COURT:  All right.  Wait for the next

12:30:45  23   question.

12:30:45  24             THE WITNESS:  It was a critical time for --

12:30:48  25             THE COURT:  Stop.  Wait for the next question.

| | | |
|---|---|---|
| 12:30:50 | 1 | Next question. |
| 12:30:50 | 2 | BY MR. JUPITER: |
| 12:30:51 | 3 | Q.   As a result of those discussions, what did you do? |
| 12:30:56 | 4 | A.   As far as? |
| 12:30:57 | 5 | Q.   Leaving. |
| 12:30:59 | 6 | A.   I didn't receive a release, so I stayed. |
| 12:31:02 | 7 | Q.   So did you make any attempts to, any other attempts |
| 12:31:08 | 8 | to live -- for you and your wife to live in the same |
| 12:31:11 | 9 | place? |
| 12:31:11 | 10 | A.   Yes. |
| 12:31:11 | 11 | Q.   Okay.  What did you do? |
| 12:31:12 | 12 | A.   I went back to the chain of command, and after I |
| 12:31:15 | 13 | completed a task that they asked me to complete, which |
| 12:31:17 | 14 | was certified and setting up the team, I asked for a |
| 12:31:21 | 15 | release at that time. |
| 12:31:22 | 16 | Q.   Was -- did you have conversations about releasing |
| 12:31:27 | 17 | then? |
| 12:31:27 | 18 | A.   Yes. |
| 12:31:28 | 19 | Q.   Okay.  As a result of those conversations, were you |
| 12:31:30 | 20 | able to get a release? |
| 12:31:33 | 21 | A.   No, no one -- I was told I could be released, and I |
| 12:31:36 | 22 | was not released. |
| 12:31:39 | 23 | Q.   Now with respect to -- did there come a time where |
| 12:31:42 | 24 | you made any attempts to have your wife, Ms. Aelleyne, |
| 12:31:47 | 25 | to come here? |

12:31:48   1              MR. POTTER:  Objection, Your Honor.  Leading.

12:31:51   2              THE WITNESS:  Yes.

12:31:52   3              THE COURT:  Sustained.

12:31:52   4     BY MR. JUPITER:

12:31:52   5     Q.   What did you do after that?

12:31:55   6     A.   I went back to the leadership and I explained to

12:31:57   7     them, you know, the criticalness of what was impacting

12:32:00   8     my family as far as separation from my children, as well

12:32:04   9     as the financial difficulty with trying to maintain two

12:32:07   10    households.  And then I was given a letter saying that I

12:32:10   11    would be released.

12:32:11   12    Q.   Okay.  Did there come -- what happened after that?

12:32:14   13    A.   They reneged on that.  I was not given the release.

12:32:19   14    I was given another project and asked to complete the

12:32:25   15    project.  And we discussed it at a later time.

12:32:27   16    Q.   Did you have any interaction -- well, let me just

12:32:29   17    ask you, what happened after that in terms of your

12:32:34   18    efforts to reunite with your wife?

12:32:36   19    A.   The leadership then came to me and said, you

12:32:38   20    know --

12:32:39   21              MR. POTTER:  Objection, Your Honor.

12:32:40   22              THE COURT:  Stop.

12:32:40   23        Next question.

12:32:42   24              MR. JUPITER:  Not offered for the truth, Your

12:32:44   25    Honor.

12:32:46  1              THE COURT:  You can rephrase or go around it.

12:32:53  2      BY MR. JUPITER:

12:32:54  3      Q.   As a result of your -- as a result of those

12:32:58  4      denials, what did you do -- without saying what was told

12:33:03  5      to you, what did you do with respect to making plans to

12:33:09  6      reunite with your wife?

12:33:11  7      A.   I discussed with my wife an offer that was made to

12:33:15  8      me, for her to join me here.

12:33:18  9      Q.   Okay.  At that particular time, what was she doing?

12:33:20  10     A.   She was teaching in Maryland.

12:33:22  11     Q.   Okay.  Was she doing anything else with respect to

12:33:25  12     her career?

12:33:27  13     A.   She was also working at a program in Maryland,

12:33:33  14     Impact Silver Springs, at that time.  And then I believe

12:33:34  15     in January of 2009 she started, she was a volunteer also

12:33:37  16     with the ESGR program here for the Virgin Islands

12:33:40  17     National Guard.

12:33:41  18     Q.   Okay.  Now, did, and in this -- so any efforts, did

12:33:48  19     you have any interaction with Mrs. Morales or -- well,

12:33:52  20     first of all, did you have any interaction with Colonel

12:33:55  21     Lewis regarding your wife coming here?

12:33:57  22     A.   I'm sorry?

12:33:58  23     Q.   Did you have any interaction with Colonel Lewis

12:34:00  24     regarding your wife coming here?

12:34:02  25     A.   If I had any interaction?

12:34:03  1    Q.   Yes.

12:34:04  2    A.   Yes.

12:34:04  3    Q.   What was that?

12:34:05  4    A.   He informed me that --

12:34:07  5              MR. POTTER:  Objection, Your Honor.

12:34:09  6              MR. JUPITER:  Not offered for the truth, Your

12:34:11  7    Honor.

12:34:11  8              THE COURT:  All right.

12:34:14  9         What happened as a result of that interaction?

12:34:16  10        What did you do?

12:34:18  11             THE WITNESS:  I informed my wife of the

12:34:20  12   discussion I had with the general.

12:34:26  13             THE COURT:  Okay.  Next question.  Go ahead.

12:34:28  14   BY MR. JUPITER:

12:34:28  15   Q.   And as a result of those discussions, did you at

12:34:31  16   any point come into contact with Mrs. Morales?

12:34:34  17   A.   Yes.

12:34:34  18   Q.   Okay.  And what was that about?

12:34:37  19   A.   Mrs. Morales felt that -- we discussed that she

12:34:41  20   felt that --

12:34:42  21             MR. POTTER:  Objection, Your Honor.

12:34:43  22             THE COURT:  Stop.  No.  Wait for the next

12:34:46  23   question.

12:34:47  24   BY MR. JUPITER:

12:34:47  25   Q.   At that time, what position or positions did

12:34:52  1    Mrs. Morales hold?

12:34:54  2    A.   Mrs. Morales was the ESGR coordinator, I believe,

12:34:57  3    at that time.

12:34:58  4          THE COURT:  You're asking what he observed

12:34:59  5    or -- not that he learned from.

12:35:04  6    BY MR. JUPITER:

12:35:04  7    Q.   Well, as a result of those discussions, what did

12:35:06  8    you learn in terms of the --

12:35:09  9    A.   My wife will be taking over the ESGR position from

12:35:12  10   Mrs. Morales.

12:35:16  11   Q.   And at that time, what other positions did

12:35:21  12   Mrs. Morales have?

12:35:22  13         MR. POTTER:  Objection, Your Honor.

12:35:24  14         THE COURT:  Overruled.

12:35:26  15         THE WITNESS:  Mrs. Morales was the J5 of the

12:35:29  16   Virgin Islands National Guard at the time.

12:35:34  17         MR. JUPITER:  No further questions, Your Honor.

12:35:35  18         THE COURT:  Attorney Potter?

12:35:37  19         MR. POTTER:  Court's indulgence, Your Honor?

12:35:42  20         THE COURT:  Yes.

12:35:47  21      (Pause)

12:35:47  22         MR. POTTER:  No questions, Judge.

12:35:48  23         THE COURT:  Okay.

12:35:50  24         Colonel Aelleyne, thank you for your testimony.

12:35:53  25         You may step down.

12:35:53  1                    THE WITNESS:  Thank you, sir.

12:35:55  2              (Witness withdrew from stand.)

12:35:55  3            THE COURT:  Ladies and gentlemen, it is time

12:35:56  4      for lunch.  So we will break for 50 minutes today.

12:36:11  5      Enjoy your lunch.

12:36:12  6            (Jury out.)

12:36:58  7            THE COURT:  Attorney Jupiter, how many more

12:36:59  8      witnesses do you have?

12:37:03  9            MR. JUPITER:  I believe three, Your Honor.

12:37:04 10            THE COURT:  You expect that they will be long

12:37:06 11      witnesses or short?

12:37:07 12            MR. JUPITER:  Only one, Your Honor, will be

12:37:09 13      long.

12:37:09 14            THE COURT:  All right.

12:37:11 15        We will try to get you, sometime during the

12:37:15 16      witnesses, the jury instructions so we can have our

12:37:20 17      charging conference this afternoon.

12:37:21 18        All right, Counsel, 5-0 minutes.  Enjoy your lunch.

12:38:31 19            (Court in recess 12:38 p.m.)

13:32:39 20            (After recess, 1:43 p.m., jury present).

13:43:08 21            THE COURT:  Good afternoon, ladies and

13:43:09 22      gentlemen.

13:43:09 23        How was lunch today?

13:43:11 24            (Jurors respond.)

13:43:12 25            THE COURT:  Better than yesterday?

13:43:12   1          (Jurors indicating.)

13:43:15   2              THE COURT:  I see two thumbs up.  I think I --

13:43:19   3      all right.

13:43:19   4          (Laughter.)

13:43:21   5              THE COURT:  All right.  As you know, we're

13:43:22   6      still taking evidence from the defense.

13:43:25   7          Attorney Jupiter, are you ready to proceed?

13:43:27   8              MR. JUPITER:  I am, Your Honor.

13:43:28   9          We call Sherrymae Morales.

13:43:49  10              THE CLERK:  Please stand and raise your right

13:43:51  11      hand to take the oath.

13:43:53  12          (Witness sworn.)

13:43:54  13              THE WITNESS:  I do.

13:43:58  14              THEREUPON, SHERRYMAE MORALES, having been duly

13:43:58  15      sworn, was examined and testified as follows:

13:43:58  16                        DIRECT EXAMINATION

13:44:00  17      BY MR. JUPITER:

13:44:06  18      Q.   Please tell us your name, and spell your first and

13:44:08  19      last name.

13:44:10  20      A.   Sherrymae Morales; S-h-e-r-r-y-m-a-e,

13:44:17  21      M-o-r-a-l-e-s.

13:44:19  22      Q.   And Ms. Morales, do you now reside in St. Croix?

13:44:24  23      A.   No, I do not.

13:44:25  24      Q.   Are you from St. Croix?

13:44:26  25      A.   I am from St. Croix, yes.

13:44:28  1    Q.   And did you, did you -- were you ever a member of

13:44:36  2    the Virgin Islands National Guard?

13:44:37  3    A.   Yes, I was.

13:44:38  4    Q.   From what years?

13:44:39  5    A.   June 24th, 1983, through December 15th, 2003; and

13:44:47  6    then again in February 2010 through May of 2011.

13:44:57  7    Q.   Do you have any children?

13:45:02  8    A.   I have one daughter, Rosa Shari Morales.

13:45:09  9    Q.   What education have you received, Mrs. Morales?

13:45:12  10   A.   I have a master's in public administration and a

13:45:16  11   bachelor's in business administration.

13:45:17  12   Q.   And where did you get your bachelor's?

13:45:20  13   A.   I got my bachelor's degree from California Coast

13:45:24  14   University.

13:45:24  15   Q.   And your master's?

13:45:25  16   A.   From Walden University.

13:45:26  17   Q.   Now, you served in the Guard for a number -- in the

13:45:30  18   National Guard for a number of years.  You said between

13:45:33  19   '83 and 2003?

13:45:35  20   A.   That is correct.

13:45:35  21   Q.   And what are the various positions -- what are some

13:45:39  22   of the positions you've held?

13:45:40  23   A.   When I initially joined the Guard, I joined as an

13:45:45  24   enlisted member.  I got commissioned through Fort

13:45:49  25   Benning, Georgia, in 1984.  Upon commissioning, I

13:45:55  1    accepted a position in the National Guard full-time as a

13:46:00  2    systems analyst.

13:46:02  3        After that, I became a logistics management

13:46:08  4    officer, contacting officer, human resources officer,

13:46:15  5    and I believe that's it -- recruiting and retention

13:46:18  6    manager.

13:46:19  7    Q.   Okay.  Now, with regard to -- what area would you

13:46:25  8    say you received the most training in, in the Guard,

13:46:29  9    your first years in the Guard?

13:46:30  10   A.   I was actually a military police officer when I

13:46:36  11   came into the National Guard.  The most training I had

13:46:39  12   in the Guard would be logistics management.

13:46:41  13   Q.   Okay.  And what did you do as logistics management?

13:46:45  14   A.   Basically, I was -- I oversaw equipment coming into

13:46:50  15   the territory, distributing -- ensured that they were

13:46:57  16   distributed to the various units, and was basically

13:47:01  17   responsible at the headquarters level for

13:47:05  18   accountability, property accountability.

13:47:08  19   Q.   In 2003, when you left the Guard, what were your

13:47:12  20   plans -- what did you do at that time?

13:47:14  21   A.   Basically, I retired on December 15th, 2003, and I

13:47:20  22   opened my own real estate business and management

13:47:24  23   consulting firm.

13:47:26  24   Q.   Okay.  Tell me a little bit about the management

13:47:27  25   consulting firm.  What were you doing?

13:47:29  1    A.    Management consulting.  I basically did a lot of

13:47:33  2    leadership training for private entities and government

13:47:39  3    agencies.

13:47:40  4    Q.    And how would you obtain that type of work?

13:47:45  5    A.    Individuals contacted me, I guess from knowing my

13:47:50  6    background and skill sets.

13:47:52  7    Q.    What was the form of the relationship with the

13:47:55  8    individuals who you worked for?

13:47:58  9    A.    I was a contractor with -- I had a contract for

13:48:06  10   Triangle Construction.  I've also had a contract for

13:48:09  11   Lutheran Social Services.  I've had a contract with

13:48:15  12   Hovensa Refinery.

13:48:17  13   Q.    Now, with regard to your working these -- your real

13:48:23  14   estate, your consulting, what kind of hours would you

13:48:25  15   work?

13:48:28  16   A.    I basically worked pretty much 15-, 16-hour days my

13:48:36  17   entire career.

13:48:38  18   Q.    That includes your military career?

13:48:41  19   A.    That includes my military career.

13:48:43  20   Q.    And when you were doing your real estate and your

13:48:46  21   consulting -- first of all, how long did you do the real

13:48:49  22   estate and the consulting?

13:48:51  23   A.    I've been a real estate broker since -- for

13:48:56  24   ten years, since 2005.  Prior to that time, I did real

13:49:00  25   estate for seven years as a sales agent with Hamilton

13:49:09  1    Real Estate.

13:49:09  2    Q.   Now, I want to bring you to November of 2007.  Did

13:49:16  3    you -- were you doing real estate at that time?

13:49:18  4    A.   I was doing real estate at that time.  I was

13:49:22  5    actually a board member for the St. Croix Board of

13:49:27  6    Realty -- Realtors.  And November 2007, that's what I

13:49:33  7    was doing, between that and my management consulting.

13:49:38  8    Q.   Did you get a call with regard to an ESGR position?

13:49:44  9    A.   I got a call regarding an ESGR contract from

13:49:50  10   General Lewis, and Major Marise James.

13:49:55  11   Q.   As a result -- and did you engage in any -- did you

13:50:00  12   engage with them in conversation -- first of all, what

13:50:03  13   was the call about?

13:50:07  14   A.   The call -- they called me on November 7th and

13:50:11  15   basically told me that they -- they were about to lose

13:50:18  16   the ESGR contract.

13:50:19  17          MR. POTTER:  Objection, Your Honor.

13:50:20  18          THE COURT:  Overruled.

13:50:21  19   BY MR. JUPITER:

13:50:21  20   Q.   As a result of that call, what did you do next as a

13:50:27  21   result of that call?

13:50:28  22   A.   As a result of that call, I accepted the ESGR

13:50:33  23   contract.

13:50:34  24   Q.   Did you have any discussion with anyone else

13:50:40  25   regarding the ESGR contract?

13:50:42  1    A.    I spoke to Baron Hignite regarding the ESGR

13:50:47  2    contract, yes.

13:50:48  3    Q.    Okay.  Did you give him any indication during that

13:50:55  4    phone call of what you were doing with respect to your

13:50:58  5    other businesses?

13:50:59  6              MR. POTTER:  Objection, Your Honor.  Leading.

13:51:01  7              THE COURT:  Sustained.

13:51:02  8    BY MR. JUPITER:

13:51:02  9    Q.    What did you discuss with -- what did you tell

13:51:05  10   Baron Hignite?

13:51:07  11   A.    When Mr. Hignite called me, I told him -- I asked

13:51:12  12   him if he was aware that I ran my own real estate firm

13:51:16  13   as well as my own management consulting company.

13:51:18  14         He said yes, he was.

13:51:20  15             MR. POTTER:  Objection, Your Honor.

13:51:21  16   BY MR. JUPITER:

13:51:22  17   Q.    As a result -- first of all, how long -- by the

13:51:26  18   time you spoke with Mr. Hignite, had you accepted the

13:51:31  19   position?

13:51:31  20   A.    Not until after I spoke to him.

13:51:34  21   Q.    Okay.  Was there anything that you wanted to do

13:51:37  22   with respect to any conditions you wanted to set on

13:51:44  23   that, on that contract position?

13:51:45  24             MR. POTTER:  Objection, Your Honor.

13:51:46  25             THE COURT:  Sustained.

13:51:52  1      BY MR. JUPITER:

13:51:53  2      Q.   What, what if, any terms did you discuss?

13:52:02  3      A.   We discussed the fact that I owned my own real

13:52:08  4      estate company and my own management consulting firm,

13:52:12  5      and I would not accept the contract other than if I

13:52:16  6      could continue to do that.

13:52:19  7      Q.   Now, did you continue to do that?

13:52:21  8      A.   I continued to do that for the whole time that I

13:52:24  9      had that contract.

13:52:25  10     Q.   And where was your -- where was your real estate

13:52:28  11     office?

13:52:28  12     A.   It was at 45-M La Grande Princess.

13:52:33  13     Q.   What did you -- so how long did you hold this ESGR

13:52:37  14     contract, initially?

13:52:38  15     A.   I held the contract for ESGR initially for

13:52:44  16     three years.

13:52:44  17     Q.   Okay.  Now, during those three years, what did you

13:52:56  18     understand your duty -- first of all, what do you

13:52:58  19     understand your duties to be as the ESGR contractor?

13:53:00  20     A.   When I spoke to Mr. Hignite, I understood my duties

13:53:05  21     to be building the volunteer committee for ESGR, finding

13:53:11  22     a state chair for ESGR, conducting USERRA briefings,

13:53:19  23     which is Uniform Services Employment and Reemployment

13:53:24  24     Rates Act, for service members returning from

13:53:26  25     deployments -- both predeployment and post-deployment,

13:53:35  1    as well as holding events for employers, getting

13:53:38  2    statements of support from employers.  And I think that

13:53:44  3    was mostly it, in a nutshell.

13:53:47  4    Q.   Were you advised as to what your hours were with

13:53:50  5    respect to getting this stuff done?

13:53:52  6    A.   Never.

13:53:52  7    Q.   Now, when you started to do the work that you talk

13:53:56  8    about, could you explain -- could you kind of give the

13:54:02  9    jury an understanding of what you were actually doing

13:54:04  10   during this time period before you were hired with the

13:54:09  11   Virgin Islands National Guard?

13:54:11  12   A.   As an ESGR-- as the ESGR executive director, I had

13:54:16  13   to build a volunteer management committee.  That

13:54:21  14   committee was, when I took the ESGR contract, was zero.

13:54:27  15   I built it to 60 members, that basically did not have an

13:54:32  16   issue signing up online, giving us their addresses,

13:54:39  17   phone numbers, contact information.  So we went from

13:54:43  18   zero to 60 volunteers.

13:54:47  19        I also interacted with employers, both private and

13:54:51  20   government.  I did a lot of training regarding the

13:54:59  21   USERRA law, and I did a pre- and post-deployment

13:55:07  22   briefings all on the weekends with service members.

13:55:11  23   Q.   Why would you do them on weekends?

13:55:14  24   A.   That's when the service members were available, as

13:55:17  25   well as any volunteers that would come into my office.

13:55:24  1    Q.    Now when you say come into your office, what office

13:55:29  2    was this?

13:55:29  3    A.    My real estate office.

13:55:31  4    Q.    Why weren't you at the VING office?

13:55:33  5    A.    The VING never invited me to have an office there

13:55:38  6    for the three years that I was -- that I held the ESGR

13:55:43  7    contract.

13:55:44  8    Q.    Okay.  And how far away were you from the VING

13:55:48  9    office?

13:55:49  10   A.    My office -- my real estate office was literally

13:55:52  11   about a quarter mile west of the VING office, if that

13:55:57  12   much.

13:55:58  13   Q.    When you talked about duties you had with respect

13:56:04  14   to soldiers and their employers, could you explain what

13:56:08  15   would happen with that?

13:56:09  16         How would you carry out those duties?

13:56:13  17   A.    The duties I held with service members and their

13:56:18  18   employers, basically any service members that had an

13:56:21  19   issue with their employers, I would contact the

13:56:32  20   employer.

13:56:32  21         Sometimes they would call me back.  Other times

13:56:34  22   they wouldn't.  I would try to mediate or actually

13:56:43  23   mitigate whatever issues came up from those -- between

13:56:46  24   the service member and the employer, looking for a good

13:56:51  25   result.

13:56:54    1     Q.    During this time period, did your -- first of all,

13:56:59    2     what was the payment amount that you were going to get

13:57:04    3     paid -- the amount of payment for your services on this

13:57:07    4     ESGR contract?

13:57:10    5     A.    Initially, I believe it was $52,000.

13:57:16    6     Q.    Okay.  Did that change any?

13:57:18    7     A.    It changed when Mr. Hignite -- it changed when my

13:57:25    8     volunteer membership increased and the events that I was

13:57:29    9     holding on the weekends increased.  I was offered an

13:57:34   10     increase to, I think we ended up at like $60,000.

13:57:40   11     Q.    Now, with respect to -- did you meet with -- did

13:57:45   12     you meet with anyone at your real estate office in terms

13:57:48   13     of your ESGR duties?

13:57:52   14           MR. POTTER:  Objection, Your Honor.  Leading.

13:57:53   15           THE WITNESS:  I met with volunteers --

13:57:57   16           THE COURT:  Overruled.

13:57:58   17           THE WITNESS:  -- at my real estate office in

13:58:00   18     the evening, because most of these people are working

13:58:06   19     during the day and on weekends.  At times when I hold

13:58:09   20     events I also met with them to help me, whether it was

13:58:13   21     to set up the venue, and that was basically it.

13:58:20   22     BY MR. JUPITER:

13:58:22   23     Q.    What was your understanding with regard to how you

13:58:24   24     did timekeeping for your ESGR contract position?

13:58:30   25     A.    The ESGR contract specified that there would be a

13:58:36  1    requirement to work evenings and weekends.  And as a

13:58:42  2    result, basically we had to do 40 hours.  That's what I

13:58:51  3    understood.

13:58:52  4    Q.   Now what, if -- in terms of when you actually had

13:58:56  5    to put your -- put time into, what was the system

13:59:02  6    called?

13:59:02  7    A.   The Deltek system.

13:59:04  8    Q.   Okay.  What kind of system is this?

13:59:07  9    A.   The Deltek is a timekeeping system, and is very

13:59:12  10   popular with contractors --

13:59:14  11   Q.   Okay.

13:59:14  12   A.   -- because it is a very good system.  Basically,

13:59:19  13   you can only enter time on the Deltek system during the

13:59:27  14   week from 8:00 to 5:00.  It does not give you an option

13:59:33  15   at all, and it never has, to enter time during the

13:59:36  16   weekends or evenings.

13:59:38  17   Q.   Okay.  So with respect to what you understood you

13:59:41  18   had to do, your hours, what was the requirement with

13:59:48  19   respect to your hours?

13:59:49  20   A.   Basically, I just entered eight hours from Monday

13:59:51  21   to Friday.  There was no specific time delineated within

13:59:56  22   Deltek.  There never has been.  Basically, I just had

14:00:01  23   to -- and the times that I did my yellow ribbon

14:00:05  24   integration briefings, all that had to be entered during

14:00:13  25   the week.

14:00:14  1   Q.   Okay.  Now, did there come a time when you, when

14:00:20  2   you were hired by the National Guard in 2010?

14:00:24  3   A.   Yes.  Sorry.

14:00:30  4   Q.   All right.  How did that come about?

14:00:33  5        How did you learn about that position?

14:00:34  6   A.   General Lewis contacted me.  And Caroline Adams, I

14:00:40  7   think, the person that held the position -- I know the

14:00:45  8   person that held the position was being deployed to

14:00:50  9   Guantanamo Bay.  They needed a replacement for the time

14:00:52  10  that she was going to be gone, and asked if I was

14:00:55  11  willing to come in and do the strategic plans and policy

14:00:59  12  position.

14:00:59  13  Q.   Were you willing to do that?

14:01:01  14  A.   Yes, I was.

14:01:02  15  Q.   Why did you want to do that?

14:01:04  16  A.   Initially, I looked at it as an extension to my

14:01:15  17  skill sets.

14:01:18  18  Q.   Okay.

14:01:21  19  A.   Basically, as a contractor it would look good as my

14:01:25  20  doing chain management, restructuring, strategic

14:01:30  21  planning, and Lean Six Sigma.

14:01:33  22  Q.   What is Lean Six Sigma?

14:01:37  23  A.   Lean Six Sigma deals with processes where you go

14:01:40  24  into an organization, basically conducting assessments

14:01:44  25  and looking for gap areas, as well areas where you

14:01:48  1    can improve efficiencies.

14:01:52  2    Q.    Now, did you take the military tech position?

14:01:58  3    A.    Yes, I did.

14:01:59  4    Q.    What, if any, conversation -- well, let me ask you

14:02:05  5    this:  Did you notify Baron Hignite about your intent to

14:02:12  6    take that position?

14:02:13  7    A.    Yes, I did.  As soon as I accepted the position I

14:02:16  8    contacted Mr. Hignite and told him that I was going back

14:02:20  9    in the Guard, I had gotten a military technician

14:02:25  10   position, and as a result would be leaving the

14:02:26  11   contracting position.

14:02:28  12   Q.    Why did you want to leave the contracting position?

14:02:32  13   A.    The contracting position was very time-incen- --

14:02:40  14   very time-intensive as it relates to my evenings.

14:02:46  15        In 2010 -- before my daughter was 16, and I had

14:02:55  16   been working late nights, weekends throughout.  I saw

14:03:00  17   the military technician position to be a way that I can

14:03:06  18   decrease my hours.

14:03:08  19        However, when I notified Mr. Hignite that I had

14:03:11  20   gotten the military technician position, he asked if I

14:03:16  21   could help him find a replacement.

14:03:18  22   Q.    Okay.  Now with respect to -- what did he -- did he

14:03:21  23   make any requests to you with respect to -- any other

14:03:26  24   requests to you besides finding a replacement --

14:03:33  25             MR. POTTER:  Objection.  Leading, Your Honor.

14:03:34  1                    THE COURT:  Sustained.

14:03:34  2    BY MR. JUPITER:

14:03:34  3    Q.   What, if anything else, did he ask you?

14:03:37  4    A.   Mr. Hignite asked if I would stay on and do the

14:03:44  5    ESGR contract until I could find him a qualified

14:03:47  6    replacement.  He asked for my assistance in doing that.

14:03:52  7    Q.   Okay.  Now, with respect to doing that, did you

14:03:58  8    know of anything that was restricting you -- other than

14:04:03  9    the long hours, did you know of anything that was going

14:04:05  10   to restrict you from doing --

14:04:08  11   A.   I know of nothing prohibiting --

14:04:10  12             MR. POTTER:  Objection.  Leading --

14:04:14  13             THE COURT:  Stop.

14:04:15  14        Sustained.

14:04:15  15   BY MR. JUPITER:

14:04:15  16   Q.   What was your understanding of your ability to do

14:04:17  17   that?

14:04:19  18   A.   Military Personnel Services Corp is a private

14:04:24  19   entity, meaning it isn't a governmental entity.  It is a

14:04:34  20   private corporation.  As such, it is no different than

14:04:37  21   any other corporation that I would hold a contract with,

14:04:40  22   whether it is Hovensa Refinery or Triangle Construction

14:04:46  23   or if I was doing state work, social services or

14:04:51  24   Department of Planning and Natural Resources.  It is no

14:04:53  25   different than any other contract that I performed on,

14:04:56  1    which basically my hours are never delineated beyond my

14:05:02  2    having to do presentations, if I was doing a leadership

14:05:06  3    training course.

14:05:08  4    Q.   Okay.

14:05:09  5    A.   That's the only time that I've ever had an hours

14:05:15  6    specified contract.

14:05:15  7    Q.   You mentioned one of the positions you held in the

14:05:18  8    Guard was an HR specialist, correct?

14:05:20  9    A.   Yes.

14:05:21  10   Q.   Is there any --

14:05:23  11   A.   HR, human resources officer.

14:05:26  12   Q.   Human resources officer.

14:05:28  13        Is there anything that you had remembered from that

14:05:29  14   training that indicated that there was going to be a

14:05:31  15   problem?

14:05:32  16   A.   No.

14:05:32  17   Q.   Now -- and so what was your intent in terms of how

14:05:39  18   long you were going to stay on the ESGR contract after

14:05:43  19   you were hired as a military tech?

14:05:45  20   A.   My intent was to find Mr. Hignite a qualified

14:05:54  21   replacement.  I submitted to him, I remember it was at

14:05:57  22   least three names, Deja Clark, Kainuma Simmonds, and the

14:06:05  23   third person, Dazarene Lescott.

14:06:08  24   Q.   Okay.  So was he -- now, at this time in 2010, were

14:06:18  25   you able to continue on in both positions?

14:06:22  1    A.    In June of 2010, General Lewis gave me a huge

14:06:29  2    assignment.  He wanted me to conduct a strategic

14:06:33  3    leadership workshop for the National Guard.  Basically,

14:06:38  4    I was responsible for pulling that entire workshop

14:06:42  5    together, for finding speakers, for selecting topics,

14:06:49  6    and basically putting on the presentations for that

14:06:53  7    leadership conference.

14:06:55  8         The leadership conference was for three days, if

14:07:00  9    I'm not mistaken, and it started pretty much at 8:00 in

14:07:07  10   the morning until like 5:00 each afternoon.

14:07:11  11        We flew in presenters that included high-level

14:07:18  12   military officers, as well as enlisted members --

14:07:23  13   Q.    Okay.

14:07:24  14   A.    -- the -- to do presentations, as well as some

14:07:27  15   local presenters.

14:07:29  16            MR. JUPITER:  I want to show you what I am

14:07:33  17   marking as Defendant's Exhibit Number 1.

14:07:35  18        (Defendant's Exhibit 1 marked for identification.)

14:07:35  19   BY MR. JUPITER:

14:07:44  20   Q.    This is a -- could you tell what this is?

14:07:47  21   A.    This is a booklet that we created for the

14:07:49  22   leadership conference that started on September 18,

14:07:54  23   2010.

14:07:54  24   Q.    And when did you, when did you get the assignment

14:07:58  25   to start putting this together?

14:08:00  1    A.    I got the assignment in June 2010.

14:08:04  2    Q.    And as a result of getting that assignment, what,

14:08:08  3    if anything, did you do?

14:08:09  4    A.    I basically tendered my resignation from ESGR --

14:08:17  5    from the ESGR contract.

14:08:23  6    Q.    At that time, was there a replacement for you?

14:08:27  7    A.    No.  But I could not handle the leadership

14:08:31  8    conference and my J5 position and the contract for ESGR.

14:08:40  9    It was just too much.  It was -- the conference was too

14:08:46  10   demanding.

14:08:46  11   Q.    After -- now, did you -- in handing over your

14:08:52  12   resignation to Mr. Hignite, did he make any requests to

14:08:57  13   you?

14:08:58  14          MR. POTTER:  Objection, Your Honor.

14:09:00  15          THE WITNESS:  He asked me to find him a --

14:09:02  16          THE COURT:  Stop.

14:09:04  17      Next question.

14:09:05  18   BY MR. JUPITER:

14:09:05  19   Q.    Did you have a conversation with Mr. Hignite,

14:09:09  20   without telling us the content of the conversation --

14:09:11  21   A.    Yes, I did.

14:09:12  22   Q.    -- after he got your resignation?

14:09:15  23   A.    Yes, I did.

14:09:16  24   Q.    As a result of that conversation, what did you do

14:09:19  25   as part -- what did you do for him?

14:09:21   1   A.   I started to look for someone that was qualified to

14:09:25   2   take over -- well, not -- I didn't put out like a whole

14:09:30   3   lot of effort into it, but I tried my best to find

14:09:36   4   someone to take over the contract, because I resigned

14:09:38   5   from it and I really cared about the fact they wouldn't

14:09:43   6   have anyone to represent the service members.

14:09:46   7   Q.   When you weren't able to do that, what happened in

14:09:48   8   terms of the activities with ESGR?

14:09:52   9   A.   Nothing happened.  Basically everyone still

14:09:57   10  continued to come to me to ask for assistance when they

14:10:02   11  needed it.  And I gave assistance whenever I could.

14:10:10   12       At another point, Mr. Hignite asked me to

14:10:13   13  complete --

14:10:13   14       MR. POTTER:  Objection, Your Honor.

14:10:14   15       THE COURT:  Sustained.

14:10:15   16  BY MR. JUPITER:

14:10:16   17  Q.   Without telling us -- just tell us what you did,

14:10:18   18  without telling us --

14:10:19   19  A.   Okay.  I completed the PEPAS report.  I basically

14:10:25   20  still fielded any complaints that came in from service

14:10:28   21  members, and basically that was it.

14:10:37   22  Q.   Okay.  Now I want to draw your attention to

14:10:42   23  Government Exhibit Number 10.

14:11:27   24       You heard testimony, Colonel Cills testify about

14:11:33   25  Government's Exhibit 10, correct?

14:11:34   1    A.   Yes, I did.

14:11:34   2    Q.   Did you receive this e-mail from Colonel Cills?

14:11:38   3    A.   Yes, I did.

14:11:39   4    Q.   All right.  And what is the e-mail dealing with?

14:11:43   5    A.   The e-mail is dealing with ESGR funds.

14:11:47   6    Q.   And when you say it's dealing with ESGR funds, what

14:11:51   7    does, what do you understand in terms of the

14:11:57   8    requirements of funding matters?

14:12:00   9    A.   As --

14:12:01   10        MR. POTTER:  Objection, again.

14:12:04   11        THE COURT:  Overruled.

14:12:05   12        THE WITNESS:  As an ESGR contractor is

14:12:08   13   responsible for spending ESGR funds.

14:12:11   14   BY MR. JUPITER:

14:12:11   15   Q.   Can anyone -- can a volunteer do that?

14:12:14   16   A.   No.

14:12:15   17   Q.   And so when she was -- and who did you deal with in

14:12:19   18   terms of the expenditure of funds when you were doing

14:12:22   19   this in 2010?

14:12:23   20   A.   Colonel Linda Cills.

14:12:31   21   Q.   And during this time period, were you still the

14:12:37   22   ESGR contractor?

14:12:38   23   A.   Yes, I was.

14:12:39   24   Q.   Okay.  Now, what was your intent during -- at that

14:12:42   25   particular time with respect to the ESGR position, this

14:12:47  1    e-mail dated April 12, 2010?

14:12:50  2    A.    I was the ESGR contractor.  I was looking for a

14:12:55  3    replacement.  However, I still handled all the ESGR

14:13:04  4    contracting responsibilities because I still had the

14:13:06  5    contract.

14:13:07  6    Q.    Okay.  So you see that this -- in this particular

14:13:12  7    exhibit someone underlined, there's -- someone put on

14:13:21  8    the side of the paragraph in your response, the sentence

14:13:24  9    that says, "I'll still" -- "I'll be staying on in a

14:13:29  10   volunteer capacity."  What were you trying to convey at

14:13:34  11   that, in terms of your intent?

14:13:36  12   A.    I conveyed that as far as ESGR, I will be staying

14:13:45  13   on in a volunteer capacity.

14:13:46  14   Q.    And what were you talking about, in reference to

14:13:48  15   what time period?

14:13:50  16   A.    When I vacated the contract.

14:13:53  17   Q.    Okay.  And with respect to what you were doing at

14:13:59  18   that particular time, what was your understanding --

14:14:01  19   what were you -- what role were you -- what role were

14:14:03  20   you in at that time?

14:14:04  21   A.    I was the ESGR -- I still had the ESGR contract.

14:14:10  22   Q.    And with respect to -- did you continue to do

14:14:13  23   funding?

14:14:16  24   A.    Yes, I did.  I --

14:14:17  25   Q.    And who did you --

14:14:19   1    A.   I continued to obligate funds for my events.  I

14:14:27   2    continued to obligate funds for our giveaway items,

14:14:32   3    whether T-shirt, pens, things of that matter.  I

14:14:34   4    continued to obligate funds for venues where the events

14:14:42   5    were being held.

14:14:42   6    Q.   Were you planning on being a volunteer in ESGR?

14:14:44   7    A.   Absolutely.  It's a program that I really believe

14:14:48   8    in.

14:14:48   9    Q.   And when did you plan to act in a volunteer

14:14:53   10   capacity with ESGR?

14:14:54   11        MR. POTTER:  Objection, Your Honor.

14:14:55   12        THE WITNESS:  As soon as I gave up the

14:14:57   13   contract.

14:14:57   14        THE COURT:  Overruled.

14:15:15   15   BY MR. JUPITER:

14:15:15   16   Q.   Did there come a time when you went back to the

14:15:17   17   ESGR contract?

14:15:18   18   A.   As soon as I was done with the leadership

14:15:21   19   contract -- the leadership conference, I received a call

14:15:26   20   from Mr. Hignite regarding the ESGR contract.  He -

14:15:31   21   Q.   Okay.  As a result of that call, what did you end

14:15:33   22   up doing?

14:15:34   23   A.   I ended up taking back up the ESGR contract, since

14:15:41   24   they had no qualified individual to do it.

14:15:44   25   Q.   Was it your intent to keep the ESGR contract?

14:15:47   1     A.   I actively kept looking for a replacement for the

14:15:54   2     contract.

14:15:54   3     Q.   Why were you looking for a replacement for a

14:15:57   4     contract that was paying you money?

14:16:00   5     A.   Basically, I knew that I did not want to continue

14:16:05   6     with the late hours and the weekends.  I have one child,

14:16:11   7     and that's who suffered the most with my long hours --

14:16:17   8     well, actually my daughter and my now ex-husband.

14:16:22   9     Q.   Now, with regard to -- did you finally, did you

14:16:30   10    finally come up with someone who was acceptable?

14:16:32   11    A.   Yes.

14:16:34   12    Q.   Okay.  And who was that?

14:16:36   13    A.   Mrs. Janice Aelleyne.

14:16:41   14    Q.   How far back did you put in place to have

14:16:45   15    Ms. Aelleyne come and take over your contract position?

14:16:48   16              MR. POTTER:  Objection, Your Honor.  Leading.

14:16:54   17              THE COURT:  Overruled.

14:16:55   18              THE WITNESS:  I initially spoke to

14:16:58   19    Mrs. Aelleyne in November of 2010, and started to plan

14:17:00   20    for her to go to training, so that no one would say she

14:17:05   21    was not qualified.  So I coordinated a series of

14:17:09   22    training for her to attend.

14:17:11   23              MR. JUPITER:  Okay.  I want to show you what's

14:17:12   24    been marked as Defendant's Exhibit Number 8.

14:17:12   25         (Defendant's Exhibit 8 marked for identification.)

14:17:12  1    BY MR. JUPITER:

14:17:22  2    Q.   And this is a three-page document.  I want you to

14:17:24  3    look at the front and then the second page, and the

14:17:35  4    third page.

14:17:41  5         Do you recognize that document?

14:17:43  6    A.   I do.  But you went a little bit fast with the

14:17:46  7    second page.

14:17:47  8    Q.   The second page?

14:17:48  9    A.   If I could see the second page.

14:17:49  10        Uhm-hmm.

14:17:56  11   Q.   Okay?

14:17:57  12   A.   Yes.

14:17:57  13   Q.   And the third page.

14:18:03  14   A.   Yes.

14:18:04  15   Q.   Can you tell me what that document is?

14:18:06  16   A.   The document is an invitational travel order for

14:18:11  17   Mrs. Aelleyne to attend training, I believe it was in

14:18:16  18   Florida, from Maryland where she resided.

14:18:18  19   Q.   And who did that come from?

14:18:19  20   A.   That came from me.

14:18:21  21   Q.   Okay.  But who did -- okay.  The first page of that

14:18:25  22   document is in the form of what?

14:18:27  23   A.   It's in the form of an e-mail.

14:18:29  24   Q.   And who's the e-mail from?

14:18:32  25   A.   The e-mail is from Colonel Linda Cills.

14:18:36  1    Q.    And with regard to a category, what category of

14:18:40  2    your duties would this fall under?

14:18:44  3    A.    Colonel Cills was talking to me about the funding

14:18:47  4    for Mrs. Aelleyne's travel -- well, in the e-mail it's

14:18:50  5    about the funding for Mrs. Aelleyne's travel.  She was

14:18:54  6    in receipt of the invitational travel order that I had

14:18:57  7    set up.

14:18:58  8    Q.    Okay.  Now, did you have any discussions with

14:19:08  9    Colonel Lewis about Ms. Aelleyne?

14:19:12  10   A.    Yes, I did.

14:19:13  11   Q.    Now, as a result of those discussions, what did you

14:19:16  12   do?

14:19:19  13   A.    I started to send Mrs. Aelleyne with a command

14:19:29  14   concurrence for training to take over the ESGR contract.

14:19:51  15   Q.    Did Mr. -- did Colonel Lewis tell you -- well,

14:19:58  16   first of all, let me ask you this:  Was Colonel Lewis

14:20:10  17   involved in any way in you finding the replacement for

14:20:15  18   yourself?

14:20:15  19             MR. POTTER:  Objection.  Leading, Your Honor.

14:20:17  20             THE COURT:  Rephrase.

14:20:18  21   BY MR. JUPITER:

14:20:18  22   Q.    What, if any, role Colonel Lewis played in all of

14:20:22  23   this?

14:20:23  24             MR. POTTER:  Objection.  Leading, Your Honor.

14:20:24  25             THE COURT:  Overruled.

14:20:25  1    BY MR. JUPITER:

14:20:25  2    Q.    You may answer.

14:20:26  3    A.    General Lewis concurred with Mrs. Aelleyne's

14:20:31  4    replacing me for the contract, and basically I stayed as

14:20:37  5    a placeholder until Mrs. Aelleyne could leave Maryland

14:20:42  6    in June of 2011.

14:20:46  7    Q.    With respect to you staying as a placeholder, who

14:20:51  8    asked you to do that?

14:20:53  9    A.    General Lewis.

14:20:55  10   Q.    Okay.  And what time period is this?

14:20:59  11   A.    This was around November of 2010.

14:21:04  12   Q.    Okay.  And with respect to Mrs. Aelleyne's

14:21:11  13   availability, what did you understand in terms of when

14:21:15  14   she was going to be able to come?

14:21:18  15   A.    Mrs. Aelleyne was a teacher with the Maryland

14:21:22  16   school system, and she was completing her PhD and was

14:21:28  17   not available --

14:21:30  18              MR. POTTER:  Objection, Your Honor.

14:21:32  19              THE COURT:  Overruled.

14:21:33  20              MR. JUPITER:  Go ahead.

14:21:34  21              THE WITNESS:  -- was not available until the

14:21:35  22   end of the school year to take over the contract.

14:21:40  23   BY MR. JUPITER:

14:21:40  24   Q.    Did you convey that information to General Lewis?

14:21:44  25   A.    To -- yes.

14:21:46    1    Q.    Okay.  And after that, did you move forward with

14:21:51    2    this plan?

14:21:52    3    A.    Yes.  I started to organize training for

14:21:55    4    Mrs. Aelleyne, which she attended.

14:21:59    5    Q.    Okay.  I want to talk to you a little bit about

14:22:02    6    Dazarene Lescott.

14:22:04    7    A.    Yes.

14:22:05    8    Q.    How did she come to be hired?

14:22:07    9    A.    Ms. Lescott came to be hired because when I had the

14:22:13   10    conversation with Mr. Hignite, I told him the only way I

14:22:17   11    would take over the contract was if I had an assistant.

14:22:22   12    Q.    What was she -- what was her role?

14:22:24   13    A.    She was a secretary.

14:22:25   14    Q.    Okay.  Now --

14:22:27   15    A.    Basically.

14:22:28   16    Q.    Now, could you explain -- did you have any

14:22:30   17    conversation with her with regard to weekend hours?

14:22:34   18    A.    The ESGR contract was such that I wanted her to

14:22:40   19    understand that for when she worked evenings or

14:22:45   20    weekends, she could take a day off during the week.

14:22:48   21    Because you could not allocate more than 40 hours in any

14:22:54   22    given week.

14:22:56   23    Q.    You heard her testimony, that you told her that

14:22:59   24    anything on the weekends was volunteer.  Did you tell

14:23:03   25    her that?

14:23:04  1   A.   Never.  No.

14:23:04  2   Q.   Did you advise her with regard to timekeeping on

14:23:09  3   weekends?

14:23:09  4        MR. POTTER:  Objection.  Leading, Your Honor.

14:23:10  5        THE COURT:  Sustained.

14:23:11  6   BY MR. JUPITER:

14:23:11  7   Q.   What did you advise her with regard to timekeeping?

14:23:14  8   A.   As it relates to timekeeping, the Deltek system is

14:23:20  9   built such that you can only enter time from Monday

14:23:23  10  through Friday, 8:00 to 5:00.  If work was required on

14:23:30  11  the weekend, we could switch out the time for the

14:23:34  12  weekend by giving her a day off during the week, which I

14:23:38  13  did.

14:23:40  14  Q.   Now, had you -- how are her duties different from

14:23:47  15  yours?

14:23:49  16  A.   Ms. Lescott was an administrative assistant.

14:23:54  17  Basically she did secretarial duties.  I was an

14:24:00  18  executive director for, on the ESGR contract, and as

14:24:04  19  such I was responsible for any mediation briefings,

14:24:10  20  building the volunteer committee, finding a state chair,

14:24:15  21  holding the events and doing the briefings.  She was not

14:24:22  22  qualified to do any briefings.

14:24:23  23  Q.   What did you do -- how often would you meet with

14:24:26  24  her?

14:24:28  25  A.   I met with her probably maybe twice a month, if

14:24:31  1    that much.

14:24:33  2    Q.   Okay.  And when you met with her, how long would

14:24:36  3    you meet?

14:24:37  4    A.   Ten, twenty minutes, basically.  Each time that she

14:24:42  5    came over here was to pick up supplies for events for

14:24:48  6    St. Thomas.  We had ordered T-shirts, coffee mugs, a

14:24:54  7    whole lot of giveaway items.  And she would basically

14:24:59  8    come by, pick it up, we'd have a short conversation and

14:25:06  9    then she would leave.

14:25:06  10   Q.   With regard to the PEPAS report, is that something

14:25:09  11   that you had to do with her, or without her?

14:25:11  12   A.   Well, PEPAS report she could do to a limited

14:25:16  13   extent.  Basically, her responsibility as far as PEPAS

14:25:20  14   report was to keep track of the events that we had.

14:25:26  15   Q.   You heard the testimony of Staff Advocate Judge

14:25:35  16   Marise James, and she indicated she had a conversation

14:25:41  17   with you at an event at The Palms.  Did you see Marise

14:25:45  18   James at the event at The Palms?

14:25:48  19   A.   The event that Major James referred to was on

14:25:55  20   St. Thomas, and yes, I did see her at that event, and I

14:25:59  21   welcomed her back.

14:26:00  22   Q.   Did you convey to her that you were a volunteer?

14:26:04  23   A.   No.

14:26:05  24   Q.   Okay.  At any time that you held this ESGR contract

14:26:11  25   position, did you tell anyone that you were a volunteer?

14:26:13   1    A.   No, I didn't.

14:26:15   2              MR. POTTER:  Objection, Your Honor.  Leading.

14:26:16   3              THE COURT:  Sustained.

14:26:29   4    BY MR. JUPITER:

14:26:29   5    Q.   As ESGR -- well, let me ask you this:  What's a

14:26:36   6    Boss Lift, B-o-s-s, L-i-f-t?

14:26:39   7    A.   The Boss Lift is an event where we invite employers

14:26:44   8    on basically to familiarize them and orient them to our

14:26:49   9    program, to the ESGR program.  It is a trip that they

14:26:54   10   are scheduled on the -- we -- in this event we used the

14:27:02   11   National Guard plane to Puerto Rico to hold the Boss

14:27:07   12   Lift.

14:27:07   13   Q.   And when was that?

14:27:11   14   A.   I think it was April of 2010, or April or May of

14:27:17   15   2010.

14:27:17   16   Q.   Okay.  Did anyone in the leadership attend the Boss

14:27:22   17   Lift?

14:27:22   18              MR. POTTER:  Objection.

14:27:24   19              THE WITNESS:  General Rivera attended the Boss

14:27:28   20   Lift.

14:27:28   21              THE COURT:  Go ahead.

14:27:29   22   BY MR. JUPITER:

14:27:31   23   Q.   And in terms of who can put on the Boss Lift, whose

14:27:36   24   responsibility is that?

14:27:37   25   A.   Only the ESGR contractor can put on the Boss Lift,

14:27:41   1    because it involves funds.

14:27:43   2    Q.   You heard the testimony of General Lewis with

14:27:48   3    respect to conversation that he had with you regarding

14:27:52   4    the ESGR position.  Is that true?

14:27:55   5           MR. POTTER:  Objection, Your Honor.

14:27:56   6           THE COURT:  Sustained.

14:27:58   7    BY MR. JUPITER:

14:27:59   8    Q.   Could you tell us about any conversations with

14:28:03   9    General Lewis about holding these two positions?

14:28:07  10    A.   We never had any conversation, other than my

14:28:13  11    assisting him in finding a replacement.

14:28:18  12    Q.   And you conveyed -- and what was it that you

14:28:20  13    conveyed to him?

14:28:22  14           MR. POTTER:  Objection.  Leading, Your Honor.

14:28:24  15           THE COURT:  Overruled.

14:28:27  16           THE WITNESS:  I basically conveyed to him that

14:28:29  17    we were looking for a replacement -- as a matter of

14:28:32  18    fact, he met with one of the persons that I recommended,

14:28:39  19    Ms. Kainuma Simmonds.

14:28:45  20    BY MR. JUPITER:

14:28:45  21    Q.   Now, General Lewis, when he held the position as

14:28:47  22    your supervisor, did he hold any meetings?

14:28:54  23    A.   Yes.

14:28:54  24    Q.   Can you tell us about the staff meetings?

14:28:56  25    A.   We had staff meetings every Tuesday at the

14:29:00  1    National Guard headquarters.  Each directorate, which I

14:29:06  2    was one, the J5 directorate, had to submit our

14:29:13  3    presentation slides for that meeting.

14:29:18  4    Q.   And with regards to those, did you -- what else did

14:29:21  5    you have to do at the meeting?

14:29:23  6    A.   Briefed on my strategic plans and policy position,

14:29:29  7    as well as the ESGR contract.

14:29:31  8    Q.   So would you, when you were ESGR contractor, alone,

14:29:36  9    did you submit, did you brief on ESGR?

14:29:40  10   A.   I did.  Yes.

14:29:42  11   Q.   Okay.  Did you continue to do so after you were

14:29:46  12   hired?

14:29:47  13            MR. POTTER:  Objection, Your Honor.

14:29:49  14            THE WITNESS:  I did.

14:29:49  15            THE COURT:  Sustained.

14:29:50  16   BY MR. JUPITER:

14:29:50  17   Q.   What did you do with respect to those briefings

14:29:53  18   after you were hired?

14:29:54  19   A.   After I was hired, I briefed on the complaints that

14:29:58  20   I received, and any problems -- any problems that the

14:30:04  21   service members were encountering as it relates to the

14:30:12  22   USERRA, the law, and their return back from their

14:30:16  23   deployment.

14:30:29  24   Q.   Ms. Morales, did you ever try to trick anyone with

14:30:37  25   respect to your position with ESGR?

14:30:40  1    A.   I did not.  I never tried to trick anyone.  I

14:30:43  2    held -- I continued to hold events as an ESGR

14:30:47  3    contractor.  I continued to do the briefings, the

14:30:51  4    reintegration briefings, which were required

14:30:55  5    pre-deployment and post-deployment at the 30-, 60- and

14:30:59  6    90-day mark.  I continued to meet with employers as well

14:31:05  7    as service members regarding any issues that potentially

14:31:09  8    came up as it relates to their full-time employment.

14:31:27  9    Q.   Was ESGR an 8:00 to 5:00 position?

14:31:30  10   A.   Never.

14:31:52  11   Q.   With respect to your weekend hours, how long would

14:31:57  12   you work over the weekends?

14:31:58  13   A.   Basically about 20, 25 hours on the weekends.

14:32:05  14   Q.   You combined Saturday and Sunday?

14:32:08  15   A.   Correct.

14:32:08  16   Q.   And where would you provide those hours when you

14:32:12  17   held the military tech position and you held the ESGR

14:32:16  18   position?

14:32:17  19   A.   I conducted -- I held hours both at my real estate

14:32:22  20   office and at the National Guard -- in my office at the

14:32:25  21   National Guard.

14:32:29  22   Q.   With respect to during the week, how many hours

14:32:33  23   were you putting in during the week, Monday through

14:32:35  24   Friday?

14:32:36  25   A.   Basically, five, six hours every day, because I had

| | | |
|---|---|---|
| 14:32:44 | 1 | to return calls in the evenings, yeah, and meet with |
| 14:32:48 | 2 | volunteers. |
| 14:32:52 | 3 | MR. JUPITER:  I tender the witness, Your Honor. |
| 14:32:53 | 4 | THE COURT:  Attorney Potter? |
| 14:32:55 | 5 | MR. POTTER:  Thank you, Judge. |
| 14:33:00 | 6 | CROSS-EXAMINATION |
| 14:33:01 | 7 | BY MR. POTTER: |
| 14:33:02 | 8 | Q.   Good afternoon, Mrs. Morales. |
| 14:33:03 | 9 | A.   Good afternoon, Mr. Potter. |
| 14:33:15 | 10 | Q.   Now, your -- |
| 14:33:20 | 11 | MR. JUPITER:  I'm sorry, Your Honor.  I move to |
| 14:33:22 | 12 | admit Defense Exhibit Number 1 and Defense Exhibit |
| 14:33:27 | 13 | Number 8. |
| 14:33:33 | 14 | THE COURT:  Attorney Potter? |
| 14:33:34 | 15 | MR. POTTER:  We object, Your Honor. |
| 14:33:35 | 16 | THE COURT:  To each of them? |
| 14:33:37 | 17 | MR. POTTER:  To each of them. |
| 14:33:38 | 18 | THE COURT:  All right.  It's under advisement. |
| 14:33:41 | 19 | Place Number 8 on the Elmo, Attorney Jupiter, |
| 14:33:44 | 20 | please. |
| 14:33:56 | 21 | MR. JUPITER:  It's three pages. |
| 14:34:06 | 22 | THE COURT:  Turn to the second page, please. |
| 14:34:21 | 23 | Third. |
| 14:34:46 | 24 | All right.  Thank you. |
| 14:34:47 | 25 | Under advisement. |

BY MR. POTTER:

Q.   Ms. Morales, you were hired by the National Guard when?

A.   Which position, sir?

Q.   The initial time you came on with the National Guard?

A.   In 1984.

Q.   And you worked for them for --

A.   Twenty-one years.

Q.   And in those 21 years, you were not an actually employee, were you?

A.   Excuse me?

Q.   In those 21 years as a full-time member of the Guard, you were a full-time member for the Guard in those 21 years?

A.   In those 21 years, I served as military technician as well as active Guard officer.

Q.   And in those 21 years that you were with the Guard, you never held outside employment, full-time, at the same hours you were working for the Guard, did you?

A.   No, I did not.

Q.   And you didn't do that because you know that's something that you were not permitted to do?

A.   That is not true.

Q.   You have a master's degree?

14:36:29    1    A.    Yes, I do.

14:36:31    2    Q.    You have very extensive knowledge and training in

14:36:40    3    the Guard, in the rules and regulations that the Guards

14:36:44    4    abide by, do you not?

14:36:46    5    A.    I have extensive training in the Guards in a number

14:36:50    6    of areas, and that's why they said that I was excellent

14:36:55    7    at what I do.

14:36:56    8    Q.    I'm not disputing that.

14:37:01    9          The --

14:37:05   10          MR. POTTER:  Can I bring up Government's

14:37:05   11    Exhibit 1.8?

14:37:27   12          Can we have it published, Your Honor?  I think it's

14:37:31   13    been admitted.

14:37:46   14          (Exhibit published.)

14:37:46   15    BY MR. POTTER:

14:37:46   16    Q.    Ms. Morales, this is your resume?

14:37:49   17    A.    That is correct.

14:37:51   18    Q.    And you submitted that resume to the National Guard

14:37:54   19    when you were trying to get rehired in 2010; is that

14:37:59   20    correct?

14:38:00   21    A.    The National Guard got my resume after the fact.  I

14:38:06   22    had already started, employed when I turned -- when I

14:38:09   23    gave them my resume.

14:38:10   24    Q.    And that's the resume you gave to them?

14:38:13   25    A.    I believe so, uhm-hmm.

14:38:14   1    Q.   Is there a reason you didn't list that you were

14:38:17   2    full-time military -- that you were full-time ESGR

14:38:21   3    person with the MPSC on your resume?

14:38:28   4    A.   There are a number of positions that are not on my

14:38:31   5    resume.  My position as a logistics management officer

14:38:35   6    in the Guard is not on my resume.  My position as

14:38:40   7    assistant analyst is not on my resume.

14:38:43   8    Q.   Is there a reason --

14:38:45   9    A.   My position with the MPSC.

14:38:48   10   Q.   Is there a reason the MPSC --

14:38:51   11   A.   There's no reason for it to be there.  It was a

14:38:53   12   contracting position.  None of my contracting positions

14:38:56   13   are on there, neither Hovensa or Triangle or MPSC.

14:39:02   14   Q.   Okay.  You have on there that you're a financial

14:39:10   15   planner?

14:39:10   16   A.   Correct.

14:39:11   17   Q.   You have specific training in that, ma'am?

14:39:13   18   A.   I got my Series 6 licenses.

14:39:16   19   Q.   Just a yes or no.  Do you have specific training in

14:39:20   20   that?

14:39:20   21   A.   I had training for financial planning, correct.

14:39:24   22   Q.   And you were the human resource director for the

14:39:27   23   Virgin Islands National Guard, weren't you?

14:39:29   24   A.   Yes, I was.

14:39:30   25   Q.   And you were familiar with the rules and

14:39:32  1    regulations with respect to employment matters with

14:39:36  2    respect to the National Guard?

14:39:37  3    A.    Absolutely.

14:39:39  4    Q.    Yes.

14:39:46  5          And you were also the chief negotiator for labor

14:39:50  6    contracts for civil service employees when you were with

14:39:54  7    the National Guard --

14:39:57  8    A.    The --

14:39:58  9    Q.    -- is that correct?

14:39:59  10   A.    -- union -- yes.

14:40:00  11   Q.    Yes?

14:40:01  12   A.    That was when the union came into effect in the

14:40:06  13   National Guard.

14:40:07  14   Q.    And you were familiar with the chief labor

14:40:10  15   contractor, you're very familiar with the rules and

14:40:13  16   policies of the National Guard with respect to

14:40:17  17   employees, and specifically with respect to military

14:40:21  18   technicians, are you not?

14:40:22  19   A.    I am.

14:40:28  20   Q.    So when you started in 2007 as the ESGR

14:40:40  21   representative, were you not told that you're a contract

14:40:45  22   employee, ma'am?

14:40:46  23   A.    Absolutely not.  I was told I was a contractor.

14:40:51  24   Q.    Were you given an employee handbook at the time,

14:40:54  25   ma'am?

14:40:55  1    A.   I have one --

14:40:57  2    Q.   You don't recall whether or not you got an employee

14:41:00  3    handbook when you started with the --

14:41:01  4    A.   Basically --

14:41:02  5    Q.   -- ESGR?

14:41:04  6    A.   -- when I started ESGR, I was on St. Croix.  The

14:41:06  7    first training --

14:41:07  8    Q.   The question is, did you get --

14:41:09  9    A.   I --

14:41:09  10   Q.   -- the ESGR employee handbook?

14:41:13  11   A.   I really don't recall.  I'm sorry.

14:41:16  12   Q.   And in that employee handbook, it would list you as

14:41:19  13   an employee, a contract employee --

14:41:22  14   A.   I can't --

14:41:23  15   Q.   -- of the MPSC?

14:41:28  16         MR. JUPITER:  Objection, Your Honor.  She said

14:41:29  17   she don't recall.

14:41:30  18         THE COURT:  In order to have a clear record,

14:41:32  19   only one person can speak at a time.

14:41:33  20      So if the objection is interposed, wait till the

14:41:38  21   Court rules on it before anyone speaks.

14:41:41  22      Okay.  Go ahead.

14:41:44  23   BY MR. POTTER:

14:41:44  24   Q.   Ms. Lescott was also a contract employee?

14:41:48  25   A.   Yes, she was.

14:41:51   1   Q.   And she had set hours, didn't she?

14:41:54   2   A.   As a secretary, absolutely.

14:41:56   3   Q.   As a contract employee she had set hours, didn't

14:42:01   4   she?

14:42:01   5   A.   As a secretary, yes, she did.

14:42:05   6   Q.   She was equal to you, was she not?

14:42:14   7   A.   Never.

14:42:17   8   Q.   You were above her?

14:42:19   9   A.   I was an executive director for the program.

14:42:33   10   Q.   And your hours, whether executive assistant or not,

14:42:39   11   were prescribed by Mr. Hignite, and those were 9:00 to

14:42:43   12   5:00; isn't that true?

14:42:45   13   A.   That is false.

14:42:46   14           MR. JUPITER:   Objection.   Compound, Your Honor.

14:42:48   15           THE COURT:   Okay.   Overruled.

14:42:50   16           THE WITNESS:   That is false.   And I -- just for

14:42:53   17   clarification, I was the --

14:42:54   18   BY MR. POTTER:

14:42:55   19   Q.   No clarification necessary.

14:42:57   20   A.   Okay.

14:43:06   21   Q.   And if you are a contract employee and Ms. Lescott

14:43:13   22   is also a contract employee, you are not her supervisor;

14:43:17   23   isn't that true?

14:43:18   24   A.   Pardon?

14:43:19   25   Q.   If you are a contract employee for the ESGR and

14:43:26   1   Mrs. Lescott is a contract employee for the ESGR, you

14:43:30   2   are both contract employees, correct?

14:43:32   3   A.   We were both contractors, correct.

14:43:38   4   Q.   And you heard her testify that her hours were 9:00

14:43:40   5   to 5:00?

14:43:43   6   A.   Her hours were from 8:00 to 4:00, if I recall

14:43:47   7   correctly.

14:43:48   8   Q.   And you're saying your hours were whenever you

14:43:51   9   wanted to work, or not work?

14:43:53   10   A.   As the executive director, I did not have any set

14:43:58   11   hours as an MPSC contractor, no.

14:44:01   12   Q.   Okay.  So in spite of what the handbook may have

14:44:09   13   said, you worked however and whenever you want to work?

14:44:14   14   A.   I did that for three years.

14:44:21   15   Q.   And in 2010, when you were, you had no desire to

14:44:28   16   get back into the Guard?

14:44:30   17   A.   General Lewis contacted me regarding --

14:44:35   18   Q.   Yes, but did you have a desire to get back into the

14:44:38   19   Guard?

14:44:38   20   A.   I had no issue with it.

14:44:42   21   Q.   You had no issue with getting back into the Guard?

14:44:44   22   A.   No.

14:44:48   23   Q.   It's something that you wanted to do?

14:44:50   24   A.   Yes.

14:45:00   25   Q.   Didn't General Lewis tell you that you can't have

14:45:08   1   two positions full-time, eight hours a week, so you had

14:45:14   2   to resign?

14:45:15   3   A.   Never had that conversation with General Lewis.

14:45:22   4   Q.   When you were hired in 2010 as a full-time member

14:45:26   5   of the Guard, what were your hours?

14:45:30   6   A.   I basically got into work about 7:15 to 7:30.

14:45:36   7   Q.   What were the set hours for someone in your

14:45:38   8   position?

14:45:41   9   A.   As a director, again, we do not have set hours.

14:45:49   10   Q.   So any -- so, again, as a military tech person, you

14:45:54   11   work whatever hours you wanted to work?

14:45:56   12   A.   I reported to work between 7:15 and 7:30, and I

14:46:02   13   stayed to work until late at night.

14:46:05   14   Q.   And you worked five days a week for the ESGR?

14:46:14   15   A.   I worked seven days a week for ESGR.

14:46:19   16   Q.   And you were paid for how much?

14:46:22   17   A.   I was paid for 40 hours for ESGR.

14:46:24   18   Q.   And you were paid for 40 hours for the military

14:46:29   19   position, also, weren't you?

14:46:31   20   A.   I was paid for 40 hours.

14:46:32   21   Q.   So you were paid 80 hours, you were paid 80 hours

14:46:39   22   for a 40-hour workweek; is that true?

14:46:43   23   A.   That is false.

14:46:46   24   Q.   No one authorized that, Ms. Morales; isn't that

14:46:51   25   true?

14:46:51   1        No one authorized that?

14:46:52   2   A.   No one authorized what?

14:46:54   3   Q.   That.

14:46:57   4   A.   That?

14:46:58   5   Q.   Your working -- your being paid for 80 hours in a

14:47:03   6   40-hour week?

14:47:06   7   A.   I can't -- no, I had no conversation with anyone as

14:47:12   8   it relates to my ESGR contract hours.

14:47:16   9   Q.   Mr. Hignite didn't know that you were a full-time

14:47:21   10  employee of the National Guard?

14:47:23   11  A.   Mr. Hignite testified that I called him and told

14:47:26   12  him I got hired at the National Guard, which was true.

14:47:32   13  Q.   He told you that?  June -- I think his testimony

14:47:36   14  was in June of 2010, that you contacted him --

14:47:42   15       MR. JUPITER:  Objection, Your Honor.

14:47:43   16       THE COURT:  Sustained.

14:47:49   17  BY MR. POTTER:

14:47:49   18  Q.   What about March to June?

14:47:50   19  A.   When I --

14:47:51   20  Q.   You didn't tell Mr. Hignite that you were a

14:47:53   21  full-time member of the Guard between March and June;

14:47:56   22  isn't that true?

14:47:57   23  A.   That is false.

14:48:13   24  Q.   You didn't tell anyone in the Guard, Ms. Morales,

14:48:17   25  that you were working two jobs, getting paid 80 hours in

14:48:24  1    a 40-hour week.  You didn't tell them that, didn't you?

14:48:29  2    A.   Everyone in the Guard knew I was the contractor for

14:48:33  3    ESGR and the military technician.  I never hid any of my

14:48:40  4    duties at any time.

14:48:40  5    Q.   But you hid that you were being paid.

14:48:45  6    A.   No, I did not.

14:48:47  7    Q.   You told Major James that you were volunteering --

14:48:51  8    A.   I did not.

14:48:52  9    Q.   -- because you were hiding the fact that you were

14:48:54  10   being paid?

14:48:57  11   A.   I did not.

14:48:58  12   Q.   You told --

14:49:03  13        MR. POTTER:  Can we see -- let me see

14:49:08  14   Government's Exhibit Number 10.

14:49:33  15        Can we have it published?

14:49:34  16        (Exhibit published.)

14:49:36  17   BY MR. POTTER:

14:49:37  18   Q.   So you know Colonel Cills?

14:49:38  19   A.   Yes, I know Colonel Cills.

14:49:40  20   Q.   You know her very well?  Colonel Cills?

14:49:42  21   A.   I know she works with me -- worked with me in the

14:49:45  22   National Guard.  What do you define as "very well"?

14:49:49  23   Q.   Well, do you know who she is?

14:49:51  24   A.   I do.  I've said that.

14:49:52  25   Q.   And you've seen her around the National Guard in

14:49:54  1    the 20 years or so that you have been a member of the

14:49:57  2    Guard?

14:49:57  3    A.    Colonel Cills worked for me, as a matter of fact,

14:50:02  4    in the National Guard.

14:50:04  5    Q.    You know better.  Yes.

14:50:06  6          So in April -- when were you hired as a full-time

14:50:10  7    military tech person in the National Guard?

14:50:12  8    A.    In March of 2010.

14:50:14  9    Q.    So right after you were hired, approximately, maybe

14:50:20  10   a little bit more than a month, about a month later,

14:50:25  11   Colonel Cills sends you this e-mail, and she says, "I

14:50:32  12   know you are no longer the ESGR coordinator."

14:50:41  13         Did you respond and say, "No, no, I am still"?

14:50:44  14         Did you correct her, that she was in error?

14:50:46  15   A.    I was never the ESGR coordinator.

14:50:51  16   Q.    We could play semantics, but she -- did you correct

14:50:55  17   her?

14:50:56  18   A.    There was no need for me -- I addressed what she

14:50:59  19   wanted me to address, which was the funding.  The only

14:51:03  20   way I can address that is as a contractor.

14:51:05  21   Q.    And you said you're volunteering, you're going to

14:51:09  22   remain on as a volunteer?

14:51:10  23   A.    A volunteer cannot handle the ESGR funding, which

14:51:15  24   Colonel Cills is aware of.

14:51:16  25   Q.    But you said Mr. Hignite authorized to do that.

14:51:19  1      Isn't that what you said in that e-mail?

14:51:20  2      A.   A contractor cannot -- is the only person that can

14:51:25  3      handle ESGR funds.  A volunteer cannot.

14:51:34  4      Q.   You were deceiving Linda Cills by saying, "I am

14:51:45  5      going to remain on in a voluntary capacity," when you

14:51:53  6      know you were actually being paid; isn't that true?

14:51:57  7      A.   No.

14:52:15  8      Q.   You submitted a letter of resignation from the

14:52:22  9      MPSC -- to the MPSC in June of 2010; is that correct?

14:52:31  10     A.   Yes.

14:52:36  11     Q.   So when you submitted that letter, you were very

14:52:44  12     much aware of this conversation that you had with Linda

14:52:51  13     Cills, where you were indicating to her that you had

14:52:55  14     already left that position.  Isn't that true?

14:52:57  15     A.   That is false.

14:53:14  16     Q.   Now, in Two Thousand- -- I think your testimony was

14:53:20  17     that in 2010, you had a desire to get back to ESGR?

14:53:30  18              MR. JUPITER:  Object, Your Honor.

14:53:32  19              THE COURT:  Overruled.

14:53:36  20              THE WITNESS:  What I said is that I had a

14:53:40  21     desire -- no, I did not.

14:53:41  22     BY MR. POTTER:

14:53:42  23     Q.   You had no desire to get back to work for the ESGR?

14:53:45  24     A.   I have no idea what you're asking me.

14:53:48  25     Q.   Okay.  Did you go to Mr. Hignite and indicate to

14:54:01  1    him that you were not being challenged enough, you

14:54:06  2    didn't like your military tech position, and you wanted

14:54:10  3    to be rehired as the ESGR representative?

14:54:14  4    A.    That is false.

14:54:26  5    Q.    But ultimately that's what happened, though.  You

14:54:30  6    asked to be hired?

14:54:31  7    A.    That is false.

14:54:35  8    Q.    You're saying he begged you?

14:54:36  9    A.    Mr. Hignite called me and told me he couldn't find

14:54:39  10   anyone that was qualified for the position, and would I

14:54:42  11   be willing to come back.

14:54:45  12   Q.    So in your view, he begged you to come back because

14:54:49  13   only you could fill this position?

14:54:56  14         Yes?

14:54:57  15   A.    Mr. Hignite asked me to come back into the contract

14:55:00  16   position because he could not find anyone else that was

14:55:04  17   qualified.

14:55:06  18   Q.    And with how your testimony was, that you were so

14:55:09  19   busy, you couldn't find enough hours in the day to get

14:55:13  20   things done --

14:55:14  21         MR. JUPITER:  Your Honor, I object to counsel

14:55:15  22   being argumentative.  This is argumentative.

14:55:19  23         THE COURT:  All right.  Sustained.

14:55:20  24   BY MR. POTTER:

14:55:20  25   Q.    You decided to jump back into the ESGR position?

14:55:29  1   A.   I don't understand your question.

14:55:30  2   Q.   You never told anybody at the National Guard that

14:55:48  3   you were rehired as a full-time ESGR contract employee?

14:55:56  4         MR. JUPITER:  Objection.  Asked and answered.

14:55:59  5         THE COURT:  Overruled.

14:56:03  6         THE WITNESS:  What was your question?  I'm

14:56:05  7   sorry.

14:56:05  8   BY MR. POTTER:

14:56:05  9   Q.   You didn't tell anybody in the Guard that you were

14:56:10  10  hired back as a full-time ESGR, 9:00 to 5:00 employee?

14:56:23  11  A.   I was never a 9:00 to 5:00 employee.  It was clear

14:56:28  12  that I had the contract.  Mr. Hignite sent an e-mail to

14:56:34  13  General Lewis.

14:56:35  14  Q.   Did you tell anybody back at the Guard, your

14:56:38  15  colleagues --

14:56:39  16  A.   Uhm-hmm.

14:56:39  17  Q.   -- that you had just been hired as a full-time ESGR

14:56:46  18  employee?

14:56:51  19  A.   I did my functions -- there was no need --

14:56:55  20  Q.   That's not my, that's not my question.  Did you?

14:57:00  21  A.   Did I tell anyone that I was on contract with ESGR

14:57:04  22  in September of 2010?

14:57:07  23       Yes, I did.

14:57:13  24  Q.   And did that person or persons who you told, did

14:57:18  25  you also tell them, "And guess what?  I'm also a

14:57:23  1    full-time 9:00 to 5:00 military tech employee"?

14:57:29  2    A.    You asked me if I told my colleagues.  I'm at work

14:57:35  3    every day.  My colleagues see me at work.

14:57:40  4    Q.    But some of them testified that you told them you

14:57:42  5    were volunteering.

14:57:44  6    A.    People testify to a lot of things when they're

14:57:49  7    nervous about covering themselves.

14:57:52  8    Q.    But you're not doing that?

14:57:54  9    A.    I had no need to.  I never hid my ESGR contract

14:57:59  10   responsibilities.  I never hid that I was planning a

14:58:06  11   senior leadership conference --

14:58:08  12   Q.    In spite of what that e-mail says?

14:58:10  13   A.    -- or anything else.

14:58:11  14   Q.    In spite of what that e-mail says?

14:58:13  15   A.    I never hid any of my functions --

14:58:16  16   Q.    In spite of what Major Morales said -- Major James

14:58:19  17   said?

14:58:20  18   A.    I'll wait for you to ask me a question.

14:58:22  19   Q.    Yes.

14:58:31  20        General Rivera testified that you could not hold a

14:58:42  21   full-time military tech position and also hold the ESGR

14:58:50  22   full-time position.  Did you hear him testify to that?

14:58:55  23   A.    I heard him give testimony to that, which is false.

14:59:01  24   Q.    General Rivera, in your view, does not understand

14:59:08  25   the rules and regulations of a full-time military tech

14:59:13  1    employee of the Virgin Islands National Guard?

14:59:15  2    A.   General Rivera doesn't understand a lot of things

14:59:20  3    for the V.I. National Guard.   That's why he has officers

14:59:27  4    that are experts.

14:59:28  5    Q.   That's fine.

14:59:29  6         General Lewis doesn't understand the rules and

14:59:34  7    regulations with respect to a full-time military tech

14:59:37  8    person assigned to the National Guard?

14:59:41  9    A.   I can't answer what General Lewis understands.   I

14:59:46  10   could tell you what General Rivera doesn't know, though.

14:59:49  11   Q.   Okay.

15:00:07  12        Were there times in -- let's go back to September.

15:00:19  13   After you were rehired by the Guard in September of

15:00:28  14   2010, did there come a time that you were under the

15:00:31  15   supervision of Colonel Ruan?

15:00:36  16   A.   In September of 2010?

15:00:39  17   Q.   No.   After September 2010, did there come a time?

15:00:43  18   A.   January of 2011, I believe Colonel Ruan took over

15:00:50  19   as the director of joint staff.

15:00:52  20   Q.   Okay.   And I think he had replaced General Lewis?

15:01:00  21   A.   Yes.

15:01:01  22   Q.   So Ruan was now your new supervisor; isn't that

15:01:05  23   true?

15:01:05  24   A.   Yes.

15:01:06  25   Q.   Did you go to General -- Colonel Ruan and say,

15:01:09   1   "Colonel, I know you're just coming into this position.

15:01:14   2   You should know I am a full-time military tech person,

15:01:21   3   and I am also the full-time ESGR representative"?

15:01:27   4        Did you tell him that?

15:01:31   5   A.   When anyone takes over a position --

15:01:32   6   Q.   Did you tell him that?  Yes or no?

15:01:34   7   A.   I would hope they know who is working for them.

15:01:42   8   Q.   Ah.  And you're surprised that he didn't know?

15:01:49   9   A.   Any position that I've taken, I know who works for

15:01:53  10   me and who doesn't.

15:02:17  11   Q.   Let me show you Government's Exhibit 2.8.

15:02:57  12             MR. POTTER:  I think that's in evidence, Judge.

15:03:01  13             THE WITNESS:  Pardon?  Oh.

15:03:04  14             MR. POTTER:  Can we publish, Judge?

15:03:06  15             THE COURT:  Let's find out if it's in evidence.

15:03:23  16             MR. POTTER:  As well as Government's

15:03:23  17   Exhibit 6.8.

15:03:40  18        (Exhibit published.)

15:03:40  19   BY MR. POTTER:

15:03:40  20   Q.   Now, Ms. Morales, 6.8 -- sorry -- 2.8 is your time

15:03:47  21   sheet for the National Guard; is that correct?  For that

15:03:51  22   pay period?

15:03:51  23   A.   2.8 is on the left-hand side?

15:03:55  24   Q.   Yes.

15:03:56  25   A.   Correct.  That is a time and attendance record

15:04:06   1    signed by Colonel Ruan.

15:04:07   2    Q.   And Government's Exhibit 6.8.  Tell us what 6.8 is.

15:04:15   3    A.   6.8 is a Deltek time sheet for the contract for

15:04:22   4    ESGR.

15:04:29   5          MR. POTTER:  Now can we see the dates, the time

15:04:31   6    period for those documents?

15:04:31   7    BY MR. POTTER:

15:04:50   8    Q.   Have you ever -- you have taken the leave from the

15:04:53   9    National Guard while at the same time you were actually

15:05:00   10   working full-time as an ESGR contract person; isn't that

15:05:06   11   true?

15:05:08   12   A.   I was the ESGR contractor, yes.

15:05:14   13   Q.   And as a contract person, you requested leave?

15:05:28   14   A.   If I was unavailable to MPSC, yes, I submitted for

15:05:33   15   leave.

15:05:33   16   Q.   As a contractor, you submitted for leave?

15:05:38   17   A.   As long as I was unavailable, yes.

15:05:40   18   Q.   And you submitted for leave to be asked to be

15:05:44   19   excused for any given pay period or day of the week;

15:05:49   20   isn't that true?

15:05:50   21   A.   Any given time that I was unavailable, yes.

15:05:54   22   Q.   So you were expected to work 8:00 to 5:00 on any

15:06:02   23   given day as a contract employee?

15:06:05   24   A.   Pardon?

15:06:06   25   Q.   And if you're not seeking -- if you're not going to

15:06:10   1    work, you have to ask for time off; isn't that true?

15:06:13   2    A.   That's false.

15:06:15   3         MR. JUPITER:  Objection.

15:06:16   4         THE COURT:  Overruled.

15:06:21   5    BY MR. POTTER:

15:06:21   6    Q.   That's false?

15:06:23   7    If I should say you're an independent contractor,

15:06:25   8    why do you have to go to an employee -- employer and ask

15:06:29   9    for leave?

15:06:32   10   A.   Any time I was unavailable to MPSC, I ensured that

15:06:39   11   I turned in a leave slip, correct.

15:06:42   12   Q.   Okay.  So in 6.8, you submitted a leave slip for --

15:06:53   13   I can't see.

15:07:39   14        MR. POTTER:  Court's indulgence, Your Honor?

15:07:44   15        THE COURT:  Yes.

15:07:45   16        MR. POTTER:  Okay.  Bring up 2.8 for us,

15:07:52   17   please.

15:07:52   18   BY MR. POTTER:

15:07:53   19   Q.   So you requested leave from the National Guard for

15:08:01   20   June 10th and June 11th; is that correct?

15:08:07   21   A.   That is correct.

15:08:15   22   Q.   And for those very same days on June 10th and

15:08:23   23   June 11th, a Thursday and a Friday, you were working for

15:08:30   24   the ESGR?

15:08:36   25   A.   I need to see the entire thing.

15:09:44  1    Q.   I apologize, Ms. Morales.  We're trying to get this

15:09:49  2    straight.

15:09:49  3         So on the 10th and 11th of June, you worked

15:10:01  4    16 hours for the National Guard, correct?

15:10:06  5         You worked the Thursday and you worked the Friday,

15:10:08  6    correct?

15:10:08  7    A.   No.

15:10:15  8    Q.   You did not?

15:10:16  9    A.   You showed me the National Guard time sheet, in

15:10:20  10   which I took leave for 16 hours, Mr. Potter.

15:10:23  11   Q.   I apologize.

15:10:25  12        But you worked those very same days for ESGR?

15:10:30  13   A.   I accounted for 16 hours on my ESGR contract, yes.

15:10:35  14   Q.   You accounted for it.  So it was easy for you to

15:10:46  15   submit leave to the National Guard or leave to the

15:10:55  16   ESGR -- you didn't have a supervisor, did you?

15:10:59  17   A.   Pardon?

15:10:59  18   Q.   You had no supervisor here in St. Croix, did you?

15:11:02  19   A.   No, I did not.

15:11:03  20   Q.   You had no one knowing whether or not you were

15:11:06  21   actually working or not at any given time on any given

15:11:10  22   day; is that true?

15:11:10  23   A.   That was for three years.

15:11:12  24   Q.   Yes.

15:11:18  25        So here you told the Guard you're not working

15:11:20  1    today -- you told ESGR, "I'm not working today," and you

15:11:24  2    told the Guard, "I am working today"?

15:11:27  3    A.   That is not true.  You just showed me the leave

15:11:37  4    slip from the Guard.

15:11:38  5    Q.   You were not being deceptive with respect to the --

15:11:41  6    A.   No, I was not.

15:11:43  7    Q.   Okay.

15:11:53  8         Let me show you Government's Exhibit 2.19, and

15:12:18  9    Government's Exhibit 6.19.

15:12:47  10        Now in Government's Exhibit 2.19 you took leave.

15:12:54  11   You took leave on January 31st through February 4th; is

15:13:10  12   that correct?

15:13:13  13   A.   That is correct.

15:13:15  14   Q.   You took leave from the National Guard?

15:13:17  15   A.   Annual leave, correct.

15:13:21  16   Q.   And then let's look at what you did for MPSC.

15:13:45  17        For the very same period --

15:13:51  18        MR. JUPITER:  Your Honor, I would object to

15:13:52  19   counsel just testifying as to --

15:13:56  20        THE COURT:  I'm waiting for the question.

15:14:01  21   Overruled.

15:14:04  22   BY MR. POTTER:

15:14:04  23   Q.   That very same workweek you worked a full week for

15:14:09  24   MPSC?

15:14:11  25   A.   Mr. Potter, I think I made clear that if I worked

15:14:15   1    on a Saturday or Sunday evenings, during the week I

15:14:20   2    accounted for 40 hours, because the Deltek system does

15:14:26   3    not admit -- does not accept any time to show actual

15:14:34   4    time worked outside of 8:00 to 5:00, Monday through

15:14:39   5    Friday.

15:14:39   6    Q.   So you're on the honor system?

15:14:41   7    A.   Pardon?

15:14:42   8    Q.   You were on the honor system with MPSC, with the

15:14:46   9    Deltek system?

15:14:49   10   A.   Within 54 states and territories.

15:14:53   11   Q.   Okay.  But we don't all have two jobs?

15:14:56   12   A.   Some of them did.

15:14:57   13   Q.   At the same time?

15:14:58   14   A.   Absolutely.

15:14:59   15   Q.   So you're aware of other folks in your position who

15:15:05   16   were working --

15:15:07   17            THE COURT:  Let's move on.  That's not the

15:15:08   18   issue.

15:15:09   19            MR. POTTER:  Yes, Judge.

15:15:09   20       (Pause.)

15:15:29   21            MR. POTTER:  Court's indulgence, Judge?

15:15:30   22            THE COURT:  Yes.

15:15:31   23       (Pause.)

15:15:31   24   BY MR. POTTER:

15:15:31   25   Q.   So let me show you -- let me show you what is

15:15:49  1    marked as Government's Exhibit, I think it's 1.13.  And

15:16:33  2    tell us what that is?

15:16:35  3    A.   That is a direct deposit signup form for the

15:16:40  4    National Guard.

15:16:41  5    Q.   You were asking the Guard to send your money

15:16:44  6    directly -- wire moneys directly into your checking

15:16:49  7    account?

15:16:49  8    A.   Everyone has to be on direct deposit within the

15:16:53  9    Virgin Islands National Guard.  We don't have a choice.

15:17:04  10        MR. POTTER:  I may be done, Your Honor.  One

15:17:07  11   second.

15:17:15  12       (Pause.)

15:17:15  13        THE COURT:  Are you yielding the witness?

15:17:18  14        MR. POTTER:  Yes, I might be yielding the

15:17:21  15   witness, Your Honor.  One second.  Court's indulgence.

15:17:35  16       (Pause.)

15:17:35  17   BY MR. POTTER:

15:17:35  18   Q.   Were you eventually terminated from the National

15:17:37  19   Guard?

15:17:43  20   A.   Was I terminated from the National Guard?

15:17:46  21   Q.   From the National Guard.

15:17:50  22   A.   When?

15:17:51  23   Q.   The last time that you worked for the National

15:17:53  24   Guard --

15:17:53  25   A.   Uhm-hmm.

15:17:54  1   Q.   -- were you terminated?

15:17:55  2   A.   I lost my military membership, and as such was

15:18:01  3   given a 30-day notice for termination, correct.

15:18:06  4   Q.   And why was it that you lost your military

15:18:10  5   membership?

15:18:11  6   A.   Basically they were waiting for my temporary

15:18:15  7   clearance to come through.

15:18:17  8   Q.   And what happened with your temporary clearance?

15:18:20  9   A.   It never --

15:18:22  10       MR. JUPITER:  Objection.

15:18:23  11       THE COURT:   Sustained.

15:18:27  12       MR. POTTER:  I think that's all I have, Your

15:18:29  13  Honor.

15:18:29  14       THE COURT:  Redirect?

15:18:37  15                REDIRECT EXAMINATION

15:18:39  16  BY MR. JUPITER:

15:18:40  17  Q.   Were you approached by Colonel Ruan before you left

15:18:46  18  the Guard?

15:18:49  19  A.   I was approached by Colonel Ruan before I left the

15:18:53  20  Guard, that is correct.

15:18:53  21  Q.   And what was Colonel Ruan's position at that time?

15:18:56  22  A.   He was the director of joint staff.

15:19:00  23  Q.   And what, if anything, did Colonel Ruan offer you?

15:19:04  24       MR. POTTER:  Objection, Your Honor.

15:19:05  25       THE WITNESS:  He asked me if I was --

15:19:06    1          THE COURT:  Hold on.

15:19:07    2          Sustained.

15:19:09    3    BY MR. JUPITER:

15:19:09    4    Q.    What did -- what happened at that point?

15:19:13    5    A.    Colonel Ruan approached me regarding my staying as

15:19:25    6    a --

15:19:26    7          MR. POTTER:  Objection, Your Honor.

15:19:29    8          THE COURT:  Overruled.

15:19:31    9          MR. JUPITER:  Go ahead.

15:19:32   10          THE WITNESS:  -- as a civilian technician for

15:19:34   11    the National Guard in the J5 position.

15:19:40   12    BY MR. JUPITER:

15:19:40   13    Q.    So he wanted you to stay on?

15:19:42   14    A.    Yes, sir.

15:19:43   15    Q.    And this was in what month and in what year?

15:19:46   16    A.    That was in May of 2011.

15:19:50   17    Q.    And what, if anything, did you tell him?

15:19:53   18    A.    I told him that I was moving to the States, and

15:20:00   19    would not stay.

15:20:01   20    Q.    And why didn't you want to stay?

15:20:04   21    A.    Pardon?

15:20:04   22    Q.    Why didn't you want to stay?

15:20:06   23    A.    I did not want to stay because I basically had

15:20:10   24    already -- after I had gotten the 30-day notice, I

15:20:14   25    basically decided I was going to move back to Arlington,

15:20:18  1    Virginia.

15:20:20  2    Q.   The 30-day notice, are you allowed to appeal that?

15:20:24  3         MR. POTTER:  Objection, Your Honor.

15:20:25  4         THE COURT:  Sustained.

15:20:32  5    (Defendant's Exhibit 9 marked for identification.)

15:20:32  6    BY MR. JUPITER:

15:20:32  7    Q.   I want to show you what I've marked as Defendant's

15:20:35  8    Exhibit 9 and see if you recognize that.

15:20:38  9         THE COURT:  It's in evidence?

15:20:41  10        MR. JUPITER:  No, Your Honor.

15:20:43  11        THE COURT:  All right.

15:20:46  12   BY MR. JUPITER:

15:20:46  13   Q.   Do you recognize that?

15:20:51  14        Without telling us the content, what is it?

15:20:53  15   A.   A resume.

15:20:59  16   Q.   Are you looking at the screen, Defendant's Exhibit

15:21:02  17   Number 9?

15:21:03  18   A.   Yes.

15:21:04  19   Q.   And what do you see?

15:21:07  20        What is the date of it?

15:21:07  21   A.   Oh, sorry.  It's an e-mail.

15:21:10  22   Q.   Okay.  And what's the date of it?

15:21:13  23   A.   September 27th, 2010.

15:21:15  24   Q.   Okay.  And who is it from?

15:21:18  25   A.   From Baron Hignite.

15:21:20   1    Q.   Okay.  Did you receive this e-mail?

15:21:23   2    A.   Yes, I did.

15:21:24   3    Q.   Okay.  And did you see it on that date?

15:21:27   4    A.   Yes, I did.

15:21:28   5    Q.   Okay.  And did you -- does it appear to be in the

15:21:35   6    same form in which you received it on that date?

15:21:39   7    A.   Yes, it is.

15:21:41   8         MR. JUPITER:  Your Honor, I move to admit

15:21:43   9    Defendant's Exhibit Number 9.

15:21:45   10        THE COURT:  Attorney Potter?

15:21:48   11        MR. POTTER:  No objection, Your Honor.

15:21:49   12        THE COURT:  All right.  Nine is admitted.

15:21:56   13      (Defendant's Exhibit 9 admitted into evidence.)

15:21:56   14        MR. JUPITER:  I would ask to publish it.

15:22:08   15      (Exhibit published.)

15:22:08   16   BY MR. JUPITER:

15:22:09   17   Q.   Okay.  Can you -- you indicated that this was an

15:22:11   18   e-mail from Mr. Hignite, correct?

15:22:13   19   A.   Yes.

15:22:15   20   Q.   All right.  Can you read on the -- in the two

15:22:18   21   column or in the cc column on the third line -- I mean

15:22:30   22   the second line of the cc, who is indicated, underlined,

15:22:34   23   there?

15:22:34   24   A.   General Lewis.

15:22:37   25   Q.   All right.  And what does this e-mail concern?

15:22:41  1    A.   It concerns Mr. Hignite announcing that I will be

15:22:46  2    back as, on as an ESGR contractor.  "I am very pleased

15:22:57  3    to announce that I have..."

15:23:01  4    Q.   Okay.  And before you received this e-mail, did you

15:23:04  5    have a discussion with General Lewis about the ESGR --

15:23:08  6    about you going back to the ESGR position?

15:23:11  7              MR. POTTER:  Objection, Your Honor --

15:23:13  8              THE WITNESS:  Yes, I did.

15:23:15  9              THE COURT:  Sustained.

15:23:26  10   BY MR. JUPITER:

15:23:27  11   Q.   Between January and June of 2011, did Aubrey Ruan

15:23:34  12   ever confront you about having these two positions?

15:23:37  13             MR. POTTER:  Objection, Your Honor.

15:23:38  14             THE WITNESS:  No.

15:23:38  15             THE COURT:  Sustained.

15:23:45  16   BY MR. JUPITER:

15:23:45  17   Q.   What is your purpose when you -- in requesting

15:23:48  18   leave on ESGR in the Deltek system, what's your purpose

15:23:53  19   for doing that?

15:23:54  20   A.   I would request leave if I know I was going to be

15:23:58  21   unavailable to accept any calls on that given day or

15:24:02  22   time.

15:24:03  23   Q.   Now, on average, how many calls would you get from

15:24:07  24   military personnel?

15:24:09  25   A.   From MPSC itself?  From the company?

15:24:16  1    Q.   Yes -- no, from the military -- from Guard members.

15:24:20  2    A.   Oh, okay.  Maybe three to four calls per week.

15:24:25  3    Q.   And how long would those calls usually last?

15:24:28  4    A.   Five to ten minutes.

15:24:31  5    Q.   With regard to your -- you talked about being

15:24:34  6    unavailable.  What do you mean by that?

15:24:36  7    A.   It means that I'm not answering my phone.

15:24:41  8    Q.   Now with regard to -- Mr. Potter asked you about

15:24:44  9    your 21 years in the military -- in the Guard prior to

15:24:53  10   2003.  What was your status during those years?

15:24:57  11   A.   I was military technician for 12 years, and active

15:25:00  12   duty for 8 years.

15:25:26  13   Q.   Now, did Baron Hignite -- Mr. Potter asked you

15:25:32  14   about Mr. Hignite's phone call to you in September.

15:25:40  15        Were you trying to attempt to get that position, or

15:25:43  16   was he trying --

15:25:44  17            MR. POTTER:  Objection, Your Honor.

15:25:44  18            THE COURT:  Sustained.

15:25:56  19            MR. JUPITER:  No further questions, Your Honor.

15:25:57  20            THE COURT:  Ms. Morales, thank you for your

15:26:01  21   testimony.

15:26:01  22        You may step down.

15:26:01  23        (Witness withdrew from stand.)

15:26:04  24            THE COURT:  Next witness.

15:26:06  25            MR. JUPITER:  Your Honor, subject to our

| | | |
|---|---|---|
| 15:26:07 | 1 | exhibits, we rest.  Subject to our -- |
| 15:26:11 | 2 | THE COURT:  Put Number 8 on again for me, |
| 15:26:14 | 3 | please. |
| 15:26:21 | 4 | MR. JUPITER:  Three-page document. |
| 15:26:36 | 5 | THE COURT:  The second again. |
| 15:26:42 | 6 | The third. |
| 15:26:58 | 7 | All right.  Thank you. |
| 15:26:59 | 8 | Ladies and gentlemen, defense rests.  That means |
| 15:27:00 | 9 | that all the evidence in this case is now before you. |
| 15:27:03 | 10 | There's a brief matter I need to tend to at |
| 15:27:06 | 11 | sidebar, then we'll resume. |
| 15:27:08 | 12 | Counsel? |
| 15:27:22 | 13 | (Sidebar discussion held as follows:) |
| 15:27:26 | 14 | THE COURT:  Okay.  What's the government's |
| 15:27:28 | 15 | problem with Eight? |
| 15:27:31 | 16 | MR. POTTER:  This is the first time I ever saw |
| 15:27:32 | 17 | it, so I didn't even know -- |
| 15:27:34 | 18 | THE COURT:  That's not necessarily |
| 15:27:36 | 19 | objectionable.  It seems like all of the statements were |
| 15:27:39 | 20 | from people aligned with the United States:  Linda |
| 15:27:45 | 21 | Cills, I can't remember who else.  But there wasn't a |
| 15:27:48 | 22 | statement from someone else -- can you get the document, |
| 15:27:53 | 23 | Attorney Jupiter, please? |
| 15:27:55 | 24 | MR. JUPITER:  Yes, Your Honor. |
| 15:28:16 | 25 | THE COURT:  Don't put it on the microphone. |

15:28:41  1          MR. POTTER:  I have no objection.  It's fine.

15:28:43  2          THE COURT:  Okay.  It's admitted.

15:28:43  3      (Defendant's Exhibit 8 admitted into evidence.)

15:28:43  4          RULE 29 MOTION BY THE DEFENDANT

15:28:45  5          THE COURT:  You want to be heard, Attorney

15:28:47  6  Jupiter?

15:28:48  7          MR. JUPITER:  Yes, Your Honor.  We renew our

15:28:49  8  motion for Rule 29 judgment of acquittal, for the same

15:28:53  9  reasons.

15:28:53  10         THE COURT:  Same ruling.

15:28:54  11     All right.  We're going to have a charging

15:28:57  12 conference in chambers right now, and I'll charge them

15:28:59  13 up and we'll deal with the other logistics.  Okay?

15:29:04  14     (End sidebar discussion, open court as follows:)

15:29:10  15         THE COURT:  Ladies and gentlemen, we need to

15:29:11  16 take a break.  It's time for your afternoon break,

15:29:14  17 anyway.  So this will be for about 20 minutes, and then

15:29:18  18 we'll resume.  All right.

15:30:01  19     (Jury out.)

15:30:04  20         THE COURT:  Okay.  I'll see counsel in

15:30:06  21 chambers.

15:30:08  22     (Court in recess, 3:30 p.m.)

16:15:18  23     (After recess, 4:15 p.m., jury present.)

16:15:20  24         THE COURT:  Good afternoon again, ladies and

16:15:20  25 gentlemen.

JURY INSTRUCTIONS BY THE COURT

THE COURT:  Let me first thank you.  The Court appreciates the services that you have rendered as jurors in this case, as does counsel and as does the United States.

You've been most cooperative, patient and attentive to these proceedings, and have been courteous to counsel and to the Court, and for this we are indeed grateful.

Under our system of justice the Court, represented by me as judge, and you, the jury, have different jobs in a case such as this.

I'm responsible for safeguarding both the rights of the defendant and the interests of the public in the administration of criminal justice.  I preside over the trial, to make sure it is conducted in accordance with well-established principles and rules of law.

I decide questions of law as they arise in the trial.

I also charge or instruct the jury on the law that applies to the case, as I'm doing right now.

Regarding the facts, on the other hand, you and you alone are the sole judges of the facts.  I do not decide the facts and you do not decide questions of law.

I want you to consider these instructions as a whole, and not emphasize one section over another.  That

16:16:22  1    is, do not place too much emphasis on any one section.

16:16:26  2    Read all sections together.

16:16:27  3        You must ignore any contrary interpretation of the

16:16:31  4    law that you may have heard in other cases.

16:16:33  5        Just as it is my job to instruct you on the law

16:16:36  6    that governs this case, you must accept and follow these

16:16:39  7    instructions.  As the judges of the facts, you may not

16:16:42  8    be concerned with the wisdom of any of these rules of

16:16:44  9    law I am stating to you.

16:16:47  10       Regardless of any opinion you may have on what the

16:16:49  11   law ought to be, to base a verdict upon any view of the

16:16:53  12   law other than what I instruct you would be a violation

16:16:55  13   of your sworn duty.

16:16:57  14       Questions, objections, statements, arguments and

16:17:01  15   statements of counsel incorporated in a question are not

16:17:04  16   evidence in this case.

16:17:05  17       You must entirely disregard any proposed testimony

16:17:08  18   or any proposed exhibit which I did not admit, and any

16:17:12  19   testimony or exhibit I ordered to be stricken from the

16:17:14  20   record.

16:17:14  21       You must also disregard anything you may have seen

16:17:17  22   or heard outside the courtroom.

16:17:18  23       Also remember that the defendant is not on trial

16:17:21  24   for any act or any conduct not specifically charged in

16:17:24  25   the indictment.

16:17:25  1      In your deliberations, you may consider only the

16:17:27  2  offenses charged against the defendant in the

16:17:29  3  indictment.

16:17:31  4      Evidence may be direct or circumstantial.  Direct

16:17:35  5  evidence directly proves a fact, such as testimony of an

16:17:38  6  eyewitness.

16:17:39  7      Circumstantial evidence indirectly proves a fact by

16:17:43  8  establishing a chain of facts from which you can find

16:17:45  9  that another fact exists.

16:17:46  10     From one or more facts you find have been proved

16:17:48  11  you can use your reason, experience and common sense to

16:17:51  12  infer that some other fact exists and has been proved.

16:17:54  13     You may infer a fact, that is, draw a deduction or

16:17:57  14  a conclusion from the facts that you find have been

16:18:00  15  established by either direct evidence, or even other

16:18:04  16  circumstantial evidence.

16:18:05  17     This process of drawing inferences from facts in

16:18:08  18  evidence is not a matter of guesswork or speculation.

16:18:11  19  I'll give you a simple example to illustrate the point.

16:18:16  20     You're sitting in court.  You cannot see outside.

16:18:18  21  When you came in this morning, assume it was a sunny

16:18:20  22  day.  And assume that someone just walked in the door

16:18:23  23  with an umbrella that was wet and a raincoat that was

16:18:26  24  dripping.  From such circumstantial evidence, you could

16:18:28  25  infer and conclude that it was now raining outside.

16:18:32  1        The government can rely entirely on circumstantial

16:18:34  2   evidence to prove the elements of any of the crimes

16:18:37  3   charged in the indictment.

16:18:38  4        You are to consider both kinds of evidence, direct

16:18:41  5   and circumstantial.  The law permits you to give equal

16:18:46  6   weight to both.  But it is for you to decide how much

16:18:48  7   weight to give to any evidence.

16:18:50  8        The indictment is but a formal method of accusing a

16:18:53  9   defendant of a crime.  It is not evidence of any kind

16:18:56  10   against the accused.  It may not be considered by you as

16:18:59  11   any evidence of the guilt of the defendant, Sherrymae

16:19:02  12   Morales.

16:19:03  13        By her plea of not guilty, the defendant denies

16:19:06  14   that she is guilty of the charges in this indictment.

16:19:09  15        There is nothing particularly different in the way

16:19:13  16   a juror should consider the evidence in a trial from

16:19:15  17   that in which any reasonable and careful person would

16:19:18  18   treat any very important question that you must be -- or

16:19:21  19   that you must consider, that is received by examining

16:19:24  20   facts and evidence.

16:19:26  21        You are expected to use your good sense in

16:19:28  22   considering and evaluating the evidence in the case for

16:19:31  23   only those purposes for which it has been admitted, and

16:19:33  24   to give such evidence a reasonable and fair construction

16:19:37  25   in the light of your common knowledge of the natural

16:19:40   1    tendencies and inclinations of human beings.

16:19:43   2        If the government proves the defendant is guilty

16:19:46   3    beyond a reasonable doubt, say so.  If the government

16:19:48   4    fails to prove the defendant is guilty beyond a

16:19:50   5    reasonable doubt, say so.

16:19:51   6        An important part of your job will be making

16:19:55   7    judgments about the testimony of the witnesses who

16:19:57   8    testified in this case.  You should decide whether you

16:20:00   9    believe what each person had to say and how important

16:20:02   10   that testimony was.

16:20:03   11       In making that decision, I suggest that you ask

16:20:06   12   yourselves a few questions:

16:20:08   13       Did the person impress you as honest?

16:20:10   14       Did the person have any particular reason not to

16:20:12   15   tell the truth?

16:20:13   16       Did the witness have a good memory?

16:20:16   17       Did the witness have the opportunity and ability to

16:20:18   18   observe accurately the things the witness testified

16:20:22   19   about?

16:20:23   20       Did the witness appear to understand the questions

16:20:26   21   clearly and answer them directly?

16:20:28   22       Did a witness's testimony differ from the testimony

16:20:30   23   of other witnesses?

16:20:33   24       These are but a few of the considerations that will

16:20:35   25   help you determine the accuracy of what each witness

said.

The testimony of a witness may be discredited or, as we sometimes say, impeached, by showing that the witness previously made statements which are different than or inconsistent with the witness's testimony here in court.

The earlier inconsistent or contradictory statements are admissible only to discredit or impeach the credibility of the witness, and not to establish the truth of these earlier statements made somewhere other than here during the trial.

If you find that a witness knowingly testified falsely about any important or material matter, you may distrust the witness's testimony about other matters. You may reject all of the testimony of that witness or give it such weight or credibility that you conclude it deserves.

In making up your minds in reaching a verdict, do not make any decisions simply because there were more witnesses on one side than the other.

You must treat all witnesses alike. That is, do not give greater consideration to a government witness than to a defense witness.

Your job is to think about the testimony of each witness you heard and decide how much you believe of

16:21:38  1   what the witness had to say.

16:21:41  2        You've heard the testimony of law enforcement

16:21:43  3   officials, at least one.  The fact that a witness may be

16:21:48  4   employed by the government as a law enforcement official

16:21:50  5   does not mean that her testimony is necessarily

16:21:52  6   deserving of more or less consideration or greater or

16:21:57  7   lesser weight than that of an ordinary witness.

16:22:00  8        At the same time, it is quite legitimate for

16:22:04  9   defense counsel to try to attack the credibility of a

16:22:06  10  law enforcement witness on the ground that the law

16:22:09  11  enforcement witness's testimony may be covered by --

16:22:12  12  colored, rather, by a personal or professional interest

16:22:15  13  in the outcome of the trial.

16:22:17  14       It is your decision, after reviewing all the

16:22:20  15  evidence, whether to accept the testimony of the law

16:22:23  16  enforcement witness and to give to that testimony

16:22:25  17  whatever weight, if any, you find it deserves.

16:22:29  18       The defendant chose to testify in this case.  The

16:22:32  19  law permits a defendant to testify on her own behalf.

16:22:36  20  As with the testimony of any witness, you must determine

16:22:39  21  to what extent the testimony of the defendant is

16:22:42  22  credible.  The defendant's testimony is to be judged the

16:22:44  23  same as that of any other witness.

16:22:47  24       As I mentioned before trial, the defendant is

16:22:49  25  presumed to be innocent until proved to be guilty.  Thus

16:22:53  1    the defendant, although charged by indictment, begins

16:22:55  2    the trial with no evidence against her.

16:22:57  3        This presumption of innocence continues until

16:23:00  4    overcome by evidence that establishes guilt to your

16:23:02  5    satisfaction beyond a reasonable doubt.

16:23:05  6        The burden of proving beyond a reasonable doubt

16:23:07  7    each and every essential element of the crimes charged

16:23:10  8    is upon the government and always upon the government.

16:23:13  9    That burden never shifts, but rests upon the government

16:23:16  10   throughout the entire case.

16:23:17  11       A defendant never has to prove her lack of guilt.

16:23:20  12   The law never imposes upon a defendant the burden or

16:23:23  13   duty of calling any witnesses or producing any evidence.

16:23:27  14       If you have a reasonable doubt about whether the

16:23:29  15   defendant is guilty, you must find the defendant not

16:23:34  16   guilty.

16:23:34  17       The defendant is charged with several offenses.

16:23:36  18   Each offense is charged in a separate count of the

16:23:40  19   indictment.  The number of offenses charged are not

16:23:42  20   evidence of guilt and they should not influence your

16:23:45  21   decision in any way.

16:23:46  22       You must separately consider the evidence that

16:23:48  23   relates to each offense, and you must return a separate

16:23:51  24   verdict for each offense.

16:23:53  25       For each offense charged, you must decide whether

16:23:55   1   the government has proved beyond a reasonable doubt that

16:23:57   2   the defendant is guilty of that particular offense.

16:24:00   3       Your decision on one offense, whether guilty or not

16:24:03   4   guilty, should not influence your decision on any of the

16:24:06   5   other offenses charged.  Each offense should be

16:24:09   6   considered separately.

16:24:11   7       "Reasonable doubt" is a term often used, probably

16:24:14   8   well understood, but not easily defined.  Reasonable

16:24:16   9   doubt is what the term implies.  A reasonable doubt is a

16:24:19   10  fair doubt, based upon reason and common sense.

16:24:22   11      The government's evidence must be proof of such a

16:24:24   12  convincing character that you would be willing to rely

16:24:27   13  and act upon it unhesitatingly in the most important of

16:24:31   14  your own affairs.

16:24:32   15      The doubt must be reasonable.  It is not a mere

16:24:34   16  possible or imaginary doubt.  Because as you well know,

16:24:37   17  everything relating to human affairs and depending on

16:24:40   18  oral testimony is open to some possible or imaginary

16:24:44   19  doubt.

16:24:45   20      The government is not required to produce evidence

16:24:47   21  that will exclude every possibility of the defendant's

16:24:51   22  innocence.  It is only required to prove a defendant's

16:24:54   23  guilt beyond a reasonable doubt, not beyond all possible

16:25:00   24  doubt.  The test is one of reasonable doubt.

16:25:01   25      The defendant is never to be convicted on mere

16:25:04   1    speculation, suspicion or conjecture or, indeed, on

16:25:07   2    proof that is less than beyond a reasonable doubt.

16:25:09   3        Reasonable doubt may arise from a lack of credible

16:25:12   4    evidence or proof.  If you find that the government has

16:25:16   5    failed to produce evidence sufficient to satisfy you of

16:25:18   6    the guilt of the defendant beyond a reasonable doubt,

16:25:21   7    then that defendant is entitled to an acquittal or a

16:25:24   8    verdict of not guilty.

16:25:26   9        But if, after considering all of the evidence and

16:25:29   10   giving the accused the benefit of a reasonable doubt,

16:25:31   11   you are led to the conclusion that a defendant is

16:25:34   12   guilty, you should so declare by your verdict.

16:25:39   13       The crimes charged in this case are serious crimes,

16:25:41   14   which require proof of the defendant's mental state or

16:25:43   15   intent before the defendant can be convicted.

16:25:45   16       To establish mental state or intent, the government

16:25:47   17   must prove that the defendant's actions were knowingly

16:25:51   18   and intentionally done.

16:25:51   19       The government is not required to prove that the

16:25:54   20   defendant knew that she was breaking the law when she

16:25:56   21   did the acts charged in the indictment.

16:25:58   22       You may determine her mental state or intent from

16:26:01   23   all the facts and circumstances surrounding the case.

16:26:04   24       State of mind or knowledge ordinarily may only be

16:26:07   25   proved indirectly, that is, by circumstantial evidence,

16:26:11    1    because there's no way we can get inside to observe the

16:26:15    2    operations of the human mind.

16:26:17    3        While witnesses may be able to give direct evidence

16:26:19    4    of what the defendant said or did or failed to say or

16:26:22    5    do, there can be no eyewitness account of the state of a

16:26:25    6    person's mind at the time an act was done.  But what a

16:26:28    7    person does, says, or fails to say or do, may indicate

16:26:32    8    the state of mind in which the person did the act.

16:26:34    9        Although you're not required to do so, you may

16:26:36   10    reasonably infer that a person ordinarily intends the

16:26:39   11    natural and probable consequences of his or her own

16:26:41   12    knowing and conscious acts.

16:26:45   13        As the judges of the facts, you may draw the

16:26:46   14    inference that a defendant knew and intended all the

16:26:49   15    consequences which someone in similar circumstances and

16:26:52   16    having the same or similar knowledge should reasonably

16:26:55   17    have expected to result from their intentional act or

16:26:58   18    conscious omission.

16:27:00   19        You can consider any such inference in determining

16:27:03   20    whether the government has proved beyond a reasonable

16:27:08   21    doubt that the defendant possessed the required criminal

16:27:09   22    intent or state of mind.

16:27:10   23        Unless otherwise instructed, in determining the

16:27:13   24    issue of state of mind of the defendant you may consider

16:27:16   25    any statements made and acts done by her, as well as

16:27:19   1   other facts, inferences and circumstances in evidence

16:27:23   2   which indicate the defendant's state of mind or intent.

16:27:27   3        The term "knowingly" as used in these instructions

16:27:31   4   describes the state of mind of the defendant.  It means

16:27:33   5   that the defendant was conscious and aware of the

16:27:34   6   defendant's actions.  Whether or not a defendant has

16:27:38   7   this knowledge is a question of fact to be determined by

16:27:40   8   you on the basis of all the evidence.

16:27:43   9        An act is done knowingly only if it is done

16:27:45   10  purposely and deliberately, and not because of accident,

16:27:48   11  mistake, negligence or other innocent reason.

16:27:51   12       You can consider any statements made and acts done

16:27:54   13  or omitted by a defendant, as well as other facts,

16:27:58   14  inferences and circumstances in evidence which indicate

16:28:00   15  the defendant acted knowingly.

16:28:03   16       The term "intentionally" is used in these

16:28:05   17  instructions and describes the state of mind of the

16:28:09   18  defendant, either that, one, it was defendant's

16:28:12   19  conscious desire or purpose to act in a certain way or

16:28:15   20  to cause a certain result, or that, two, the defendant

16:28:19   21  knew that she was acting in that way or would be

16:28:21   22  practically certain to cause that result.

16:28:24   23       You can consider any statements made and acts done

16:28:26   24  or omitted by a defendant, as well as other facts,

16:28:29   25  inferences and circumstances in evidence, which indicate

16:28:34   1    the defendant acted knowingly.

16:28:35   2         The defendant is charged with crimes labeled in the

16:28:39   3    indictment and described in these instructions.  The

16:28:40   4    defendant is not on trial for any other act or any other

16:28:44   5    conduct.

16:28:44   6         In determining whether the government has met its

16:28:47   7    burden of proving the defendant guilty beyond a

16:28:55   8    reasonable doubt, you are to consider only the offenses

16:28:57   9    charged.

16:28:57   10   In assisting you in your determination I will

16:29:00   11   instruct you on the elements of the offense charged, or

16:29:05   12   several offenses charged.

16:29:12   13   Count 1 and Count 2 each charge the defendant with

16:29:15   14   theft of a program receiving federal funds, which is a

16:29:18   15   violation of federal law.

16:29:19   16   In order to find the defendant guilty of this

16:29:22   17   offense, you must find the government proved each of the

16:29:25   18   following elements beyond a reasonable doubt:

16:29:27   19   First, that at the time alleged in the indictment

16:29:30   20   the defendant was an agent of the Virgin Islands

16:29:33   21   National Guard.

16:29:34   22   Second, that in a one-year period the Virgin

16:29:38   23   Islands National Guard received federal benefits in

16:29:40   24   excess of $10,000.

16:29:41   25   Third, that the defendant stole, embezzled,

16:29:44  1    obtained by fraud, or knowingly converted property.

16:29:49  2        Fourth, that the property stolen, embezzled,

16:29:51  3    obtained by fraud or knowingly converted was in the

16:29:54  4    care, custody or control of the Virgin Islands National

16:29:57  5    Guard.

16:29:58  6        0and fifth, that the value of the property stolen,

16:30:02  7    embezzled, obtained by fraud or knowingly converted was

16:30:04  8    at least $5,000.

16:30:06  9        If you are convinced that each element has been

16:30:10  10   proven beyond a reasonable doubt with respect to a

16:30:11  11   specific count, then it is your duty to return a verdict

16:30:14  12   of not -- I'm sorry -- return a verdict of guilty as to

16:30:18  13   the defendant on that count.

16:30:19  14       However, if you have a reasonable doubt as to any

16:30:22  15   of these elements with respect to a particular count,

16:30:27  16   then it is your duty to return a verdict of not guilty

16:30:30  17   as to the defendant on that count.

16:30:36  18       An agent is a person authorized to act on behalf of

16:30:37  19   another person, organization or government.  Employees,

16:30:39  20   partners, directors, officers, managers and

16:30:41  21   representatives are all agents of the organization with

16:30:45  22   which they are associated.

16:30:47  23       An agent does not necessarily have any control over

16:30:49  24   the federal funds received by the organization.

16:30:52  25       To prove that the Virgin Islands National Guard

16:30:54  1      received federal funds, the government must establish

16:30:57  2      that the Virgin Islands National Guard received during a

16:31:00  3      one-year period benefits in excess of $10,000 under a

16:31:04  4      federal program involving a grant, contract, subsidy,

16:31:09  5      loan, guaranty, insurance, or some other form of federal

16:31:12  6      assistance.

16:31:12  7          If some of the funds paid to the Virgin Islands

16:31:15  8      National Guard originated with the Federal Government

16:31:18  9      and some from the State Government, it is for you to

16:31:21  10     decide which were federal benefits, and that those

16:31:23  11     federal benefits were in excess of $10,000.

16:31:28  12         The government does not have to prove that the

16:31:30  13     property stolen, embezzled, obtained by fraud or

16:31:33  14     knowingly converted by the defendant was received by the

16:31:36  15     Virgin Islands National Guard as federal benefits or

16:31:38  16     derived from federal benefits received by the Virgin

16:31:42  17     Islands National Guard.

16:31:45  18         What the government must prove beyond a reasonable

16:31:47  19     doubt is that the defendant stole, embezzled, obtained

16:31:51  20     by fraud or knowingly converted from the Virgin Islands

16:31:53  21     National Guard at the same time that the Virgin Islands

16:31:55  22     National Guard received federal benefits in excess of

16:31:59  23     $10,000 during a one-year period.

16:32:03  24         In other words, the government does not need to

16:32:05  25     establish a connection between the criminal activity and

16:32:07  1    the federal funds.

16:32:09  2         The one-year period must begin no more than

16:32:13  3    12 months before the defendant began committing the

16:32:15  4    offense, and must end no more than 12 months after the

16:32:18  5    defendant stopped committing the offense.  The one-year

16:32:22  6    period may include time both before and after the

16:32:24  7    commission of the offense.

16:32:25  8         To steal money or property is to take someone

16:32:29  9    else's money or property without the owner's consent,

16:32:42  10   and with the intent to deprive the owner of that money

16:32:45  11   or property.

16:32:46  12        To embezzle money means to intentionally take or

16:32:49  13   convert to one's own use the property of another, after

16:32:53  14   that money or property lawfully came into the possession

16:32:57  15   of the person taking it by virtue of some office,

16:32:58  16   employment or position of trust.

16:32:59  17        To obtain by fraud means to intentionally take

16:33:02  18   something by false representation, suppression of the

16:33:04  19   truth or deliberate disregard for the truth.

16:33:06  20        To knowingly convert money or property means to

16:33:13  21   knowingly appropriate or use such money or property

16:33:16  22   without proper authority for the benefit of one's self

16:33:19  23   or any other person who was not the rightful owner, with

16:33:23  24   the intent to deprive the rightful owner of the money or

16:33:26  25   property.

16:33:27  1      You must agree unanimously on at least one of the

16:33:30  2  alternative illegitimate ways in which the defendant

16:33:34  3  obtained the funds.

16:33:38  4      The term "care, custody and control" means the

16:33:41  5  organization had control over and responsibility for the

16:33:44  6  property.

16:34:00  7      Value of the property stolen, embezzled, obtained

16:34:03  8  by fraud or knowingly converted by the defendant does

16:34:05  9  not include legitimate salary, wages, fees or other

16:34:08  10  compensation paid or expenses paid or reimbursed in the

16:34:12  11  ordinary course of business.

16:34:13  12      If you find that the defendant devised a scheme or

16:34:22  13  plan to steal, embezzle, obtain by fraud, or knowingly

16:34:25  14  convert money or property from the Virgin Islands

16:34:30  15  National Guard on a recurring basis through a series of

16:34:33  16  acts, you may aggregate or add up the value of the

16:34:35  17  property obtained from this series of acts by the

16:34:38  18  defendant to meet this $5,000 requirement, so long as

16:34:43  19  those acts occur within the same one-year time period.

16:34:55  20      Counts 3 through 36 each charge that the defendant

16:34:57  21  committed wire fraud, which is a violation of federal

16:34:59  22  law.

16:35:00  23      In order to find the defendant guilty of this

16:35:02  24  offense, you must find that the government proved each

16:35:05  25  of the following elements beyond a reasonable doubt:

16:35:07  1          First, that the defendant devised a scheme to

16:35:09  2     defraud or to obtain money or property by materially

16:35:13  3     false or fraudulent pretenses, representations or

16:35:17  4     promises from the Virgin Islands National Guard.

16:35:20  5          Second, that the defendant acted with the intent to

16:35:24  6     defraud.

16:35:24  7          And third, that in advancing, furthering or

16:35:27  8     carrying out the scheme, the defendant transmitted in

16:35:30  9     writing, signal or sound, by means of a wire, radio or

16:35:33 10     telephone communication in interstate commerce, or

16:35:36 11     caused the transmission of any writing, signal or sound

16:35:39 12     of some kind by means of a wire, radio or television

16:35:43 13     communication in interstate commerce.

16:35:45 14          If you're convinced that each element has been

16:35:48 15     proven beyond a reasonable doubt with respect to a

16:35:52 16     specific count, then it is your duty to return a verdict

16:35:55 17     of guilty as to the defendant on that count.

16:35:57 18          However, if you have a reasonable doubt as to any

16:36:03 19     of these elements with respect to a particular count,

16:36:05 20     then it is your duty to return a verdict of not guilty

16:36:07 21     as to the defendant on that count.

16:36:11 22          The first element that the government must prove

16:36:13 23     beyond a reasonable doubt is that the defendant

16:36:15 24     knowingly devised or willfully participated in a scheme

16:36:17 25     to obtain money or property by materially false or

16:36:21  1    fraudulent pretenses, representations or promises.

16:36:25  2         A scheme is merely a plan for accomplishing an

16:36:30  3    object.

16:36:30  4         "Fraud" is a general term which embraces all the

16:36:34  5    various means by which one person can gain an advantage

16:36:36  6    over another by false representations, suppression of

16:36:39  7    the truth or deliberate disregard for the truth.

16:36:42  8         Thus, a scheme to defraud is any plan, device or

16:36:48  9    cause of action to deprive another of money or property

16:36:50  10   by means of false or fraudulent pretenses,

16:36:53  11   representations or promises, reasonably calculated to

16:36:57  12   deceive persons of average prudence.

16:37:00  13        A statement, representation, claim or document is

16:37:03  14   false if it is untrue when made, and if the person

16:37:07  15   making the statement, representation, claim or document

16:37:09  16   or causing it to be made knew it was untrue at the time

16:37:13  17   it was made.

16:37:17  18        The deception need not be premised upon spoken or

16:37:20  19   written words alone.  If there's deception, the manner

16:37:22  20   in which it is accomplished is immaterial.

16:37:36  21        The false or fraudulent representation must relate

16:37:38  22   to a material fact or matter.

16:37:40  23        A material fact is one which would reasonably be

16:37:41  24   expected to be of concern to a reasonable and prudent

16:37:43  25   person in relying upon the representations or statements

in making the decision.

This means that if you find that a particular statement of fact was false, you must determine whether that statement was one that a reasonable person might have considered important in making his or her decision.

The same principle applies to fraudulent half-truths or omissions of material facts.  You cannot convict the defendant unless all of you agree to at least one of the material representations.

In order to establish a scheme to defraud, the government must prove -- must also prove that the alleged scheme contemplated depriving another of money or property.

However, the government is not required to prove that the defendant originated the scheme to obtain money or property.

Furthermore, it is not necessary that the government prove that the defendant actually realized any gain from the scheme, or that any intended victim actually suffered any loss.

The phrase "transmits by means of wire, radio or television communication in interstate commerce" means to send from one state to another by means of telephone or telegraph lines or by means of radio or television. The phrase includes a telephone conversation by a person

16:38:57   1   in one state with a person in another state, or

16:39:00   2   electronic signal sent from one state to another, such

16:39:04   3   as by fax or financial wire.

16:39:06   4       You are instructed that the term "state" includes

16:39:09   5   the U.S. Virgin Islands.

16:39:10   6       The use of the Internet to send a message, such as

16:39:13   7   an e-mail or to communicate with a website, may

16:39:16   8   constitute a wire transmission in interstate commerce.

16:39:19   9       The government is not required to prove that the

16:39:21   10   defendant actually used a wire communication in

16:39:23   11   interstate commerce, or that the defendant even intended

16:39:26   12   that anything be transmitted in interstate commerce by

16:39:30   13   means of a wire, radio or telephone communication, to

16:39:33   14   further or to advance or to carry out the scheme or plan

16:39:36   15   for obtaining money or property by means of false or

16:39:39   16   fraudulent pretenses, representations or promises.

16:39:42   17       However, the government must prove beyond a

16:39:45   18   reasonable doubt that a transmission by a wire, radio or

16:39:48   19   a television communication facility, in interstate

16:39:53   20   commerce, was in fact used in some manner to further or

16:39:55   21   to advance or to carry out the scheme to obtain money or

16:39:58   22   property.

16:39:59   23       The government must also prove either that the

16:40:02   24   defendant used wire, radio or television communication

16:40:05   25   in interstate commerce, or that the defendant knew the

16:40:08  1    use of the wire, radio or television communication in

16:40:11  2    interstate commerce would follow in the ordinary course

16:40:15  3    of business or events, or that the defendant should

16:40:17  4    reasonably have anticipated that wire, radio or

16:40:21  5    telephone communication in interstate commerce would be

16:40:23  6    used.

16:40:23  7        It is not necessary that the information

16:40:26  8    transmitted by the means of wire, radio or television

16:40:30  9    communication in interstate commerce itself was false or

16:40:32  10   fraudulent or contained any false or fraudulent

16:40:36  11   pretense, representation or promise, or contained any

16:40:38  12   request for money or thing of value.

16:40:40  13       However, the government must prove beyond a

16:40:43  14   reasonable doubt that the use of the wire, radio or

16:40:45  15   television communication in interstate commerce

16:40:49  16   furthered or advanced or carried out in some way the

16:40:52  17   scheme.

16:40:53  18       The term "intend to defraud" means knowingly and

16:40:56  19   with the intention or the purpose to deceive or to

16:41:00  20   cheat.

16:41:00  21       Each transmission by wire communication in

16:41:03  22   interstate commerce to advance or to further or to carry

16:41:05  23   out the scheme or plan may be a separate violation of

16:41:08  24   the wire fraud statute.

16:41:11  25       All right.  We'll now have the closing argument.

16:41:13  1          We'll begin with the government.

16:41:15  2          Attorney Potter?

16:41:16  3              MR. POTTER:  Thank you, Your Honor.

16:41:30  4                CLOSING ARGUMENT BY THE GOVERNMENT

16:41:30  5              MR. POTTER:  Good afternoon.

16:41:31  6          When I began and started speaking to you

16:41:38  7    yesterday -- it seems longer than yesterday, but it was

16:41:43  8    yesterday -- I began by saying this is a case about

16:41:46  9    deceit and it's a case about greed.

16:41:55  10         And I think -- or I know that the evidence that we

16:41:58  11   presented to you over the past day and a half

16:42:02  12   establishes that fact.

16:42:10  13         The defendant, by all means is a very intelligent,

16:42:12  14   very smart young lady who possesses very good skills,

16:42:20  15   and who came to work at the National Guard, and she

16:42:27  16   worked in the National Guard for 20 years, HRO manager,

16:42:36  17   very, very sophisticated positions that she had with the

16:42:39  18   National Guard.

16:42:40  19         In 2007 she started working for the MPSC, Military

16:42:52  20   Services Personnel Corp.  And in that position she was

16:42:54  21   the ESGR.  And for three years she held that position,

16:42:58  22   until in 2010, when she started working full-time for

16:43:03  23   the National Guard.

16:43:05  24         So for those three years the employees and

16:43:11  25   management of the National Guard were used to seeing her

16:43:13  1    in this position and performing this function.

16:43:21  2         In 2010, the testimony was the defendant wanted to

16:43:26  3    come back to the National Guard.  And in coming back to

16:43:32  4    the National Guard, she was told:  Well, you can't come

16:43:34  5    back to the National Guard full-time and keep your other

16:43:37  6    full-time job.  You have to give up one.

16:43:41  7         She did not.

16:43:46  8         The -- the government charged the defendant with

16:43:52  9    theft from program funds.  Those funds would be funds

16:43:56  10   from the National Guard.

16:43:57  11        We have to show you five things to meet our burden.

16:44:03  12        One, that she was an employee of the National

16:44:08  13   Guard, which she was.  There's no dispute there.

16:44:16  14        That the National Guard receives more than $10,000

16:44:18  15   in any one given calendar year.  Well, that's easy, too,

16:44:24  16   because you heard testimony from Renaldo Rivera that the

16:44:30  17   National Guard receives approximately $45 million in any

16:44:34  18   one given year.

16:44:38  19        And we have to show that the defendant obtained

16:44:43  20   moneys from the National Guard by fraud, that the money

16:44:49  21   was Virgin Islands National Guard money, which again

16:44:53  22   there's no disputing that.

16:44:59  23        And that she deceived more -- or defrauded more

16:45:01  24   than $5,000 from the Guard.

16:45:03  25        I think you heard that of the wages that the

16:45:05  1      National Guard paid her was something like $89,000.  In

16:45:12  2      addition to that, there were severance moneys.  And the

16:45:14  3      total, I think, was approximately $150,000.

16:45:25  4          The fraud.  When the defendant started working for

16:45:31  5      the National Guard, she attempted to deceive; and when

16:45:39  6      you heard her MPSC manager testify that:  We would not

16:45:44  7      hire her if we knew she had a full-time position

16:45:50  8      anywhere else.

16:45:56  9          You heard General Lewis testify that:  When she

16:45:58  10     came back to the Guard, she told me she wanted to keep

16:46:02  11     both jobs, because she thought she could do both of

16:46:06  12     them.

16:46:06  13         And he told her:  You crazy.  You can't keep both

16:46:11  14     jobs.  You can't work two jobs in a 40-hour week.  You

16:46:16  15     can't get paid 80 hours for a 40-hour week.

16:46:28  16         But that's what the defendant intended to do.

16:46:30  17         We saw the e-mail that Colonel Cills sent to the

16:46:37  18     defendant.  I'll put it up.  I think that's Government's

16:46:47  19     Exhibit 10.

16:46:47  20         And in that e-mail Colonel Cills says to Morales,

16:46:53  21     "I know you are no longer the ESGR coordinator."

16:47:00  22         But how did she know that?

16:47:03  23         She knew that because she knew that Morales had

16:47:06  24     been hired as a full-time military tech person.

16:47:11  25         But after sending that e-mail, it confirmed,

16:47:15   1   because Morales didn't e-mail back and say:  What are

16:47:20   2   you talking about?  I'm still working here full-time for

16:47:25   3   the ESGR.  They hired me as the military tech person --

16:47:31   4        MR. JUPITER:  Objection as to admission.

16:47:32   5        THE COURT:  Okay.  Overruled.

16:47:38   6        MR. POTTER:  -- but I'm still here.

16:47:40   7      Cills thought she had resigned the MPSC position.

16:47:45   8      In responding to Cills's e-mail, Morales did not

16:47:50   9   correct her and say:  I am still the ESGR person.

16:47:58  10      And that deception continued up until June of 2010,

16:48:04  11   when Morales finally got around to resigning the ESGR

16:48:11  12   position.

16:48:20  13      When Morales began working with the National Guard,

16:48:23  14   what's the first thing she did?

16:48:25  15      Well, not the first thing she did, but what she did

16:48:30  16   was fill out the automatic deposit wire form that

16:48:37  17   permitted the National Guard to send moneys directly

16:48:39  18   into her checking account.

16:48:45  19      She did that knowing she was a full-time employee

16:48:48  20   of the ESGR, knowing that the National Guard would not

16:48:57  21   hire her if they knew she was a full-time ESGR person.

16:49:04  22      And Cills's e-mail proves the deception, I submit

16:49:10  23   to you.  Cills's e-mail proves the deception.

16:49:14  24      And I think you saw defense counsel try to

16:49:19  25   manipulate the meaning of "will," I think.  I think

16:49:27   1    "will" was the word, and whether or not it was future or

16:49:30   2    past.

16:49:30   3       But it was what it was.  She said what she said:  I

16:49:35   4    am -- Hignite told me to stay on as a volunteer.

16:49:42   5       And that's what she did, and you'll see the e-mail.

16:49:55   6       For Count 3 through Count 36, it's for wire fraud.

16:50:03   7    And how do we prove wire fraud?

16:50:05   8       We prove wire fraud to show that the deception, the

16:50:10   9    scheme to get money from the National Guard existed,

16:50:15   10    pretending to be a volunteer when she knew she was being

16:50:26   11    paid.  Hignite, the MPSC contractor, her boss,

16:50:32   12    basically, he didn't even know.

16:50:35   13       His testimony, he didn't even know she was a

16:50:38   14    full-time member of the National Guard.

16:50:39   15       Because he is where?  He is in the States.

16:50:43   16       Who supervises the defendant in the ESGR position

16:50:48   17    in St. Thomas?  Nobody.

16:50:50   18       What does she do?  She sends monthly reports to

16:50:54   19    Hignite in the States.  And as long as Hignite gets his

16:51:00   20    report, he assumes she's doing the work.  But he has no

16:51:04   21    idea that she's a full-time employee of the Virgin

16:51:10   22    Islands National Guard.  And you heard him testify to

16:51:12   23    that.

16:51:17   24       So the intent to defraud, I submit to you, the

16:51:21   25    evidence is clear of that intend to defraud.

16:51:25  1        And the use of the wire, every time that the Virgin

16:51:32  2   Islands National Guard paid Ms. Morales, Major Morales,

16:51:39  3   it went from a bank in Cleveland, Ohio, to a bank in

16:51:52  4   Texas, Arlington, Texas, I think it was.

16:52:02  5        And every time she permitted the National Guard to

16:52:05  6   send a wire for payment to her account at the USAA in

16:52:13  7   Texas, she was committing wire fraud.  She knew if the

16:52:19  8   National Guard knew she was employed full-time for the

16:52:23  9   ESGR, that she would not be holding a National Guard

16:52:27  10  job.

16:52:27  11       And the smoke screen is:  Well, nobody else could

16:52:36  12  do this work.  They recruited me for the National Guard.

16:52:43  13  They recruited me for the ESGR.

16:52:46  14       She is a machine.  She knows how to get things

16:52:54  15  done.

16:52:54  16       But that's all besides the point, isn't it?  It's

16:53:03  17  all besides the point whether you do the job or get

16:53:07  18  somebody to assist you to do the job.  Because you heard

16:53:09  19  the testimony from Lescott that she prepared PEPAS

16:53:17  20  report, she prepared the monthly report, sent them to

16:53:21  21  Morales.

16:53:22  22       Not even Ms. Lescott, who is her cocontractor, who

16:53:25  23  worked tight with her from October of 2010 to when

16:53:31  24  Ms. Morales left in June of 2011, she had no idea that

16:53:40  25  Sherrymae Morales is a full-time National Guard

employee.  She didn't have a clue.

There was deception, and that deception permitted her to work for the National Guard and to send -- to have wires go to her account.

This case is not complicated.  It's not.  It's a scheme that actually worked because of the former position that Ms. Morales held, that Major Morales held. She held it for three years.

And folks just got so used to seeing her in the position, that even when she came on board full-time with the Guard, they were still going to her for assistance.

But they weren't just going to her.  Other members of the Guard were volunteering.  And you heard that testimony.

So when Major James met Morales in 2010 and her reemployment from Cuba, and she knows Morales is in the Guard and she says to her:  Well, what are you doing here?

Because as a full-time member of the Guard, a military tech, she wasn't suppose to be there.

What are you doing here?

And her response is:  Oh, I'm volunteering.

Why utter that?  Why say that?

If you're the paid ESGR representative and you

16:55:31  1    weren't trying to hide that fact, why do you tell the

16:55:36  2    JAG, the judge advocate general, of the Virgin Islands

16:55:41  3    National Guard, coming back from Cuba, that:  I am just

16:55:48  4    here as a volunteer?

16:55:51  5        Deception.

16:55:57  6        The National Guard was sending money into Morales's

16:56:04  7    account, and she was happy with that, and she permitted

16:56:10  8    it to continue and she didn't want it to stop and she

16:56:20  9    just kept her mouth shut.

16:56:25  10       That's deception.  That's fraud.  So, nothing

16:56:37  11   complicated about this case.

16:56:41  12       And Mrs. Morales took the witness stand.  You heard

16:56:44  13   her testify.  And basically, her testimony is nobody

16:56:51  14   else knew or -- let me rephrase that -- General --

16:57:06  15   sorry -- General Lewis, General Rivera, Marise James,

16:57:12  16   Cills, all of them knew that she was the full-time ESGR,

16:57:23  17   in spite of the fact that each and every one of them

16:57:26  18   took that witness stand and said:  We did not have a

16:57:28  19   clue.  We thought she was volunteering.  That's what she

16:57:32  20   led us to believe.

16:57:34  21       There's no direct supervision.  She isn't paid

16:57:37  22   through the National Guard.  MPSC pays her.

16:57:43  23       She has no supervision in St. Thomas -- in the

16:57:45  24   Virgin Islands.  Her supervisor is in the States.

16:57:53  25       The evidence, I think, is clear.  I'm going to ask

16:57:56   1    you to go back to your jury room, deliberate, weigh the

16:58:02   2    evidence that you heard today and yesterday, and return

16:58:07   3    a verdict of guilty, because that is the only reasonable

16:58:16   4    verdict in this case.

16:58:17   5        You can't work 80 hours in a 40-hour week for

16:58:26   6    almost -- for more than a year, I think.  So --

16:58:35   7    particularly someone with this defendant's experience

16:58:39   8    and knowledge.  It only happens by a plan, by a scheme.

16:58:43   9    She employed it.  She utilized it to her benefit, and

16:58:48   10   she is here to answer for it, eventually, today.

16:58:50   11       Thank you.

16:58:53   12           THE COURT:  Thank you, Attorney Potter.

16:58:55   13       Attorney Jupiter?

16:59:09   14               CLOSING ARGUMENT BY THE DEFENDANT

16:59:09   15           MR. JUPITER:  Good afternoon.

16:59:11   16       Sherrymae Morales didn't steal anything from the

16:59:15   17   Virgin Islands National Guard.  Sherrymae Morales is not

16:59:17   18   guilty.

16:59:18   19       Ladies and gentlemen of the jury, Baron Hignite

16:59:21   20   came in here as the government's witness, and he told

16:59:25   21   you that in March or February of 2010, that Sherrymae

16:59:34   22   Morales told him that she was going to be hired as

16:59:40   23   military technician.  That was the government's witness

16:59:45   24   who told you that she said:  I got a full-time position

16:59:51   25   with the National Guard.

| | | |
|---|---|---|
| 16:59:55 | 1 | Baron Hignite told you that in September of 2010, |
| 17:00:03 | 2 | he contacted both Colonel Lewis and Colonel Cills to get |
| 17:00:11 | 3 | their concurrence to rehire Sherrymae Morales as the |
| 17:00:22 | 4 | ESGR person for the Virgin Islands National Guard; the |
| 17:00:25 | 5 | government's witness. |
| 17:00:27 | 6 | Baron Hignite told you that he sent the e-mail |
| 17:00:35 | 7 | that's been marked as Defendant's Exhibit Number 9, to |
| 17:00:39 | 8 | notify Colonel Lewis that he rehired Sherrymae Morales. |
| 17:00:46 | 9 | And you'll see the e-mail in evidence. |
| 17:00:51 | 10 | Ladies and gentlemen, Sherrymae Morales is not |
| 17:00:56 | 11 | guilty.  She didn't have any intent to scheme or to |
| 17:01:00 | 12 | defraud. |
| 17:01:01 | 13 | As you saw from the evidence that you saw these |
| 17:01:04 | 14 | last two days, that you heard over these last two days, |
| 17:01:09 | 15 | the government's witnesses in very important respects |
| 17:01:12 | 16 | were consistent with exactly what we told you in |
| 17:01:16 | 17 | opening, and what we told you, what Ms. Morales came and |
| 17:01:21 | 18 | told you herself. |
| 17:01:22 | 19 | What was her intent, her intent when she took this |
| 17:01:28 | 20 | position, the employer support for the Guard and the |
| 17:01:33 | 21 | Reserve, the ESGR contract? |
| 17:01:35 | 22 | What would she have been doing? |
| 17:01:36 | 23 | She had been doing contracting work. |
| 17:01:39 | 24 | How does she work? |
| 17:01:42 | 25 | She's a workaholic.  She's that person you call |

17:01:50  1    from -- can't see at morning to can't see at night, and

17:01:53  2    she's at work.  That's what she's been doing.

17:02:14  3        Can you hear me okay?

17:02:15  4        Is that better?

17:02:16  5        All right.  Thank you, Mrs. Brann.

17:02:20  6        Now, there are a number of pieces of evidence, I

17:02:24  7    think, that are very telling about what happened

17:02:30  8    four years ago.  But the truth of the matter -- four and

17:02:33  9    five years ago.

17:02:33  10        But the truth of the matter is that it's impossible

17:02:36  11    to present that whole story.  And ladies and gentlemen,

17:02:41  12    let's make no mistake about where we are.  We are in

17:02:46  13    criminal court.

17:02:48  14        There are number of things I think the government

17:02:50  15    wants you to consider and wants this case to be about,

17:02:53  16    that it's just not about.

17:02:57  17        I want you to be very careful when you look at the

17:03:00  18    charges in this case.  Ms. Morales, mind you, is being

17:03:05  19    charged in other counts that are going to come back to

17:03:09  20    you with an intent to -- with a scheme to defraud the

17:03:15  21    Virgin Islands National Guard.

17:03:19  22        All of the counts, whether it's Counts 3 through

17:03:25  23    36, Counts 1 and 2, all of them relate to a salary,

17:03:30  24    payments, payments made by the Virgin Islands National

17:03:36  25    Guard.

17:03:36  1          The government's own witness, Colonel Lewis,

17:03:42  2   Ms. Morales's supervisor, testified very clearly, as did

17:03:46  3   his colleagues, that Ms. Morales worked for the

17:03:52  4   Virgin Islands National Guard.  She did everything that

17:03:54  5   was asked of her.  She worked numerous hours.

17:04:00  6          There was no testimony at all that any of the

17:04:07  7   payments that were paid to Sherrymae Morales were not

17:04:10  8   earned by Sherrymae Morales.

17:04:14  9          There was no testimony that Ms. Morales was hired

17:04:20  10   to do anything other than the things that Colonel Lewis

17:04:23  11   asked her to do, and she didn't perform at an adequate

17:04:29  12   level.

17:04:30  13          Ladies and gentlemen of the jury, she performed at

17:04:31  14   a super level.  That's just a fact.  Okay?

17:04:35  15          It wasn't just Colonel Lewis who relied on her --

17:04:40  16   General Lewis, General Rivera, Aubrey Ruan.  Aubrey

17:04:44  17   Ruan, who testified that he asked for an investigation

17:04:49  18   of Ms. Morales in early 2010, Aubrey Ruan asked

17:04:58  19   Ms. Morales to stay on with the Virgin Islands National

17:05:02  20   Guard.

17:05:02  21          And the Court has instructed you -- although you

17:05:06  22   have a lot of instructions, the Court has instructed you

17:05:10  23   with respect, definitely with respect to Counts 1 and 2,

17:05:16  24   the government has to prove a certain amount of money

17:05:20  25   was stolen, that there was theft.

17:05:24  1      The government wants you to consider, even though

17:05:27  2  they didn't charge, the government wants you to consider

17:05:32  3  all of this business about MPSC.

17:05:35  4      It's irrelevant.  She's not charged with stealing a

17:05:41  5  dime from MPSC.  That's not the charge before you.  All

17:05:44  6  the charges before you relate to the Virgin Islands

17:05:46  7  National Guard.

17:05:49  8      The government has to produce enough evidence for

17:05:52  9  you to find that she stole from the Virgin Islands

17:05:56  10  National Guard, when their own witnesses tell you that

17:06:00  11  she earned every bit of that, that she put in those

17:06:03  12  hours, that she was there from early in the morning

17:06:06  13  until late at night.

17:06:11  14      Those were legitimate salary payments.  And that's

17:06:15  15  what they're asking you to find that she stole.

17:06:21  16      Now, Colonel Lewis also was notified of the rehire.

17:06:26  17  And Colonel Lewis himself testified about the fact that

17:06:31  18  he were with Ms. Morales in replacing -- in her

17:06:37  19  replacement with Janice Aelleyne.

17:06:43  20      Major Aelleyne came in here and testified about

17:06:46  21  that as well, gave corroboration to it, as did Sherrymae

17:06:52  22  Morales.

17:06:54  23      Baron Hignite corroborated Ms. Morales in talking

17:06:57  24  about the replacement, that there was a need for

17:07:02  25  replacement, and that all along Sherrymae Morales was

17:07:08   1   submitting people to him to replace her.

17:07:16   2        How do you find an intent to deceive, an intent to

17:07:20   3   defraud?

17:07:21   4        Isn't the whole purpose of defrauding someone, is

17:07:25   5   that you want to keep doing it?

17:07:28   6        A fraudster doesn't try to find someone to replace

17:07:37   7   them in doing the fraud.  She's not a fraudster.  No.

17:07:41   8   Because she didn't want to continue in the position, and

17:07:44   9   she told Baron Hignite that in 2010.

17:07:47   10       Now, is it so hard to believe that somebody

17:07:52   11   actually cared about this ESGR and cared about the

17:07:54   12   soldiers who were being deployed and being returned and

17:07:57   13   had to be reintegrated in everyday life?

17:08:03   14       She didn't just do it at the adequate level.  She

17:08:10   15   did it at a great level.  She built that volunteer base

17:08:13   16   up.  She had the briefings.  Weekends.  She had the

17:08:18   17   reports done.  She had the events going on.

17:08:22   18       She did these things, ladies and gentlemen, and

17:08:26   19   it's clear when these events -- when this stuff was

17:08:30   20   going to be done.  She is meeting with volunteers who

17:08:34   21   work full-time.  When is she going to meet with them?

17:08:38   22       She is meeting with military personnel who worked

17:08:42   23   for them full-time.  When is she going to meet with

17:08:44   24   them?

17:08:44   25       She is having blue ribbon events.  When do they

17:08:49  1     occur?  Over the weekends.

17:08:51  2          She came to learn her job over those three years.

17:08:55  3          Was there anything entered into evidence by the

17:08:59  4     government as to when she didn't perform those duties

17:09:06  5     between 2007 and 2010?

17:09:09  6          We have some afterwards, right?  I mean, they did

17:09:13  7     enter the e-mails from Dazarene Lescott, e-mail at 4:37

17:09:21  8     in the morning.

17:09:22  9          Who works at 4:37 in the morning?

17:09:27  10         An e-mail at 7:55 at night?  Who works at 7:55 at

17:09:35  11    night?

17:09:40  12         Who functions for a volunteer as the ESGR contract

17:09:49  13    person from September 2010, going all the way to June of

17:09:55  14    2011?

17:09:58  15         And how do you -- how does the government square

17:10:04  16    the fact that Colonel Lewis and Colonel Cills were

17:10:07  17    notified of this in September of 2010.  And then they

17:10:13  18    said:  We were so surprised later on to find this out.

17:10:17  19         I'll tell you what happened, ladies and gentlemen.

17:10:21  20    It's something very simple that happened.  And that was

17:10:25  21    somebody got mad and started an investigation.  Okay?

17:10:30  22         And everybody wanted to disassociate themselves

17:10:33  23    with this.  Why?

17:10:39  24         Because it's easier to do it that way.  It's easier

17:10:42  25    to do it that way rather than saying:  Yeah, this is,

17:10:45  1    this is how it was done.

17:10:48  2         There's a difference between how things appear on

17:10:53  3    paper and how they are actually done.  You look at it.

17:10:58  4    When you put in -- how many of you -- how many of us

17:11:02  5    actually punch a clock any more?  We don't do that.

17:11:06  6         And as much as Mr. Potter tried to get Captain

17:11:14  7    Lobbenmeier, Ms. Lobbenmeier to say that there's a

17:11:19  8    document that Ms. Morales is suppose to submit for her

17:11:24  9    leave, for her time sheets, Captain Lobbenmeier said:

17:11:30  10   No, the employee doesn't do anything to submit the time

17:11:35  11   sheet.  The employee doesn't even see the time that's

17:11:37  12   being entered.

17:11:39  13        The employee is not a part of that process.  She

17:11:43  14   doesn't submit any time sheets.  And he tried and tried,

17:11:47  15   asked her seven different ways till Sunday, and she kept

17:11:51  16   saying the same thing:  No, there's nothing.  It's

17:11:54  17   submitted.  The supervisor certifies it, and then we

17:12:02  18   enter it.  The employee has nothing to do with that.

17:12:09  19        The employee doesn't say:  Well, I was at work.

17:12:13  20        And ladies and gentlemen, you know, your employers

17:12:17  21   through the years have different ways of having how your

17:12:22  22   time is certified, how your time is submitted, and at

17:12:27  23   the end of the day you get a paycheck.

17:12:29  24        Some of you, sometimes you may have different ways

17:12:32  25   of how that's done.  But in this particular process,

17:12:38   1   Ms. Morales is not part of submitting the time sheet

17:12:42   2   that is submitted to -- well, the DFAS system to submit

17:12:49   3   a check.

17:13:01   4        Now, you also heard that Colonel Ruan said that he

17:13:07   5   made this inquiry about these two positions, and that it

17:13:14   6   was two months before he heard anything back from

17:13:17   7   Colonel Rivera and Colonel Lewis.

17:13:21   8        When Colonel Rivera took the stand he said:  I

17:13:24   9   immediately called for an investigation.

17:13:27  10        But when I asked him:  Would that be accurate, that

17:13:29  11   there was this delay?

17:13:31  12        Now why is that important?

17:13:33  13        Well, ladies and gentlemen, as I stated before,

17:13:38  14   doesn't that affect the credibility of the government's

17:13:41  15   witnesses?

17:13:44  16        Doesn't that show you that they have a certain bias

17:13:49  17   in how they testify?

17:13:52  18        Doesn't that indicate to you, if in fact there's

17:13:56  19   this inquiry going on, and there's this long delay in

17:14:02  20   terms of what's going to happen after that, and who ends

17:14:07  21   up reviewing the investigation?

17:14:12  22        Marise James.

17:14:15  23        Now, we don't have a burden of proving anything.

17:14:20  24   The government has the burden of bringing to you

17:14:24  25   objective testimony to prove their case beyond a

17:14:31    1    reasonable doubt.

17:14:31    2         Now, this is an office where you have ESGR

17:14:35    3    activities going on.  You have funding activities going

17:14:41    4    on.  You have Ms. Morales doing her military tech

17:14:47    5    position.  You have meetings going on.

17:14:48    6         And what do we have?  Four, five -- like four, five

17:14:53    7    e-mails over a year.  Pick out a little e-mail here and

17:15:02    8    a little e-mail there.

17:15:03    9         And even those don't even connect with each other.

17:15:05   10    They contradict each other.  They contradict the e-mail

17:15:08   11    that Baron Hignite sent to Colonel Lewis, and the

17:15:13   12    testimony from their own witness.

17:15:14   13         Just a little bit of stuff.  Any given day you

17:15:18   14    might have 20 e-mails, some of you, in your jobs and in

17:15:22   15    your social life.

17:15:23   16         This is somebody who worked over 80 hours a week,

17:15:29   17    who worked from early in the morning to late at night,

17:15:32   18    and they pick up four to five little e-mails, two

17:15:37   19    e-mails -- one e-mail between her and Colonel Cills, who

17:15:40   20    is in charge of budgeting.

17:15:42   21         And what did Baron Hignite tell you about the

17:15:45   22    budgeting?

17:15:45   23         It can only be done by the ESGR contractor, not by

17:15:49   24    a volunteer.  It can't be done by a volunteer.

17:15:53   25         She knows that because she's the person in charge

17:15:56   1    of the -- in charge of the budgeting.

17:16:04   2         It doesn't come together.  These are just their

17:16:07   3    witnesses.

17:16:10   4         Now, ladies and gentlemen of the jury, we don't

17:16:12   5    have a burden of trying to put together for you what

17:16:16   6    happened four or five years ago.  That's not fair to us.

17:16:23   7    But we can at least present to you the people who saw

17:16:28   8    and who worked and who worked hard at what was going on

17:16:36   9    at the Virgin Islands National Guard.

17:16:38   10        Captain Wanda Williams:  Of course she had the ESGR

17:16:44   11   position and she had the military tech position.

17:16:50   12        Major Aelleyne:  My wife was going to replace her

17:16:56   13   when she finished her school year.

17:16:58   14        When does the school year finish?  When did she do

17:17:01   15   it?

17:17:01   16        The summer.

17:17:12   17        And Major Morales brought it all together for you

17:17:16   18   to explain:  Look, when I took that position, the

17:17:19   19   military tech position, I didn't want to keep the ESGR

17:17:23   20   position.  I tried to get a replacement consistent with

17:17:29   21   what Baron Hignite said.  And when I got this major

17:17:35   22   assignment from Colonel Lewis, I said "I just can't do

17:17:39   23   it any more," and so I resigned the ESGR position.

17:17:45   24        And if you look -- and she testified as to when

17:17:48   25   that VING leadership conference was.  It was in

17:17:53  1    September of 2010.  And it's only after that, that she

17:17:58  2    goes back to ESGR.

17:18:02  3        When she couldn't do the work, ladies and

17:18:06  4    gentlemen, she resigned.  When she wasn't available, she

17:18:10  5    took leave.

17:18:16  6        The government has got a serious burden.  They've

17:18:18  7    got serious work, and they failed short, because they

17:18:23  8    want you to rely on innuendo and speculation, and they

17:18:29  9    want you to take the word of witnesses who, who are not

17:18:38  10   credible and who are inconsistent with their own

17:18:40  11   evidence.

17:18:44  12       She earned the money.  She worked hard.  This was

17:18:48  13   her salary.  She stayed in a position because she was

17:18:51  14   asked to.  She performed admirably.  She didn't steal

17:18:58  15   anything.  She didn't deceive anyone.  And they have not

17:19:03  16   proven anything of the sort.

17:19:10  17       Ladies and gentlemen, you know, we all have serious

17:19:23  18   jobs, and in this instance you all have a serious job.

17:19:28  19   Your job is -- well, you have Judge Gomez here, who is

17:19:32  20   the judge.  You are the judges of the facts.

17:19:38  21       You notice that every time you came in the

17:19:39  22   courtroom, we all stood up, because your role is

17:19:43  23   critically important.  And it's really a question in

17:19:47  24   this case of whether or not we're going to ask the

17:19:50  25   government to prove their case beyond a reasonable doubt

17:19:53   1   or not.

17:19:55   2      Because they failed miserably in that, because they

17:20:02   3   didn't present to you a picture that's consistent or

17:20:05   4   complete about what happened between 2010 and 2011.

17:20:13   5      The question is, is whether or not you can follow

17:20:18   6   that burden of proof.  Because if you do, the answer is

17:20:22   7   very easy.  The answer is not guilty on each and every

17:20:27   8   count.

17:20:27   9      Now before I sit down, let me point a couple other

17:20:30   10   things out to you, ladies and gentlemen, because

17:20:34   11   sometimes the government has to prove each and every

17:20:37   12   count.

17:20:37   13      We submit there was no proof of any intent to

17:20:40   14   defraud.  So that really takes care of the work in terms

17:20:50   15   of not guilty on each count.

17:20:51   16      And you're also going to look, there are some

17:20:53   17   counts that even deal with this period where she's not

17:20:57   18   even working at ESGR.  Obviously those are -- I don't

17:21:03   19   know what the government's theory is on those counts.

17:21:07   20      But also, ladies and gentlemen, you know, each one

17:21:12   21   of these counts would be asking you the question of

17:21:19   22   whether or not she defrauded the Virgin Islands National

17:21:24   23   Guard and whether or not she made any kind of a material

17:21:28   24   misrepresentation to them.

17:21:31   25      You've been instructed what's material in this

17:21:34  1   case.  And in this case, and once again they failed

17:21:40  2   miserably with that.

17:21:41  3       Well, ladies and gentlemen, on behalf of

17:21:45  4   Ms. Morales, I thank you for your service.  We trust

17:21:47  5   that you will -- you have served admirably, and you will

17:21:51  6   continue to do so.  We ask you to return a verdict of

17:21:55  7   not guilty on each and every count.

17:21:58  8       Thank you.

17:22:00  9         THE COURT:  Thank you, Attorney Jupiter.

17:22:02  10        Attorney Potter?

17:22:12  11          REBUTTAL ARGUMENT BY THE GOVERNMENT

17:22:12  12        MR. POTTER:  I want to go back to what

17:22:15  13   Mr. Hignite said.

17:22:19  14       Hignite said that he spoke to Morales a week before

17:22:26  15   she submitted her resignation to him in June, June of

17:22:32  16   2010.  And his testimony was:  She told me she was

17:22:37  17   returning to the Guard.

17:22:41  18       June of 2010, not March.  He corrected himself on

17:22:47  19   the stand.  He said it was June.  And we submitted to

17:22:50  20   you the letter of resignation that the defendant sent to

17:22:57  21   Mr. Hignite.

17:22:59  22       So don't believe that somehow, in March, Hignite

17:23:07  23   thought that she had resigned.  It was June, because she

17:23:12  24   was still being paid from March up until June.  Okay?

17:23:18  25       I just want it to be clear.

17:23:21  1        And again, Attorney Jupiter talks about getting

17:23:25  2   e-mails at 4:00 in the morning, who does that, and

17:23:28  3   working at 7:55 in the evening, and sending e-mails in

17:23:37  4   the evening.

17:23:38  5        But it was Ms. Lescott who sent the e-mail in the

17:23:43  6   evening.  She was being paid.  Ms. Morales was only

17:23:46  7   claiming to be volunteering.

17:23:49  8        So when she responded to that e-mail at 4:30 in the

17:23:54  9   morning, she was being paid.  It's just that the folks

17:24:05  10  in the Guard, they didn't know she was being paid.  But

17:24:12  11  she knew.  So she was working hard, because she was

17:24:16  12  being paid.

17:24:18  13        Does that mean fraud did not occur in her getting

17:24:22  14  that job?

17:24:24  15        Their argument seems to be:  Okay, if you do a good

17:24:28  16  job, if you commit fraud and you do a good job, it's

17:24:32  17  okay.

17:24:34  18        So I guess the other argument is:  If you commit

17:24:38  19  fraud and you don't do a good job, well, maybe that's

17:24:41  20  not okay.

17:24:42  21        Fraud is fraud.  Getting the job through fraud is

17:24:47  22  fraud.

17:25:03  23        The defendant, she took the stand.  When she took

17:25:09  24  the stand, she put her credibility on the line.

17:25:14  25        I submit to you that when she told Mr. Hignite that

17:25:28  1    she wanted to come back to the Guard and Mr. Hignite

17:25:31  2    brought her back into the Guard -- and I think she said

17:25:39  3    in 2011, 2010, December, General Lewis left and Mr. Ruan

17:25:49  4    took over as her supervisor.

17:25:53  5        And the question was:  You didn't tell your new

17:25:58  6    supervisor, Mr. Ruan, you know, "I'm your full-time

17:26:05  7    military tech, but I'm also being paid as a full-time

17:26:10  8    ESGR."

17:26:10  9        Her response was:  Well, he's supposed to know.

17:26:13  10       Well, he's your brand new supervisor coming in.  He

17:26:16  11   testified he didn't have a clue.  He testified he found

17:26:21  12   out -- as a matter of fact, he said he called the MPSC

17:26:26  13   to ask them:  Who is our ESGR representative?  I don't

17:26:31  14   know who it is.  Who is it?

17:26:34  15       And for the first time he found out he was told:

17:26:39  16   Oh, that's Sherrymae Morales.

17:26:42  17       He's like:  Huh?  She can't be ESGR.  She is my

17:26:50  18   full-time military tech.

17:26:52  19       And then he started an investigation.  He had not a

17:26:56  20   clue.  And she was full-time in the military, in the

17:27:05  21   National Guard.  Supervising her from January to May,

17:27:15  22   five months, he didn't have a clue.

17:27:19  23       If he had a clue, he wouldn't ask for an

17:27:22  24   investigation, would he?

17:27:34  25       And then the defendant says:  Well, you know, I was

17:27:37  1    always trying to find a replacement.  I was always

17:27:40  2    trying to find a replacement for -- herself, because she

17:27:44  3    didn't really want the job.

17:27:47  4         She's being paid two salaries.  Every pay period,

17:27:54  5    she's getting two of them.  She didn't want the job.

17:27:57  6         She really, really wanted to end it and find

17:28:01  7    somebody to replace her, and it took her a year?  It

17:28:07  8    took a year, in her view.

17:28:12  9         She didn't want to be replaced.  She enjoyed the

17:28:15  10   two salaries.

17:28:18  11        And if the issue of her dual employment didn't come

17:28:25  12   up, she probably would have kept the two salaries,

17:28:36  13   89,000 and I think it's 64, somewhere close to that,

17:28:40  14   thousand.  That's in excess of $150,000 a year.

17:29:06  15             THE CLERK:  Two more minutes.

17:29:08  16             MR. POTTER:  Yes.

17:29:09  17        Now, it's not a difficult case.  We know.  We don't

17:29:13  18   have to have an MPA, master's in public administration,

17:29:19  19   we don't have to have big lofty positions, big lofty

17:29:23  20   education to know you can't do it.  You can't submit

17:29:31  21   80 hours, working 40 hours.  You cannot do it.  And she

17:29:39  22   hid it.  She hid it.

17:30:00  23        The judge has told you and I will tell you, this is

17:30:03  24   a very important case and it requires your attention,

17:30:11  25   your attention to detail, your taking sense from

17:30:15  1    nonsense, your looking at the evidence objectively.

17:30:27  2         And if you do that and you make your ruling without

17:30:29  3    fail, and you make your ruling without passion, there's

17:30:34  4    only one true verdict that you could come up with, and

17:30:38  5    that verdict is guilty, guilty on each and every count.

17:30:43  6    And it's guilty on each and every count because she is

17:30:47  7    guilty on each and every count.  She devised a scheme

17:30:55  8    and she got caught.

17:31:01  9         The testimony of the government witnesses, I keep

17:31:07  10   going back to that very important e-mail, where she

17:31:12  11   confirmed she's volunteering.  That's -- it's telling.

17:31:20  12   If you're not volunteering, you don't say you're

17:31:22  13   volunteering.

17:31:22  14             THE CLERK:  One more minute.

17:31:24  15             MR. POTTER:  The conversation with Major James,

17:31:26  16   not just anyone within the Guard, but the -- I'm

17:31:31  17   repeating it -- the JAG, and you come up to her face and

17:31:36  18   bold-facedly tell her a lie:  I am a volunteer.  That's

17:31:44  19   why I am here.

17:31:46  20        That was a lie.

17:31:49  21        Why did she do that?

17:31:55  22        Because she would have had to have said:  I am here

17:31:58  23   as the paid ESGR person.

17:32:00  24        And Ms. James knew:  She's a full-time Guard,

17:32:04  25   working 9:00 to 5:00, and she can't be here as a paid

17:32:10  1    ESGR person.  That's why she said what she said.

17:32:18  2        The evidence is before you.  Take your time,

17:32:23  3    deliberate, and again without fear, without passion,

17:32:28  4    return the only verdict that is appropriate in this

17:32:33  5    case, and that verdict is guilty on each and every count

17:32:36  6    of the government's indictment.

17:32:37  7        I thank you.

17:32:38  8            THE COURT:  All right.  Thank you, Attorney

17:32:40  9    Potter.

17:32:40  10        Ladies and gentlemen, that's where we're going to

17:32:42  11   end for the night.

17:32:43  12        Let me thank you for your patience and cooperation,

17:32:45  13   and give you some instructions.

17:32:47  14        You have a lot of information before you now.  You

17:32:49  15   have the, all the evidence, the attorneys' arguments and

17:32:54  16   my charge on the law.

17:32:55  17        It is very important at this time that you resist

17:32:57  18   any temptation, any urge, any invitation, any

17:33:01  19   inclination, to do any sort of research on this case, to

17:33:06  20   talk to anyone on this case.  Do not do that.  The only

17:33:09  21   things you are to consider are two things:  one, the

17:33:11  22   evidence that came in in this case; two, the

17:33:14  23   instructions on the law that I gave you.

17:33:16  24        You'll have a chance to deliberate tomorrow.  There

17:33:19  25   are a few final instructions I'll give you in the

17:33:22  1    morning.

17:33:22  2        Until then, do not do any research.  Do not talk to

17:33:25  3    anyone about this case.  We take that extremely serious.

17:33:28  4        If anyone attempts to approach you about this case,

17:33:31  5    bring it to the Court's attention promptly and we will

17:33:34  6    address it promptly.

17:33:35  7        Keep an open mind.  You haven't begun your

17:33:38  8    deliberations yet.  You'll do that tomorrow.

17:33:41  9        We will begin at 8:15 tomorrow, so please be here

17:33:47  10   at 8:00.  I'll give you final instructions and you'll

17:33:50  11   begin your deliberations.  The final portion of the

17:33:52  12   instructions should be no more than five minutes, and

17:33:54  13   then you'll begin your deliberations.

17:33:56  14       Like I said yesterday, everyone has to be here by

17:34:00  15   8:00 so that you can make your order for lunch, et

17:34:04  16   cetera, so that we can start on time.  If one person is

17:34:06  17   late, we cannot start.  So I urge you to be here on time

17:34:10  18   so we can proceed on time.

17:34:12  19       All right.  With that, let me wish you a pleasant

17:34:15  20   evening, and I'll see you tomorrow morning.

17:34:19  21       (Jury out.)

17:34:41  22        THE COURT:  Counsel, I'll see you tomorrow at

17:34:44  23   8:15.  Have a pleasant evening.

24       (Court in recess, 5:34 p.m.)

25                              ---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE

4

5              This document is hereby certified

6            to be a true and accurate transcript

7               of the foregoing proceedings.

8

9

10      /s_____    _____
                Chandra Kean, RMR                  DATE
11              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25